# NOT YET SCHEDULED FOR ORAL ARGUMENT
# Nos. 15-3078(L), 15-3079, 15-3080, 15-3081

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### UNITED STATES OF AMERICA,
Appellee,

**v.**

### NICHOLAS SLATTEN, PAUL ALVIN SLOUGH,
### EVAN SHAWN LIBERTY, and DUSTIN LAURENT HEARD,
Defendants-Appellants.

On Appeal From The United States District Court
for the District of Columbia
The Hon. Royce C. Lamberth

## PROOF BRIEF OF APPELLANTS
## SLOUGH, LIBERTY, AND HEARD

Brian M. Heberlig (No. 455381)
Michael J. Baratz (No. 480607)
Bruce C. Bishop (No. 437225)
Linda C. Bailey (No. 985081)
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
(202) 429-3000
*Counsel for Defendant Paul A. Slough*

David Schertler (No. 367203)
Lisa Hertzer Schertler (No. 430754)
Janet Foster (*pro hac vice*)
Schertler & Onorato LLP
575 7th Street, N.W., Suite 300 South
Washington, D.C.  20004
 (202) 628-4199
*Counsel for Defendant Dustin L. Heard*

*(Counsel listing continued on inside cover)*

February 1, 2016

William F. Coffield IV (No. 431126)
Laina C. Lopez (No. 477412)
Berliner, Corcoran & Rowe, LLP
1101 17th Street, N.W.
Suite 1100
Washington, DC 20036
(202) 293-5555
*Counsel for Defendant Evan S. Liberty*

NOT YET SCHEDULED FOR ORAL ARGUMENT

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

A.     **Parties and Amici**

Appellants Paul Slough (No. 15-3079), Evan Liberty (No. 15-3080), and Dustin Heard (No. 15-3081) were Defendants below.

Defendant below Donald Ball was dismissed with prejudice before trial and is not involved in this appeal.

Defendant below Nicholas Slatten was originally indicted with these Defendants-Appellants.  (No. 1:08-CR-360-RCL-2).  The superseding indictment against Slatten was dismissed with prejudice, on a motion to enforce this Court's writ of mandamus.  R.428 (Apr. 23, 2014); *see* R.415 (Apr. 7, 2014) (mandamus order).[1]  The government responded by indicting Slatten separately on a new charge.  *See United States v. Slatten*, No. 1:14-CR-107-RCL, Dkt.1 (May 8, 2014).  Slatten was tried and sentenced in joint proceedings with these Defendants-Appellants, and is the Appellant in consolidated appeal No. 15-3078(L).

There were no intervenors or amici below.

An amicus brief urging reversal may be filed in this appeal by the National Association of Criminal Defense Lawyers (NACDL).

---

[1] On this Court's docket, see *United States v. Slatten*, No. 14-3007, Doc. #1487269 (Apr. 7, 2014) (per curiam), *reh'g denied*, Doc. #1489094 (Apr. 18, 2014).

### B.     Rulings Under Review

Defendants challenge the following rulings by the district court (the Hon.

Royce C. Lamberth).  None of the rulings is reported.

### 1.     Military Extraterritorial Jurisdiction Act

Defendants challenge the following rulings concerning whether they were

"employed by the Armed Forces outside the United States" under the Military

Extraterritorial Jurisdiction Act, 18 U.S.C. §§ 3261, 3267 ("MEJA")):

> (A)   the denial of Defendants' motions for judgment of acquittal
> based on lack of evidence to satisfy MEJA[2];

> (B)   the trial court's error in instructing the jury on the proof
> required to satisfy MEJA[3]; and

> (C)   the trial court's refusal to inform the jury that by statute the
> provision of diplomatic security in a foreign nation is the
> responsibility of the State Department.[4]

---

[2] 8/21/14 PM Tr. 56 (denying motion at close of government's evidence); R.748 (4/9/15) (denying renewed motions); *see* 8/20/14 AM Tr. 9 (motion at close of government's evidence); 8/21/14 PM Tr. 4-5, 18-21 (motion argument); 8/25/14 PM Tr. 73-74 (renewing at close of defense evidence); 8/26/14 PM Tr. 87-88 (renewing at close of all evidence); 10/22/14 Tr. 24 (renewing after verdict).

[3] R.625 at 34-36 (9/2/14) (written jury charge); 9/2/14 AM Tr. 65-66  (jury charge transcript); *see* 8/26/14 AM Tr. 41-54 (charge conference argument and ruling); R.618, at 5-7 (defense objections); R.618-2, at 32-34 (Defense Corrected Proposed Instruction 15); 8/26/14 PM Tr. 88-89 (preserving objection); 8/27/14 PM Tr. 141-43 (same); 9/2/14 AM Tr. 77 (same).

[4] *See* R.618-2, at 35 (Def. Corr. Prop. Instr. 16); 8/26/14 AM Tr. 54-55 (charge conference denial); *id.* at 55 (requesting alternative instruction, and denial of same); Def. Corr. Prop. Instr. 16A; 8/26/14 AM Tr. 61-62 (submitting same); 8/26/14 PM Tr. 25 (additional argument and denial); *id.* at 88-89 (preserving objection); Def. Corr. Prop. Instr. 16B; 8/27/14 PM Tr. 153-56 (submitting and

(Continued …)

2.     New Trial Motion

Defendants challenge the district court's denial of their motion for a new trial based on new evidence showing that a principal government witness perjured himself at trial.[5]

3.     Venue

Defendants challenge the following rulings with respect to venue:

(A)     the denial of Defendants' motions for judgment of acquittal based on lack of venue[6]; and

(B)     the trial court's taking the issue of venue from the jury.[7]

---

arguing same); 8/28/14 AM Tr. 5 (denying same); 8/28/14 PM Tr. 104-05 (same); 9/2/14 AM Tr. 77 (preserving objection).

[5] R.820, 821 (11/10/15) (order and memorandum opinion denying motion); *see* R.765 (Defendants' new trial motion).

[6] 8/21/14 PM Tr. 56 (denying motion at close of government's evidence); R.748 (4/9/15) (denying renewed motions); *see* 8/20/14 AM Tr. 9 (motion at close of government's evidence); 8/21/14 PM Tr. 35-37 (motion argument); 8/25/14 PM Tr. 73-74 (renewing at close of defense evidence); 8/26/14 PM Tr. 87-88 (renewing at close of all evidence); 10/22/14 Tr. 24 (renewing after verdict).

[7] 8/26/14 PM Tr. 56 (ruling at jury charge conference); *contra id.* at 51 (court's initial ruling, subsequently vacated, that "I think the defendant is right, you're entitled to have the jury decide the question"); *see* R.618-2, at 39-41 (Def. Corr. Prop. Instr. 18); 8/26/14 PM Tr. 40-47 (charge conference argument) (also incorporating earlier briefing and argument, *see* R.35, at 8-18; R.55, at 4-11; R.398, at 7-11; R.425, at 4-8; R.647, at 34-35); *see also* 9/2/14 AM Tr. 77 (preserving objection).

4.     Sufficiency of Evidence as to Defendant Liberty

Defendant Liberty challenges the denial of his motions for judgment of acquittal for insufficient evidence.[8]

5.     30-Year Mandatory Minimum Sentence

Defendants challenge the district court's denial of their as-applied Eighth Amendment challenge to the imposition of a 30-year mandatory minimum sentence for using automatic weapons the State Department required Defendants to carry to perform their job of protecting U.S. diplomats in a war zone.[9]

C.     Related Cases

1.     Prior *Kastigar* appeal

This Court heard the government's previous appeal from the district court's dismissal, reported at 677 F. Supp. 2d 112 (D.D.C. 2009), of the indictment on *Kastigar* grounds.  *United States v. Slough*, No. 10-3006, 641 F.3d 544 (D.C. Cir. 2011) ("*Slough II*"), *cert. denied*, 132 S. Ct. 2710 (2012).

The earlier *Kastigar* appeal concerned the effect of witnesses' and prosecutors' pretrial exposure to Defendants' compelled post-incident statements,

---

[8] 8/21/14 PM Tr. 56 (denying motion at close of government's evidence); R.748 (4/9/15) (denying renewed motion); *see* 8/20/14 AM Tr. 9 (motion at close of government's evidence); 8/21/14 PM Tr. 34-35, 37 (argument); 8/25/14 PM Tr. 73-74 (renewing at close of defense evidence); 8/26/14 PM Tr. 87-88 (renewing at close of all evidence); 10/22/14 Tr. 24 (renewing after verdict).

[9] 4/13/15 Tr. 23-24 (sentencing); *see* R.725 (Def. Mot. to Forgo Mandatory Minimum Sentencing); 4/13/15 Tr. 6-23 (argument); *id.* at 159 (preserving objection).

which were protected from use or derivative use under *Kastigar v. United States*, 406 U.S. 441 (1972), and *Garrity v. New Jersey*, 385 U.S. 493 (1967). *See Slough II*, 641 F.3d at 547, 549-50. To prevent further disclosure of those compelled statements or evidence derived from them, the briefs in No. 10-3006 were submitted under seal, and the appeal was argued in a closed courtroom. (Redacted copies of the briefs, record, and argument transcript were subsequently made public.)

To further protect against the compelled statements infecting the trial proceedings in any way, on remand the government employed new trial prosecutors and a separate, new team of "filter" prosecutors to ensure that only evidence free from *Kastigar* taint was furnished to those trial prosecutors and used at trial. *See generally* R.416 at 4, reported at 36 F. Supp. 3d 37, 42 (describing filter procedures).

Thus, the 2011 *Kastigar* appeal focused principally on tainted evidence that was filtered from this trial record to protect Defendants' Fifth Amendment rights. The 2011 appeal did not address the merits of the case, or any issues that will be addressed in this appeal.

2.    Prior disclosure proceedings

In 2010, the press filed motions seeking disclosure of the sealed *Kastigar* record from the district court. *See Washington Post v. United States*, No. 1:10-mc-0005-RMU (D.D.C.), *on appeal*, No. 10-3007. Pursuant to a negotiated resolution,

the district court's disclosure order was stayed by the motions panel until completion of this matter, including appellate review.  Order, No. 10-3007, Doc. 1388557 (D.C. Cir. Aug. 10, 2012) (per curiam).

The disclosure appeal, like the *Kastigar* appeal, did not address the merits of the case, or any issues that will be addressed in this appeal.

> 3.    *United States v. Nicholas Slatten*:

Defendant Slatten was indicted separately in No. 14-CR-107 below.  He was tried, convicted, and sentenced in joint proceedings with these Defendants.  His consolidated appeal is No. 15-3078(L).

> 4.    *United States v. Jeremy Ridgeway*:

Witness Jeremy Ridgeway pled guilty and testified against Defendants under a cooperation agreement.  *United States v. Ridgeway*, No. 1:08-CR-341-RCL (D.D.C.).

> 5.    Immunized Witnesses:

Witnesses Adam Frost, Mark Mealy, Jimmy Watson, and Donald Ball were granted statutory immunity.  *In re Frost*, Misc. No. 07-513 (D.D.C. Nov. 21, 2007); *In re Mealy*, Misc. No. 07-514 (D.D.C. Nov. 21, 2007); *In re Watson*, Misc. No. 13-206 (D.D.C. Mar. 11, 2013); *In re Ball*, Misc. No. 07-513 (D.D.C. Oct. 4, 2013).

6.      <u>Motion to Quash Grand Jury Subpoenas</u>:

In 2007, several witnesses subpoenaed to the grand jury moved

unsuccessfully to quash their subpoenas.  *United States v. (Under Seal)*, No. MISC

07-516 (D.D.C.).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ...............i

    A.    Parties and Amici ...........................................................................i

    B.    Rulings Under Review ................................................................... ii

    C.    Related Cases ................................................................................iv

TABLE OF AUTHORITIES .................................................................. xiii

GLOSSARY OF ABBREVIATIONS .....................................................xix

JURISDICTION......................................................................................1

INTRODUCTION ...................................................................................2

ISSUES PRESENTED.............................................................................5

CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS ...........6

STATEMENT OF THE CASE.................................................................6

I.    Nature of the Case .............................................................................6

II.    Procedural History ............................................................................7

    A.    Original Indictment and *Kastigar* Proceedings.....................7

    B.    Superseding Indictment and *Kastigar* Filter ........................7

    C.    MEJA.........................................................................................8

    D.    Venue.......................................................................................10

    E.    Rule 29 Motions .....................................................................12

    F.    Trial, Verdict and Sentencing................................................13

    G.    New Trial Motion...................................................................13

III.    Statement of Facts ........................................................................ 14

    A.    Defendants' Contract Employment By the State Department to
          Provide Diplomatic Security ............................................... 14

    B.    Baghdad in September 2007 ............................................... 15

    C.    The Events of September 16, 2007 ..................................... 16

          1.    Raven 23 Responds to Aid an American Diplomat After a Car
                Bomb Attack ........................................................... 16

          2.    Raven 23 Secures the Nisur Square Traffic Circle ................. 16

          3.    An Apparent Car Bomb Threat Approaches the Convoy ......... 17

          4.    The Convoy Takes Incoming Gunfire From the South ........... 21

          5.    Incoming Fire Disables the Command Vehicle ...................... 26

          6.    Ridgeway Fires as the Convoy Exits the Circle ..................... 26

          7.    Slough Fires at a Vehicle Backing Into the Convoy;  No One Is
                Injured ...................................................................... 28

          8.    Ridgeway Fires to the Far North of the Circle ....................... 29

    D.    Evidence Collection After the Incident .............................. 30

          1.    Damage to the Command Vehicle ...................................... 30

          2.    Evidence Collected Near Nisur Square .............................. 32

          3.    Lack of Forensics ......................................................... 34

    E.    The Government's Incredible Theory of a One-Sided Massacre ....... 36

          1.    Jeremy Ridgeway Changed His Testimony Under Pressure .... 36

          2.    Raven 23 Members Murphy, Mealy and Frost Could Not See
                Threats to the South ..................................................... 39

          3.    Iraqi Witnesses ........................................................... 41

    SUMMARY OF ARGUMENT .............................................................. 41

ARGUMENT .........................................................................................46

I.  The Military Extraterritorial Jurisdiction Act Does Not Apply Because
    Defendants Were Not "Employed by the Armed Forces" ...........................46

    A.  Standard of Review ............................................................................49

    B.  MEJA Must Be Construed Strictly ....................................................49

    C.  MEJA Applies to Non-Defense Department Contractors Only in
        Limited Circumstances.......................................................................50

    D.  Defendants' Contract Employment to Provide Diplomatic Security
        Did Not Relate to Supporting the Defense Department's Mission.....51

    E.  Even if the Court Could Look Outside the Contracts, the Government
        Failed to Prove That the Charged Conduct Related to Supporting the
        Defense Department's Mission ...........................................................55

    F.  The Government's MEJA Arguments Contravene the Statute's Text
        and are Legally Insufficient to Support Conviction...........................57

    G.  Even if MEJA Were Somehow Ambiguous, the Rule of Lenity Would
        Apply ..................................................................................................62

    H.  At a Minimum, Defendants Are Entitled to a New Trial Before a
        Properly Instructed Jury ....................................................................64

        1.  The MEJA Instruction Was Erroneous ....................................65

        2.  The Court Erred by Refusing to Instruct the Jury That
            Diplomatic Security is a State Department Responsibility ......70

II. THE DISTRICT COURT ERRED IN DENYING A NEW TRIAL, WHERE
    A KEY WITNESS'S SENTENCING STATEMENT SHOWED HIS TRIAL
    TESTIMONY WAS PERJURED .................................................................76

    A.  Legal Framework and Standard of Review.........................................77

    B.  A Key Witness's Unsolicited Sentencing Statement Fundamentally
        Contradicted His Trial Testimony......................................................78

        1.  Monem's Trial Testimony:  The White Kia's Driver Was Killed
            Instantly and the Car Posed No Threat ...................................78

- x -

    2.    Monem's New Statement: The Kia Driver Was Alive During the Incident, and Monem Was Hiding in His Booth ...............79

    3.    The Government's Attempt to Obtain an Ex Parte Retraction.81

C.    The District Court Abused Its Discretion By Denying a New Trial...82

    1.    Monem's Trial Testimony Was Perjured..................................82

    2.    The New Evidence Would Probably Result in Acquittal ........86

D.    At a Minimum, the Court Should Have Held a Hearing to Examine Monem Regarding His Conflicting Accounts .....................................94

III.    VENUE IN THE DISTRICT OF COLUMBIA WAS IMPROPER, AND WITHHOLDING THE ISSUE FROM THE JURY WAS REVERSIBLE ERROR ..................................................................................................96

A.    Standard of Review and Governing Legal Principles .........................97

B.    The Evidence at Trial Was Legally Insufficient to Establish Proper Venue...................................................................................................98

    1.    The Evidence Was Insufficient to Prove Ridgeway Was a "Joint Offender" on Every Charged Count .........................................98

    2.    The Evidence Was Insufficient to Prove Ridgeway Was Arrested in Connection With the Offenses Charged .............100

C.    The Court's Failure to Submit Venue to the Jury Was Reversible Error..................................................................................................103

D.    Dismissal is Warranted Because the Government Manufactured Venue in the District of Columbia ....................................................107

IV.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT LIBERTY .......108

V.    APPLICATION OF THE 30-YEAR MANDATORY-MINIMUM SENTENCE ON THE FIREARMS CHARGE VIOLATES THE EIGHTH AMENDMENT ........................................................................................112

A.    Legal Framework and Standard of Review......................................112

      B.     A Thirty-Year Sentence for the Defensive Use of Government-Issued Weapons in a War Zone is Grossly Disproportionate ...................... 113

      C.     The Mandatory Nature of the Thirty-Year Sentence as Applied to Government Employment Conduct in a War Zone Violates the Eighth Amendment ...................................................................................... 116

CONCLUSION ..................................................................................... 117

CERTIFICATE OF COMPLIANCE ..................................................... xx

ADDENDUM ........................................................................................ xxi

MILITARY EXTRATERRITORIAL JURISDICTION ACT ............................ xxii

DIPLOMATIC SECURITY ACT ......................................................... xxv

FOREIGN AFFAIRS MANUAL ....................................................... xxvii

CONSTITUTION AND STATUTE REGARDING VENUE ......................... xxviii

CONSTITUTION AND STATUTE REGARDING PENALTY ....................... xxix

CERTIFICATE OF SERVICE ............................................................ xxxi

# TABLE OF AUTHORITIES[10]

**Page(s)**

CASES

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ....................................51

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)...........................66, 75

*Bond v. United States*, 134 S. Ct. 2077 (2014) .......................................................51

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .......................................................84

*Chapman v. California*, 386 U.S. 18 (1967)...........................................................64

*Dallago v. United States*, 427 F.2d 546 (D.C. Cir. 1969) ......................................87

*Davis v. Alaska*, 415 U.S. 308 (1974)......................................................................95

\* *Graham v. Florida*, 560 U.S. 48 (2010)..............................................112, 113, 115

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ...................................................113, 116

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008)..................................................................60

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999) .........................................49

*Hurst v. Florida*, 136 S. Ct. 616, No. 14-7505,
2016 WL 112683 (Jan. 12, 2016) ....................................................................105

*In re Silveira*, 141 F.3d 34 (1st Cir. 1998)..............................................................60

\* *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
510 U.S. 86 (1993)............................................................................................60

*Kastigar v. United States*, 406 U.S. 441 (1972) .....................................................7, 8

\* *Kyles v. Whitley*, 514 U.S. 419 (1995)........................................................86, 88, 92

\* *Laughlin v. United States*, 474 F.2d 444 (D.C. Cir. 1972) ...............................72, 75

\* *Levine v. United States*, 261 F.2d 747 (D.C. Cir. 1958) ...................................72, 75

---

[10] Authorities on which Defendants chiefly rely are marked with asterisks.

\* *Logue v. United States*, 412 U.S. 521 (1973)..........................................................52

\* *McBoyle v. United States*, 283 U.S. 25 (1931) ......................................................50

\* *McNally v. United States*, 483 U.S. 350 (1987)....................................................50

*Middle South Energy v. FERC*, 747 F.2d 763 (D.C. Cir. 1984)............................52

\* *Miller v. Alabama*, 132 S. Ct. 2455 (2012)....................................................113, 116

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................................114

\* *Napue v. Illinois*, 360 U.S. 264 (1959) ....................................................................91

*Neder v. United States*, 527 U.S. 1 (1999)................................................................64

*Nieves v. United States*, 160 F.2d 11 (D.C. Cir. 1947).............................................52

*Pope v. Illinois*, 481 U.S. 497 (1987) ......................................................................64

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ........................................................63

\* *Rosemond v. United States*, 134 S. Ct. 1240 (2014).......................................109, 111

\* *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009)...................................................52

*Salley v. United States*, 353 F.2d 897 (D.C. Cir. 1965)...........................................72

\* *Skilling v. United States*, 561 U.S. 358 (2010) .......................................................60

*Solem v. Helm*, 463 U.S. 277 (1983) ......................................................................113

\* *Sullivan v. Louisiana*, 508 U.S. 275 (1993)....................................76, 105, 109, 110

*Thompson v. United States*, 188 F.2d 652 (D.C. Cir. 1951)....................................77

\* *Travis v. United States*, 364 U.S. 631 (1961) .........................................................98

*United States v. Agurs*, 427 U.S. 97 (1976).............................................................86

*United States v. Bass*, 404 U.S. 336 (1971).............................................................62

*United States v. Bowman*, 260 U.S. 94 (1922) ........................................................46

*United States v. Brodie*, 524 F.3d 259 (D.C. Cir. 2008)..........................................77

*United States v. Cabrales*, 524 U.S. 1 (1998)..........................................................97

*United States v. Catino*, 735 F.2d 718 (2d Cir. 1984) ..........................................101

*United States v. Cores*, 356 U.S. 405 (1958)........................................................117

\* *United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997)....... 60, 64, 72, 75, 76, 97

*United States v. Donato*, 99 F.3d 426 (D.C. Cir. 1996).........................................95

*United States v. Erdos*, 474 F.2d 157 (4th Cir. 1973) ..........................................100

\* *United States v. Fahnbulleh*, 752 F.3d 470 (D.C. Cir. 2014) .......................103, 106

\* *United States v. Gaudin*, 515 U.S. 506 (1995) ....................... 75, 103, 104, 105, 106

*United States v. Granderson*, 511 U.S. 39 (1994) ..................................................63

\* *United States v. Haire*, 371 F.3d 833 (D.C. Cir. 2004) ................................103, 106

*United States v. Hall*, 324 F.3d 720 (D.C. Cir. 2003) ....................................... 77-78

\* *United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014)...............................49, 64, 75

*United States v. Holmes*, 670 F.3d 586 (4th Cir. 2012)........................................105

\* *United States v. Hong Vo*, 978 F. Supp. 2d 49 (D.D.C. 2013) .................98, 99, 101

*United States v. Iverson*, 637 F.2d 799 (D.C. Cir. 1980)........................................91

\* *United States v. Johnson*, 323 U.S. 273 (1944) ................................................97, 98

*United States v. Kayode*, 254 F.3d 204 (D.C. Cir. 2001) ................................49, 109

\* *United States v. Lam Kwong-Wah*, 924 F.2d 298 (D.C. Cir. 1991) .............103, 105

*United States v. Law*, 528 F.3d 888 (D.C. Cir. 2008)............................................64

\* *United States v. Levy Auto Parts*, 787 F.2d 946 (4th Cir. 1986) ...........................98

*United States v. Martinez*, 901 F.2d 374 (4th Cir. 1990)......................................106

\* *United States v. Miller*, 111 F.3d 747 (10th Cir. 1997)................................106, 116

*United States v. Moeckly*, 769 F.2d 453 (8th Cir. 1985) ......................................106

\* *United States v. Morgan*, 393 F.3d 192 (D.C. Cir. 2004).......... 97, 98, 100, 103,105

*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) ....................107, 108

*United States v. Nwoye*, 663 F.3d 460 (D.C. Cir. 2011)........................103,105, 106

*United States v. Oruche*, 484 F.3d 590 (D.C. Cir. 2007)........................................78

*United States v. Papagno*, 639 F.3d 1093 (D.C. Cir. 2011) ....................................49

*United States v. Pearson*, 791 F.2d 867 (11th Cir. 1986)........................................99

*United States v. Ron Pair Enters.*, 489 U.S. 235 (1989) ........................................49

*United States v. Said*, 798 F.3d 182 (4th Cir. 2015) ..............................................113

*United States v. Santos*, 553 U.S. 507 (2008)..........................................................62

*United States v. Shepherd*, 102 F.3d 558 (D.C. Cir. 1996) ...................104, 105, 106

*United States v. Slough*, 641 F.3d 544 (D.C. Cir. 2011) ("*Slough II*") ....................7

*United States v. Slough*, 677 F. Supp. 2d 112 (D.D.C. 2009) ("*Slough I*")...............7

*United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996) ....................................107

*United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000) ....................................87

\* *United States v. Villanueva-Sotelo*, 515 F.3d 1234 (D.C. Cir. 2008)..........49, 51, 63

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)...........................................91

\* *United States v. Williams*, 233 F.3d 592 (D.C. Cir. 2000) ................................77, 87

\* *United States v. Wilson*, 240 F.3d 39 (D.C. Cir. 1998) ..........................................64

\* *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76 (1820) .............................. 49-50

*Weems v. United States*, 217 U.S. 349 (1910) ......................................................113

*Williams v. United States*, 50 F.3d 299 (4th Cir. 1995)...........................................52

*Wood v. Standard Prods. Co.*, 671 F.2d 825 (4th Cir. 1982) ..................................52

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ................................................116

*Zaimi v. United States*, 476 F.2d 511 (D.C. Cir. 1973) ...........................................62

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. III, sec. 2, para. 3 ..............................................................6

U.S. Const. amend. V ................................................ v, 7-8, 45, 91, 105, 107, 108

U.S. Const. amend. VI .................................................................6, 64, 97, 105

U.S. Const. amend. VIII.................................................... 4, 5, 6, 112-117

**STATUTES**

1 U.S.C. §  112 ..............................................................................10

18 U.S.C. §  7 ............................................................................46, 50

18 U.S.C. §  924(c)(1).............................................................6, 46, 112

18 U.S.C. § 1112 ...............................................................................46

18 U.S.C. § 1113 ...............................................................................46

\*  18 U.S.C. §  3238 .................................................... 6, 11, 45, 96-101, 108

\*  18 U.S.C. §  3261(a)(1).....................................................6, 42, 46, 50, 61

\*  18 U.S.C. §  3267 ................................................ 6, 42, 50, 51, 52, 60, 74

22 U.S.C. §  4801(b)(1)......................................................................70

\*  22 U.S.C. §  4802(a) ........................................................6, 14, 53, 62, 70

**LEGISLATIVE MATERIALS**

H.R. Rep. 110-352 (2007) (reporting on the MEJA Expansion and
   Enforcement Act of 2007) .............................................................47

**CODE OF FEDERAL REGULATIONS**

48 C.F.R. 52.225-19(e)(3)(i) (2016) ......................................................53

## RULES

Fed. R. App. P. 4(b)(3)(A)(ii) ...................................................................1

Fed. R. Evid. 613(b) .................................................................................91

Fed. R. Evid. 803(5) .................................................................................91

Fed. R. Evid. 804 .....................................................................................91

## BOOKS AND ARTICLES

Charles Alan Wright, *et al*., *Federal Practice & Procedure* (4th ed. 2015):

Vol. 2, § 307 .................................................................................103

Vol. 3, § 584.............................................................................77, 86

Black's Law Dictionary 289 (6th ed. 1990) ...........................................98

## OTHER AUTHORITIES

*REBUILDING IRAQ:  Actions Needed to Improve Use of Private Security Providers*, Report to Congressional Committees, GAO-05-737 (July 2005) ...............................................................................................56

*Holding Criminals Accountable:  Extending Criminal Jurisdiction for Gov't Contractors & Emps. Abroad:  Before the S. Comm. on the Judiciary* (Statement of Lanny A. Breuer, Assistant Attorney General), 112th Cong. (2011) ........................................................................................48

## GLOSSARY OF ABBREVIATIONS

A.___                    Appendix

Br.                      Brief

INP                      Iraqi National Police

MEJA                     Military Extraterritorial Jurisdiction Act

Tr.                      Transcript

VBIED                    Vehicle-Borne Improvised Explosive Device

WPPS II                  Worldwide Personal Protective Services II contract:
                         the State Department contract under which Blackwater and
                         Defendants were contracted to provide personal protective
                         services for State Department personnel in Baghdad.

## JURISDICTION

The district court had criminal jurisdiction.  18 U.S.C. § 3231.  This Court

has appellate jurisdiction.  28 U.S.C. § 1291; 18 U.S.C. § 3742(a).

Judgments were entered April 23 and 24, 2015.  R.759, R.761, R.763.  On

April 27, 2015, Defendants filed a new trial motion based on newly discovered

evidence.  R.765.  The order denying that motion was entered November 10, 2015.

R.820.  Defendants' notices of appeal, filed November 20, 2015 (R.822, R.823,

R.824), were timely.  Fed. R. App. P. 4(b)(3)(A)(ii).

## INTRODUCTION

On September 16, 2007, in war-torn Baghdad, a car bomb detonated outside a meeting attended by an American diplomat.  A team of State Department contractors deployed to secure a safe route for the diplomat's return to the Green Zone.  After they secured the Nisur Square traffic circle, a white Kia sedan matching an active intelligence warning about a car bomb approached the convoy. Following State Department protocol, several contractors fired their weapons to stop the advancing threat.  Virtually simultaneously, the convoy began taking incoming fire.  Several Iraqis were killed or wounded in the exchange.

In the immediate aftermath, the overwhelming consensus of U.S. government officials—including the State and Defense Departments—was that the U.S. government lacked jurisdiction to prosecute these non-military contractors acting overseas.  Indeed, Congress sought to amend the governing statute to extend extraterritorial jurisdiction to future circumstances like this case.  It was only after substantial Iraqi outrage at the Nisur Square incident that the Justice Department brought this prosecution.  But the government's original view of its extraterritorial jurisdiction was correct.  There was no basis in U.S. law to prosecute Defendants for their conduct in Iraq.

Quite simply, Defendants were not "employed by the Armed Forces," within the meaning of the Military Extraterritorial Jurisdiction Act ("MEJA").  They were State Department contractors, employed to assist in that Department's statutory

2

diplomatic security mission—a mission they were performing in Nisur Square.
MEJA permits prosecution of non-Defense Department contractors only "to the
extent" their contract employment "relates to supporting the mission of the
Department of Defense."  The entire prosecution was built on a myth that
Defendants were somehow performing a Defense-related function they were never
hired to do.  Defendants' conduct is not covered by MEJA and they were entitled
to judgment of acquittal.

The government also manufactured venue in the District of Columbia, an
advantageous venue far from Defendants' homes, by choreographing a bogus
"arrest" of cooperating witness Jeremy Ridgeway.  Because the applicable venue
statute mandates trial in the district where the defendant or any "joint offender" is
arrested, venue was proper only in Utah, where all Defendants were arrested upon
indictment.  Ridgeway was no "joint offender," given the lack of concerted
criminal activity and his prosecution only for two offenses based on his individual
actions, perceptions and intent.  Nor was Ridgeway arrested in this District:  he
traveled voluntarily to and from his plea hearing, and his liberty was never
restrained.  The district court should have acquitted Defendants when the
government failed to prove venue, or at least allowed the jury to resolve these
contested issues.  Instead, the court improperly decided venue itself.

The trial was also tainted by the government's reliance on perjured testimony from an Iraqi traffic officer, discovered when the witness submitted a sentencing statement diametrically opposed to his trial testimony.  The witness's testimony was the foundation for the government's theory of the case:  that the incident began with the unprovoked ambush killing of the Kia's driver, setting off a chain of events in which Defendants acted unreasonably and excessively from the start.  But the officer's new statement revealed that the Kia's driver was *alive* when the shooting started, and refuted the officer's trial testimony that he warned the convoy the Kia posed no threat.  This evidence eviscerated the government's case and would have led to acquittals.  The district court abused its discretion by denying a new trial.

When Defendants refused to plead guilty, the government charged them with a 30-year mandatory minimum firearms offense, on top of manslaughter and attempted manslaughter charges, for using their State-Department-issued automatic weapons to perform their protective responsibility in a war zone.  This unconscionable charging decision removed the district court's sentencing discretion.  The resulting 30-year-and-one-day sentences, under the circumstances of this case, violate the Eighth Amendment.

4

## ISSUES PRESENTED

1.  The Military Extraterritorial Jurisdiction Act applies only to conduct committed while "employed by the Armed Forces"—a status non-Defense contractors occupy only "to the extent" their contract employment "relates to supporting the mission of the Department of Defense."

    Where Defendants were contracted by the State Department to fulfill the State Department's statutory diplomatic security mission:

    a)  Are Defendants entitled to acquittal because they were not "employed by the Armed Forces"?

    b)  Are Defendants entitled to a new trial, where the trial court erroneously instructed the jury on the definition of "employed by the Armed Forces," and refused to inform the jury that diplomatic security is, by law, the State Department's responsibility?

2.  Did the district court err in denying a new trial, where a key government witness, unsolicited by the defense, submitted a sentencing statement revealing his perjury at trial and refuting the government's theory of the case?

3.  Did the district court err in finding venue?

    a)  Was the evidence insufficient to establish venue?

    b)  Did the district court violate Defendants' right to jury trial by taking venue from the jury and resolving disputed facts itself?

    c)  Did the government improperly manufacture venue?

4.  Was the evidence insufficient to convict Defendant Liberty?

5.  Is application of the 30-year mandatory minimum sentence for Defendants' use of government-issued automatic weapons so rigid and grossly disproportionate as to violate the Eighth Amendment?

5

## CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS

Relevant provisions of the following laws appear in the Addendum:

- The Military Extraterritorial Jurisdiction Act,
  18 U.S.C. §§ 3261(a)(1), 3267;

- The Diplomatic Security and Antiterrorism Act,
  22 U.S.C. §§ 4801, 4802(a);

- The U.S. Department of State Foreign Affairs Manual,
  12 FAM 011-012 (Diplomatic Security);

- U.S. Const. Art. III, sec. 2, cl. 3 (Jury Trial, Venue);

- U.S. Const. amend. VI (same);

- 18 U.S.C. § 3238 (Offenses Not Committed in Any District);

- U.S. Const. amend. VIII (Cruel and Unusual Punishment);

- 18 U.S.C. § 924(c)(1) (penalties for use of a firearm).

## STATEMENT OF THE CASE

## I.    Nature of the Case

After more than seven weeks of deliberations following an eleven-week trial, a jury convicted Defendants of multiple counts of voluntary manslaughter, attempted manslaughter, and a 30-year mandatory-minimum firearms count, all under MEJA, 18 U.S.C. § 3261(a)(1).  R.759; R.761; R.763.  Defendants appeal their convictions and sentences, and the denial of their new trial motion based on new evidence of perjured trial testimony.  Defendants are serving their sentences.

6

## II.     Procedural History

### A.     Original Indictment and *Kastigar* Proceedings

Hours after the incident, State Department investigators summoned Defendants to mandatory interviews.  Two days later, they gave written sworn statements regarding their actions, on forms stating the statements were compulsory and could not be used against Defendants criminally.  Defendants' statements were compelled for Fifth Amendment purposes.  *See United States v. Slough*, 677 F. Supp. 2d 112, 117-20, 133-37 (D.D.C. 2009) ("*Slough I*"); *United States v. Slough*, 641 F.3d 544, 548 (D.C. Cir. 2011) ("*Slough II*").  As a result, those statements or evidence derived from them may not be used in any way in this case.  *See Kastigar v. United States*, 406 U.S. 441, 453 (1972); *Slough II*, 641 F.3d at 549-50.

In 2009, Judge Urbina dismissed the original 2008 indictment, ruling the government had impermissibly used Defendants' compelled statements to obtain the indictment.  *Slough I*, 677 F. Supp. 2d at 115-16, 166.  This Court vacated and remanded.  *Slough II*, 641 F.3d at 554-55, *cert. denied*, 132 S. Ct. 2710 (2012).

### B.     Superseding Indictment and *Kastigar* Filter

Judge Urbina retired before the case was remanded in 2012.  The case was randomly assigned to Judge Leon.  R.253.  A half-hour later, it was reassigned to then-Chief Judge Lamberth.  R.254.

7

The government assigned a new trial team and a new "filter" team to prevent evidence derived from Defendants' compelled statements from reaching the trial team or entering the record.  R.416, at 4.  The government obtained a superseding indictment in October 2013.  R.304.

Thus, the trial record contains only evidence untainted by Defendants' compelled statements.  Defendants do not raise a *Kastigar* challenge on appeal. However, Slatten challenges the district court's refusal to sever his trial to allow him to use parts of a Defendant's compelled statements in his defense, when the Fifth Amendment prohibited use of those statements in a joint trial.  The district court denied Slatten's motion, and Slatten appeals.

To protect against dissemination of those compelled statements, that part of Slatten's appeal is submitted under seal.  The Fifth Amendment and *Kastigar* prohibit any use or consideration of those statements against that Defendant here. They are not part of the trial record.

### C.    MEJA

Defendants moved to dismiss the 2008 indictment as not covered by MEJA. R.34 (motion); *see also* R.56 (reply).  Judge Urbina ruled the issue would have to await a motion for acquittal at trial.  2/17/09 Tr. 45-47.  After the 2013 superseding indictment, Defendants noted their MEJA argument but accepted Judge Urbina's procedural ruling as law of the case.  *See* R.389 at 2 n.2; R.435, at 5.

8

Defendants also broached moving to bifurcate trial of the MEJA issue,
seeking resolution of that threshold question first.  The court responded, "Hold
your breath for me bifurcating anything....  You can forget it....  This case is going
to end on my level in the future while I'm still alive."  9/10/13 Tr. 20-21.

At the close of the government's case, Defendants moved for acquittal,
contending the government failed to prove Defendants were "employed by the
Armed Forces" under MEJA.  8/20/14 AM Tr. 9 (motion); 8/21/14 PM Tr. 4-5, 18-
21 (argument, incorporating earlier briefing).  The district court denied the motion
orally without reasons.  8/21/14 PM Tr. 56.[11]  At the jury charge conference, the
court adopted the government's MEJA instruction over Defendants', again giving
no reasons.  8/26/14 AM Tr. 54.[12]  Thus, the court allowed the government to
argue all of its MEJA theories, *see* 8/21/14 PM Tr. 54-55 (gov. opp. to Rule 29
motion); 8/28/14 AM Tr. 101-05 (summation), without addressing their legal
sufficiency.

The court also refused Defendants' request to instruct the jury that
diplomatic security was the State Department's responsibility under 22 U.S.C.

---

[11] *See also* 8/25/14 PM Tr. 73-74 (denying renewed motion at close of
defense case); R.748, at 2 (denying renewed post-verdict motion).

[12] *See* R.625, at 34-36 (jury charge); 9/2/14 AM Tr. 65-66 (same); *compare*
R.618-2, at 32-34 (Def. Corr. Prop. Instr. 15); R.618, at 5-7 (defense objections);
8/26/14 AM Tr. 42-47, 49-54 (charge conference argument); 8/26/14 PM Tr. 88-89
(preserving objection); 8/27/14 PM Tr. 141-43 (same); 9/2/14 AM Tr. 77 (same).

9

§ 4802.  At an ex parte conference, Defendants told the court they intended to introduce the statute into evidence under 1 U.S.C. § 112.  The court indicated its preferred practice was to read statutes to the jury in instructions.[13]  Accordingly, Defendants submitted such an instruction (Def. Corr. Prop. Instr. 16, R.618-2, at 35), as well as two fallback alternatives quoting the statute (Def. Corr. Prop. Instrs. 16A, 16B, *see* 8/26/14 AM Tr. 57; 8/26/14 PM Tr. 25; 8/27/14 PM Tr. 153-54), all of which the court rejected out of hand.  8/26/14 AM Tr. 54-55; 8/26/14 PM Tr. 25; 8/28/14 AM Tr. 5.

### D.    Venue

Defendants' sealed indictment (which included Slough, Slatten, Heard, Liberty, and then-co-defendant Donald Ball) was filed in the District of Columbia in 2008.  R.1.  All five defendants surrendered and were arrested in the District of Utah.  R.4; R.5; R.7; R.8.[14]  Defendants raised their first venue challenge in the Utah district court, which denied the motion without prejudice to renewal in the District of Columba.  *United States v. Slough*, Crim. No. 2:08-mj-350-PMW (D. Utah), ECF.16, ECF.30.

---

[13] Though this exchange was not transcribed, defense counsel repeated it on the record during the continued charge conference.  8/27/14 PM Tr. 154.  The court did not disagree with counsel's account.  *Id.*

[14] Utah was Ball's state of residence.  Slough resided in Texas, Slatten and Heard in Tennessee, and Liberty in New Hampshire.  R.35, at 5.

After arraignment in this District, Defendants moved to dismiss the indictment for lack of venue, arguing (1) Ridgeway was not "arrested" under 18 U.S.C. § 3238 when he voluntarily appeared in the District of Columbia to enter a negotiated plea; (2) Ridgeway was not a "joint offender" with Defendants; and (3) the government improperly manufactured venue. *See* R.35, at 5-18. Judge Urbina denied the motion, ruling Ridgeway was a "joint offender" because he and Defendants were "in the same place at the same time, more or less doing the same thing." 2/17/09 Tr. 77. Judge Urbina also found Ridgeway was "arrested" under § 3238, and denied dismissal for "manufactured venue" because "the District of Columbia is well known as a default jurisdiction." *Id*. at 78.

In 2013, Defendants renewed their prior arguments for dismissal and raised a facial challenge to the adequacy of the venue allegations in the Superseding Indictment. R.390; R.398; 4/23/14 Tr. 16-29, 32. Unlike the 2008 indictment, the 2013 indictment recognized the individual (not "joint") character of several offenses by charging Slatten (Count 1) and Slough (Counts 31 and 32) alone with certain counts. R.398-2.[15] Judge Lamberth denied the motion but invited its renewal at trial. R.436, at 6.

---

[15] At trial, the government dismissed eight counts against Liberty and Heard, leaving ten counts charged only against Slough. 8/21/14 PM Tr. 3.

Defendants renewed their venue objections at the close of trial, through motions for judgment of acquittal or dismissal, which were denied. 8/20/14 AM Tr. 9; 8/21/14 PM Tr. 34-35, 56; 8/25/14 PM Tr. 73-74. Defendants also proposed a jury instruction on venue, R.618-2, at 41 (Def. Corr. Prop. Instr. 18); *see* 8/26/14 PM Tr. 40-47 (charge conference argument). The government urged the court to decide the venue issue without jury submission. R.620; 8/26/14 PM Tr. 36-40. Though the court initially agreed with Defendants that "you're entitled to have the jury decide the question," 8/26/14 PM Tr. 51, it then vacated its decision, and "decide[d] that venue exists," with "no contested issues necessary to send it to the jury." 8/26/14 PM Tr. 56.

### E.    Rule 29 Motions

At the close of the government's case, Defendants moved for acquittal, challenging the sufficiency of the evidence. 8/20/14 AM Tr. 9 (motion); 8/21/14 PM Tr. 4-56 (argument). The district court denied the motions. 8/21/14 PM Tr. 56.[16]

Though all Defendants challenge the sufficiency of the evidence on MEJA and venue, *see* Issues Presented 1.a, 3.a, *supra*, only Liberty challenges here the general sufficiency of the evidence to convict him. Issue Presented 4, *supra*.

---

[16] Defendants renewed their motions at the close of defense evidence, 8/25/14 PM Tr. 73-74; at the close of all evidence, 8/26/14 PM Tr. 87-88, and after the verdict, 10/22/14 Tr. 24. The district court denied the motions. R.748.

### F.    Trial, Verdict and Sentencing

Trial began on June 11, 2014, and lasted eleven weeks, with the jury charged

on September 2, 2014.  The jury deliberated more than seven weeks, returning

guilty verdicts on October 22, 2014.  R.669.[17]

Sentencing was held on April 13, 2015.  Defendants' Guideline range was

151-188 months (level 34).  4/13/15 Tr. 4-5; *see also id.* at 29 (denying

government's upward departure motion).  In light of the mandatory minimum, the

district court sentenced each Defendant to thirty years and one day.  4/13/15

Tr. 150-51, 154-56; R.759; R.761; R.763.

### G.    New Trial Motion

Five days before sentencing, the government submitted a victim impact

statement from a key trial witness that fundamentally contradicted the witness's

trial testimony.  The government did not identify the statement as exculpatory

evidence; it appeared deep in an 83-page package of similar statements.  *See*

*generally* R.742-6.  Defendants raised the statement in a letter to the court and an

emergency motion to continue sentencing to permit a new trial motion.  R.744.

The court denied the continuance.  R.746.

Defendants submitted their new trial motion on April 27, 2015.  R.765.  The

court denied the motion on November 10, 2015.  R.820, R.821.

---

[17] The jury deadlocked on three counts against Heard.  R.669.

## III.    Statement of Facts

### A.    Defendants' Contract Employment By the State Department to Provide Diplomatic Security

The State Department is statutorily mandated to provide security for diplomatic operations abroad.  22 U.S.C. § 4802(a)(1), (2)(B)(i).  Lacking sufficient numbers of its own agents to fulfill that mission in areas made dangerous by "conflicts, political unrest, and ... terrorist activity," DX700-006, § C.1.2, the State Department hired private contractors, under its Worldwide Personal Protective Services II contract ("WPPS II"), to provide diplomatic security in hazardous locations around the world.  *Id.* § C.1.1.  The State Department engaged Blackwater, and Blackwater subcontracted with Defendants, to provide such security for State Department personnel in Iraq.  The contract's statement of work provided:  "The Contractor, including all Contractor personnel accomplishing work under this contract shall accomplish all work under this contract in compliance with the direction provided by the Department of State" through specified officers.  DX700-010, § C.4.1.2; *accord* DX701-006.

WPPS II Task Order 6 governed Blackwater's provision of "personal protective services and site security" for the State Department in Baghdad.  DX702-008 (Task Order at 2, § 5.0).  Blackwater was to protect:  (1) U.S. Embassy personnel, (2) individuals supporting the reconstruction efforts of the U.S. Agency for International Development, and (3) visiting dignitaries or other

14

personnel under the authority of the State Department's Chief of Mission, at the direction of the Embassy's Regional Security Officer. *Id.*; *see id.* § 6.0 (contractors would operate under State Department Diplomatic Security Standards). The Defendants' Independent Contractor Service Agreements with Blackwater specified they were engaged "in support of the US Department of State Diplomatic Security Mission Contract"—a reference to WPPS II and Task Order 6. *See, e.g.*, GX9865 at 13 (Sched. A ¶1).

### B.    Baghdad in September 2007

Baghdad in September 2007 was extremely dangerous. There was a "very large increase" in attacks against Americans in the months before September 16, 2007. 8/25/14 AM Tr. 92 (Mieszka Laczek-Johnson). Threats included suicide car bombs, known as "vehicle-borne improvised explosive devices" (VBIEDs), *id.* at 92-95, and attacks by Iraqi Police. *Id.* at 95-99.

The week before the incident, insurgents twice attacked Defendants' tactical support team, known as "Raven 23." On September 9, Raven 23 came under insurgent fire during a mission to secure an escape route for a diplomat under attack at a venue in Baghdad. *See* 7/16/14 AM Tr. 57-63, 66 (Mark Mealy). The next day, Raven 23 took fire again during a rescue operation after a helicopter was downed by insurgent fire. *Id.* at 78-79.

On September 12, insurgents fired an explosively formed projectile at another Blackwater team, Raven 26, after Iraqi Police waved their convoy into the

15

ambush.  7/15/14 AM Tr. 16-17 (Adam Frost).  The explosive destroyed an

armored vehicle and ejected one member into the air, leaving him unconscious on

the road.  *Id.* at 17; *see* DX132A-D (photos).  Another contractor lost most of his

arm.  7/29/14 AM Tr. 7-8 (Jimmy Watson).

### C.    The Events of September 16, 2007

#### 1.    Raven 23 Responds to Aid an American Diplomat After a Car Bomb Attack

Shortly before noon on September 16, 2007, a massive car bomb detonated

outside a meeting attended by a U.S. diplomat guarded by Blackwater.  GX9801 at

5.  The explosion could be heard miles away, 7/22/14 AM Tr. 24 (Charles

Pearson), and caused a large cloud of smoke over Baghdad.  *See* GXE005.

Raven 23 promptly exited the "Green Zone" to secure an escape route for

the diplomat.  7/17/14 AM Tr. 89 (Juan Mendoza).  Raven 23 consisted of four

armored trucks and nineteen men.  In the third or "command" vehicle, Liberty was

the driver, Slatten the designated defensive marksman, and Slough the single turret

gunner.  DX0101-003.  In the fourth vehicle, cooperating witness Ridgeway

manned the front turret, and Heard manned the rear turret.  DX0101-004.

#### 2.    Raven 23 Secures the Nisur Square Traffic Circle

Nisur Square was a traffic circle along the "most direct route" from the car

bomb site to the Green Zone.  7/9/14 AM Tr. 79 (Abraham Bronn); *see* GX323

(overhead photo); *see also* 8/25/14 PM Tr. 35-36 (Laczek-Johnson); DX2397-003

16

(map).  After Raven 23 left the Green Zone, the Tactical Operations Center watch officer directed the convoy to "lock down" Nisur Square traffic to aid the diplomat's return.  7/17/14 AM Tr. 89 (Mendoza).

Nisur Square was no exception to the dangers of wartime Baghdad.  8/12/14 AM Tr. 77 (Peter Decareau); *see* DX2397-003 (map showing insurgent attacks around Nisur Square in the 15 days before September 16, 2007); 8/25/14 PM Tr. 33-39 (Laczek-Johnson); 8/18/14 PM Tr. 96 (Michael Gosiewski); 6/26/14 AM Tr. 26 (Sabah Salah Abdulrahman).  For instance, in April 2007, a car bomb exploded in a tunnel under the circle, leaving an enormous crater.  6/23/14 PM Tr. 11-14; 6/26/14 AM Tr. 27-28 (Sarhan Dheyab Abdul Monem); *see* DX3025, DX3026 (photos).

On September 16, 2007, Nisur Square and its surrounding neighborhoods were considered "elevated risk areas."  8/25/14 PM Tr. 10-12 (Laczek-Johnson). Indeed, "there were several threats of VBIED's in the weeks prior [to September 16, 2007] for the surrounding neighborhood around Nisur Square."  *Id.* at 7.

### 3.    An Apparent Car Bomb Threat Approaches the Convoy

Raven 23 entered the circle and positioned itself along the southern side. Shortly thereafter, a white Kia sedan pulled out of a line of stopped cars entering the circle from the south, and drove directly toward the convoy.  8/5/14 PM Tr. 23 (Jeremy Krueger); 7/31/14 PM Tr. 85-86 (Ridgeway).  Days before, Blackwater's intelligence analyst had warned that three suicide VBIEDs, *including a white Kia*

17

*sedan*, were operating in the area in search of a "target of opportunity" like "a convoy or a marketplace." 8/25/14 PM Tr. 20-21 (Laczek-Johnson). This threat was still active on September 16, 2007. *Id.* at 57.

The Kia was "moving fast." 7/28/14 PM Tr. 40 (Watson); *accord* 7/31/14 PM Tr. 88 (Ridgeway) (Kia "was moving at a faster rate of speed than I would have liked."). Several Iraqi eyewitnesses told a U.S. Army Captain immediately after the incident that the Kia "punche[d] forward towards the convoy similar to a VBIED. And that's when the vehicle was engaged." 8/12/14 PM Tr. 47 (Decareau). By "breaking from the pack" of stopped traffic, the Kia exhibited a key indicator of a potential VBIED. 6/30/14 AM Tr. 88 (Matthew Murphy); *accord* 8/5/14 PM Tr. 23-24 (Krueger).

Many government witnesses viewed the Kia as a threat. *See, e.g.*, 8/5/14 PM Tr. 22-23 (Krueger); 8/6/14 AM Tr. 86 (Rhodes); 7/14/14 PM Tr. 79 (Frost); 7/7/14 PM Tr. 38-39 (Charles Gehrsitz); 8/11/14 PM Tr. 40 (Edward Randall); 8/18/14 PM Tr. 91 (Gosiewski). Others acknowledged the Kia could have been perceived as a threat. *See* 7/1/14 PM Tr. 80 (Murphy); 7/15/14 PM Tr. 100 (Mealy).

Raven 23 members tried to stop the Kia by signaling its driver and taking other steps. *See, e.g.*, 7/16/14 AM Tr. 42-43 (Mealy); 6/18/14 PM Tr. 45 (Mohammed Kinani); 7/2/14 AM Tr. 89 (Ali Khalif Salman Al-Hamidi). After the

18

Kia failed to stop, Slough fired at it. When Eddie Randall, driver of the fourth

vehicle, first saw the Kia, it had bullet holes in its hood but not its windshield.

8/11/14 AM Tr. 58.

Ridgeway heard shots, turned, and saw Slough firing at the oncoming Kia.

7/31/14 PM Tr. 83-85. He did not see rounds hitting the windshield. 8/4/14 PM

Tr. 64. Within "a second or two," Ridgeway fired three to five rounds "through

the driver's side of the windshield," 7/31/14 PM Tr. 85, aiming for the driver's

head. 8/4/14 PM Tr. 56; *see also id.* at 59-61. Ridgeway testified that Heard also

fired at the Kia. 7/30/14 PM Tr. 90-91; *see also* 7/15/14 PM Tr. 99, 104 (Mealy).

Donald Ball, the rear turret gunner in the first vehicle, also fired at the Kia.

7/15/14 PM Tr. 101, 104 (Mealy).

Several Raven 23 members then saw an Iraqi policeman appear to push the

vehicle toward the convoy. 6/30/14 PM Tr. 124, 127-28 (Murphy); 8/6/14 AM

Tr. 87 (Rhodes); 8/11/14 AM Tr. 56 (Randall). Raven 23 members feared this

individual was moving the VBIED closer to the convoy. 8/11/14 PM Tr. 40-42

(Randall); 8/6/14 AM Tr. 87 (Rhodes) ("The closer the blast, the more damage it

does").[18] With the Kia continuing to approach, Slough fired controlled bursts into

---

[18] Raven 23 received regular intelligence briefings that Iraqi Police or insurgents dressed as Iraqi Police posed serious threats. 8/25/14 AM Tr. 95-99 (Laczek-Johnson). Iraqi army and police forces would often assist insurgents by helping to orchestrate VBIED and small arms attacks on security contractors. *See, e.g.*, 7/7/14 PM Tr. 43-44 (Gehrsitz); 7/15/14 AM Tr. 15-17 (Frost); 7/1/14 PM

(Continued …)

the vehicle's engine block. 7/1/14 PM Tr. 136 (Murphy); 8/5/14 PM Tr. 28-29 (Krueger). Slough did not fire at the Iraqi policeman. 7/1/14 PM Tr. 137 (Murphy).

Around the same time, shift leader Jimmy Watson ordered Liberty to open the command vehicle's door, and fired over Liberty's lap at the still-approaching Kia. 7/28/14 PM Tr. 40-41, 43-44 (Watson). Liberty did not fire at the Kia. *Id.* at 50.[19] With the vehicle "still coming," Watson and Slough fired M-203 grenades to stop it. 7/28/14 PM Tr. 41-42 (Watson); *see also id.* at 45-46. Military witnesses testified an M-203 was a viable option to disable an approaching threatening vehicle. 7/10/14 AM Tr. 96 (Marine Gunner Shelby Lasater); 8/13/14 PM Tr. 17-18 (Col. David Boslego). Watson believed one of his rounds hit the Kia driver's door, bringing it to a stop. 7/28/14 PM Tr. 41-42 (Watson); *see also id.* at 45-46, 47-48.[20]

Slough's grenade hit underneath the Kia's front axle. *See* GX8803 (photo showing damage on undercarriage); GX8045 (photo of impact mark in street). Though Raven 23 member Matthew Murphy believed Slough fired two to three

---

Tr. 33-36 (Murphy). Days earlier, Iraqi Police had waved Raven 26 into an ambush. 7/15/14 AM Tr. 16-17 (Frost).

[19] *See also* 7/31/14 AM Tr. 39 (Ridgeway did not see Liberty fire that day).

[20] In fact, Watson likely hit the driver's door of the white VW Caddy truck behind the Kia, which had an impact hole consistent with Watson's description. *See* GX0532W. The Kia's door was not hit by a grenade round. *See* GXE277A.

20

grenade rounds, 6/30/14 PM Tr. 131-132, Murphy did not see Watson's grenade shots.  7/1/14 PM Tr. 138 (Murphy).  Watson and Slough were in the same vehicle, and Watson acknowledged firing three grenade rounds.  7/28/14 AM Tr. 91; *see also* 7/31/14 PM Tr. 112 (Ridgeway) (Watson told Ridgeway he fired multiple grenade rounds).

When the Kia was on fire, Ridgeway saw hand movement in the car through the smoke.  He fired three to five rounds at the hands through the passenger side windshield.  7/30/14 PM Tr. 95; 7/31/14 PM Tr. 108; 8/4/14 PM Tr. 56.  The contractors were trained, if it became necessary to engage a car bomb threat, to shoot all vehicle occupants, because any passenger might have a secondary detonation device.  7/15/14 AM Tr. 20-23 (Frost).   Ridgeway testified he did not think before he shot.  7/30/14 AM Tr. 68.

### 4.    The Convoy Takes Incoming Gunfire From the South

Around the same time, Raven 23 took incoming gunfire from south of the circle.  Matthew Murphy and Jeremy Krueger heard AK-47 gunfire coming from the south.  7/1/14 AM Tr. 18-20 (Murphy); 8/5/14 PM Tr. 34 (Krueger).  Eddie Randall saw the paint splatter of bullets striking the southern-facing side of the command vehicle directly in front of him.  8/11/14 AM Tr. 78-79.  Kevin Rhodes saw radiator fluid pouring out of the command vehicle after the very first sound of gunfire.  8/6/14 AM Tr. 81-82.

21

Tommy Vargas, tactical commander of the fourth vehicle, reported on internal radio that individuals in Iraqi police uniforms were firing at the convoy from an "IP shack" south of Nisur Square, which turned out to be a bus stop. 8/11/14 PM Tr. 49-50 (Randall); 7/14/14 PM Tr. 85-86 (Frost); 7/1/14 AM Tr. 23-34 (Murphy); 8/5/14 PM Tr. 34-37 (Krueger); 7/28/14 PM Tr. 28 (Watson). Watson radioed that Raven 23 was under fire.  7/28/14 PM Tr. 28-29 (Watson). The Tactical Operations Center's watch officer contemporaneously recorded in the watch log that multiple insurgents and Iraqi police were shooting at Raven 23. 7/17/14 AM Tr. 89-90 (Mendoza); GX9801 at 6-7 (watch log).  A Blackwater helicopter gunner heard real-time radio reports that Raven 23 was "receiving a fairly heavy volume of small arms fire from the south."  7/7/14 PM Tr. 28 (Gehrsitz).

A few weeks after the incident, Heard told Murphy that he returned fire during the incident at an Iraqi policeman who was shooting at the convoy.  7/1/14 PM Tr. 107-08 (Murphy).  Murphy "believe[d] Dustin plain and simple," and thought Heard's return fire was appropriate.  *Id.* at 109.  Heard suffered a first-degree burn injury through his Nomex suit during the incident.  8/6/14 AM Tr. 106-07 (Rhodes).

This evidence of incoming gunfire from the south was corroborated by bullet holes in a black taxi located between the convoy and the bus stop.  During the

22

shooting, the taxi's left side faced the convoy, and its right side faced south. 6/26/14 PM Tr. 19 (Hayder Ahmed Rubie Hussain Al-Khafaji); *see also* DX2539 (diagram drawn by Hayder). Photographs and a video showed three bullet holes in the taxi's right rear quarter panel, and another in the rear passenger window—all on the side facing away from the convoy. *See* DX2496; GX2312; DX2531; GXE292I.

A white Daewoo sedan was also hit from the south. The Daewoo's driver turned around after shooting started, drove away from the convoy toward the bus stop, and was hit with gunfire, including three shots *to the front of his south-facing vehicle*. 7/30/14 AM Tr. 24-27 (Hassan Jabar Salman). Though he believed the rounds came from helicopters overhead, *id.*, evidence showed no helicopter fired, *e.g.*, 7/7/14 PM Tr. 18 (Gehrsitz), and the prosecution conceded that Iraqis who thought gunfire came from helicopters were likely mistaken. 8/27/14 AM Tr. 75-76. Other photographs and a video showed strikes from bullets fired from the south toward the convoy. *See* DX3151; DX3152; GX8417; DX3884.

Numerous witnesses perceived a two-way firefight. A helicopter pilot believed the gunfire "sounded like a typical fire fight." 8/11/14 PM Tr. 127 (Franklin Paul). A helicopter gunner "absolutely" perceived that Raven 23 was in a firefight. 8/18/14 PM Tr. 92 (Gosiewski). Another helicopter gunner, a former Navy SEAL, saw several blue-shirted police officers in Nisur Square take their

23

shirts off after the incident, drop their guns, and walk away. 7/24/14 AM Tr. 14-15 (Timothy Spisak). This testimony was consistent with Vargas's reports of individuals in Iraqi police uniforms shooting at the convoy, *see supra* at 22, and intelligence that insurgents had access to Iraqi police uniforms. *See* 8/25/14 AM Tr. 99 (Laczek-Johnson) (such uniforms were sold at roadside stands).

Brett Fishback, a former Green Beret weapons specialist in a security detail just north of Nisur Square (unaffiliated with Blackwater), heard a burst of AK-47 fire followed by a "two-way gunfight." 8/25/14 AM Tr. 21-22. "[W]ithin seconds," he testified, "approximately 20 rounds landed in our area" that were "coming from the south to the north." *Id.* at 24-25. He picked one up and recognized it as AK-47 ammunition. *Id.*

After the incoming gunfire started, Slough briefly returned fire. Slough was generally oriented to the south, 8/5/14 PM Tr. 43 (Krueger), where the bus stop was located (GX495B), and fired "for only a second or two." 7/31/14 PM Tr. 122-23 (Ridgeway). Slough's fire to the south was brief enough that others did not even see him fire. *See* 7/28/14 PM Tr. 80 (Watson, inside Slough's vehicle, did not recall Slough shooting south beyond the Kia); 8/11/14 PM Tr. 58 (Randall, the fourth vehicle's driver with a direct sightline to Slough, did not see Slough shoot south beyond the Kia).

24

After Watson ordered Liberty to open his door a second time, he saw Liberty fire out the door toward the southeast tree line, where Watson believed incoming fire was originating.  *See* 7/28/14 PM Tr. 55-56, 59-60; GX498-D2.  No alleged victim was in that area.  No other witness saw Liberty fire his weapon.[21]  No witness, other than cooperating witness Ridgeway, testified that Heard fired anywhere other than at the Kia.

Ridgeway, on the other hand, fired indiscriminately and profusely.  Randall, located in Ridgeway's vehicle, saw Ridgeway engage in "sustained fire" of a "hundred plus" rounds to the south, virtually "the whole time" the convoy was in the circle.  8/11/14 PM Tr. 59, 61.  Murphy saw Ridgeway shoot two men near the Kia, and then start "picking out targets" as he "continued shooting down the road" to the south.  *See* 7/1/14 AM Tr. 11-14.  Ridgeway admitted he engaged in unaimed "suppressive fire" or "area fire" with his machine gun.  8/4/14 PM Tr. 52.  He acknowledged shooting to the south toward the bus stop and a distant Iraqi Army bunker.  He saw his shots hit a black Suburban and "assumed" he also hit other vehicles.  *Id.* at 51.  Ridgeway did not testify that any of this fire was planned or coordinated with anyone else.  *See generally id.* at 47-54.

---

[21] Jeremy Krueger and Eddie Randall *assumed* that gunfire out the command vehicle's driver door came from Liberty, because they knew Liberty was driving that day.  They did not actually see Liberty fire.  8/5/14 AM Tr. 31, 34 (Krueger); 8/5/14 PM Tr. 65-66 (same); 8/11/14 AM Tr. 81 (Randall). Watson testified he shot at the Kia out the driver's door.  *See supra* at 20 & n.19.

25

### 5.    Incoming Fire Disables the Command Vehicle

When the firefight began, an incoming round disabled the command vehicle by penetrating its radiator.  Immediately after hearing the first shots fired, medic Kevin Rhodes saw "copious amounts of radiator fluid coming out from underneath the command vehicle."  8/6/14 AM Tr. 80-81.  Rhodes believed incoming fire took out the radiator.  *Id.* at 81.

Raven 23 radioed that its command vehicle was down and it was executing a tow-out.  GX9801 at 6 (watch log; downed vehicle reported two minutes after incoming gunfire).  Members exited vehicle two, hooked a strap to the command vehicle, and towed it out of the circle.  *E.g.*, 7/14/14 PM Tr. 91-96 (Frost).[22]

### 6.    Ridgeway Fires as the Convoy Exits the Circle

During the tow, while the convoy exited Nisur Square, Ridgeway fired to the west and northwest.  The second and third vehicles were 20 feet apart, separated only by the tow strap.  One of the second vehicle's turret gunners, Murphy, heard machine gun fire coming from a single individual behind him and saw bullets

---

[22] Mark Mealy, a turret gunner in the first vehicle, believed someone fired two to three shots during the tow setup from a kneeling position by the third vehicle.  7/15/14 PM Tr. 117-20.  However, six Raven 23 members, including all three who executed the tow setup, testified no such shots were fired.  7/14/14 PM Tr. 96 (Frost); 8/5/14 AM Tr. 64 (Krueger); 8/6/14 AM Tr. 95-96 (Rhodes); 7/1/14 AM Tr. 31 (Murphy); 7/31/14 AM Tr. 23 (Ridgeway); 8/11/14 PM Tr. 57 (Randall).  Mealy believed the kneeling individual fired to the northeast and hit a man in a traditional robe in the stomach.  7/15/14 PM Tr. 120-21.  No alleged victim matched this description.  Rhodes monitored that area during the tow setup and did not see anyone shot there.  8/6/14 AM Tr. 96-97 (Rhodes).

hitting to the northwest. 7/1/14 AM Tr. 31-34. The other, Frost, saw Ridgeway

fire 20-30 automatic rounds at a tanker truck in the same vicinity. 7/15/14 AM

Tr. 70-74. Watson, inside the third vehicle, heard gunfire only from the "very rear

vehicle"—Ridgeway's vehicle—as the convoy left the circle. 7/28/14 PM Tr. 88.

No Raven 23 member saw or heard Slough fire to the west or northwest.

Frost was facing Slough from 25 feet away, and did not see Slough fire in those

directions. 7/15/14 AM Tr. 69. Rhodes, inside the second vehicle, was watching

the third vehicle, and did not see or hear Slough fire any shots as the convoy exited

the circle. 8/6/14 AM Tr. 99.[23]

Right after seeing Ridgeway fire at the tanker truck, Frost heard Defendant

Heard, the rear turret gunner in the fourth vehicle, call out over the radio that the

convoy was still "taking fire from the rear," i.e., the south. 7/15/14 AM Tr. 74-75,

113-15. When someone said to shoot back, Heard replied, "I can't shoot back

because I can't see where it's coming from." *Id.* at 76. Instead, Heard deployed

smoke grenades to conceal the convoy's exit. *Id.* at 113.

---

[23] One Iraqi traffic policeman northwest of Nisur Square claimed that a turret gunner in a single-turret vehicle fired shots in his direction. 6/26/14 PM Tr. 47-48 (Hussam Abdul Rahman Kadhim). However, he described the vehicle as stationary, parked alone in the middle of the street, with its nose pointed south. *Id.* at 72-73. He was "confident" it was not being towed. *Id.* at 74. None of these observations matched the ample evidence about Slough's vehicle being towed to the north out of the square.

### 7.     Slough Fires at a Vehicle Backing Into the Convoy; No One Is Injured

The convoy exited north against traffic, because the regular exit lanes were under construction.  7/15/14 PM Tr. 129 (Mealy).  The road "was completely clogged with cars."  *Id.* at 130.  It was a "very tense period" because the convoy was in "close proximity" to many vehicles and "any one of them could have been a potential bomb."  8/6/14 AM Tr. 100 (Rhodes); *accord* 8/11/14 PM Tr. 71 (Randall).

Shortly after exiting the circle, Slough engaged a red car.  Murphy, Watson, and Randall all placed the car to the immediate north of the circle.  7/29/14 AM Tr. 20 & DX2246 (Watson); 7/2/14 AM Tr. 16 & DX3090 (Murphy); 8/11/14 PM Tr. 75 & DX2769 (Randall).  Suddenly, a red car "just started reversing into [the convoy]."  7/28/14 PM Tr. 81 (Watson); *accord* 8/11/14 PM Tr. 78 (Randall).  Unbeknownst to Slough, Murphy had directed the car to start "backing up" to clear traffic.  7/1/14 AM Tr. 46 (Murphy).  At the sight of the car reversing into the convoy, Watson went "wide eyed" at the "very scary situation" and "grabbed Paul Slough's leg ... real hard."  *See* 7/28/14 PM Tr. 85 (Watson).

Slough fired one short burst, hitting the vehicle's rear windshield.  7/2/14 AM Tr. 24, 26 (Murphy); 7/28/14 PM Tr. 86, 88 (Watson).  Slough immediately stopped when Murphy and Frost yelled "cease fire."  7/15/14 AM Tr. 90 (Frost);

7/2/14 AM Tr. 24-26 (Murphy).  The car drove away; its driver did not appear

injured.  7/2/14 AM Tr. 27, 29 (Murphy).

### 8.    Ridgeway Fires to the Far North of the Circle

Later during the exit, Ridgeway shot three vehicles and their drivers near a

median roughly 300 meters north of the circle.  *See* DX2229 (photo showing

median).  Ridgeway pled guilty to shooting the driver of a white Celebrity in this

area.  DX2298 (Ridgeway Count Two).  No Defendant was charged with that

driver's injuries.  Ridgeway also shot at a red Hyundai and a white Opel nearby.

From his turret facing the third and fourth vehicles, Frost had "absolutely no

doubt" that Ridgeway alone fired at those cars.  7/15/14 AM Tr. 84.  Krueger,

inside the second vehicle, also saw Ridgeway fire multiple rounds through the

driver's side door of the red vehicle.  8/5/14 PM Tr. 57-58.  Randall, driving

Ridgeway's vehicle, heard Ridgeway firing both his rifle and machine gun north of

the circle.  8/11/14 PM Tr. 60.

Krueger and Frost saw the driver of the red Hyundai exit with a wound to his

left abdomen after Ridgeway shot the car.  8/5/14 PM Tr. 58 (Krueger); 7/15/14

AM Tr. 81-82 (Frost).  That driver testified he exited his vehicle with a gunshot

injury to his left abdomen.  7/2/14 PM Tr. 68-69 (Bara Sadoon Al-Ani).

The red Hyundai and white Opel had bullet holes in their driver's-side doors.

*See* GX526H; GX531Q.  Neither car had bullet holes in its rear windshield, *see*

29

GX526D; GX531T, and thus did not match the description of the red car shot by Slough.

### D.     Evidence Collection After the Incident

#### 1.     Damage to the Command Vehicle

On return, the command vehicle was towed to a maintenance facility. Mechanic T.J. Hill observed multiple "round impact shots" on the driver's side that looked "very fresh."  8/8/14 Dep. Tr. 46-48, 51-52; *see* DX2456-DX2460 (photos). The marks had not been there when Hill rode in the vehicle days earlier.  8/8/14 Dep. Tr. 53.

Nine government witnesses, all experienced combat veterans, testified the marks on the command vehicle were bullet strikes.[24]  Randall also saw a fresh "bullet strike" on the left (south-facing) side of the fourth vehicle that "wasn't there" before Nisur Square.  8/11/14 PM Tr. 65-66.

During his inspection, Hill also saw radiator fluid in a "very odd place" under the hood.  8/8/14 Dep. Tr. 55-56.  When he filled the radiator, fluid started

---

[24] 7/1/14 PM Tr. 103-04 (Murphy); 7/7/14 PM Tr. 47 (Gehrsitz); 7/14/14 PM Tr. 114 (Frost); 7/22/14 AM Tr. 71-72 (Chuck Pearson); 7/29/14 AM Tr. 14 (Watson); 8/5/14 PM Tr. 63 (Krueger); 8/6/14 AM Tr. 105 (Rhodes); 8/11/14 PM Tr. 67 (Randall); 8/18/14 PM Tr. 16 (Dustin Hill).

T.J. Hill also opined, based on his experience repairing vehicles damaged by gunfire, that the marks were bullet impacts.  8/8/14 Dep. Tr. 53.  The district court excluded this testimony.  *See* 8/19/14 PM Tr. 3-19.

"shooting" in a solid stream out of a five millimeter hole in the radiator. *Id.* at 56-58; *see also* DX2490 (diagram drawn by Hill).

Hill also observed a "round strike" on the front differential, which had "lines in it, like something left some residue behind." 8/8/14 Dep. Tr. 77-78.[25] Hill used a rod to see if there was a viable ricochet trajectory from the differential strike to the radiator hole, and it "lined up." *Id.* at 84; *see* DX2460-DX2465 (photos).[26] Government investigators confirmed the differential strike (*see* GX8522-24, GX8527) and trajectory to the radiator hole (*see* GX8541, 7/23/14 AM Tr. 60 (Thomas O'Connor)), suggesting an incoming bullet ricocheted into the radiator. That trajectory was consistent with a round fired from a grassy area southwest of the circle, where State Department investigators found eight AK-47 shell casings days after the incident. *See* GX7996 at 19-20 (Item 10, casings in grass area).

The prosecution hypothesized that the impact marks and radiator hole were all caused by "blowback" fragments from a Raven 23 grenade. But Rhodes saw radiator fluid leaking "almost immediately" after the first shots fired, "well before"

---

[25] Hill testified he believed the differential mark was a bullet strike, 8/8/14 Dep. Tr. 80, but the court excluded this testimony as well. 8/19/14 PM Tr. 19.

[26] Hill also testified (8/8/14 Dep. Tr. 46, 50) that Liberty was in the motor shop during this inspection—contrary to Ridgeway's testimony that Liberty was walking away with him and at that time told Ridgeway he had shot out of his driver's-door porthole during the incident. 7/31/14 AM Tr. 43-44; 7/30/14 PM Tr. 73-74.

any grenades detonated.  8/16/14 AM Tr. 80-81, 92.  Similarly, the grenades

exploded "well before" Randall saw paint splatter from bullets hitting the truck's

side.  8/11/14 PM Tr. 55.  Moreover, government-tested grenade fragments were

minuscule:  barely three millimeters across, half the size of a Tic-Tac.  GX6038,

GX60-Q91.  The fragments were too small to have caused either the side impacts

or the differential strike.  The impact marks were distinct, round, and far apart, and

looked nothing like splattered grenade fragment damage.  *Compare* GX8811

(fragmentation pattern from FBI test fire) *with* DX2457 (impacts on command

vehicle).

### 2.    Evidence Collected Near Nisur Square

There was no forensic crime scene investigation in Nisur Square.  One of the

first responders, U.S. Army Captain Peter Decareau, photographed eight AK-47

shell casings directly behind the bus stop south of Nisur Square—the "shack"

Vargas described from which individuals were firing at the convoy.  *See* DX2413;

DX2414 (photos of casings).  No physical evidence was collected by any U.S.

government personnel on scene.

Dozens of Iraqi police and Iraqi army personnel swarmed Nisur Square

immediately after the incident.  *See, e.g.*, DX2489; GX3575.  An Iraqi traffic

policeman testified the Iraqi National Police collected four pillowcase-sized bags

of shell casings without documenting or photographing their locations.  6/23/14

AM Tr. 44-45; 6/23/14 PM Tr. 69-70 (Sarhan Monem).

32

Four days after the incident, State Department investigators collected
evidence from around Nisur Square, including three AK-47 casings near the bus
stop, 7/24/14 PM Tr. 91-92 (David Farrington), an AK-47 casing further south, *id.*
at 96, and eight AK-47 casings from a grassy area southwest of the circle.  *Id.* at
96-100; *see also* GX7996 (photos of areas where casings were collected).  The
eight AK-47 casings behind the bus stop, photographed by Captain Decareau
immediately after the incident, were no longer there.  7/24/14 PM Tr. 101-105
(Farrington).  The Iraqi National Police never gave those AK-47 casings or any
other evidence to the State Department.  *Id.* at 105.  During their search, State
Department agents expressed concern that Iraqi personnel were picking up
evidence before it could be collected.  7/24/14 PM Tr. 83 (Farrington).

The FBI did not search Nisur Square until a month after the incident.
8/16/14 PM Tr. 24 (O'Connor).  The FBI collected numerous cartridge casings
consistent with AK-47 machine guns and Dragunov sniper rifles (typical insurgent
weapons).  7/23/14 PM Tr. 20-36 (O'Connor); *see* GX8006-A.  The Iraqi National
Police gave the FBI a few items of physical evidence, but no AK-47 casings or
bags of shell casings.  *See* 8/6/14 PM Tr. 34, 74-76 (O'Connor).

The FBI obtained certain cars that had been shot and collected bullet and
metal fragments from them.  Because the cars had all been moved from Nisur
Square, 7/23/14 PM Tr. 65-66 (O'Connor), the FBI's attempted trajectory analysis

33

could not link any bullet hole or trajectory to any particular source, 7/14/14 AM
Tr. 34-35 (Douglas Murphy).

### 3.    Lack of Forensics

The forensic evidence did not show that any Defendant shot any particular
victim.  FBI forensic examiner Brandon Giroux could not match any bullet or
fragment to any specific weapon.  *See* 8/7/14 PM Tr. 22; GX9051; GX9054-
GX9061, GX9064-GX9066.  From the shell casings the FBI obtained from the
Iraqis, Giroux matched five to Slough's M-240 machine gun, four to Ridgeway's
rifle, one to Heard's rifle, and one to Slough's rifle.  GX9052; GX9053.  Giroux
matched one of two grenade casings to Slough's weapon, and could not match the
other.  *See* 8/7/14 AM Tr. 45; GX9053; GX8002 (seized weapon inventory).

Of the 34 casings collected by the FBI, Giroux matched two to a machine
gun from the fourth vehicle.  8/7/14 AM Tr. 62-63; GX9050; GX8002.  He
determined that fifteen casings were consistent with an AK-47 rifle, and four
casings were consistent with a Russian Dragunov sniper rifle.  GX9050.  These
casings could not have been fired by any of the Raven 23 firearms.  8/7/14 PM
Tr. 26-27.  Giroux could not match the remaining casings to any weapon.
GX9050; *see also* 8/7/14 AM Tr. 47-56.

Though no forensic evidence linked any Raven 23 member to a particular
shot, the government claimed in its rebuttal closing argument that forensics proved
Slough killed the child victim at issue in Count Four.  8/28/14 PM Tr. 83.  Giroux

34

testified that a bullet core fragment recovered from the rear seat of the blue Suzuki where the child was sitting was consistent with an M993 cartridge, a "black-tipped" armor-piercing round that can be fired by an M-240 machine gun.  8/7/14 AM Tr. 77-78.   Giroux could not match this core fragment to any specific firearm.  8/7/14 PM Tr. 39.  The government told the jury that Slough was the only individual firing an M-240 who was positioned to fire this shot.  8/28/14 PM Tr. 83 (rebuttal).

Contrary to its argument, the government possessed evidence not elicited at trial proving Slough did not fire the round recovered from the Suzuki.  Giroux's forensic reports showed each of the five casings matched to Slough's M-240 had a NATO-affiliated headstamp *not* associated with an M993 round.  R.765 at 21 & n.9 (citing R.765-11, at 35, 81).  Moreover, the two casings Giroux matched to a machine gun used by the fourth vehicle[27] had a headstamp associated with a Swedish company that manufactured M993 ammunition.  R.765-11, at 54.  Thus, Slough fired different ammunition from his machine gun than the core fragment found in the Suzuki.  The Court denied without explanation Slough's request for a curative instruction based on this false or misleading argument, made for the first time in rebuttal when Slough had no opportunity to respond.  9/2/14 AM Tr. 10-16.

---

[27] The weapons seizure form identified two machine guns associated with the fourth vehicle but did not match either weapon to a particular turret in that vehicle.  GX8002.

### E.    The Government's Incredible Theory of a One-Sided Massacre

The government maintained the incident began when Slatten, without warning or provocation, shot the Kia's driver in the head, killing him instantly.[28] The government further claimed that the ensuing shooting was a one-sided massacre, with Raven 23 taking no incoming gunfire and facing no threats. No credible evidence supported these claims.

### 1.    Jeremy Ridgeway Changed His Testimony Under Pressure

Ridgeway testified under a cooperation agreement that he perceived no incoming gunfire or threats. 7/31/14 AM Tr. 40, 62-63. This testimony contradicted the version of events Ridgeway had maintained *for years*, before the government pressured him into changing his story.

The day after the incident, Ridgeway told his father he and his colleagues did "nothing wrong" in Nisur Square. 7/31/14 AM Tr. 83-85; DX4100R. The next day, Ridgeway submitted a sworn statement to State Department investigators in which he described returning fire at various threats, including a white sedan driving at the convoy and muzzle flashes. 7/31/14 AM Tr. 79-82; DX220.

In summer 2008, Ridgeway learned he was a target of the investigation, and the charges could include a firearms offense with a 30-year mandatory minimum.

---

[28] As set forth in Slatten's separate brief, which Defendants adopt under Rule 28(i), there was insufficient evidence for a reasonable jury to have concluded Slatten murdered the Kia's driver.

7/31/14 AM Tr. 89-92.  This caused Ridgeway "great concern" and led him to seek

a resolution.  *Id.* at 91-93.  Ridgeway's attorney wrote to the prosecutors that

Ridgeway "conducted himself honorably, courageously, and responsibly at every

point during the [i]ncident," and "did nothing wrong."  DX1025.  The same letter

stated that seconds after firing defensively at the Kia—a suicide VBIED threat—

"members of Raven 23 began receiving machine gun fire from multiple directions,

which threatened the entire convoy and posed an especially lethal risk to the seven

turret gunners," and thereafter "[a] deadly two-way firefight ensued."  *Id.*

     During an ensuing proffer session, Ridgeway said he followed the rules and

returned fire at real threats, including the approaching Kia and muzzle flashes

7/31/14 PM Tr. 7-8.  He said the muzzle flashes came from a person firing a

machine gun at the convoy from a prone position.  8/4/14 AM Tr. 50-51.  The

government rejected his exculpatory proffer, and insisted Ridgeway plead guilty or

face the 30-year mandatory minimum and other charges.  7/31/14 PM Tr. 10.

     Ridgeway pled guilty in November 2008 to one count of voluntary

manslaughter for killing the Kia's passenger, and one count of attempted

manslaughter for shooting the Celebrity's driver.  *See* GX497-I; GX9936-B.  In

exchange, the government did not charge the 30-year firearms offense or any other

offense, capped Ridgeway's exposure at 10 years for manslaughter and 7 years for

attempted manslaughter, stipulated to a 78-month Guidelines high end, and agreed

to move for downward departure if Ridgeway provided substantial assistance. 7/31/14 PM Tr. 17-21; GX497I.  Ridgeway's negotiated factual proffer stated his use of deadly force was not objectively reasonable, but said nothing about Ridgeway's subjective beliefs.  DX2293.

In post-plea cooperation meetings, Ridgeway continued to describe the incoming gunfire.  7/30/14 AM Tr. 60; 7/31/14 PM Tr. 37.  Eventually, prosecutors told Ridgeway they did not believe him, and "pressured" him.  7/31/14 PM Tr. 44.  This pressure "play[ed] a role" in Ridgeway's decision to do a "180" and supposedly "come clean" by saying he had seen no incoming gunfire or muzzle flashes.  *Id.* at 41, 44-45.  At trial, Ridgeway agreed this was a "major change in [his] story" that was "more incriminating" for Defendants.  *Id.* at 47.

Ridgeway faced "no consequences ... whatsoever for lying to the FBI and the prosecutors after [he] pled guilty."  *Id.* at 46.  The government did not hold him in breach of his agreement, prosecute him for false statements, obstructing justice, the 30-year firearms charge, or any other offense in Nisur Square, or increase his sentencing exposure, though they had the power to do all those things.  *Id.* at 45-46.

Even after he changed his story, Ridgeway gave conflicting information about incoming gunfire.  Shortly after the incident, Ridgeway applied for and obtained financial benefits as a result of post-traumatic stress disorder caused by

38

the Nisur Square incident, which he described as an "intense firefight, engaged several active threats under fire."  8/4/14 AM Tr. 54-57 (Ridgeway); DX4109R.  In a 2010 civil deposition not attended by the prosecutors, Ridgeway testified that this description of the incident as a "firefight" was truthful.  8/4/14 AM Tr. 60-66.

Ridgeway was also discredited in other ways, including his general discharge from the Army for a "pattern of misconduct," 7/31/14 AM Tr. 65-66, and his admitted lies in his Blackwater job application, where he grossly exaggerated his military service, and falsely concealed his treatment for post-traumatic stress disorder.  *Id.* at 69-72, 76-77.

In closing argument, the prosecution distanced itself from Ridgeway by describing him as a mere "corroborative witness" and inviting the jury to "scuttle" his testimony altogether.  8/27/14 AM Tr. 40; 8/28/14 PM Tr. 97.

### 2. Raven 23 Members Murphy, Mealy and Frost Could Not See Threats to the South

The government relied on three turret gunners in the first and second vehicles—Mark Mealy, Matthew Murphy and Adam Frost—who testified they did not see anyone shooting at the convoy.  They, however, had different viewpoints than Defendants, and were unable to see the threats.

The four-truck convoy was arrayed along the southern portion of Nisur Square, spanning two roads to the south—one exiting and one entering the circle.  *See* GX8006.  These roads were separated by a tree-lined median with heavy

39

vegetation, a large billboard, and a police kiosk at the traffic circle. *See* DX3992, DX3997, DX2043 (photos). Vehicles one and two were at the intersection of the outgoing road and the circle; vehicles three and four were in front of the incoming road. *See* GX493B (Murphy's illustration).

Most of the shooting was from vehicles three and four, and was directed principally at the Kia on the incoming road and the bus stop located roughly 150 meters behind it to the south. GX7996 at 6. The billboard and vegetation in the median obstructed the views from vehicles one and two (where Mealy, Frost and Murphy were) to the incoming road to the south. *See, e.g.*, 8/5/14 PM Tr. 38 (Krueger); 8/18/14 PM Tr. 36 (D. Hill); DX3992, DX3997 (photos). Likewise, individuals in cars to the south could only see one or two of the trucks in the circle, and trees in the median blocked their view of the others. *See, e.g.*, 6/19/14 AM Tr. 36 (Kinani).

Government witnesses acknowledged that in a fast-moving, threat-filled event like a firefight, individuals situated close together can perceive events very differently. Frost described the "adrenaline dump" that occurs during a gunfight, which can interfere with hearing, cause tunnel vision, and lead to time distortion. 7/15/14 PM Tr. 8-9. Frost and team medic Kevin Rhodes testified that people within feet of each other may not see the same things. 7/15/14 PM Tr. 9 (Frost); 8/6/14 AM Tr. 77 (Rhodes). Rhodes agreed that "someone could pop out, pose a

40

threat, be taken out or neutralized and disappear from sight." *Id.* at 78-79. As an

example, Mealy, lead turret gunner in the first vehicle, saw his rear turret gunner,

Donald Ball, fire at the Kia. 7/15/14 PM Tr. 101, 104. Murphy and Frost,

stationed yards away atop the second vehicle, never saw or heard Ball fire. 7/1/14

PM Tr. 139 (Murphy); 7/15/14 AM Tr. 56-57 (Frost). Nor did Dustin Hill, who

was located inside Ball's vehicle. 8/18/14 AM Tr. 95 (Hill).

### 3.    Iraqi Witnesses

The government also relied on Iraqi witnesses' failure to perceive gunfire

directed at the convoy. But virtually all of those witnesses took cover, and were

not in a position to see threats. Iraqi witnesses were also clearly mistaken about

sources of gunfire, as several described helicopters shooting overhead,[29] when in

fact none of the helicopter gunners fired their weapons.[30]

## SUMMARY OF ARGUMENT

1. <u>MEJA</u>:  Defendants are entitled to a judgment of acquittal on all counts

because the Military Extraterritorial Jurisdiction Act ("MEJA") does not apply.

MEJA allows federal prosecution of extraterritorial conduct committed "while

employed by ... the Armed Forces outside the United States."  18 U.S.C.

---

[29] *See* 7/7/14 AM Tr. 58, 61-62 (Wisam Raheem Fliah Hasan Al-Miri);
7/9/14 PM Tr. 30 (Jasim Mohammad Lamloon Alhuraishi); 7/9/14 PM Tr. 68-69
(Adil Ali Mahdi Al-Azawi); 7/17/14 PM Tr. 30-31 (Abdul Wahab Abdul Qader
Abdulwahab); 7/30/14 AM Tr. 24-27 (Salman).

[30] *See, e.g.,* 7/7/14 PM Tr. 18 (Gehrsitz).

§ 3261(a)(1).  Non-Defense Department contractors are so employed only "to the extent such employment relates to supporting the mission of the Department of Defense overseas."  18 U.S.C. § 3267(1)(A)(ii)(II).  As a criminal statute, MEJA's definition governing non-Defense Department contractors must be construed strictly, and the scope of such individuals' contract employment is determined by examining their contracts.  Defendants were State Department contractors providing diplomatic security—a core State Department statutory responsibility unrelated to any Defense Department mission.  They were not "employed by the Armed Forces" under MEJA.

    Even if the Court could look outside the contracts, the statutory terms "*while* employed by ... the Armed Forces" and "*to the extent* such employment relates ..." limit MEJA to specific charged conduct related to supporting the Defense Department's mission.  On September 16, 2007, when Defendants attempted to secure a safe return for a U.S. diplomat, they were performing a core State Department function in no way related to the Defense Department's mission.

    The government's principal arguments for satisfying MEJA were legally erroneous and rendered these statutory limitations meaningless.  The government argued that the State and Defense Departments worked as "one team" in support of the United States' "one mission," and that the State Department's use of Blackwater contractors to fulfill its diplomatic security responsibility allowed an

42

Army unit that had been providing such security to resume military missions. These overreaching theories render MEJA's textual limits superfluous, and would make every federal employee and contractor in any country where the U.S. military conducts operations "employed by the Armed Forces." Because the government failed as a matter of law to prove Defendants were "employed by the Armed Forces," Defendants are entitled to acquittal.

At a minimum, Defendants are entitled to retrial by a jury correctly instructed on MEJA. The court refused to instruct the jury on MEJA's express limiting terms or on the State Department's statutory responsibility to provide diplomatic security. These fundamental instruction errors denied Defendants fair and informed consideration by the jury on the critical, dispositive issue of whether they were "employed by the Armed Forces."

2. <u>New Trial Based on Witness Perjury</u>: Defendants are entitled to a new trial based on a key witness's sentencing statement showing he perjured himself at trial. The witness, an Iraqi police officer, testified at trial that the Kia's driver was killed by the first shots fired, causing the Kia to roll slowly forward, and that after approaching the car and seeing its driver dead, he ran in front of the convoy, holding up his hands and telling them to stop firing, then ran back to the Kia and walked slowly alongside it, trying to extract its passenger. The government highlighted his testimony again and again to argue the Kia driver's unprovoked

43

death began the incident, and the officer's actions showed Defendants the Kia was no threat.

At sentencing, the officer submitted a statement (unsolicited by the defense) telling a very different story:  that he remained in his traffic kiosk, rooted by fear and unable to move or act, and that from that vantage point he witnessed the Kia's driver trying to get his mother out of the car, while they held one another fearing for their lives—proving the driver *was alive after gunfire began, and was not killed by an unprovoked ambush as the government argued*.  This statement, supported by strong indicia of reliability, eviscerated the government's entire theory of the case, not only as to the killing of the driver, but as to whether the Kia was an apparent threat—the crucial predicate for all that followed.

The government reacted quickly, telephoning the witness in Iraq, then giving the court a one-page memorandum stating the officer told them he did not understand his sentencing statement to be "investigative" or "factual," but intended it as an "expression," in which he tried to "imagine" what the Kia's driver experienced.  This obvious evasion bore no resemblance to the sentencing statement, which was a vivid, detailed narration of witnessed events.  The district court adopted the officer's explanation, characterizing the sentencing statement as a "work of fiction" employing "omniscient third-person narration."  The court's speculative effort to reconcile the statement with the trial evidence was clearly

44

erroneous, and its denial of Defendants' new trial motion without a hearing was an abuse of discretion.

3. <u>Venue</u>:  Defendants are entitled to acquittal because the government failed to prove proper venue under 18 U.S.C. § 3238.  The evidence was insufficient to find either that cooperator Jeremy Ridgeway was a "joint offender" with Defendants as to all counts or that Ridgeway was "arrested" in this District "in connection with the offenses charged."  At a minimum, a new trial is required because the district court refused to submit venue to the jury despite disputed factual issues.  That omission violated both Circuit precedent and the Constitution.  Alternatively, dismissal is warranted because the government improperly manufactured advantageous venue in this District, in violation of Due Process.

4. <u>Insufficiency of Evidence (Liberty)</u>:   There was no evidence upon which a rational trier of fact could convict Liberty of the charged offenses.  There was no evidence that Liberty fired in the direction of any alleged victims, caused any of their deaths, or intended to commit manslaughter against any of them.  There was also no evidence showing Liberty knew anyone else was shooting unjustifiably at any alleged victim or that Liberty knowingly did any act intending to aid that crime, or that he knew in advance that any crime was to be committed.

5. <u>30-Year Mandatory Minimum</u>:   The imposition of mandatory thirty-year sentences under 18 U.S.C. § 924(c), based solely on the nature of the government-

issued weapons Defendants used defensively in a war zone, was unconstitutionally rigid and grossly disproportionate, in violation of the Eighth Amendment.  The sentences were grossly disproportionate because Defendants were *required* to carry and use those weapons to perform their protective responsibilities.  The mandatory nature of the sentences unconstitutionally prevented consideration of unique mitigating offender characteristics present in this case.

## ARGUMENT

## I.    The Military Extraterritorial Jurisdiction Act Does Not Apply Because Defendants Were Not "Employed by the Armed Forces"

This prosecution should never have been brought, since the offenses charged do not reach Defendants' conduct in Iraq.[31]  The government's only hook for reaching overseas conduct is the Military Extraterritorial Jurisdiction Act ("MEJA"), which extends certain federal criminal laws to conduct committed "while employed by ... the Armed Forces outside the United States."  18 U.S.C. § 3261(a)(1).  On its face, MEJA does not apply.  As State Department contractors aiding the State Department's statutory diplomatic security mission, Defendants were not "employed by the Armed Forces" under MEJA.

---

[31] The manslaughter and attempted manslaughter statutes apply only "within the special maritime and territorial jurisdiction of the United States," 18 U.S.C. §§ 1112(b), 1113, and the territorial reach of the firearms statute is derivative of the predicate offense.  *See* 18 U.S.C. § 924(c)(1)(A).  That jurisdiction does not include foreign nations.  *See* 18 U.S.C. § 7; *see also United States v. Bowman*, 260 U.S. 94, 98 (1922).

The overwhelming governmental consensus after Nisur Square was that MEJA did not permit prosecution here.  Both the State and Defense Departments stated that Defendants' provision of diplomatic security under State Department contract did not relate to supporting the Defense Department's mission in Iraq. The Secretary of State's Panel on Personal Protective Services in Iraq found no "basis for holding non-Department of Defense contractors accountable under U.S. law." R.34-24, at 5 ¶¶4, 6.[32]  Deputy Defense Secretary Gordon England wrote members of Congress, expressing the Defense Department's view that "these private security contractors were not engaged in employment supporting the DoD mission overseas."  R.56-3, at 4 (letter to then-Sen. Obama).[33]

That view was shared by the House Judiciary Committee and sixteen House co-sponsors of legislation to expand MEJA to reach non-Defense contractors[34];

---

[32] *See also* R.56-12, at 11 (Secretary of State Rice testifying, "there is a lacuna in our law about this").

[33] *See also* R.56-4, at 3 (expressing same view to Rep. David Price).  After Defendants' indictment, the Defense Department reaffirmed that "the views in the letter [to Rep. Price] remain the view of the Defense Department."  R.56-16, at 2.

[34] *See* R.56-11, at 5 (H.R. Rep. 110-352, at 4, reporting on the MEJA Expansion and Enforcement Act of 2007) (finding many contractors in Iraq "are not contracted through the Defense Department, but through other agencies such as USAID or the Department of Interior, and they do not work directly in support of Defense Department missions," and that "these contractors are not subject to any applicable law imposing criminal liability").

47

Senator Leahy, who sponsored the legislation in the Senate[35]; and then-Senator Obama.[36]  Even the Department of Justice acknowledged MEJA's limits, in thinly-veiled congressional testimony that precisely described this case:

> MEJA leaves significant gaps in our enforcement capability....
> For example, a civilian Government contractor whose
> employment is unrelated to the mission of the Department of
> Defense—but is related to the mission of another U.S.
> Government agency—cannot currently be prosecuted under
> MEJA .... [37]

Despite these widely-understood limitations, the government prosecuted Defendants under a theory that was defective from the start, and convinced the trial court to give erroneous jury instructions that ignored MEJA's statutory limits.

Properly read, MEJA does not support Defendants' convictions.

---

[35] *See* R.56-13, at 2 (Sen. Leahy announcement) ("Currently, only workers contracted by the Department of Defense or working in support of their mission are subject to MEJA," and the Nisur Square incident "exposed [a] jurisdictional gap in MEJA").

[36] *See* R.56-15, at 2 (Obama campaign announcement) ("MEJA says that contractors for the armed forces can be prosecuted under US law ....  However, because companies like Blackwater have contracts with the State Department rather than the Defense Department, the company is not technically subject to that law.").

[37] *Holding Criminals Accountable:  Extending Criminal Jurisdiction for Gov't Contractors & Emps. Abroad:  Before the S. Comm. on the Judiciary*, 112th Cong. 1-2 (2011) (Statement by Lanny A. Breuer, Assistant Attorney General Lanny Breuer), http://www.judiciary.senate.gov/imo/media/doc/11-5-25%20Breuer%20Testimony.pdf (last visited Jan. 30, 2016).

## A.    Standard of Review

Statutory interpretation questions are reviewed *de novo*. *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014). The trial court's denial of a motion for judgment of acquittal is likewise reviewed *de novo*, considering whether the evidence in the light most favorable to the government is sufficient to permit a rational trier of fact to find all essential elements of the crime beyond a reasonable doubt. *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001). Though factual determinations receive deference, if they rest on an erroneous view of the law, the judgment should be reversed. *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011) (citations omitted).

## B.    MEJA Must Be Construed Strictly

Statutory interpretation begins with the text, and where the text is clear, "ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008). "[W]here ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (citation omitted); *accord Villanueva-Sotelo*, 515 F.3d at 1237.

From the time of the founding, criminal laws have been construed strictly. *See United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.). The rule is founded on concern for individuals' rights, "and on the plain principle that ... [i]t is the legislature, not the Court, which is to define a crime." *Id.*

49

That a certain alleged ill may be *similar* to what Congress has proscribed does not make it punishable, if Congress did not include it in the statute. *See Wiltberger*, 18 U.S. (5 Wheat.) at 95-96. Courts may not extend a criminal statute "simply because it may seem ... that a similar policy applies, or upon the speculation that if the legislature had thought of it, very likely broader words would have been used." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). Instead, individuals may be punished only under the law as it is written at the time of their conduct—not according to what the government or a court later decides the law should be. *See McNally v. United States*, 483 U.S. 350, 360 (1987).

## C.   MEJA Applies to Non-Defense Department Contractors Only in Limited Circumstances

MEJA narrowly extends the reach of criminal laws applicable within the special maritime and territorial jurisdiction of the United States (*see* 18 U.S.C. § 7) to cover conduct committed "while employed by or accompanying the Armed Forces outside the United States." 18 U.S.C. § 3261(a)(1). "The term 'employed by the Armed Forces outside the United States' means" a civilian employee or contractor of:

> (I) the Department of Defense ...; or
>
> (II) any other Federal agency ... *to the extent such employment relates to supporting the mission of the Department of Defense* overseas ....

18 U.S.C. § 3267(1)(a)(i), (ii), (iii) (2006) (emphasis added).

50

MEJA thus requires, for all contractors, a direct link between the

contractor's work and the Defense Department.  Defense Department contractors

are always within MEJA's scope.  § 3267(1)(A)(ii)(I).  Non-Defense contractors,

however, are "employed by the Armed Forces" only "*to the extent such*

*employment* relates to supporting the mission of the Department of Defense

overseas . . . ." § 3267(1)(A)(ii)(II) (emphasis added).

This requirement should not be surprising, given the statute's title—the

*Military* Exterritorial Jurisdiction Act—and its operative term, "employed by the

Armed Forces."  *See Almendarez-Torres v. United States*, 523 U.S. 224, 234

(1998) (statute's title and heading may aid interpretation); *Bond v. United States*,

134 S. Ct. 2077, 2091 (2014) ("In settling on a fair reading of a statute, it is not

unusual to consider the ordinary meaning of a defined term ...."); *Villanueva-*

*Sotelo*, 515 F.3d at 1243 ("We begin with section 1028A's title:  'aggravated

identity theft.'").  There was nothing military, or military-related, about

Defendants' work guarding State Department personnel.

### D. Defendants' Contract Employment to Provide Diplomatic Security Did Not Relate to Supporting the Defense Department's Mission

Defendants' employment as State Department contractors supported the

State Department's statutory mission to provide diplomatic security.  *See* 22 U.S.C.

§ 4802(a).  As contractors of a non-Defense agency, Defendants could be

51

considered "employed by the Armed Forces" under MEJA only "*to the extent such employment* relate[d] to supporting the mission of the Department of Defense" in Iraq. 18 U.S.C. § 3267(1)(a)(ii)(II) (emphasis added). "Such employment" refers to their *contract employment*. *See id.* ("employed as ... a contractor (including a subcontractor ...) of ... a [non-Defense] Federal agency").[38]

To determine the scope of an individual's employment as a government contractor, courts look to the governing contracts. *See, e.g.*, *Saleh v. Titan Corp.*, 580 F.3d 1, 9-10 (D.C. Cir. 2009) (in determining whether contractor qualifies for "government contractor defense" to tort liability, court looks to contract's statement of work to see whether it specifies manner of performance, or only required results).[39] Indeed, the regulation that requires federal contractors operating overseas to notify their personnel of potential MEJA coverage focuses *exclusively* on the contracts:

---

[38] *See, e.g., Middle South Energy v. FERC*, 747 F.2d 763, 768 (D.C. Cir. 1984) ("[T]he use of the iterative adjective 'such' indicates that this language is understandable only by reference to the sole prior reference in [the statute]."); *Nieves v. United States*, 160 F.2d 11, 12 (D.C. Cir. 1947).

[39] *Accord*, *e.g.*, *Logue v. United States*, 412 U.S. 521, 526-28 (1973) (in deciding whether contractor is government agent for tort liability, critical determinant is contract's provisions regarding government's authority to control performance); *Wood v. Standard Prods. Co.*, 671 F.2d 825, 829 (4th Cir. 1982) (under *Logue*, "the contract and its terms" are "critical"); *Williams v. United States*, 50 F.3d 299, 301-03, 305-07 (4th Cir. 1995) (collecting cases).

(3)  The Contractor shall notify all [non-host-country personnel] that:

(i)  If this contract is with the Department of Defense, or ***the contract*** *relates to supporting the mission of the Department of Defense outside the United States*, such employees ... may potentially be subject to the criminal jurisdiction of the United States [under MEJA].

48 C.F.R. 52.225-19(e)(3)(i) (eff. Mar. 31, 2008) (emphasis added).

Here, the relevant contracts provide *no support* for the government's theory that Defendants' employment related to supporting the Defense Department's mission.  Defendants were employed under the State Department's Worldwide Personal Protective Services II ("WPPS II") contract, in which the State Department hired private security contractors to help provide armed diplomatic security worldwide.  *See* DX700-006 (Statement of Work).  That mission—"to provide for the security of United States Government operations of a diplomatic nature," is, by law, the State Department's responsibility.  *See* 22 U.S.C. § 4802(a)(1), (2)(B)(i) (discussed in Subsection H.2, *infra*).  Because the Bureau of Diplomatic Security lacked enough agents to provide security in areas made dangerous by "conflicts, wars, political unrest, and ... terrorist activity," the State Department hired private contractors through the WPPS II contract to perform those responsibilities.  DX700-006, § C.1.2.

In 2007 Blackwater provided diplomatic security in Baghdad under WPPS II Task Order 6.  Blackwater's contractors supported the State Department's

53

diplomatic security mission, under the operational control of the State

Department's Diplomatic Security Service:

> DS [Diplomatic Security] has set up and is operating a large
> protective services operation in Iraq to provide for the personnel
> [sic] protection and safety of the U.S. Embassy in Baghdad, Iraq,
> Regional Embassy Offices and State Embedded Sites, with this
> Task Order specifically covering Baghdad ....  This contingent is
> comprised of experienced, specially trained contractors *working
> under the direction of DS Special Agents from the Regional
> Security Office (RSO) and under the auspices of the Department
> of State ....*

DX702 at 9, ¶6.0 (emphasis added).  The State Department contracted Blackwater

to protect:

> (1) U.S. Embassy non-government and government personnel
> supporting official U.S. government business, (2) individuals or
> groups who are directly supporting development or reconstruction
> for or in conjunction with the U.S. Agency for International
> Development and (3) personnel under Chief of Mission authority,
> upon RSO request.

*Id.* at 8, ¶5.0.  Defendants' subcontracts (GX9845, GX9865, GX9885, GX9913)

specified they were engaged "in support of the US Department of State Diplomatic

Security Mission Contract"—a reference to the WPPS II and Task Order 6.  *E.g.*,

GX9865 at 13 (Sched. A ¶1).

The contracts leave no ambiguity.  Their scope of work is focused entirely

on supporting the *State Department's* statutory mission to provide diplomatic

security.  No Defense Department mission is mentioned.  Defendants thus were not

"employed by the Armed Forces," and are entitled to acquittal.

### E.    Even if the Court Could Look Outside the Contracts, the Government Failed to Prove That the Charged Conduct Related to Supporting the Defense Department's Mission

Even if the Court could look outside the contracts to define the scope of Defendants' employment, the facts on the ground only confirm what is in the contracts.  Defendants were performing a core State Department function in Nisur Square when they attempted to secure a safe return route for an attacked U.S. diplomat.  *See* GX9801 at 5.  They were acting under Embassy, not military, supervision, and were not participating in any military operation or supporting any Defense Department mission.

Deputy Secretary of Defense Gordon England testified that Blackwater's contractual obligation to provide diplomatic security was not part of the Defense Department's mission in Iraq, 8/21/14 AM Tr. 21-22, but rather was the State Department's responsibility.  *Id.* at 22.  Military commanders in Baghdad did not give orders to State Department contractors, nor did they direct the State Department's diplomatic security missions.  *Id.* at 24.  In the limited instances where soldiers provided security to diplomatic missions, the Defense Department lent people to do the State Department's mission—not the other way around.  *See id.* at 22-23, 50, 71, 83 ("[W]e were supporting the Department of State mission, they were not supporting the DOD mission.").  Deputy Secretary England confirmed the position he expressed after the Nisur Square incident:  that "these

55

private security contractors were not engaged in employment supporting the DOD

mission overseas." *Id.* at 35 (quoting DX25); *accord id.* at 39 (quoting DX605).[40]

Similarly, the government elicited from nearly all its Blackwater witnesses

that their diplomatic security mission was protective, not military ("defensive," not

"offensive").[41]  Blackwater contractors answered to the State Department, not the

Defense Department, and operated under State Department use-of-force rules, not

military rules of engagement.[42]  No Blackwater witness described taking orders

---

[40] The Defense Department reaffirmed this view in 2009.  *See* R.56-16, at 2.
A month after Nisur Square, the Secretary of State's Panel on Protective Services
in Iraq confirmed that the Defense Department did not deem diplomatic security
part of its mission.  R.34-24, at 5, Principal Finding No. 6; *see also* R.34-23, at 10-
12 (GAO, *REBUILDING IRAQ:  Actions Needed to Improve Use of Private
Security Providers,* Report to Congressional Committees, GAO-05-737 (July
2005) ("U.S. civilian government agencies ... have had to contract with private
security providers *because it is not part of the U.S. military's stated mission to
provide security to these organizations*.") (emphasis added).  These State and
Defense Department positions were submitted to the district court in support of
Defendants' motions to dismiss, R.34; R.56; R.389, and incorporated by reference
in Defendants' Rule 29 argument, 8/21/14 PM Tr. 18.

[41] *See* 7/22/14 AM Tr. 17-18 (Pearson); 6/30/14 AM Tr. 77 (Murphy);
7/14/14 PM Tr. 36 (Frost); 7/28/14 AM Tr. 40-43 (Watson); 7/30/14 PM Tr. 16
(Ridgeway); 8/4/14 PM Tr. 125-26 (Krueger); 8/11/14 AM Tr. 13-14 (Randall);
8/18/14 AM Tr. 95 (D. Hill); 8/18/14 PM Tr. 43 (Gosiewski); 8/6/14 AM  Tr. 14
(Rhodes).

[42] *See* 7/22/14 AM Tr. 46-50 (Pearson); 6/30/14 AM Tr. 84-85 (Murphy);
7/1/14 PM Tr. 9-10, 46-47 (Murphy); 7/15/14 AM Tr. 11 (Frost); 7/30/14 PM
Tr. 21 (Ridgeway); 8/6/14 AM Tr. 90 (Rhodes).

from the military or engaging in missions to combat or capture insurgents at any

time, much less on September 16, 2007.

### F.    The Government's MEJA Arguments Contravene the Statute's Text and are Legally Insufficient to Support Conviction

The government's principal MEJA arguments rendered meaningless the

statute's express limitations.  First, the government argued the State and Defense

Departments worked "seamlessly" as "one team" with "one mission," to rebuild

Iraq.  8/27/14 AM Tr. 101-02 (summation).  Second, the government argued that

after Blackwater began providing State Department security, an Army unit that had

previously escorted State Department employees was able to reallocate its

resources to its military mission.  *Id.* at 102-103; 8/21/14 PM Tr. 54 (Rule 29

opposition); 8/28/14 PM Tr. 49 (rebuttal).[43]   The prosecution characterized this

argument in closing as "consistent with the one mission you just heard about.  One

team, one mission."  8/27/14 AM Tr. 102.  These broad arguments rendered

meaningless MEJA's express limitations on application to non-Defense

Department contractors.

All federal agencies are on "the same team" and support the United States'

"one mission."  But MEJA does not apply to *all* federal agency contractors abroad.

By equating the "mission of the Department of Defense" in Iraq to the

---

[43] *See also* 7/8/14 AM Tr. 102-03 (Michael Tarsa); 8/12/14 AM Tr. 73-74 (Decareau).

57

"overarching mission of the United States" there, 8/27/14 AM Tr. 101, the

prosecution eliminated the statute's crucial textual limitation. Under this theory,

*every federal employee and contractor in Iraq* was "employed by the Armed

Forces."

    Similarly, the fact that an Army unit initially escorted diplomatic convoys in

Baghdad, when State Department personnel were unavailable to perform that State

Department function, does not render diplomatic security part of the Defense

Department's mission. As Deputy Secretary England explained, that is an instance

of the military performing the State Department's mission, not the other way

around. 8/21/14 AM Tr. 71. Nor does the fact that the military's resources were

subsequently freed up when the State Department began to perform its own

responsibility (by contracting Blackwater) mean that work "related to supporting"

the Defense Department's mission. Under the same logic, if the Army had staffed

the Embassy mess hall during a personnel shortage, later-hired Embassy food

service contractors would be "employed by the Armed Forces" because they

allowed military employees to resume their normal functions. MEJA does not

sweep so broadly.

    The government also urged that Defendants' employment related to

supporting the Defense Department's mission because *other* Blackwater

contractors, on *other* occasions, took *other* actions to assist the military. *See*

8/21/14 PM Tr. 54-55 (opposition to Rule 29 motion); 8/26/14 AM Tr. 48, 49

(charge conference).  The government relied on the following miscellaneous

actions:

> (a) a Blackwater tasker in the Embassy's Tactical Operation
> Center coordinated with Army personnel to avoid conflict
> between State Department missions and military operations;
>
> (b) Blackwater teams occasionally escorted "Provisional
> Reconstruction Teams" when Army escorts were not available;
>
> (c) Blackwater trained some Army escort security convoys to
> conduct personal security missions; and
>
> (d) if a military unit ran into distress in the Red Zone, a
> Blackwater team supervised by the Embassy would occasionally
> respond to help.

8/27/14 AM Tr. 103-05 (summation); *see* 7/17/14 AM Tr. 27-29, 67 (Juan

Mendoza); 7/15/14 PM Tr. 71-72 (Mealy); 8/21/14 AM Tr. 73-74 (England).  *But*

*see* 7/22/14 AM Tr. 77 (Pearson) (such assistance was "few and far between").

The government urged that MEJA application be determined all-or-nothing:  if any

of these theories showed relation to the Defense Department's mission, Defendants

were covered.  *See* 8/21/14 PM Tr. 53-54 (opposition to Rule 29 motion); 8/27/14

AM Tr. 101-05 (summation).[44]  The government's theories ignore two

unambiguous restrictions in the statute's text.

---

[44] The trial court made no ruling on the sufficiency of the government's legal
theories, allowing all of them to go to the jury.  *See supra* at 9.  The jury's general
verdict (R.669) gave no indication which of the government's theories it accepted.

(Continued …)

59

First, non-Defense contractors are "employed by the Armed Forces" only "*to the extent* such employment relates to supporting the mission of the Department of Defense." 18 U.S.C. § 3267(1)(A)(ii)(II) (emphasis added). "To the extent" is express language of limitation. *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 105 (1993). When Congress uses "these words of limitation," it expressly provides for something "to *some* extent," but not beyond. *Id.* Congress did not state that non-Defense contractors are employed by the Armed Forces "*if*" their employment "relates to supporting" the military—the standard the government urged below. *See* 8/26/14 AM Tr. 49 (charge conference argument). Instead, by covering non-Defense contractors "to the extent" their employment relates to supporting the Defense Department's mission, MEJA reaches those contractors *only in the limited capacities or at those limited times* that the contractor is actually performing such work. *See, e.g.*, *In re Silveira*, 141 F.3d 34, 36 (1st Cir. 1998) ("If Congress intended [the statutory provision] to be an 'all-or-nothing' matter, one might wonder why the provisions' drafters chose to use the connective phrase 'to the extent that,' in lieu of the word 'if,' which obviously would have been a simpler construction.").

---

Thus, if *any* of the government's theories is legally insufficient, the Court must grant a new trial because the government cannot prove beyond a reasonable doubt that the jury convicted on a legally sufficient theory. *See Skilling v. United States*, 561 U.S. 358, 414 & n.46 (2010); *Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 (2008); *United States v. DeFries*, 129 F.3d 1293, 1304-06 (D.C. Cir. 1997).

60

Second, MEJA does not criminalize all extraterritorial conduct *if* a defendant is "employed by the Armed Forces," but only such conduct committed "*while* employed by the Armed Forces outside the United States." 18 U.S.C. § 3261(a)(1). The term "while" works parallel to the "to the extent" limitation in § 3267(1)(A)(ii)(II): the conduct of a non-Defense contractor whose employment relates to supporting the Defense Department's mission only at limited times or capacities falls within MEJA only if it is committed "while" so employed.

This statutory language forecloses the government's expansive arguments. The government argued that because other Blackwater contractors occasionally responded to military units in trouble in the Red Zone, Defendants' employment related to supporting the Defense Department's mission. 8/21/14 PM Tr. 55 (Rule 29 opposition); 8/27/14 AM Tr. 104-05 (summation). But even if those other contractors supported the Defense Department's mission on those limited occasions, they would only be subject to MEJA for crimes committed "while" and "to the extent" they were so employed. At all other times, "while" performing the non-Defense-related security mission required under their State Department contracts, their employment would be outside "the extent" to which it related to supporting the Defense Department's mission, and would not constitute "employ[ment] by the Armed Forces."

61

In Nisur Square, Defendants were performing their core diplomatic security mission:  attempting to secure a diplomat's safe return after a car bomb detonation. That mission, by law, was a State Department responsibility unrelated to supporting any Defense Department mission.  22 U.S.C. § 4802(a)(1), (2)(B)(i). Thus, even if "employ[ment] by the Armed Forces" could be determined based on conduct on the ground, Defendants' conduct in Nisur Square was neither "related to supporting the mission of the Department of Defense," nor committed "while" Defendants were "employed by the Armed Forces."

### G.    Even if MEJA Were Somehow Ambiguous, the Rule of Lenity Would Apply

"[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *United States v. Bass*, 404 U.S. 336, 347-48 (1971).  "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."  *Id.* (citation omitted).  In simplest terms, "the tie must go to the defendant."  *United States v. Santos*, 553 U.S. 507, 513 (2008).

The "crucial inquiry is not whether [the statute] covers [the alleged conduct] ambivalently, but whether it 'plainly and unmistakably' does so."  *Zaimi v. United States*, 476 F.2d 511, 523 (D.C. Cir. 1973) (citation omitted).  Even if the statute's reach *were* ambiguous, the rule of lenity would still require construction in favor of

the defendant.  *See United States v. Granderson*, 511 U.S. 39, 54 (1994); *Ratzlaf v. United States*, 510 U.S. 135, 148 (1994); *Villanueva-Sotelo*, 515 F.3d at 1246.

Thus, to justify extending MEJA to reach Defendants' conduct, the government must establish its reading of MEJA is *unambiguously*, not arguably, correct.  "[W]here text, structure, and history fail to establish that the Government's position is *unambiguously correct*, [this Court] appl[ies] the rule of lenity ...."  *Villanueva-Sotelo*, 515 F.3d at 1247 (quoting *Granderson*, 511 U.S. at 54) (emphasis added, alteration marks omitted).

Even if the government's hodgepodge of theories raised competing plausible interpretations (which it does not), the rule of lenity would still require construing the statute in Defendants' favor.  As set forth above, Defendants' reading of the Act is supported by its text, the ordinary meaning of the term being defined, and the official positions of the State and Defense Departments.  Indeed, the near-unanimous governmental consensus that Defendants' actions did not fall within MEJA, *see supra* at 47-49, confirms the plausibility of Defendants' construction. Where the Court, after consulting the statute's text, context, and history, is left with more than one plausible interpretation, the rule of lenity requires it to adopt the construction favorable to Defendants.

### H.    At a Minimum, Defendants Are Entitled to a New Trial Before a Properly Instructed Jury

At a minimum, Defendants are entitled to a new trial because the district court refused to instruct the jury on the proper standards to determine whether Defendants were "employed by the Armed Forces," and refused to inform the jury, either through instruction or by furnishing a copy of the statute, that diplomatic security is, by law, a State Department responsibility.  *See Hite*, 769 F.3d at 1166 (remanding for new trial because of jury instruction error).

Jury instructions are reviewed *de novo*.  *United States v. DeFries*, 129 F.3d 1293, 1303 (D.C. Cir. 1997).  The Court "must determine whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards."  *Id.* at 1304 (citation omitted).  Because "improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee," *Neder v. United States*, 527 U.S. 1, 13 (1999), it requires a new trial unless the error is harmless beyond a reasonable doubt.  *See id.* at 15 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  To avoid retrial, the government must show it is "beyond a reasonable doubt that the jury's verdict ... was not affected by the erroneous instruction." *Pope v. Illinois*, 481 U.S. 497, 502 (1987); *see United States v. Wilson*, 240 F.3d 39, 44 (D.C. Cir. 1998).  In harmless error review, inferences are *not* drawn in favor of the government.  *See United States v. Law*, 528 F.3d 888, 905 (D.C. Cir.

2008) ("We review the district court's decision not to give the instruction *de novo*, viewing the facts in the light most favorable to [the defendant].").

Because the MEJA instructions were legally flawed, and the error was not harmless beyond a reasonable doubt, Defendants are entitled to a new trial.

### 1.    The MEJA Instruction Was Erroneous

The district court refused Defendants' proposed instruction on MEJA,[45] and adopted the government's proposal instead.[46]  The instruction erroneously omitted several critical points of law under MEJA.

### a.    The court did not instruct on the statute's terms of limitation

The MEJA instruction erroneously omitted MEJA's express terms of limitation:  the charged conduct must be committed "*while* employed by the Armed Forces," § 3261(a)(1), and non-Defense contractors are "employed by the Armed Forces" only "*to the extent*" their contract employment relates to supporting the Defense mission.  *Compare* R.618-2, at 33, last paragraph (Def. Corr. Prop. Instr. 15) *with* R.625, at 34-36 (adopting R.448, at 17-18) (government's proposed instruction) (eliminating any such discussion).[47]

---

[45] R.618-2, at 32 (Def. Corr. Prop. Instr. 15).

[46] *See* R.625, at 34-36 (final jury instructions); R.448, at 17-18 (Gov. Prop. Instr.); 8/26/14 AM Tr. 54 (adopting government's instruction).

[47] Defendants objected at R.618, at 6-7 (written objections); 8/26/14 AM Tr. 45-47, 49-54 (charge conference); and 9/2/14 Tr. 77 (objections after charge).

65

Neither those statutory terms nor any limitation they convey appear in the instruction defining "employed by the Armed Forces."  Instead, the court instructed the jury:

> [T]he Government may prove that the defendant was 'employed by the Armed Forces' by establishing that:
>
> (a) the defendant was employed as a contractor, or an employee of a contractor (including a subcontractor at any tier) of any federal agency, and
>
> (b) that the defendant's employment related to supporting the mission of the Department of Defense overseas.

R.625, at 35; *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 706-07 (2005) (focusing on the specific sentences that told the jury the basis on which it could convict).

Even if it is permissible to look outside the contracts to define the scope of Defendants' employment, the "while" and "to the extent" limitations at a minimum require the specific charged conduct to have related to supporting the Defense Department's mission.  *See supra* at 60-61.  The court's instruction, however, erroneously defined "employ[ment] by the Armed Forces" as an all-or-nothing proposition, and permitted the jury to convict as long as any aspect of Defendants' employment, at any time, related to supporting the mission of the Defense Department.

The defense proposed instruction referenced these statutory terms and accurately stated:

66

> [I]f you find that part of a defendant's contract employment for the Department of State related to supporting the mission of the Department of Defense, and part of his contract employment did not relate to supporting the mission of the Department of Defense, you must consider whether the work the defendant was performing at the time of the conduct charged in the indictment related to supporting the mission of the Department of Defense in Iraq.  For purposes of this case, a Defendant is 'employed by the Armed Forces of the United States' only if the contract employment he was performing at the time of the charged conduct related to supporting the mission of the Department of Defense in Iraq.

R.618-2, at 33 (last paragraph).  The district court rejected this instruction without explanation.  *See* 8/26/14 AM Tr. 54.

The failure to give Defendants' proposed instruction was not harmless beyond a reasonable doubt.  The charged conduct fell squarely within Defendants' core contractual mission to protect U.S. diplomats.  That conduct occurred "while" Defendants were supporting the State Department's mission, and did not relate to the "extent" to which other Blackwater contractors, on other occasions, may have supported the Defense Department's mission in other ways.  *See supra* at 60-61. The erroneous instruction allowed the government to argue for an all-or-nothing determination completely untethered from the charged conduct, focused almost exclusively on the conduct of other Blackwater contractors on the ground, on occasions *other* than September 16, 2007.  *See* 8/27/14 AM Tr. 101-05 (summation); 8/28/14 PM Tr. 48-50 (rebuttal).  The government cannot prove

beyond a reasonable doubt that the erroneous instruction and argument had no effect on the jury's verdict.

> **b.**    **The court did not instruct that "such employment" meant Defendants' contract employment to provide diplomatic security**

The court declined to instruct the jury, as MEJA requires, to consider Defendants' *contract* employment.  As set forth in Sections I.C and I.D, *supra*, in the statutory language "to the extent such employment relates to … ," "such employment" refers to a defendant's contract employment for the non-Defense agency.  Thus, whether a non-Defense contractor is covered by MEJA depends on the scope of his contract.  *See id.*

Defendants proposed that the court read the statutory definition, *see* R.618-2, at 32; 8/26/14 AM Tr. 43, but the court instead used the government's two paraphrases of the statute.  R.625, at 34-35.[48]  The first paraphrase (R.625, at 34-35, first two paragraphs) omitted the statutory language "*employed as*—a contractor (including a subcontractor ....) of" (emphasis added), thereby eliminating the clear antecedent showing that "such employment" meant *contract employment*—to be considered by reference to Defendants' contracts.  The second

---

[48] Defendants objected at R.618, at 5-6 (written objections); 8/26/14 AM Tr. 43-47, 49-54 (charge conference); 9/2/14 Tr. 77 (objections after charge). The court noted all objections were preserved.  8/26/14 PM Tr. 88-89 (charge conference).

paraphrase (R.625, at 35, paragraphs "(a)" and "(b)") omits the word "*such*" from paragraph (b), again eliminating the requirement that the "employment" to be considered was Defendants' *contract* employment.

The defense's proposed instruction made clear the required focus on the terms of Defendants' contracts, instructing that to prove Defendants were "employed by the Armed Forces outside the United States," the government must prove that "[e]ach Defendant's contract employment for the Department of State related to supporting the mission of the Department of Defense in Iraq." R.618-2, at 32-3. The instruction further provided: "Each Defendant's contract employment means the work that he was contracted to perform under his subcontract with the Department of State." *Id*; *see* 8/26/14 AM Tr. 43, 45-46, 49-51 (charge conference argument). By refusing this instruction and giving the government's paraphrases instead, the court severed the statutory connection between the Defendants' *contracts* with the State Department and the "*employment*" the jury was to consider to determine whether MEJA applied.

This error allowed the government to take advantage of what it characterized as this "incredibly broad definition" by ignoring the contracts when arguing for application of MEJA. *See* 8/27/14 AM Tr. 101-05 (summation); 8/28/14 PM Tr. 48-50 (rebuttal). The government cannot prove beyond a reasonable doubt the error had no effect on the jury's verdict.

69

## 2.    The Court Erred by Refusing to Instruct the Jury That Diplomatic Security is a State Department Responsibility

The district court grievously erred by refusing to instruct the jury that diplomatic security is a State Department responsibility.  That is an unambiguous requirement of the U.S. Code.  The district court rejected Defendants' three requests to inform the jury of that centrally relevant statute.

The Diplomatic Security Act expressly assigns to the Secretary of State the responsibility for "the security of diplomatic operations ... abroad."  22 U.S.C. § 4801(b)(1).  The Act requires the Secretary to implement programs "to provide for the security of United States operations of a diplomatic nature," *id.* § 4802(a)(1), including protecting all U.S. government personnel on official duty abroad, and providing security for all U.S. government missions abroad (other than personnel and facilities under military command).  *Id.* §§ 4802(a)(1), (2)(B)(i).  The State Department's Bureau of Diplomatic Security fulfills this "mission ... to provide a safe and secure environment for the conduct of U.S. foreign policy."  12 Foreign Affairs Manual 011; *see also* 12 FAM 012 (Legal Authorities).

Defendants proposed putting the relevant statute into evidence, but the court stated its preference to address the statute in jury instructions.  *See supra* at 10 & n.13.  Thus, Defendants proposed to instruct the jury that:

> The Defendants in this case were independent subcontractors employed by the Department of State to provide personal security

70

to State Department personnel in Baghdad, Iraq.[49]  By law, the
provision of personal security to State Department personnel
overseas is the responsibility of the Department of State.

R.618-2, at 35 (Def. Corr. Prop. Instr. 16) (citing § 4802 and the Foreign Affairs

Manual provision quoted above).

Despite its earlier statement, the court rejected the instruction, and any

reference to the statute, out of hand:

> THE COURT:  Yeah, forget that one.
>
> [COUNSEL]:  And it [goes] to whether—
>
> THE COURT:  No, we're not doing that.
>
> [COUNSEL]:  Your Honor, there's been a lot of argument in this
> case about [whether] guarding diplomats is military work or
> military related work or diplomatic work.  And there's a statute
> that specifically governs this and specifically gives that
> responsibility to the—
>
> THE COURT:  I rejected that argument.  I reject that instruction.
>
> [COUNSEL]:  May I ask Your Honor to consider as a substitute
> for that argument simply instructing the jury on the language of
> the statute?
>
> THE COURT: No.  It's very misleading.  It's not, in fact, what
> they're doing over there.  I don't believe it.
>
> [COUNSEL]:  Your Honor, the contracts and the task order in this
> case refer to the statutory mission of the State Department to
> protect its diplomats, and what we're asking is—

---

[49] This first sentence was undisputed, being alleged in the indictment.  R.304
¶1.a.

71

THE COURT: I understand. You think the Department of Defense doesn't have any obligation? You think it doesn't relate to—I'm giving them the [government's] instruction.

[COUNSEL]: Under 22 U.S.C. § 4802, that's—

THE COURT: If I believe this, I would dismiss the case right now for lack of jurisdiction. I don't believe this. This isn't what—you can't read this and the other statute together, so forget it. What's the next objection?

8/26/14 AM Tr. 54-55.[50]

"Where the evidence presents a theory of defense, and the court's attention is particularly directed to it, it is reversible error for the court to refuse to make any charge on such theory." *Levine v. United States*, 261 F.2d 747, 748-49 (D.C. Cir. 1958); *accord Laughlin v. United States*, 474 F.2d 444, 455 n.14 (D.C. Cir. 1972). This rule applies to a theory greater than mere denial of guilt, "involving 'law' or fact, or both, that is not so obvious to any jury." *Laughlin*, 474 F.2d at 455 & n.14 (citing *Salley v. United States*, 353 F.2d 897, 898 (D.C. Cir. 1965)). "The district court is required to give [such an] instruction 'if there is any foundation in the evidence' sufficient to bring the issue into the case ...." *DeFries*, 129 F.3d at 1308 (addressing advice-of-counsel defense). Refusal to give such an instruction is reversible error if the requested instruction "(1) is substantively correct; (2) was

---

[50] Defendants proposed two fallback instructions quoting the statute, which the court also rejected, repeating, "if I agree with that, then I should dismiss all these charges." 8/26/14 PM Tr. 25; *see* Def. Corr. Prop. Instr. 16A (offered 8/26/14 AM Tr. 61); Def. Corr. Prop. Instr. 16B (offered 8/27/14 PM Tr. 154).

not substantially covered in the charge actually delivered to the jury; and (3)
concerns an important point in the trial so that the failure to give it seriously
impaired the defendant's ability to effectively present a given defense." *Id.* at 1309
(citation omitted).

Here, Defendants' proposed instruction on the Diplomatic Security Act was
well founded in law:  Defendants simply asked the Court to summarize, or to read
verbatim, on-point excerpts from a United States statute.  Defendant's proposed
instruction was also well founded in the record:  it is undisputed that "[t]he
defendants were ... subcontractors of Blackwater Worldwide, a company
contracting with the United States Department of State, who were employed to
provide personal security services in the Republic of Iraq."  R.304 ¶1.a
(Superseding Indictment).  Abundant evidence showed that was what Defendants
were employed to do and in fact were doing in Nisur Square.  *See* Statement of
Facts Secs. A, C, *supra*; Argument Sec. I.D, *supra*; GX9801.  The proposition was
not covered elsewhere in the jury charge.  *See* 8/26/14 AM Tr. 55 (emphatically
rejecting any such instruction); R.625 at 34-36 (MEJA instruction, containing no
reference to Diplomatic Security Act or State Department's responsibility).

Finally, the instruction was critical to guilt or innocence:  whether the
indictment stated prosecutable offenses turned on whether Defendants' State
Department contract employment to provide diplomatic security related to

73

supporting the Defense Department's mission.  18 U.S.C. § 3267(1)(A)(ii)(II).

Nothing was more probative on this issue than the law making diplomatic security

the responsibility of the State, not Defense, Department.

At the charge conference, the court brooked no argument:  "Yeah, forget that

one."  "No, we're not doing that."  "I rejected that argument.  I reject that

instruction."  "So forget it."  8/26/14 AM Tr. 54, 55.  The court made only two

statements that could be taken as reasons.  The first was the judge's unspecified

subjective belief:  "No.  It's very misleading.  It's not, in fact, what they're doing

over there.  I don't believe it."  *Id.* at 55.  The second was that the law was fatal to

the government's case:  "If I believe this, I would dismiss the case right now for

lack of jurisdiction.  I don't believe this.  This isn't what—you can't read this and

the other statute together, so forget it."  *Id.*; *accord* 8/26/14 PM Tr. 25 ("And if I

agree with that, then I should dismiss all these charges.... Denied.").  The court

later said it kept the statute out "because I think the statute would just be confusing

to the jury and what they need to decide is taken right out of the MEJA statute."

8/28/14 PM Tr. 104-05.

There is nothing confusing about § 4082(a)'s clear mandate that the State

Department provide diplomatic security.  It is true there is a fundamental conflict

between that statutory assignment of responsibility and MEJA's requirement that

Defendants' contract employment relate to supporting the Defense Department's

74

mission.  But it is only "confusing" if one begins, as the trial court did, with the

presumption that this prosecution must survive.  The fact that the statute is fatal to

this prosecution (as the district court twice recognized, 8/26/14 AM Tr. 55; 8/26/14

PM Tr. 25), was no reason to keep it out.  The statute actually made it impossible

for any rational factfinder to conclude Defendants' diplomatic security work

related to supporting the Defense Department's mission, and thus required

acquittal.  *See* Secs. I.C, I.D, I.F, *supra*.  But at a minimum, the court was

obligated to instruct the jury on the what the law provided, so the jury could

decide.  *See DeFries*, 129 F.3d at 1311 ("[A] court must give the jury the

opportunity to evaluate whether the government has proven its case beyond a

reasonable doubt for every element of the crime charged.") (citing *United States v.

Gaudin*, 515 U.S. 506, 510, 522-23 (1995)).

The court's refusal to instruct the jury on this critical statute denied

Defendants a fair trial.  *See Arthur Andersen*, 544 U.S. at 706-08, *DeFries*, 129

F.3d at 1305-06, 1309, 1311-12; *Hite*, 769 F.3d at 1166; *Laughlin*, 474 F.2d at 455

n.14 (citing *Levine*, 261 F.2d at 748-49).  The error was not harmless beyond a

reasonable doubt.  The jury was denied knowledge of the law on a point critical to

its determination of a necessary element of every charged offense.  Lacking that

knowledge, the jury deliberated for more than seven weeks before convicting.  The

district judge, *with* that knowledge, said if he believed it he would have to dismiss

the case. This Court cannot "conclude with certainty ... that 'the guilty verdict

actually rendered in *this* trial was surely unattributable to the error.'" *DeFries*, 129

F.3d at 1306 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

## II.    THE DISTRICT COURT ERRED IN DENYING A NEW TRIAL, WHERE A KEY WITNESS'S SENTENCING STATEMENT SHOWED HIS TRIAL TESTIMONY WAS PERJURED

The government's case was built on the foundation of perjured testimony

from an Iraqi police officer who testified vividly that he approached the white Kia

moments after the first shots were fired and found its driver dead. Based chiefly

on that eyewitness testimony, the government argued the entire incident began

when Slatten, unprovoked, shot and killed the car's driver. Only after trial, in a

sentencing statement, did the officer tell the court that he never actually

approached the car, but instead cowered in his traffic kiosk, where he saw and

heard the Kia's driver arguing passionately with his mother about getting her to

safety—a conversation which could have taken place only *after* shooting had

started. In short, the officer's trial testimony was false, and the truth is devastating

to the government's case.

Faced with a motion for new trial, the government scrambled quickly to get

the genie back into the bottle, and reported that the officer claimed he

misunderstood the nature of his post-trial statement and was merely spinning an

imaginative "expression" of events. That the government tries to explain a central

76

witness's revelation of his earlier false testimony as a work of creative fiction, to be disregarded by the court, is an outrageous miscarriage of justice, which requires the jury's verdicts to be set aside.

### A.    Legal Framework and Standard of Review

Where new evidence shows perjury at trial, and that perjury was unknown to the prosecution at the time, defendants are entitled to a new trial if they "would probably be acquitted on retrial." *United States v. Williams*, 233 F.3d 592, 594 (D.C. Cir. 2000).  In *Williams*, this Court distilled the "standard for ordering a new trial when the newly discovered evidence is that perjury occurred," *id.* at 594, from the five-factor test for new-evidence motions generally.  *See Thompson v. United States*, 188 F.2d 652, 653 (D.C. Cir. 1951) (asking whether (1) the evidence is truly newly discovered; (2) the failure to learn of it earlier was not due to lack of due diligence; (3) the new evidence is not merely impeaching or cumulative; (4) the new evidence is material; and (5) the new evidence would probably produce an acquittal).  That five-factor test "applies ... only to ordinary motions on the ground of newly discovered evidence....  [A] less restrictive rule applies if the motion is based on a claim of false testimony at the trial ...."  3 Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 584, at 453 (4th ed. 2011) ("Wright & Miller").

A district court's denial of a new trial motion is reviewed for abuse of discretion.  *United States v. Hall*, 324 F.3d 720, 722 (D.C. Cir. 2003).  This Court defers to trial court findings of fact, *United States v. Brodie*, 524 F.3d 259, 268

(D.C. Cir. 2008), but reviews legal questions *de novo*.  *Hall*, 324 F.2d at 722;

*United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007).  The likely effect of

perjured testimony on the trial result, like *Brady* materiality, is a question of law.

*See Brodie*, 524 F.3d at 268; *Oruche*, 484 F.3d at 595.  If the new evidence of

perjury would likely result in acquittal, a new trial is required.  *See Brodie*, 524

F.3d at 268; *Oruche*, 484 F.3d at 595.

### B.    A Key Witness's Unsolicited Sentencing Statement Fundamentally Contradicted His Trial Testimony

#### 1.    Monem's Trial Testimony:  The White Kia's Driver Was Killed Instantly and the Car Posed No Threat

The government's second witness at trial was Sarhan Dheyab Abdul Monem

("Monem"), an Iraqi police officer stationed in Nisur Square.  The government

maintained the incident began when Slatten, without provocation, shot the Kia's

driver in the head, killing him instantly.  6/17/14 PM Tr. 5, 7 (opening); 8/27/14

AM Tr. 47-48 (closing).  Monem was the principal witness for this account.  He

testified that after hearing the convoy fire the first two shots, he heard screaming

from the Kia, ran to it, and found the driver dead of a gunshot wound to the head.

6/23/14 AM Tr. 9-18.

According to the prosecution, this unprovoked killing caused the driver's

foot to come off the brake, allowing the Kia to roll slowly toward the convoy.

6/17/14 PM Tr. 7-8 (opening); 8/27/14 AM Tr. 48 (summation).  Monem testified

the Kia was "at a standstill" when its driver was shot, and with the driver

78

incapacitated, it came to rest against the truck in front of it, moving again only when the truck moved out of the way.  6/23/14 AM Tr. 19-20.  At that point, Monem said, the Kia moved "very slow," such that he could "walk with it."  *Id.* at 20; *see id.* at 20-22 (Monem demonstrating in court).

Monem testified that after approaching the car and seeing the driver dead, he ran in front of the convoy with his hands up, told them to stop shooting, then ran back to the car and tried to get the passenger out, walking alongside the slowly-moving car.  6/23/14 AM Tr. 16-24, 59.  Monem testified he saw no evidence of a bomb inside the car.  *Id.* at 59-60.  The government emphasized to the jury that Monem's claimed actions showed the Kia was no threat.  6/17/14 PM Tr. 9 (opening); 8/27/14 AM Tr. 50, 75 (summation); 8/28/14 PM Tr. 66-67 (rebuttal).

### 2.    Monem's New Statement:  The Kia Driver Was Alive During the Incident, and Monem Was Hiding in His Booth

None of Monem's testimony was true.  Five days before sentencing, the government submitted Monem's "victim impact statement," in which Monem told a very different story, contradicting his trial testimony in every material respect. Far from affirming that the driver died from the first unprovoked shots, Monem now described the driver *being alive during the incident, talking with his mother as they feared for their lives*:

> I saw so much that day, I saw a mother weeping for her son, the doctor, because she felt he was going to be killed and she too was unable to move.  *Her son wanted to get her out of the damned car*

79

.... The mother wept and hugged her son as if to say to him no, don't go, we will be killed. *The son tells her to get out of the car, that we will be killed and she hugs him and begs him not to go ....* Until this day I still hear the cries of the mother *and her son*.

R.773-1, at 3 (emphasis added).

The driver wanted his mother "out of the damned car," and told her "we will be killed," because gunfire had already begun. He obviously could not have had this exchange with his mother if he died with the first shot fired. This account conclusively demonstrates that the unprovoked ambush killing the prosecution described to the jury *categorically did not happen*.

Moreover, contrary to his claim at trial of heroic efforts to stop the shooting, Monem now admitted he actually cowered in his kiosk, paralyzed by fear:

> I was scared and remained in my traffic cabin unable to move nor think.... Her son wanted to get her out of that damned car and I was not able to move to help him and I just remained looking.... I was watching without making a move.... I hid in that cabin and until this day I still hear the cries of the mother and her son. And until now I hear myself telling me that I am a coward and I am the cause of what happened. Why I did not help them because I was helpless and I was only thinking of my children and my mother ....

R.773-1, at 3. Monem *did not* run in front of the convoy and try to wave them off, or run to the car to try to get the passenger out, or walk slowly alongside the car, as he testified at trial. Instead, he remained rooted in his traffic kiosk, "unable to move nor think," "watching without making a move." *Id.*

80

### 3.    The Government's Attempt to Obtain an Ex Parte Retraction

The government's conduct concerning Monem's contradiction only exacerbated the problems with his testimony. The government initially did nothing with the contradiction, burying Monem's statement among 83 pages of other victim statements. *See* R.742-6. When Defendants alerted the court to this evidence of perjury, the government quickly telephoned Monem in Iraq and interviewed him ex parte. R.745, at 2. The FBI's one-page interview summary (R.773-16) does not show the length of the call, the government's questions, or whether the government—as it did during virtually every interview of Monem— first reviewed with him his many prior statements. *See* R.773-4 at 1; R.773-6 at 2; R.773-7, at 1; R.773-9, at 1-2 (government beginning each interview of Monem by reviewing past statements); R.745, at 2 (touting his prior statements). The summary states in five terse bullet points that Monem repeated certain aspects of his trial testimony, including his claimed observations of the driver's injuries, states the driver "died immediately after being shot," and that Monem "did not, at any time, hear the driver talking or see him moving *after he was shot*." R.773-16. It is silent about what Monem saw or heard *before* the driver was shot.

The summary's only mention of the sentencing statement was Monem's reported claim that

> he understood the victim impact statement to be an 'expression'
> and not an investigative or factual statement. He explained that

81

> when he was writing his victim impact statement he was
> imagining what it would be like to be the driver of the vehicle.

*Id.*  Monem did not otherwise address the factual discrepancies in his story.  If he was asked about the factual content of his sentencing statement, the questions and answers are not recorded.  *See id.*

After its ex parte phone call, the government did nothing further to investigate Monem's statement.  It made no offer or attempt to bring Monem to court, obtain an affidavit, or provide an opportunity for the court or Defendants to examine Monem.  Instead, it relied solely on Monem's reported explanation.  The district court denied relief without a hearing.  R.820, R.821, at 19.

### C.    The District Court Abused Its Discretion By Denying a New Trial

Monem's perjury warrants reversal and a new trial, since it is plain Defendants "would probably be acquitted on retrial."  *Williams*, 233 F.3d at 594.

### 1.    Monem's Trial Testimony Was Perjured

Monem's new statement shows he lied at trial.  In that statement, he reveals he never left his kiosk, cowering instead inside; he never warned the convoy that the Kia posed no threat; and he heard the driver and passenger crying and fearing for their lives, proving the driver was alive after gunfire began, and could not have been hit without warning by the first shots fired.[51]

---

[51] The district court puzzlingly noted that Defendants "cite no other evidence supporting this proposition [that the driver was alive], and indeed seem to have forgotten the point when they repeatedly imply that Jeremy Ridgeway fired the

(Continued …)

The district court's finding that "Monem's [new statement] largely ratifies his trial testimony" (R.821, at 8) is inexplicable and flatly wrong. Monem's trial testimony—that he ran repeatedly to the car, tried to help the passenger escape, and stood in front of the convoy, hands held high to warn them off—is 180 degrees opposite to his sentencing statement admitting he "remained in [his] traffic cabin unable to move nor think," "not able to move to help [the driver] and [he] just remained looking." R.773-1, at 3. Nor can his trial testimony that the first shots killed the driver be squared with his new statement describing the driver's fearful actions and statements. The accounts are irreconcilable.

Monem's new statement contains powerful indicia of truthfulness. In this unsolicited statement, Monem candidly discusses his fears and failures that day. R.773-1, at 3. He grapples with his inaction, and blames himself for the deaths of the Kia's occupants. *Id.* ("I hear myself telling me that I am a coward and I am the cause of what happened. Why I did not help them because I was helpless ...."). Monem questions his own cowardice, and shares embarrassing details about the psychological and physical impact of the incident. *Id.* No one would falsify such a

---

first shots and killed Al-Rubia'y." R.821, at 9. But Defendants never contended Ridgeway "fired the first shots" at Nisur Square. *Insurgents* fired the first shots— immediately after the first sound of gunfire, radiator fluid poured out of the command vehicle. 8/6/14 AM Tr. 81-82 (Rhodes); *see also* 8/25/14 AM Tr. 21-22 (Fishback) (first gunshots were a burst of AK-47 fire). Moreover, there was ample evidence the Kia was approaching the convoy at a threatening speed (*see supra* at 17-18)—suggesting the driver was alive and driving.

story, *Chambers v. Mississippi*, 410 U.S. 284, 298-99 (1973), nor tell it publicly unless it were true.  *Wilson*, 160 F.3d at 741.

The trial court's dismissal of these irreconcilable conflicts relied almost entirely on the FBI's report that Monem "said he understood the victim impact statement to be an 'expression' and not an investigative or factual statement." R.773-16; *see* R.821, at 13-14.  This obvious prevarication was unworthy of the district court's credence.  The notion that a police officer may take back a statement to the court with the excuse that he did not know it was "investigative or factual" (R.773-16) is dumbfounding.  The district court's acceptance of such transparent evasion was, to use the court's word, "charitable."  R.821, at 13.  This Court need not defer to it.  *See Wilson*, 160 F.3d at 737 (this Court's review, "although deferential, is not servile").

Even worse is the district court's rationalization that Monem's express narrative of events he saw and heard was actually a crafted attempt "to imagine what [the driver] and his mother experienced" "as though he had witnessed it." R.821, at 12.  In the court's view, "[w]orks of fiction routinely adopt third-person omniscient narration, and that Monem did so in part of his [statement] ... is hardly proof his [statement] is true." *Id.*

The district court gave too much credit to the claimed literary license of a witness caught red-handed in a lie.  Whatever Monem meant in describing his

84

statement as an "expression," R.773-16, it was in no way a "work of fiction." R.821, at 12. It was a recitation of facts, squarely at odds with his trial testimony. The statement does not address in any way "what it would be like to be the driver of the vehicle," R.773-16, but instead relates what Monem "witnessed on that horrible day," when he "saw so much." R.773-1, at 3. It describes what *he* did ("I hid in that cabin"), what *he* did not do ("I was watching without making a move"), and what *he* saw and heard others do ("[t]he son tells her to get out of the car, that we will be killed and she hugs him and begs him not to go"). *Id.* Far from "third-person omniscient narration," R.821, at 12, Monem's statement is what it purports to be: a specific account of witnessed events.

The district court struggled mightily to reconcile Monem's competing stories, acknowledging its reading was both speculative and implausible. R.821, at 12-14. The court could not, however, resolve the most basic conflict: the new statement shows the driver was alive after gunfire began. The district court rejected this inescapable conclusion because "it presumes that Monem's [sentencing statement] describes events that precede Al-Rubia'y being shot," when it could "just as sensibly [be] read to describe a time *after* he was shot—and injured—but before he died." R.821, at 13. This reasoning ignores Monem's express affirmation that the driver "died immediately after being shot," R.773-16, at 3. It also ignores common sense: the driver could not have spoken to his

85

mother and tried to remove her to safety *after being shot in the middle of the forehead*.  6/23/14 AM Tr. 15; R.773-16, at 3.

Monem's accounts inescapably and categorically conflict on facts vital to the government's case theory:  whether the first shots killed the Kia's driver, and whether Monem warned the convoy off, or instead "remained in [his] traffic cabin unable to move nor think."  R.773-1, at 3.  His trial testimony, likely to be reported in Iraq (and read by his superiors), hewed to the well-rehearsed story contained in his first statement to the Iraqi National Police—a story reviewed in each government interview, reinforced with each telling.  His unsolicited sentencing statement, on the other hand, was written in complete candor—months after trial, when he felt free to be unguarded and spoke for himself.  The new statement's strong indicia of reliability prove his trial testimony was false.

### 2.    The New Evidence Would Probably Result in Acquittal

When evaluating the effect of false testimony, the court considers the new evidence in light of the entire record.  *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).  "The strength of the evidence presented at the trial is an important consideration."  3 Wright & Miller § 584, at 463.  "[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."  *United States v. Agurs*, 427 U.S. 97, 113 (1976).

86

The jury deliberated for seven weeks. It clearly found the case a close one.[52] The government's claim of an unprovoked massacre was weak. It could not explain obvious evidence of an attack on the convoy, including the command vehicle being disabled by gunfire, *see supra* at 26-27, 30-31; fresh bullet marks on the side of the command vehicle, *supra* at 22, 30-33; multiple accounts of incoming fire by uncharged witnesses (including prosecution witnesses and witnesses unaffiliated with Blackwater), *supra* at 22-25; a contemporaneous log of incoming fire reports, *supra* at 22; GX9801; and AK-47 shell casings found where witnesses reported incoming fire. *See supra* at 33-34. The government also struggled to prove that the Kia posed no threat to the convoy, given that the men had been warned of active car bomb threats in the area, *including a white Kia*, *supra* at 15, 17-18; Nisur Square had been the site of a car bomb attack large enough to create a crater in the square, *supra* at 17; DX3025, DX3026; Raven 23 was *directly responding to a car bomb attack at the time*, *supra* at 16; GX9801; the State Department's use-of-force rules directed guards to shoot the occupants of vehicles that refused to stop despite warnings, 7/15/14 AM Tr. 20-23 (Frost); and

---

[52] "Lengthy deliberations suggest a difficult case." *United States v. Varoudakis*, 233 F.3d 113, 126 (1st Cir. 2000); *see Dallago v. United States*, 427 F.2d 546, 559 (D.C. Cir. 1969) ("The jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner.").

no fewer than eight government witnesses described the approaching Kia as an apparent or potential threat, *see supra* at 18.

Under these circumstances, it would not have taken much to create reasonable doubt. Plainly, evidence that the principal witness for the government's prosecution theory lied about critical disputed facts, *saw and heard the Kia's driver alive after gunfire began*, and cowered in his kiosk rather than alerting Defendants that the Kia posed no threat, would have demolished the government's case. *Cf. Kyles*, 514 U.S. at 441, 445.

### a. Monem's testimony was essential to the government's case theory

The government built its entire case on the notion that Slatten, unprovoked and without warning, killed the Kia's driver, causing the Kia to roll slowly forward, whereupon the other Defendants fired unreasonably and excessively at it, even though its slow speed and Monem's overt warning showed it was not a threat. The prosecutors highlighted Monem's testimony again and again for this version of events:

> Now let's talk about Sarhan, remember, he's one of the traffic policemen. He helps stop traffic. What did he say? He described a shot, a pause, and a shot.... He noticed rifles sticking out of the holes, I think that was his phrase, sticking out of the holes of the armored vehicles. Who is sticking his [sniper rifle] out of the portal? You can reasonably conclude Nicholas Abram Slatten.

8/27/14 AM Tr. 38 (summation).[53]

> And as [the Kia] rolls forward Defendant Paul Slough ... ignores the traffic men coming up to aid assistance, coming to, not going away, coming to, and he shoots.  He shoots into the windshield of that car a series of shots from his rifle.  And by shooting ... he draws the attention of other members in the convoy.  Others join in, they see this crawling vehicle coming towards the convoy and they join in.

6/17/14 PM Tr. 9 (opening).

> One of [the traffic officers] waved and signaled to the convoy that there is no threat....  [Y]ou remember those two officers?  One of them was Sarhan.  He was one who began signaling to the turret gunners not to fire anymore at the white Kia, there's no threat here.

8/27/14 AM Tr. 50 (summation).

The events surrounding the Kia were critical because they occurred at the beginning of the incident, and allegedly instigated all that followed.  Because of the dearth of evidence that any Defendant fired elsewhere, *see supra* at 20 n.19, 24-25 & n.21, 26 n.22, 27, 34-35, the government had no choice but to focus on the Kia, and convince the jury to generalize any perceived misconduct or criminal intent to the remaining counts.  *See, e.g.*, 8/27/14 AM Tr. 50 (summation) ("Everything that followed, all that carnage, all the firing and fleeing men and women and children was an unreasonable response and was excessive."); *id.* at 27

---

[53] This argument ignored Monem's unequivocal testimony that the first gunfire "was coming from the turrets and not from the holes or the windows." 6/23/14 AM Tr. 12; *accord id.* at 10-11.

("[Slatten] is, after all, the one who lit the match that ignited the firestorm that went on to engulf so many."). The government thus had to prove the Kia could not reasonably have been perceived as a threat—a significant challenge, given the wealth of evidence to the contrary. *See supra* at 87-88. Monem was the linchpin of the government's counternarrative.

### b. Monem's new statement goes well beyond "pure impeachment"

The district court went to great lengths to characterize Monem's April 10 phone call as a "repudiation" of his new statement, R.821, at 11-14, in order to render the new statement "pure impeachment evidence," which the court believed could justify a new trial only if the witness's testimony was uncorroborated. *Id.* at 14. The district court was wrong on each point. Knowledge that Monem lied about the central events the government highlighted to the jury would have destroyed the government's case.

First, Monem's reported phone statement was hardly an "unequivocal[] repudiation." R.821, at 9. Even accepting the government's secondhand summary, Monem's reported statement did not address any of the factual or substantive content of his new statement. Though Monem repeated certain aspects of his trial testimony, R.773-16, he did not attempt to square those claims with his new statement's admission that he "just remained looking ... watching without making a move." R.773-1, at 3. Nor did he say anything about his new

90

statement's assertion that the son "wanted her to get out of that damned car" while they feared for their lives. *Id.* His only explanation of those assertions was his transparently evasive contention that the statement was an imaginative "expression."

Second, "impeachment evidence" is not of lesser value, where the evidence shows a critical witness lied at trial. "The jury's estimate of the truthfulness and reliability of [such a] witness may well be determinative of guilt or innocence," and "[i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject." *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959) (citation omitted); *see also United States v. Iverson*, 637 F.2d 799, 801 (D.C. Cir. 1980), *modified on other grounds*, 648 F.2d 737 (D.C. Cir. 1981); *United States v. Wallach*, 935 F.2d 445, 458-59 (2d Cir. 1991).

Third, it is impossible to pigeonhole Monem's statement as "pure impeachment" without first examining him about his conflicting accounts. Under cross-examination, Monem could make damaging admissions while trying to explain his statement. He could deny the statement, making extrinsic evidence of it admissible. *See* Fed. R. Evid. 613(b). He could invoke the Fifth Amendment, or deny recollection, making the statement admissible as a statement against interest, *see* Fed. R. Evid. 804(b)(3), or a recorded recollection, *see* Fed. R. Evid. 803(5).

91

Most likely, he would simply (and prudently) decline to return to the United States—having necessarily lied to the court one way or the other. In that case, at a minimum, the government would not have his testimony on retrial.

The district court discounted this possibility, crediting the government's assertion that it would call Monem in a retrial. R.821, at 14. That the government might call him of course does not mean he would come. Moreover, the government's assertion that it "would not hesitate to call him" warrants skepticism. If called, Monem would be confronted on cross with the reality that he submitted diametrically opposing accounts to the district court—he either lied at trial, or he lied at sentencing. That impeachment is far more devastating than anything Monem faced at trial. *See Kyles*, 514 U.S. at 445 (in light of new evidence, key witness "could not have said anything of any significance without being trapped by his inconsistencies"). The government's mere sponsorship of such a witness would be fatal to its credibility with any jury. *See id.* (witness's conflicting statements "would have raised opportunities to attack ... the thoroughness and even the good faith of the investigation," and "would have revealed a remarkably uncritical attitude" on the part of the government). With Monem's credibility in tatters, the government would face substantial risk calling him, and could not possibly pursue the unprovoked ambush theory on which it founded this trial.

92

Monem's credibility was already in serious doubt.  He was an officer in

Iraq's Republican Guard, who fought against the United States in 2003.  6/23/14

PM Tr. 9-10.  The first statement he provided to authorities—his statement to the

Iraqi National Police ("INP")—was largely copied, often verbatim, from the

statement his traffic police partner provided a day earlier.  *Compare* R.765-1

(Monem statement) *with* R.765-2 (statement of Ali Ghalaf Salman Mansur al-

Hamidi).  This duplication was not coincidental.  More than a year before trial, the

government learned of INP efforts to coordinate Iraqi witnesses' stories.  Lead INP

investigator Colonel Faris asked prosecution witness Mohammed Kinani how

much money Kinani would want from Blackwater not to testify, and told Kinani

other Iraqi witnesses would do what Faris told them to do:  "if he told the

witnesses to go left they would go left, and if he told them to go right they would

go right."  6/19/14 PM Tr. 9-10, 15.

Monem also told several different versions of his story, inconsistent with his

trial testimony, to the media.  Less than a week after his INP statement, Monem

gave an interview to *Der Spiegel*, and according to the article stated, "The driver of

a white car was anxious to drive off[.]  I signaled to him to drive, since the distance

to the convoy was around 60 meters, far enough to get traffic rolling again."

R.765-3.  Shortly thereafter, CNN interviewed Monem and paraphrased him as

saying, "the guards fired five or six shots in an apparent attempt to scare people

93

away, but one of the rounds struck a car and killed a young man." R.765-4. At

trial, however, Monem testified that he *never* spoke with a reporter about what he

saw in Nisur Square—despite being shown video of his interview. 6/23/14 PM

Tr. 38-39.

This "persuasive impeaching evidence at trial," R.821 at 14, does not make

Monem's new statement cumulative. The statement was not the straw that broke

the camel's back, it was an anvil. This new evidence shatters Monem's credibility

and any theory that depends on him, and would probably lead to acquittal.

### D.    At a Minimum, the Court Should Have Held a Hearing to Examine Monem Regarding His Conflicting Accounts

Despite Monem's submission of a version of events irreconcilable with his

trial testimony, the district court never examined Monem about the difference, or

even reviewed a statement from Monem explaining the difference. The

government submitted no sworn testimony from Monem or its own investigators.

Nor did it offer to make Monem available for telephone examination. Instead, the

government submitted only an FBI 302 memorandum recounting an untranscribed

phone call in which the only participants were highly interested investigators and

prosecutors hoping to save the trial result.

This hearsay account of an ex parte conversation was hardly sufficient to

counter Monem's vivid, detailed narrative, or to show Monem "unequivocally

repudiated his [sentencing statement] in his April 10 conversation," as the district

94

court concluded.  R.821, at 9.  The FBI's 302 is not even Monem's statement.  It was not recorded or transcribed, and was not reviewed, signed or adopted by him. Like all 302s, it did not reflect the questions asked or answers given, any leading questioning,  any back and forth or subtle changes in Monem's answers, or what the agent chose not to write down.  *See, e.g.*, *United States v. Donato*, 99 F.3d 426, 433 (D.C. Cir. 1996).  Monem's reported excuse that he did not understand his statement to the court to be "factual," and that he instead intended it as an "expression" of "imagine[d]" circumstances, R.773-16, is too much to accept without question.

The district court's refusal to inquire into Monem's new statement, or examine him on it, relying only on his reported "repudiation," was an abuse of discretion.  At a minimum, the court should have examined Monem, under oath, concerning his conflicting accounts.  Because cross-examination "is the principal means by which the believability of a witness and the truth of his testimony are tested," *Davis v. Alaska*, 415 U.S. 308, 316 (1974), that examination should have been at an adversarial hearing.

The only other basis for the trial court's refusal of a hearing was its reliance on Monem's demeanor at trial.  R.821, at 19.  The court had no opportunity, however, to observe Monem's demeanor when telling his contradictory account, or when trying to explain it away.  Monem's trial testimony alone is not a sufficient

basis for dismissing his contradictory statement without hearing and evaluating his explanation under oath, rather than related secondhand by an interested party. At a minimum, the case should be remanded for the trial court to hold a hearing on Monem's conflicting statements.

## III. VENUE IN THE DISTRICT OF COLUMBIA WAS IMPROPER, AND WITHHOLDING THE ISSUE FROM THE JURY WAS REVERSIBLE ERROR

Venue over extraterritorial conduct is governed by 18 U.S.C. § 3238, which provides in relevant part that trial "shall be in the district in which the offender, or any one of two or more joint offenders, is arrested."[54]  Defendants maintained that proper venue was in the District of Utah, where all Defendants (including Slatten[55]) were arrested, and challenged the propriety of venue in this District throughout these proceedings.  The district court declared venue satisfied and refused to submit the issue to the jury, accepting the government's claims that (1) Jeremy Ridgeway was a "joint offender" as to all counts charged against Defendants, and (2) Ridgeway was "arrested" just before his guilty plea in this District, even though his liberty was never restrained and he freely and voluntarily traveled round trip from his California home to appear in court.

---

[54] As an alternative, § 3238 permits indictment before arrest in an offender's (or joint offender's) last known district of residence.

[55] Slatten was arrested in Utah on the original indictment (which was dismissed with prejudice, R.428), and in Tennessee on the 2014 indictment.

The district court's expansive construction of § 3238 allowed the government to manufacture venue and choose a more favorable jury pool for this controversial prosecution. The court erred by denying Defendants' motion for judgment of acquittal based on improper venue. At a minimum, the court was required to submit the contested venue element to the jury.

### A.    Standard of Review and Governing Legal Principles

The standard of review for denial of Defendants' motion for judgment of acquittal is set forth in Sec. I.A, *supra*. Whether the court violated Defendants' right to jury trial by taking a disputed element from the jury is a question of law reviewed *de novo*. *See DeFries*, 129 F.3d at 1303, 1310-11.

The proper place of criminal trials was so important to the Founders that they addressed it in the Declaration of Independence and in the Constitution twice. *See United States v. Cabrales*, 524 U.S. 1, 6 (1998); *United States v. Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004); U.S. Const. art. III, § 2; *id.* amend. VI; Decl. of Indep. ¶21 (U.S. 1776). The Sixth Amendment specifically protects a defendant's interest not only in the place of trial, but the place from which the jury will be selected. *Morgan*, 393 F.3d at 195 (citation omitted). Venue thus is not mere "formal legal procedure," but "raise[s] deep issues of public policy in the light of which [venue statutes] must be construed." *United States v. Johnson*, 323 U.S. 273, 276 (1944). If a venue statute "equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be

97

disrespected, construction should go in the direction of constitutional policy even though not commanded by it." *Id.*; *accord Morgan*, 393 F.3d at 196. Venue statutes "should not be so freely construed as to give the Government the choice of 'a tribunal favorable' to it." *Travis v. United States*, 364 U.S. 631, 634 (1961); *accord Johnson*, 323 U.S. at 275.

### B.    The Evidence at Trial Was Legally Insufficient to Establish Proper Venue

Defendants were entitled to acquittal based on improper venue, because the government failed to prove (1) that Ridgeway was a "joint offender" with respect to every charged count, (2) that Ridgeway's purported arrest was "in connection with the offense[s] charged," *United States v. Hong Vo*, 978 F. Supp. 2d 49, 60 (D.D.C. 2013), or (3) that Ridgeway was arrested in the District of Columbia.

### 1.    The Evidence Was Insufficient to Prove Ridgeway Was a "Joint Offender" on Every Charged Count

Under § 3238, an individual is a "joint offender" with other defendants if they engaged in "concerted criminal activity." *United States v. Levy Auto Parts*, 787 F.2d 946, 949 (4th Cir. 1986). "*Concerted* criminal activity," like the statutory phrase "*joint* offender," connotes collaborative criminal conduct by actors who share criminal intent. *See* Black's Law Dictionary 289 (6th ed. 1990) (defining "concerted action" as "[a]ction that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme"); *id.* at 837 (defining "joint" as "united; combined; undivided; done by or

98

against two or more unitedly ...."). Thus, cases analyzing the "joint offender" provision uniformly have involved charges alleging collaborative criminal schemes. *See*, *e.g.*, *Levy*, 787 F.2d at 949 (conspiracy to sell munitions); *United States v. Pearson*, 791 F.2d 867, 868-70 (11th Cir. 1986) (marijuana conspiracy); *Hong Vo*, 978 F. Supp. 2d at 64 (conspiracy to commit visa fraud).

Even viewed favorably to the government, the evidence did not establish that Ridgeway was a "joint offender" with Defendants on any charged count. Ridgeway pled guilty to one voluntary manslaughter count and one attempted manslaughter count based on his acknowledgement "that *his* use of deadly force against the Iraqi civilians was not objectively reasonable," under "the circumstances as they appeared *to him* at the time." R.50-2, at 3, R.50-5, at 6 (emphases added).

The centrality of individual perception to every offense charged, and the absence of any evidence that Ridgeway and Defendants formed a mutual intent to respond unjustifiably to circumstances they viewed from different perspectives, place this case outside § 3238's "joint offender" provision. *See*, *e.g.*, 7/1/14 PM Tr. 54-56 (Murphy); 7/15/14 PM Tr. 90, 102-03 (Frost) (describing Raven 23's "sector" approach for dividing areas in which each individual scanned for and responded to threats). Ridgeway testified that from *his* turret position and within *his* sector, he fired without aiming, identifying a target, or believing he was acting

99

in self-defense.  7/31/14 AM Tr. 15; 8/4/14 PM Tr. 52, 100.  But he did not (and could not) testify that Defendants fired *their* weapons, from *their* positions and perspectives, with a similar state of mind.  Indeed, addressing the Kia, Ridgeway refused to agree that another guard would have been wrong to shoot at the driver: "I'm not necessarily comfortable answering that because I couldn't see what they were seeing."  8/4/14 PM Tr. 89.  The fact that no guard "could[] see what [others] were seeing" in the rapidly-changing circumstances forecloses the "concerted criminal activity" necessary to make Ridgeway a "joint offender" under § 3238.

The government also failed to present evidence that Ridgeway was a joint offender "with respect to each count charged."  *Morgan*, 393 F.3d at 195.  Ridgeway admitted only two offenses, one of which was charged against him alone.  *See* R.35-3; *cf.* R.304.  Likewise, Slatten was charged alone in a single count, and Slough ultimately was charged alone with ten counts.  These charging decisions confirm that certain counts did not involve "joint offenders" at all.  Because venue must be proven count-by-count, the government's "joint offender" proof was inadequate on this basis as well.

### 2.    The Evidence Was Insufficient to Prove Ridgeway Was Arrested in Connection With the Offenses Charged

The "joint offender" provision applies only when the joint offender has been "arrested," § 3238 (first clause), which means (1) "first restrained of his liberty" (2) "in connection with the offense charged."  *United States v. Erdos*, 474 F.2d

100

157, 160 (4th Cir. 1973); *see United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984). The government failed to prove either component of the "arrest" requirement.

First, Ridgway was never "restrained of his liberty." Describing his supposed "arrest," Ridgway testified that (1) he "was asked to fly to Washington, DC on [his] own," and voluntarily flew here from his home in California; (2) an agent "dangled his handcuffs in front of" him and said, "If you can behave yourself I will not put these on you;" (3) he was never handcuffed or locked in a cell; (4) he went home after his plea; and (5) he would have willingly reported for his plea without any arrest warrant. 7/31/14 PM Tr. 11-14. On this record, no reasonable juror could conclude Ridgeway's liberty was ever restrained.

Second, Ridgeway's alleged arrest was not "in connection with the offenses charged." The "offense-specific" focus of § 3238 requires the court to "look at the offenses for which the defendant is facing punishment, and then determine where he [or an alleged joint offender] was 'arrested or first brought' *for those offenses*." *United States v. Holmes*, 670 F.3d 586, 594 (4th Cir. 2012) (emphasis added).

*Hong Vo* addressed "the required level of connection between the first restraint and the offense charged" in a "joint offender" prosecution where (1) one defendant was arrested in Colorado on a conspiracy charge , and (2) that defendant and others were later indicted in the District of Columbia on conspiracy and

101

bribery/visa fraud charges. *Hong Vo*, 978 F. Supp. 2d at 51-52, 60. The court held that venue was improper in this District for the bribery/visa fraud offenses, because the Colorado conspiracy arrest was "very closely related" to the substantive offenses and was "all based on the same criminal scheme." *Id*. at 60. Accordingly, Colorado was a proper venue for all indicted counts, but the District of Columbia was not.[56]

This same analysis shows venue was improper in this District in this case. Unlike the conspiracy arrest in *Hong Vo*, Ridgeway was not arrested on a charge that encompassed the offenses in Defendants' indictment. Instead, Ridgeway was "arrested" on two substantive offenses based on his personal conduct—one of which was never charged against anyone else, and neither of which alleged any criminal scheme. Ridgeway therefore was not "arrested" in this District "for the same criminal conduct as that which ultimately [gave] rise to the offenses charged" against Defendants, and venue was improper. *Hong Vo*, 978 F. Supp. 2d at 60.

---

[56] Defending venue in this District, the government argued in *Hong Vo* that an "arrest" establishes venue under § 3238 only for the *exact* offense of arrest and not for related offenses in a subsequent indictment. 978 F. Supp. 2d at 60. Here, that "offense[-]specific" approach would mean that venue in this District could be proper only as to Count Two of the 2013 Indictment, the sole Count that overlapped with the offenses on which Ridgeway was allegedly "arrested." (Even as to that Count, Ridgeway was not a "joint offender," as shown *supra*.)

### C.    The Court's Failure to Submit Venue to the Jury Was Reversible Error

The government must prove proper venue by a preponderance for every count charged.  *E.g.*, *Morgan*, 393 F.2d at 195 (citing cases); 2 Wright & Miller § 307.  Like other offense elements, venue "normally must be submitted to the jury."  *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991); *see Gaudin*, 515 U.S. at 512.  At a minimum, venue "becomes a jury question and the trial court must specifically instruct the jury on venue" when:

> (1) the defendant objects to venue prior to or at the close of the prosecution's case-in-chief, (2) there is a genuine issue of material fact with regard to proper venue, and (3) the defendant timely requests a jury instruction.

*United States v. Haire*, 371 F.3d 833, 840 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005); *accord United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011); *see also United States v. Fahnbulleh*, 752 F.3d 470, 477 (D.C. Cir. 2014).

Defendants objected to venue at every stage of this proceeding and requested a jury instruction on venue.  *See* Procedural History Sec. D, *supra*.  The district court nonetheless "decide[d] that venue exists," and found "no contested issues necessary to send it to the jury."  8/26/14 PM Tr. 56.  The court's ruling was reversible error, (a) because the record on venue was laden with genuine factual disputes, and (b) because Defendants were constitutionally entitled to a jury determination of the disputed issue.

103

Ridgeway's testimony was the *only* evidence offered concerning his "arrest"
in this District. *See* 7/31/14 AM Tr. 62; 7/31/14 PM Tr. 10-13. Ridgeway was a
cooperating witness who escaped a thirty-year mandatory charge, was highly
motivated to earn a "substantial assistance" motion, and had an admitted history of
lying. *See* Statement of Facts, Sec. E.1, *supra*. His credibility was so witheringly
impeached that the government invited the jury to "scuttle" his testimony and
assess this case without him. 8/28/14 PM Tr. 97. The government's admission
that Ridgeway's credibility was so squarely in issue that the jury could decide his
testimony had *no evidentiary value at all* shows it was reversible error to take the
venue element, which depended *solely on Ridgeway's testimony*, from the jury.

Even if Ridgeway were believed—a jury question—genuine disputes existed
as to whether the conduct he described amounted to an "arrest," and whether, *as to
each count charged*, he engaged in "concerted criminal activity" with each
Defendant charged with that count, so as to make him a "joint offender." *See*
Subsec. B.1, *supra*. These issues also required jury determination.

Alternatively, this Court should hold that it is *per se* reversible error to
withhold venue from the jury over defense objection. Though "[p]rior to *Gaudin*,
courts considered themselves entitled to rule on venue as a matter of law if there
were no disputed issues of material fact," *United States v. Shepherd*, 102 F.3d 558,
565 (D.C. Cir. 1996) (citations omitted), *Gaudin* rejected the argument that "the

104

jury's constitutionally prescribed role" is confined to deciding the *factual* components of *legal* elements. 515 U.S. at 512. Instead, the Supreme Court held that "the jury's constitutional responsibility is not merely to determine the facts but to apply the law to those facts," *id.* at 514—analysis that applies equally to venue as to "materiality" under 18 U.S.C. § 1001 in *Gaudin*.

This Court should resolve in Defendants' favor the open question in this Circuit whether withholding venue from the jury over defense objection can be reconciled with *Gaudin*. *See Nwoye*, 663 F.3d at 466; *Shepherd*, 102 F.3d at 565. The right to a *jury determination* of venue is rooted in the longstanding recognition that proper venue is essential to a fair trial and must be proved by the government. *See, e.g.*, *Morgan*, 393 F.3d at 195; *Lam*, 924 F.2d at 301. Like any other fact required for conviction, the Constitution prevents withdrawal of venue from the jury based on the trial court's unilateral judgment. *See Gaudin*, 515 U.S. at 511 (Fifth and Sixth Amendments guarantee defendant "the right to demand that a jury find him guilty of all the elements of the crime"); *accord Hurst v. Florida*, 136 S. Ct. 616, 2016 WL 112683, at *5 (Jan. 12, 2016) (citing *Alleyne v. United States*, 133 S. Ct. 2151, 2156 (2013)). The government may not move for partial judgment as a matter of law, nor may the trial judge direct verdict for the government, no matter how overwhelming the evidence. *See Sullivan*, 508 U.S. at 277; *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-73 (1977).

105

Though this Court in *Fahnbulleh* quoted *Haire* to conclude that "a venue instruction is necessary only when the question of venue is genuinely in issue," and stated *Haire* established the law of the circuit, 752 F.3d at 477, *Haire*'s discussion of the point, 371 F.3d at 839-40, was dicta. *Haire* was a forfeiture/plain error case, where the defendant had not requested a venue instruction. *Id.* at 838. The same was true in *Nwoye*, 663 F.3d at 466, and *Shepherd*, 102 F.3d at 565. *Fahnbulleh* overlooked *Haire*'s plain error context, and did not address *Gaudin* or the right to jury determination of every fact necessary to conviction. *See* 752 F.3d at 477. This Court should conclude, as other circuits have, that "[f]ailure to instruct on venue, when requested, is reversible error unless it is beyond a reasonable doubt that the jury's guilty verdict on the charged offense necessarily incorporates a finding of proper venue." *Miller*, 111 F.3d at 751.[57] Here, nothing in the facts required for the jury to convict necessarily established that Ridgeway was arrested here or that he was a joint offender on every count against every Defendant. Those disputed facts required jury determination.

---

[57] *See also United States v. Casch*, 448 F.3d 1115, 1117 (9th Cir. 2006) ("In a jury trial, it is not for the court to determine that venue exists, and it is error for the court to decline to give the instruction" on request); *United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990); *United States v. Moeckly*, 769 F.2d 453, 461-62 (8th Cir. 1985); 1A O'Malley *et al.*, *Fed. Jury Prac. & Instrs.* § 13.03, notes (6th ed. 2009) (quoting *Miller*).

### D.    Dismissal is Warranted Because the Government Manufactured Venue in the District of Columbia

This case presents a paradigm example of "manufactured venue" that violates "an outer limit of fairness guaranteed by the Due Process Clause of the Fifth Amendment."  *United States v. Myers*, 692 F.2d 823, 834 (2d Cir. 1982). *Myers* reviewed, under the Due Process Clause, whether venue was improperly laid by the government "for ulterior reasons," "primarily to enable the Eastern District prosecutors to handle the trials."  *Id*. at 847 n.21.  The court rejected the argument on the facts of *Myers*, but did "not preclude the possibility of [ ] concerns if a case should arise in which key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue."  *Id*.

In *United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996), this Court assumed without deciding that the "manufactured venue" scenario set forth in *Myers* "would be a fatal impropriety," given the constitutional protection of venue rights and the historical objection to trying criminal cases in districts far removed from a defendant's community.  *Spriggs*, 102 F.3d at 1251 (citing *United States v. Cores*, 356 U.S. 405, 407 (1958)).  This Court found no "manufactured venue" on the facts of *Spriggs*, but recognized that the government's "manufactur[ing] venue" where it was otherwise improper would be constitutionally intolerable.

107

Section 3238 (clause 2) specifically protects a defendant's interest in being indicted and tried in his district of residence, but the government instead manufactured advantageous venue in the District of Columbia, far from any Defendant's home. Even accepting the government's mistaken theory that this case involves "joint offenders," the government could have respected § 3238 by returning its indictment in a district where *at least one* Defendant lived. Instead, "the prosecution, preferring trial elsewhere, lure[d] a [cooperating] defendant to a distant district for some minor event simply to establish venue." *Myers*, 692 F.2d at 847 n.21. The "minor event" was the orchestrated "arrest" here of Ridgeway (a California resident), who would have traveled voluntarily to any jurisdiction the government selected. This purely manufactured venue crossed the fundamental fairness line charted by the Due Process Clause.

## IV. THE EVIDENCE WAS INSUFFICIENT TO CONVICT LIBERTY

The standard of review for a claim of insufficiency of the evidence is set out in Sec. I.A, *supra*. There is no evidence, even viewed favorably to the government, upon which a rational trier of fact could find Liberty guilty beyond a reasonable doubt of voluntary manslaughter, attempt to commit manslaughter, or aiding and abetting those offenses.

No evidence was introduced to show beyond a reasonable doubt that Liberty: fired his weapon in the direction of any of the alleged victims, caused the death of any of the alleged victims, or intended to commit manslaughter against

108

any of the alleged victims. *See Kayode*, 254 F.3d at 212 (evidence must be "sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt"); *Wilson*, 160 F.3d at 737 (court cannot sustain verdict where "the government's web of inference is too weak to meet the legal standard of sufficiency") (internal quotations and citations omitted). There also was no evidence that Liberty knew another defendant was shooting at any specific alleged victim, much less *unjustifiably* so, or that he knowingly did some act intending to aid such crime; or knew in advance that any crime was to be committed. *See Rosemond v. United States*, 134 S. Ct. 1240, 1248-51 (2014); *Wilson*, 160 F.3d at 738 (finding evidence of aiding and abetting insufficient because government failed to show that defendant "intended to bring about" the alleged crimes, and "that he knew why and what" the principals "intended to do" to the victim).

On September 16, 2007, Liberty was driving the command vehicle with shift leader Watson as passenger. 7/28/14 AM Tr. 65; 7/28/14 PM Tr. 21. Upon hearing reports of incoming fire and seeing a white car quickly approaching the convoy, Watson ordered Liberty to open his door, leaned across Liberty's lap, and fired out the driver's door. 7/28/14 PM Tr. 29, 40-50. Watson leaned across Liberty's lap a second time, again ordering Liberty to open the door, *id.* at 50, 55, and shot at a man to the south, while Liberty fired his weapon to the southeast into

109

a tree line, where Watson believed incoming fire was originating. *Id.* at 55-57, 59, 68-70; GX498-D2. Watson's testimony was the only evidence introduced regarding where Liberty fired his weapon that day, yet *none of the victims was located to the southeast*.

The government's other evidence is also insufficient. Krueger and Randall admitted that they *assumed* the driver of the command vehicle fired rounds toward the Kia or out of the command vehicle only because they knew Liberty was driving that day. 8/5/14 PM Tr. 65-69 (Krueger); 8/11/14 AM Tr. 80-82 (Randall). Watson, however, admitted to shooting the rounds at the Kia out the driver's door.

Mealy *perceived* shots fired by a person outside of the command vehicle with a particular type of magnification scope (ACOT), but could not identify the person. 7/15/14 PM Tr. 118-121. The government's own evidence proved Liberty had a different type of magnification scope (EOTech). *See* GX8005.

Ridgeway's cryptic testimony that Liberty told Ridgeway, when leaving the parking lot after the incident, that he "pulled a Grey 55," i.e., shot out his driver's porthole while driving, *see* 7/31/14 AM Tr. 43-44; 7/30/14 PM Tr. 73-74, was contradicted by Blackwater's mechanic, T.J. Hill, who testified that Liberty did not leave with Ridgeway, but stayed at the motor pool. 8/20/14 AM Tr. 13; 8/8/14 Dep. Tr. 46, 50.

110

The evidence shows Liberty's knowledge of actions of others was limited to Watson, who was not charged with any criminal offense. Confronted with the dearth of evidence regarding who shot whom in Nisur Square, the government contended that any defendant who fired even one shot aided and abetted the reckless, indiscriminate fire of Ridgeway, the government's cooperating witness. *See* 8/27/14 AM Tr. 68 ("If [sic] each shooter enabling and assisting one another to fire. It's also just common sense. When someone fires his weapon and another person joins in it, it becomes that much more difficult to escape if you're in that line of fire."); *see also* 8/27/14 PM Tr. 80 (rebuttal). To aid and abet, however, it is not enough that both Ridgeway and Liberty fired. Aiding and abetting requires the government to prove, for each victim, (a) that Ridgeway committed manslaughter or attempted manslaughter by shooting the victim unjustifiably, intending to kill or do serious bodily harm and not in self-defense; (b) Liberty knew *at the time* Ridgeway's shooting was unjustifiable; and (c) with time to choose whether to aid in the wrongdoing, Liberty joined Ridgeway, taking some action intended to help achieve that criminal goal. *See Rosemond*, 134 S. Ct. at 1248-51. There is no evidence Liberty communicated with Ridgeway, saw what Ridgeway saw, knew what Ridgeway was thinking, or otherwise knew Ridgeway was acting unjustifiably, and consciously tried to help him do so. No rational trier

111

of fact could have found evidence beyond a reasonable doubt that Liberty either

committed or aided and abetted the crimes charged.

## V.    APPLICATION OF THE 30-YEAR MANDATORY-MINIMUM SENTENCE ON THE FIREARMS CHARGE VIOLATES THE EIGHTH AMENDMENT

The mandatory thirty-year penalty for using machine guns or grenades,[58]

where Defendants were required to use those State-Department-issued weapons to

perform their duties in a war zone, was unconstitutionally rigid and grossly

disproportionate, in violation of the Eighth Amendment.

### A.    Legal Framework and Standard of Review

"The concept of proportionality is central to the Eighth Amendment."

*Graham v. Florida*, 560 U.S. 48, 59 (2010).   Eighth Amendment proportionality

jurisprudence falls into several categories.  One category "involves challenges to

the length of term-of-years sentences given all the circumstances in a particular

case."  *Graham*, 560 U.S. at 59.  A second concerns death sentences (inapplicable

here).  *Id*.  A third consists of "a categorical challenge to a term of years sentence

... as it applies to an entire class of offenders who have committed a range of

crimes."  *Id*. at 61.  In both the first and third categories, the Supreme Court has

---

[58] 18 U.S.C. § 924(c)(1)(B)(iii) (R.725, R.747).

vacated imprisonment terms and overturned statutory penalty schemes for violating the Eighth Amendment.[59]

Defendants challenge (1) the disproportionality of the thirty-year sentences imposed upon them under § 924(c) (a category 1 claim) and (2) the constitutionality of mandating that sentence for this category of defendants under § 924(c), *i.e.*, defendants for whom the underlying crime of violence involved defensive use of government-issued weapons in a war zone (a category 3 claim). Review is *de novo*. *United States v. Said*, 798 F.3d 182, 196 (4th Cir 2015).

## B.    A Thirty-Year Sentence for the Defensive Use of Government-Issued Weapons in a War Zone is Grossly Disproportionate

When a term-of-years sentence is challenged as excessive under the Eighth Amendment, courts first examine "all of the circumstances of the case to determine whether the sentence" satisfies the threshold requirement of "gross disproportionality" between the gravity of the offense and the severity of the sentence. *Graham*, 560 U.S. at 59-60; *Harmelin v. Michigan*, 501 U.S. 957, 1005

---

[59] *See Weems v. United States*, 217 U.S. 349, 365 (1910) (vacating 12-year sentence for falsifying documents); *Solem v. Helm*, 463 U.S. 277, 304 (1983) (vacating life-without-parole sentence under recidivist statute where felonies were nonviolent); *Graham*, 560 U.S. at 82 (prohibiting life without parole for juvenile offenders in non-homicide cases); *Miller v. Alabama*, 132 S. Ct. 2455, 2468 (2012) (holding mandatory sentence of life without parole for juvenile offenders unconstitutional).

113

(1991) (Kennedy, J., concurring).  The "gross disproportionality" threshold was crossed here.

This case presents a gross disparity between (1) the level of culpability associated with the predicate crimes of violence (manslaughter and attempted manslaughter) and (2) the severity of the mandatory sentence that followed from the § 924(c) count alone, which hinged solely on the weapons Defendants used. Unlike cases in which the destructive capacity of a weapon *could* reflect greater culpability (such as using a machine gun in a robbery or drug deal), no inference of enhanced culpability follows from the government-required use of government-issued weapons in a war zone.  Whereas the bank robber and drug dealer *choose* to arm themselves with a powerful weapon, *see Muscarello v. United States*, 524 U.S. 125, 132 (1998) (legislative purpose of § 924(c) was to "persuade the man who is tempted to commit a Federal felony to leave his gun at home" (citation omitted)), here Defendants were *required* to carry high-powered weapons to respond to mortal threats in a war zone.  Ignoring this difference, and rigidly subjecting war-zone security guards to a mandatory thirty-year penalty, without consideration of the circumstances of their crimes, is arbitrary and irrational.

The 30-year minimum also resulted in grossly disproportionate sentences. The evidence established that many Raven 23 members perceived threats in Nisur Square—threats to which Defendants were authorized to respond using their State

114

Department weapons.  Through its verdicts, the jury must have concluded that Defendants used their weapons in an unreasonable manner in response to those threats.  Defendants are responsible for *the degree to which they responded* to any threat, and the manslaughter and attempted manslaughter counts, which reflect *that* conduct, carry penalties (without a minimum) of ten and seven years, respectively. By contrast, the tripled mandatory sentence under § 924(c) reflects only one circumstance (the type of weapon used) that was *outside Defendants' control* and thus reflects no incremental culpability on their part.  This charging anomaly resulted in sentences that epitomize "gross disproportionality" under the Eighth Amendment.  A mandatory 30-year sentence is among the most severe in the law. It was imposed here without any correlation between the substance of the § 924(c) charge and Defendants' level of culpability and criminal intent.

The "grossly disproportionate" threshold inquiry ordinarily is followed by a comparative analysis of sentences received for the same crime by other offenders in the same and other jurisdictions to "validate" the conclusion that a sentence violates constitutional proportionality principles.  *See Graham*, 560 U.S. at 60. The unprecedented nature of this prosecution makes precise comparison impossible.  However, federal sentencing statistics for Fiscal Year 2013 reflect that, for defendants in Criminal History Category I, (1) the respective median and mean sentences for manslaughter was 30 months and 47 months and (2) the

115

respective median and mean sentences for firearms offenses was 30 months and 65 months. R.725-1. Appellants' sentences are *twelve times* the median sentence for first-time manslaughter or firearms offenders, and *six times* the median sentences for the two offenses combined. Severely skewed sentencing results for similarly situated defendants such as these are prohibited by the Eighth Amendment.

### C.  The Mandatory Nature of the Thirty-Year Sentence as Applied to Government Employment Conduct in a War Zone Violates the Eighth Amendment

The Eighth Amendment does not categorically prohibit mandatory sentencing provisions. *See Harmelin*, 501 U.S. at 1006 (Kennedy, J., concurring). But the Supreme Court has identified circumstances outside capital cases in which the mandatory imposition of a severe penalty without individualized analysis violates the Constitution. In *Miller*, the Court held that imposing a mandatory sentence of life without parole on a juvenile offender violates the Eighth Amendment because the court would "miss[] too much" if it could not consider individualized factors bearing on the offenders' culpability. *Miller*, 132 S. Ct. at 2468; *cf. Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (mandatory death sentence for first-degree murder violated Eighth Amendment because it precluded consideration of mitigating circumstances and offender characteristics).

*Miller* focused on the attributes of juveniles that make them "constitutionally different from adults for purposes of sentencing." *Miller*, 132 S. Ct. at 2464. This

116

case presents another category of offenders whose culpability cannot be assessed absent individual analysis. The moral culpability of a defendant who has used a government-issued weapon in response to perceived threats in the course of employment in a war zone is so starkly different from the culpability of other § 924(c) defendants that mandatory imposition of a thirty-year sentence is unjust. Removing the war-zone context from the assessment and mandating a thirty-year minimum sentence for government contractors who have used service weapons in a war zone is akin to removing "youth from the balance" when sentencing a juvenile to life without parole: it "prohibit[s] a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes" a unique class of offender with characteristics that demand individualized consideration under the Eighth Amendment. *See Miller*, 132 S. Ct. at 2466.

## CONCLUSION

For the foregoing reasons, this Court should reverse Defendants' convictions and remand with instructions to grant judgments of acquittal. Alternatively, the Court should vacate and remand for a new trial, or at a minimum for resentencing.

117

Respectfully submitted,

By:  _/s/ Bruce C. Bishop_____

| | |
|---|---|
| Brian M. Heberlig (No. 455381) | David Schertler (No. 367203) |
| Michael J. Baratz (No. 480607) | Lisa Hertzer Schertler (No. 430754) |
| Bruce C. Bishop (No. 437225) | Janet Foster (*pro hac vice*) |
| Linda C. Bailey (No. 985081) | Schertler & Onorato LLP |
| Steptoe & Johnson LLP | 575 7th Street, N.W. |
| 1330 Connecticut Ave. N.W. | Suite 300 South |
| Washington, D.C.  20036 | Washington, D.C.  20004 |
| (202) 429-3000 | (202) 628-4199 |

*Counsel for Defendant*          *Counsel for Defendant*
*Paul A. Slough*                 *Dustin L. Heard*


William Coffield (No. 431126)
Laina C. Lopez (No. 477412)
Berliner, Corcoran & Rowe, LLP
1101 17th Street, NW
Suite 1100
Washington, DC 20036
202-293-5555

*Counsel for Evan S. Liberty*

118

## CERTIFICATE OF COMPLIANCE

I, Bruce C. Bishop, hereby certify that:

1.      I am an attorney representing Defendants-Appellants in this appeal.

2.      This brief is in Times New Roman 14-pt. type.

3.      In an order dated December 18, 2015, this Court authorized the filing of a joint principal brief for Defendants-Appellants Slough, Liberty, and Heard of up to 28,000 words.  Using the word count feature of the software used to prepare the brief,  I have determined that the text of the brief (excluding the Certificate as to Parties, Table of Contents, Table of Authorities, Glossary, Addenda, and Certificates of Compliance and Service) contains 27,882 words.


    __/s/  Bruce Bishop_____
    Bruce C. Bishop
    Date:  February 1, 2016

xx

# ADDENDUM

# MILITARY EXTRATERRITORIAL JURISDICTION ACT

The Military Extraterritorial Jurisdiction Act of 2000, as amended, codified in Chapter 212 ("Military Extraterritorial Jurisdiction") of Title 18 of the United States Code, provides in relevant part:

## § 3261.  Criminal offenses committed by certain members of the Armed Forces and by persons employed by or accompanying the Armed Forces outside the United States

(a) Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States—

(1) while employed by or accompanying the Armed Forces outside the United States; or

(2) while a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice),

shall be punished as provided for that offense.

\*   \*   \*   \*

(d) No prosecution may be commenced against a member of the Armed Forces subject to chapter 47 of title 10 (the Uniform Code of Military Justice) under this section unless—

(1) such member ceases to be subject to such chapter; or

(2) an indictment or information charges that the member committed the offense with one or more other defendants, at least one of whom is not subject to such chapter.

\*   \*   \*   \*

### § 3267.   Definitions

As used in this chapter:

(1) The term "employed by the Armed Forces outside the United States" means—
    (A)    employed as—
      (i) a civilian employee of—
          (I) the Department of Defense (including a nonappropriated fund instrumentality of the Department); or
          (II) any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas;

      (ii) a contractor (including a subcontractor at any tier) of—
          (I) the Department of Defense (including a nonappropriated fund instrumentality of the Department); or
          (II) any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas; or

      (iii) an employee of a contractor (or subcontractor at any tier) of—
          (I) the Department of Defense (including a nonappropriated fund instrumentality of the Department); or
          (II) any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas;

    (B) present or residing outside the United States in connection with such employment; and
    (C) not a national of or ordinarily resident in the host nation.

(2) The term "accompanying the Armed Forces outside the United States" means—

    (A) a dependent of—

        (i) a member of the Armed Forces;

        (ii) a civilian employee of the Department of Defense (including a nonappropriated fund instrumentality of the Department); or

        (iii) a Department of Defense contractor (including a subcontractor at any tier) or an employee of a Department of Defense contractor (including a subcontractor at any tier);

    (B) residing with such member, civilian employee, contractor, or contractor employee outside the United States; and

    (C) not a national of or ordinarily resident in the host nation.

(3) The term "Armed Forces" has the meaning given the term "armed forces" in section 101(a)(4) of title 10.

*   *   *   *

# DIPLOMATIC SECURITY ACT

The Omnibus Diplomatic Security and Antiterrorism Act of 1986, codified in relevant part in Chapter 58 ("Diplomatic Security") of Title 22 of the United States Code, provides in relevant part:

## § 4801.  Findings and purposes

### (a)  Findings

The Congress finds and declares that—

(1)  The United States has a crucial stake in the presence of United States Government personnel representing United States interests abroad;

(2)  conditions confronting United States Government personnel and missions abroad are fraught with security concerns which will continue for the foreseeable future; and

(3)  the resources now available to counter acts of terrorism and protect and secure United States Government personnel and missions abroad ... are inadequate to meet the mounting threat to such personnel and facilities.

### (b)  Purposes

The purposes of this chapter are—

(1)  to set forth the responsibility of the Secretary of State with respect to the security of diplomatic operations in the United States and abroad ....

\*  \*  \*  \*

xxv

## § 4802. Responsibility of Secretary of State

### (a) Security functions

(1) The Secretary of State shall develop and implement (in consultation with the heads of other Federal agencies having personnel or missions abroad where appropriate and within the scope of the resources made available) policies and programs, including funding levels and standards, to provide for the security of United States Government operations of a diplomatic nature and foreign government operations of a diplomatic nature in the United States. Such policies and programs shall include—

(A) protection of all United States Government personnel on official duty abroad (other than Voice of America correspondents on official assignment and those personnel under the command of a United States area military commander) and their accompanying dependents;

(B) establishment and operation of security functions at all United States Government missions abroad (other than facilities or installations subject to the control of a United States area military commander);

\* \* \* \*

(2) Security responsibilities shall include the following:

**(A) Former Office of Security functions**

Functions and responsibilities exercised by the Office of Security, Department of State, before November 11, 1985.

**(B) Security and protective operations**

(i) Establishment and operation of post security and protective functions abroad.

\* \* \* \*

(v) Supervision of the United States Marine Corps security guard program.

\* \* \* \*

(viii) Protection of the Secretary of State and other persons designated by the Secretary of State, as authorized by law.

\* \* \* \*

(xii) Performance of other security, investigative, and protective matters as authorized by law.

xxvi

# FOREIGN AFFAIRS MANUAL

Volume 12 of the United States Department of State Foreign Affairs Manual

("Diplomatic Security") provides in relevant part:

## 12 FAM 000
## AUTHORITY AND LEGAL RESPONSIBILITIES

## 12 FAM 010
## SCOPE AND AUTHORITY
*(CT:  DS-106; 12-21-2004)*
*(Office of Origin:  DS/MGT/PPD)*

## 12 FAM 011  MISSION
*(TL:  DS-98, 05-11-2004)*

The mission of the Bureau of Diplomatic Security is to provide a safe and secure environment for the conduct of U.S. foreign policy.

## 21 FAM 012  LEGAL AUTHORITIES
*(CT:  DS-106, 12-21-2004)*

a.  The Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99-399; 22 U.S.C. 4801, et seq. (1986), as amended.

b.  The security functions of the Secretary of State, as delegated to the Assistant Secretary for Diplomatic Security, are set forth in 22 U.S.C. 4802(a) and Delegation of Authority No. 214, dated 9-20-1994.

U.S. Department of State, Foreign Affairs Manual and Handbook, 12 FAM 000-012, *available at* https://fam.state.gov/FAM/12FAM/12FAM0010.html (last visited December 30, 2015).

## CONSTITUTION AND STATUTE REGARDING VENUE

Article III, Section 2, Clause 3 of the Constitution provides:

The Trial of all Crimes, except in Cases of Impeachment; shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

The Sixth Amendment provides in relevant part:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law ....

18 U.S.C. § 3238 provides:

## § 3238.  Offenses not committed in any district

The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

xxviii

## CONSTITUTION AND STATUTE REGARDING PENALTY

The Eighth Amendment provides:

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

18 U.S.C. § 924(c)(1) provides in relevant part:

### § 924.  Penalties

\*   \*   \*   \*

(c)(1)(A)  Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime ... for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

(i)  be sentenced to a term of imprisonment of not less than 5 years;

(ii)  if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii)  if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

(B)  If the firearm possessed by a person convicted of a violation of this subsection—

(i)  is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

(ii)  is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

\*   \*   \*   \*

(D)  Notwithstanding any other provision of law—
    (i)  a court shall not place on probation any person convicted of a violation of this subsection; and
    (ii)  no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.


18 U.S.C. § 921 provides in relevant part:

## § 921.  Definitions

(a) As used in this chapter—

*   *   *   *

(4)  The term "destructive device" means—
    (A)  any explosive, incendiary, or poison gas—
        (i)  bomb,
        (ii)  grenade,

    *   *   *   *

    (B)  any type of weapon ... by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter ....

xxx

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2016, I caused the foregoing

Proof Brief of Appellees to be filed electronically via the CM/ECF system, which

resulted in service on the following counsel who has consented to electronic

service.  I also caused a copy to be served by United States mail, first-class postage

prepaid.

Demetra Lambros, Esq.
U.S. Department of Justice
Criminal Appellate Section
950 Pennsylvania Ave. N.W.
Room 1264
Washington, DC 20530
Demetra.Lambros@usdoj.gov

*Counsel for Appellant the United States*


___ */s/  Bruce Bishop*_____


xxxi