ORAL ARGUMENT NOT YET SCHEDULED

PUBLIC COPY – SEALED MATERIAL DELETED

# United States Court of Appeals
# For the District of Columbia

———————————

Nos. 15-3078 (L), 15-3079, 15-3080, 15-3081

———————————

## UNITED STATES OF AMERICA,
Appellee,

v.

## NICHOLAS ABRAM SLATTEN, PAUL ALVIN SLOUGH, EVAN SHAWN LIBERTY, and DUSTIN LAURENT HEARD,
Defendant-Appellants.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
(The Hon. Royce C. Lamberth)

———————————

## PROOF BRIEF FOR THE UNITED STATES

———————————

CHANNING D. PHILLIPS
United States Attorney
District of Columbia

ANTHONY ASUNCION
JAY I. BRATT
JOHN CRABB JR.
CHRISTOPHER KAVANAUGH
KENNETH C. KOHL
GREGG A. MAISEL
JONATHAN M. MALIS
T. PATRICK MARTIN
DAVID MUDD

LESLIE R. CALDWELL
Assistant Attorney General
Criminal Division
U.S. Department of Justice

SUNG-HEE SUH
Deputy Assistant Attorney General

DEMETRA LAMBROS
Attorney, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 616-4526
demetra.lambros@usdoj.gov

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**A.    PARTIES AND AMICI**

The parties in the district court were the United States of America as plaintiff and defendants Nicholas Slatten, Paul Slough, Evan Liberty, and Dustin Heard.  These same parties are before this Court.  There were no intervenors or *amici* below.  Here, the National Association of Criminal Defense Lawyers (NACDL) has filed an amicus brief supporting defendants.

**B.    RULINGS UNDER REVIEW**

The rulings under review are identified in defendants' briefs.

**C.    RELATED CASES**

The related cases are identified in defendants' briefs.

# TABLE OF CONTENTS

JURISDICTION ...................................................................... 1

ISSUES PRESENTED ............................................................ 1

STATUTES AND REGULATIONS ........................................ 2

STATEMENT OF THE CASE ................................................ 3

    I.      PROCEDURAL HISTORY ...................................... 3

    II.     STATEMENT OF FACTS ........................................ 5

         A.    Introduction ..................................................... 5

         B.    Blackwater, The Raven 23 Convoy, And Its Use-of-Force Rules ........................................................ 6

         C.    The Shooting In Nisur Square ......................... 10

             1.    It Begins: Slatten Shoots, Others Follow, And The White Kia Is Set Ablaze. ................................. 13

             2.    The Shooting Continues To The South, East, And West: "The Square Turned Into Hell." ............ 17

             3.    To The North Of The Square, Slough And Ridgeway Shoot Again. ........................................... 27

         D.    The Aftermath: U.S. Army Officers Go To the Scene And Are Appalled At What They Find. .......................... 30

         E.    Back at Blackwater Headquarters, Some Raven 23 Guards Are Also Incensed: "The Most Horrible, Botched Thing I've Ever Seen." ........................................ 32

         F.    On Incoming Fire And The Defense Case ........................ 35

    III.    RULINGS UNDER REVIEW ................................ 45

SUMMARY OF ARGUMENT ................................................ 45

ARGUMENT ...................................................................... 54

I.   DEFENDANTS WERE RIGHTLY CONVICTED
     UNDER THE MILITARY EXTRATERRITORIAL
     JURISDICTION ACT. ............................................. 54

     A.   Standard of Review ....................................... 54

     B.   Background .................................................. 54

     C.   Defendants' Employment "Relate[d] To Supporting"
          The Defense Department's Mission In Iraq. .................... 58

     D.   Neither the Views Of Executive Branch Officials Nor
          Failed Congressional Proposals To Further Expand
          MEJA Inform The Inquiry. ................................ 70

     E.   The Rule of Lenity Does Not Apply. ............... 72

     F.   The Jury Was Properly Instructed. ................. 74

II.  THE PROSECUTION OF SLATTEN WAS NOT
     VINDICTIVE. ......................................................... 82

     A.   Standard of Review ....................................... 82

     B.   Background .................................................. 83

     C.   The Reindictment Of Slatten For First-Degree Murder
          Was An Appropriate Exercise Of Prosecutorial
          Discretion. .................................................. 87

     D.   Slatten's Arguments To The Contrary Are Unavailing. .... 92

III. THE EVIDENCE PROVED SLATTEN'S AND
     LIBERTY'S GUILT. ................................................ 101

     A.   Standard of Review ...................................... 101

     B.   The Evidence Supported Slatten's First-Degree
          Murder Conviction. ...................................... 102

     C.   The Evidence Supported Liberty's Manslaughter
          Convictions. ............................................... 109

iii

IV.   THE EXCLUSION OF ██████████████████
      ████████ HEARSAY STATEMENTS WAS NOT AN
      ABUSE OF DISCRETION. ................................................... 118

      A.   Standard of Review ........................................... 118

      B.   Background ...................................................... 118

      C.   ████████████████████████████████
           ████████████████████████████████
           ████████████████████████████████
           ████████████████.................... 121

      D.   ████████ Statements Were Not A Record Of A
           Regularly Conducted Business Activity. ......................... 129

      E.   Any Error In Excluding ████████ Statements Was
           Harmless. ........................................................ 131

V.    VENUE WAS PROPER IN THE DISTRICT OF
      COLUMBIA. ................................................................ 133

      A.   Standard of Review ........................................... 133

      B.   Background ...................................................... 133

      C.   Ridgeway Was A "Joint Offender." .............................. 138

      D.   Ridgeway Was "Arrested" in D.C. ............................... 144

      E.   The Government Did Not "Manufacture" Venue. .......... 145

      F.   The District Court Did Not Err, Reversibly Or
           Otherwise, By Not Submitting Venue To The Jury. ......... 151

VI.   THE DISTRICT COURT DID NOT ABUSE ITS
      DISCRETION IN DENYING A NEW TRIAL. .................... 154

      A.   Standard of Review and Legal Principles ...................... 155

      B.   Background ...................................................... 156

      C.   Defendants Fail To Show That Monem's Victim
           Impact Statement Would Probably Produce An
           Acquittal On Retrial. ............................................ 161

           1.   Monem's Testimony, In Context .......................... 161

iv

2.    The Victim Impact Statement Is Not Direct, Exculpatory Evidence Of Slatten's Innocence. ...... 163

3.    The Victim Impact Statement Does Not Entitle Slough, Liberty, Or Heard To A New Trial, Either. ................................................................... 165

D.    The District Court Acted Within Its Discretion In Not Holding A Hearing. ....................................... 170

VII.    DEFENDANTS' SENTENCES ARE NOT CRUEL AND UNUSUAL. ................................................................. 172

A.    Standard of Review ....................................... 172

B.    Background ................................................. 172

C.    The Sentences Befit Defendants' Crimes. ....................... 175

1.    The Section 924(c) Sentences Are Not Grossly Disproportionate To Defendants' Crimes. ............. 176

2.    Defendants' Sentences Are Not Categorically Cruel And Unusual. ............................................ 182

CONCLUSION ................................................................. 185

CERTIFICATE OF COMPLIANCE ........................................... 186

CERTIFICATE OF SERVICE ................................................. 187

ADDENDUM .................................................................. 188

# TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States,* 134 S.Ct. 2259 (2014)..............................................73

\* *Al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010)....................................116

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995) ......................................139

*Blackledge v. Perry*, 417 U.S. 21 (1974)............................................................88

\* *Bordenkircher v. Hayes*, 434 U.S. 357 (1978) .............................86, 94, 95, 96, 99

\* *Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993)...................................................107

*Brendlin v. California*, 551 U.S. 249 (2007) ....................................................144

\* *California v. Hodari D.*, 499 U.S. 621 (1991)...................................................145

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .................................................125

\* *Chapman v. United States*, 500 U.S. 453 (1991)................................................72

\* *Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) ...........................................71

*Davis v. United States*, 735 A.2d 467 (D.C. 1999) ..........................................115

*District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125 (1992).....59

*Duncan v. Walker*, 533 U.S. 167 (2001) ...........................................................69

*Ewing v. California*, 538 U.S. 11 (2003)...........................................................177

\* *Friedman v. Sebelius*, 686 F.3d 813 (D.C. Cir. 2012)...................................60, 63

*Gang Luan v. UReplacementnited States*, 722 F.3d 388 (D.C. Cir. 2013)............54

*Garrity v. New Jersey*, 385 U.S. 493 (1967) ....................................................119

\*   Authorities chiefly relied upon are marked with an asterisk.

\* *Graham v. Florida*, 560 U.S. 48 (2010).................... 175, 176, 180, 182, 183, 184

*Hardwick v. Doolittle*, 558 F.2d 292 (5th Cir. 1977).......................................... 99

\* *Harmelin v. Michigan*, 501 U.S. 957 (1991) ........................................... 176, 177

*Haywood v. Chicago*, 378 F.3d 714 (7th Cir. 2004)........................................ 126

*Hedgpeth v. Pulido*, 555 U.S. 57 (2008)........................................................ 68

*Hui Lin Huang v. Holder*, 677 F.3d 130 (2d Cir. 2012) ................................. 152

\* *Hutto v. Davis*, 454 U.S. 370 (1982)....................................................... 176, 177

*In re Adrian*, 661 N.Y.S.2d 277 (N.Y.App.Div. 1997) ................................. 115

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................................... 108

*Kastigar v. United States*, 406 U.S. 441 (1972).............................................. 3

*Kinsella v. Singleton*, 361 U.S. 234 (1960)...................................................... 61

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) (en banc).................... 153

*Laumer v. United States*, 409 A.2d 190 (D.C. 1979) ..................................... 123

*Lockhart v. United States,* 136 S.Ct. 958 (2016) ............................................. 73

*Lockyer v. Andrade*, 538 U.S. 63 (2003) ........................................................ 177

*Maddox v. Elzie*, 238 F.3d 437 (D.C. Cir. 2001) ............................................ 98

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)........................................ 70

*Metropolitan Life Ins. Co. v. Mass.*, 471 U.S. 724 (1985) ............................. 60

\* *Miller v. Alabama*, 132 S.Ct. 2455 (2012) .................................................... 183

\* *Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374 (1992) ............................. 59

*Moskal v. United States*, 498 U.S. 103 (1990) ............................................... 73

*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005) .............................................. 152

*Muscarello v. United States*, 524 U.S. 125 (1998) ........................................... 72

*Neder v. United States*, 527 U.S. 1 (1999) ........................................................ 154

*North Carolina v. Pearce*, 395 U.S. 711 (1969) ................................................. 88

*O'Gilvie v. United States*, 519 U.S. 79 (1996) ................................................... 71

\* *Palmer v. Hoffman*, 318 U.S. 109 (1943) .......................................................... 130

\* *Paradise v. CCI Warden*, 136 F.3d 331 (2d Cir. 1998) .................... 91, 92, 94, 98

*People v. Bracey*, 417 N.E.2d 1029 (Ill.App.Ct. 1981) ................................... 124

*People v. Raife*, 674 N.Y.S.2d 377 (N.Y.App.Div. 1998) ............................... 124

*Pharaon v. Bd. of Governors of the Fed. Reserve Sys.*, 135 F.3d 148 (D.C. Cir. 1998) ................................................................................................................ 172

\* *Pierson v. Berghuis*, 2013 WL 4067619 (W.D.Mich. 2013) ........................... 124

*Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240 (1964) ................................. 149

*Pub. Citizen, Inc. v. Rubber Mfr's Ass'n*, 533 F.3d 810 (D.C. Cir. 2008) ............ 76

*Reid v. Covert*, 354 U.S. 1 (1957) ............................................................. 61, 134

*Reno v. Koray*, 515 U.S. 50 (1995) ................................................................... 72

*Robinson v. State*, 758 So.2d 480 (Miss.Ct.App. 2000) .................................. 124

\* *Rosemond v. United States*, 134 S.Ct. 1240 (2014) ......................... 113, 114, 115

*Rummel v. Estelle*, 445 U.S. 263 (1980) .................................................. 176, 177

\* *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ........................................... 59

*Skilling v. United States*, 561 U.S. 358 (2010) .................................................. 68

*Smith v. United States*, 508 U.S. 223 (1993) ..................................... 59, 73, 130

*Solem v. Helm*, 463 U.S. 277 (1983) ........................................................ 176, 181

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2000) ........................................................................................................ 72

*Sparf v. United States*, 156 U.S. 51 (1895) ....................................................... 70

\*  *Standefer v. United States*, 447 U.S. 10 (1980) ............................... 113

\*  *State v. Gardner*, 8 S.W.3d 66 (Mo. 1999) (en banc) ..................................91, 96

*Thompson v. Keohane*, 516 U.S. 99 (1995) .................................... 152

*United States v. Aggarwal*, 17 F.3d 737 (5th Cir. 1994) .................................... 89

*United States v. Alexander*, 471 F.2d 923 (D.C. Cir. 1973) ........................... 116

\*  *United States v. Al-Talib*, 55 F.3d 923 (4th Cir. 1995) .................................... 149

\*  *United States v. Armstrong*, 517 U.S. 456 (1996) ................................................ 87

*United States v. Bailey*, 444 U.S. 394 (1980) .................................................. 102

*United States v. Banks*, 682 F.2d 841 (9th Cir. 1982) ......................................... 99

\*  *United States v. Barner*, 441 F.3d 1310 (11th Cir. 2006) ........................ 94, 96, 98

*United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976) .................................... 128

*United States v. Bascope-Zurita*, 68 F.3d 1057 (8th Cir. 1995) ......................... 151

*United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009) ................................ 152

*United States v. Bithoney*, 472 F.2d 16 (2d Cir. 1973) ................................... 146

*United States v. Borda*, 952 F.Supp.2d 43 (D.D.C. 2013) ............................. 153

*United States v. Bowers*, 811 F.3d 412 (11th Cir. 2016) ................................. 177

*United States v. Bowman*, 260 U.S. 94 (1922) .................................................. 62

\*  *United States v. Boyd*, 803 F.3d 690 (D.C. Cir. 2015) .................................... 107

\*  *United States v. Branch*, 91 F.3d 699 (5th Cir. 1996) .................................... 115

*United States v. Bumpass*, 60 F.3d 1099 (4th Cir. 1995) .................................. 129

*United States v. Caldwell*, 560 F.3d 1202 (10th Cir. 2009) ............................. 140

*United States v. Cantley*, 1987 WL 13668 (E.D.Pa. 1987) ............................. 123

*United States v. Carbone*, 880 F.2d 1500 (1st Cir. 1989) ................................. 166

*United States v. Cardinas Garcia*, 596 F.3d 788 (10th Cir. 2010) ...................... 108

*United States v. Casch*, 448 F.3d 1115 (9th Cir. 2006).................................... 154

*United States v. Catalan-Roman*, 585 F.3d 453 (1st Cir. 2009) ........................ 113

*United States v. Catino*, 735 F.2d 718 (2d. Cir. 1984) ............................ 143, 147

*United States v. Celis*, 608 F.3d 818 (D.C. Cir. 2010) ................................... 155

*United States v. Chase*, 451 F.3d 474 (8th Cir. 2006).................................... 121

*United States v. Connolly*, 504 F.3d 206 (1st Cir. 2007)................................. 170

*United States v. Contreras*, 950 F.2d 232 (5th Cir. 1991)................................ 180

*United States v. Davis*, 960 F.2d 820 (9th Cir. 1992) .................................... 168

*United States v. DeFries*, 129 F.3d 1293 (D.C. Cir. 1997)................................ 68

*United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) .................... 62

*United States v. DiPaolo*, 835 F.2d 46 (2d Cir. 1987) ................................... 166

*United States v. Dozier*, 162 F.3d 120 (D.C. Cir. 1998) ................................. 111

*United States v. Dvorin,* 2016 WL 1085744 (5th Cir. March 18, 2016) ........... 100

*United States v. Dykes*, 406 F.3d 717 (D.C. Cir. 2005).................................. 102

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012) .................................... 151

\* *United States v. Esposito*, 968 F.2d 300 (3d Cir. 1992) ...............................90, 94

\* *United States v. Fahnbulleh*, 752 F.3d 470 (D.C. Cir. 2014), *cert. denied*, 135
     S.Ct. 1520 (2015)........................................................... 151, 152

*United States v. Fei*, 225 F.3d 167 (2d Cir. 2000) ........................................ 173

*United States v. Feng*, 277 F.3d 1151 (9th Cir. 2002) .................................... 134

*United States v. Fennell*, 53 F.3d 1296 (D.C. Cir. 1995)................................. 102

*United States v. Fight*, 625 F.3d 523 (8th Cir. 2010) ...................................... 182

*United States v. Fokker Serv. B.V.*, 2016 WL 1319266 (D.C. Cir. April 5, 2016) ..................................................................... 87

*United States v. Ford*, 870 F.2d 729 (D.C. Cir. 1989) .................................... 120

*United States v. Gallegos-Curiel*, 681 F.2d 1164 (9th Cir. 1982) ........................ 90

*United States v. Gaudin*, 515 U.S. 506 (1995)................................152, 153, 154

*United States v. Gbemisola*, 225 F.3d 753 (D.C. Cir. 2000) ........................... 140

\* *United States v. Glantz*, 884 F.2d 1483 (1st Cir. 1989) ................................... 167

*United States v. Golb*, 69 F.3d 1417 (9th Cir. 1995) ....................................... 140

\* *United States v. Gonzalez*, 528 F.3d 1207 (9th Cir. 2008) ............................... 179

\* *United States v. Gonzalez*, 559 F.2d 1271 (5th Cir. 1977) ............................... 122

\* *United States v. Goodwin*, 457 U.S. 368 (1982)............................... 87-91, 93-101

*United States v. Griley*, 814 F.2d 967 (4th Cir. 1987) ..................................... 153

*United States v. Groves*, 571 F.2d 450 (9th Cir. 1978)...................................... 97

*United States v. Guild*, 341 Fed.Appx. 879 (4th Cir. 2009)............................. 147

*United States v. Guidry*, 456 F.3d 493 (5th Cir. 2006) .................................... 180

*United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006) .................................... 146

*United States v. Haire*, 371 F.3d 833 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005) ..................................................133, 151, 154

*United States v. Halliman*, 923 F.2d 873 (D.C. Cir. 1991)............................. 140

*United States v. Hamilton*, 587 F.3d 1199 (10th Cir. 2009)............................ 153

\* *United States v. Henley*, 766 F.3d 893 (8th Cir. 2014), *cert. denied*, 135 S.Ct. 2065 (2015) ........................................................................... 123

*United States v. Henson*, 2010 WL 1068152 (D.Md. 2010) ........................... 147

\* *United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014) ..............................72, 139

xi

\*  *United States v. Holmes*, 670 F.3d 586 (4th Cir. 2012).............................. 141, 147

\*  *United States v. Hong Vo*, 978 F.Supp.2d 49 (D.D.C. 2013) .................. 141, 143

 *United States v. Hsia*, 87 F.Supp.2d 10 (D.D.C. 2000) ................................... 122

 *United States v. Jaber*, 509 F.3d 463 (8th Cir. 2007) ....................................... 151

 *United States v. Jamison*, 505 F.2d 407 (D.C. Cir. 1974)............................... 100

 *United States v. Johnson*, 46 F.3d 1166 (D.C. Cir. 1995)............................... 116

 *United States v. Johnson*, 519 F.3d 478 (D.C. Cir. 2008)............................... 156

 *United States v. Kaytso*, 868 F.2d 1020 (9th Cir. 1988) ............................153, 154

 *United States v. Kearney*, 682 F.2d 214 (D.C. Cir. 1982) ........................170, 171

 *United States v. Kelly*, 790 F.2d 130 (D.C. Cir. 1986).................................... 156

 *United States v. Keltner*, 147 F.3d 662 (8th Cir. 1998).................................... 122

 *United States v. Korey*, 2009 WL 1940381 (W.D.Pa. 2009) ............................ 97

 *United States v. Korey*, 614 F.Supp.2d 573 (W.D.Pa. 2009)............................ 97

 *United States v. Krezdorn*, 693 F.2d 1221 (5th Cir. 1982) ...........................97, 98

 *United States v. Krezdorn*, 718 F.2d 1360 (5th Cir. 1983) (en banc) .................. 99

 *United States v. Lafayette*, 983 F.2d 1102 (D.C. Cir. 1993)............................ 156

 *United States v. Lam Kwong-Wah*, 924 F.2d 298 (D.C. Cir. 1991)........... 148, 170

 *United States v. Lanier*, 520 U.S. 259 (1997) ................................................. 73

 *United States v. Lanoue*, 137 F.3d 656 (1st Cir. 1998).................................... 153

 *United States v. Lawson*, 410 F.3d 735 (D.C. Cir. 2005) ................................ 123

 *United States v. Leal-Felix*, 665 F.3d 1037 (9th Cir. 2011) ................................ 144

 *United States v. Lente*, 759 F.3d 1149 (10th Cir. 2014).................................... 173

\*  *United States v. Levy Auto Parts*, 787 F.2d 946 (4th Cir. 1986)...........140, 143, 150

\* *United States v. Long*, 328 F.3d 655 (D.C. Cir. 2003) .................................... 107

*United States v. Love*, 419 F.3d 825 (8th Cir. 2005) ......................................... 107

\* *United States v. Lowe*, 65 F.3d 1137 (4th Cir. 1995) ........................................ 128

*United States v. Lozado*, 776 F.3d 1119 (10th Cir. 2015) .................................. 128

*United States v. MacDonald*, 688 F.2d 224 (4th Cir. 1982) .............................. 128

\* *United States v. Mackin*, 561 F.2d 958 (D.C. Cir. 1977) ................................ 163

\* *United States v. Mahdi*, 598 F.3d 883 (D.C. Cir. 2010)................................... 131

*United States v. McManus*, 535 F.2d 460 (8th Cir. 1976)................................. 146

*United States v. Mendenhall*, 446 U.S. 544 (1980)........................................... 144

*United States v. Menzer*, 29 F.3d 1223 (7th Cir. 1994).................................... 173

\* *United States v. Meyer*, 810 F.2d 1242
(D.C. Cir. 1987) ...............................................86-87, 89, 92-93, 95, 97, 100

\* *United States v. Miller*, 808 F.3d 607 (2d Cir. 2015) .............................. 141, 147

*United States v. MMR Corp.*, 954 F.2d 1040 (5th Cir. 1992)............................ 166

*United States v. Monsanto*, 491 U.S. 600 (1989)................................................ 76

*United States v. Moon*, 513 F.3d 527 (6th Cir. 2008)......................................... 99

*United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011) .............. 118, 121, 125, 128

*United States v. Muhammad*, 502 F.3d 646 (7th Cir. 2007) ...................... 151, 153

*United States v. Myers*, 692 F.2d 823 (2d Cir. 1982) ....................................... 148

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001) ................................. 180

*United States v. Nwoye*, 663 F.3d 460 (D.C. Cir. 2011) ................................... 151

\* *United States v. Oruche*, 484 F.3d 590 (D.C. Cir. 2007) ................................ 156

*United States v. Patterson*, 348 F.3d 218 (7th Cir. 2003).................................. 180

\*  *United States v. Perez*, 280 F.3d 318 (3d Cir. 2002)..........................151, 153, 154

  *United States v. Pettiford*, 517 F.3d 584 (D.C. Cir. 2008) ...............................156

  *United States v. Porter*, 745 F.3d 1035 (10th Cir. 2014)...................................116

\*  *United States v. Provoo*, 215 F.2d 531 (2d Cir. 1954) ......................................147

\*  *United States v. Provost*, 969 F.2d 617 (8th Cir. 1992)..............................167, 170

  *United States v. Radcliff*, 331 F.3d 1153 (10th Cir. 2003) ...............................180

  *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ...................................180

  *United States v. Riley*, 621 F.3d 312 (3d Cir. 2010) .......................................140

  *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ......................................54

  *United States v. Rivera*, 889 F.2d 1029 (11th Cir. 1989) .................................180

  *United States v. Rivera-Niebla*, 37 F.Supp.3d 374 (D.D.C. 2014)....................147

  *United States v. Rodriguez*, 766 F.3d 970 (9th Cir. 2014)................................107

\*  *United States v. Rodriguez-Rodriguez*, 453 F.3d 458 (7th Cir. 2006) ...........148, 149

\*  *United States v. Rommy*, 506 F.3d 108 (2d Cir. 2007)......................148, 149, 153

  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989)........................59

\*  *United States v. Russell*, 971 F.2d 1098 (4th Cir. 1992) ...................................106

\*  *United States v. Safavian*, 649 F.3d 688 (D.C. Cir. 2011)...............82, 88, 89, 100

  *United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) .......................................122

  *United States v. Said*, 798 F.3d 182 (4th Cir. 2015), *petition for cert. filed*, No. 15-7332 (Dec. 8, 2015)..............................................................................172

\*  *United States v. Saltzman*, 537 F.3d 353 (5th Cir. 2008)....................................94

  *United States v. Salvador*, 820 F.2d 558 (2d Cir. 1987)...................................128

  *United States v. Seale*, 600 F.3d 473 (5th Cir. 2010).......................................107

\* *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003)..................................... 124

*United States v. Sickle*, 454 F.3d 1265 (11th Cir. 2006) .................................... 153

*United States v. Slough*, 641 F.3d 544 (D.C. Cir. 2011), *cert. denied*, 132 S.Ct. 2710 (2012) ................................................................................................ 3

\* *United States v. Smith*, 521 F.2d 957 (D.C. Cir. 1975).................................... 129

*United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996) ............................... 149

*United States v. Taylor*, 749 F.2d 1511 (11th Cir. 1985)................................... 99

*United States v. Taylor*, 997 F.2d 1551 (D.C. Cir. 1993) .................................. 79

*United States v. Townsend*, 178 F.3d 558 (D.C. Cir. 1999)............................. 174

*United States v. Trejo-Zambrano*, 582 F.2d 460 (9th Cir. 1978) ....................... 122

*United States v. Vazquez-Guadalupe*, 407 F.3d 492 (1st Cir. 2005) ................... 180

*United States v. Vega*, 2011 WL 3757883 (S.D.Ala. 2011)............................. 148

*United States v. Wall*, 37 F.3d 1443 (10th Cir. 1994) ....................................... 96

*United States v. Warren*, 42 F.3d 647 (D.C. Cir. 1994) ................................... 130

*United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997) .......................... 180

*United States v. Watson*, 717 F.3d 196 (D.C. Cir. 2013) ................................ 148

*United States v. Weathers*, 493 F.3d 229 (D.C. Cir. 2007) ............................... 99

*United States v. Westoff*, 653 F.2d 1047 (5th Cir. 1981).................................... 99

\* *United States v. Williams*, 233 F.3d 592 (D.C. Cir. 2000) ...............155, 167, 168

*United States v. Williams*, 343 F.3d 423 (5th Cir. 2003) .................................. 180

*United States v. Williams*, 809 F.2d 1072 (5th Cir. 1987) ................................ 122

*United States v. Wilson*, 240 F.3d 39 (D.C. Cir. 2001)...................................... 54

*United States v. Wilson*, 605 F.3d 985 (D.C. Cir. 2010) .................................. 140

*United States v. Winters*, 105 F.3d 200 (5th Cir. 1997) .................................... 180

*United States v. Wood*, 981 F.2d 536  (D.C. Cir. 1992) ................................. 144

*United States v. Zamora*, 661 F.3d 200 (5th Cir. 2011) .................................... 151

*Wilkett v. United States*, 655 F.2d 1007 (10th Cir. 1981) ................................ 154

\* *Williamson v. United States*, 512 U.S. 594 (1994) ...................... 49, 121, 123, 124

\* *Zafiro v. United States*, 506 U.S. 534 (1993) ................................................... 139

## Constitutional Provisions

U.S. Const. amend. VI ............................................................................... 133

U.S. Const. amend. VIII............................................................................. 175

\* U.S. Const. art. III, § 2, cl. 3 ............................................................. 133, 134

## Statutes and Rules

18 U.S.C. 2 ...................................................................................................... 3

18 U.S.C. 1111................................................................................................ 85

18 U.S.C. 1112 .......................................................................................... 3, 117

18 U.S.C. 1113 .......................................................................................... 3, 117

18 U.S.C. 3237(a) ....................................................................................... 148

\* 18 U.S.C. 3238........................................................................ 50, 51, 134, 146

18 U.S.C. 3238 (1948) ............................................................................... 134

\* 18 U.S.C. 3261(a)....................................................................... 3, 55, 62, 69

\* 18 U.S.C. 3267........................................................................ 55, 60, 69, 76

18 U.S.C. 3553(a) ................................................................................ 53, 175

18 U.S.C. 3584(a) ............................................................... 182

18 U.S.C. 921(a) ........................................................... 172, 173

18 U.S.C. 924(c) ..................................................3, 53, 172, 173

26 U.S.C. 5845(b) ............................................................. 172

Fed. R. Crim. P. 8(b) ........................................................ 139

Fed. R. Crim. P. 21 .......................................................... 149

Fed. R. Evid. 801(c) ......................................................... 163

Fed. R. Evid. 801(d)(1)(A) ................................................ 107

Fed. R. Evid. 803(5) ......................................................... 164

Fed. R. Evid. 803(6) ........................................... 50, 121, 129-131

Fed. R. Evid. 804(b) ....................... 49, 50, 120, 121, 122, 125, 131, 163, 164

Fed. R. Evid. 807(a) .................................................. 50, 120, 131

## Sentencing Guidelines

U.S.S.G. § 3D1.4(a) ......................................................... 173

U.S.S.G. § 3D1.4, comment. (backg'd) .................................. 173

U.S.S.G. § 5K2.0(a)(3) ..................................................... 174

U.S.S.G. § 5K2.14 ........................................................... 174

## Other Authorities

150 Cong.Rec. S6863 (daily ed.) (June 16, 2004)................... 61, 62, 63

H.R.Rep.No. 106-778(I) (2000) ............................................. 61

H.R.Rep.No. 110-352 (2007) ................................................. 71

\* S.Rep.No. 88-146 (1963) .............................................................134, 139, 141

\* S.Rep.No. 98-225 (1983) ............................................................... 179

Black's Law Dictionary 1109 (7th ed.) ......................................... 139

*Merriam-Webster's Collegiate Dictionary* 1180 (10th ed. 2001) ............................ 60

Lawrence M. Solan, *Law, Language and Lenity*, 40 Wm. & Mary L.Rev. 57 (1998)........................................................................................ 73

*Blackwater USA: Hearing Before the Comm. On Oversight And Gov't Reform*, 110th Cong. 92-93 (2007): http://democrats.oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/20071127131151.pdf ........................................... 71

Report of the Secretary of State's Panel on Personal Protective Services in Iraq (2007)............................................................................... 71

# GLOSSARY

INP          Iraqi National Police

MEJA         Military Extraterritorial Jurisdiction Act

PID          Personal Identification

PRT          Provincial Reconstruction Teams

VIS          Victim Impact Statement

VBIED        Vehicle-borne improvised explosive device, or car bomb

# JURISDICTION

This is a consolidated appeal from final judgments of conviction and sentence in a criminal case. The district court (Hon. Royce C. Lamberth) had jurisdiction under 18 U.S.C. 3231 and entered judgment on April 13, 2015. SR.656, R.759, R.761, R.763.[1] On November 10, 2015, the court denied defendants' post-trial motions for a new trial, SR.683, R.820, and they filed timely notices of appeal on November 20, 2015. SR.685, R.822, R.823, R.824. *See* Fed.R.App.P. 4(b)(3)(A)(ii). This Court has jurisdiction under 28 U.S.C. 1291 and 18 U.S.C. 3742(a).

# ISSUES PRESENTED

1.     Whether the Military Extraterritorial Jurisdiction Act authorized defendants' prosecution – and whether the jury was properly instructed on the Act's requirements.

2.     Whether the prosecution of Slatten for first-degree murder was vindictive.

3.     Whether the evidence sufficiently supported Slatten's conviction.

---

[1]     Defendants were indicted separately but tried jointly. "SR" refers to the record in defendant Slatten's case (D.D.C. #14-107), and "R" to the joint record (D.D.C. #08-360) for all four. "RGR" is the record in cooperating co-defendant Jeremy Ridgeway's case (D.D.C. #08-341). We refer to Slatten's separate brief as "SB," to the other three defendants' joint brief as "JB," and to the amicus brief as "AB."

4.      Whether the evidence sufficiently supported Liberty's convictions for manslaughter and attempted manslaughter.

5.      Whether the district court abused its discretion in finding that the hearsay statements of █████████████████ would be inadmissible at a severed trial.

6.      Whether the evidence showed by a preponderance that venue was proper in the District of Columbia – and whether the district court, finding no genuine factual issue, rightly decided that venue need not be submitted to the jury.

7.      Whether the court abused its discretion in finding that an Iraqi witness's post-trial victim impact submission, which included statements inconsistent with his trial testimony but which he later disavowed, did not warrant a new trial.

8.      Whether Slough's, Liberty's, and Heard's 30-year-and-a-day sentences violate the Eighth Amendment.

## STATUTES AND REGULATIONS

The applicable constitutional provisions, statutes, and regulations are contained in defendants' briefs.

# STATEMENT OF THE CASE

## I.     PROCEDURAL HISTORY

1.     In 2008, a federal grand jury in the District of Columbia charged Nicholas Slatten, Paul Slough, Evan Liberty, Dustin Heard, and a fifth defendant with multiple counts of voluntary manslaughter, in violation of 18 U.S.C. 1112, 2, and 3261(a)(1) (the Military Extraterritorial Jurisdiction Act) ("MEJA"), and attempted manslaughter, in violation of 18 U.S.C. 1113, 2, and 3261(a)(1), as well as one count of using and discharging a firearm in relation to a crime of violence, in violation of 18 U.S.C. 924(c), 2, and 3261(a)(1).  The indictment alleged that defendants, private security guards under contract with the U.S. State Department in Iraq, killed or wounded over 30 Iraqi civilians in Baghdad's Nisur Square on September 16, 2007.  R.1.

After a hearing under *Kastigar v. United States*, 406 U.S. 441 (1972), the district court (Hon. Ricardo Urbina) dismissed the indictment, finding that statements defendants made to the State Department after the shooting were compelled, and had been improperly used to indict them.  R.218.  This Court reversed.  *United States v. Slough*, 641 F.3d 544 (D.C. Cir. 2011), *cert. denied*, 132 S.Ct. 2710 (2012).

2.     On remand, the government named a different trial team unexposed to defendants' compelled statements, as well as a "filter" team that

3

insured only untainted evidence would be seen by the prosecutors and presented at trial. *See* R.416/4.

In October 2013, following a new, independent investigation, the grand jury again charged Slatten, Slough, Liberty, and Heard with multiple counts of voluntary and attempted manslaughter, as well as one Section 924(c) weapons count, again all under MEJA. R.304. Slatten successfully moved to dismiss his indictment as barred by the statute of limitations, R.428, and the government then charged him in May 2014 with first-degree murder, in violation of 18 U.S.C. 1111 and 3261(a)(1), the only applicable charge that was not time-barred. SR.1.

3.    Following a jury trial in summer 2014, Slatten was convicted on the one charged count of first-degree murder, SR.656, and sentenced to life in prison. *Id.* Slough was convicted on 13 counts of voluntary manslaughter and 17 counts of attempted manslaughter. R.759. Liberty was convicted on eight counts of voluntary manslaughter and 12 counts of attempted manslaughter. R.761. Heard was convicted on six counts of voluntary manslaughter and 11 counts of attempted manslaughter. R.763. Slough, Liberty, and Heard were each also convicted on one count of using and discharging a firearm in relation to a crime of violence under Section 924(c). R.759, R.761, R.763. Each was sentenced to 30 years plus one day in prison. *Id.* This appeal followed.

4

## II.    STATEMENT OF FACTS

### A.    Introduction

Were the facts as defendants present them, the jury, surely, would have acquitted.

To hear them tell it, the white Kia (driven by a medical student alongside his mother) accelerated straight toward the convoy despite multiple warnings to stop – and then, "virtually simultaneously," enemy combatants opened fire on the Blackwater team.  Any and all of their shots, by defendants' account, were fired justifiably, in reasonable self-defense.

To be sure, a fair bit of evidence in this 11-week trial was contested. Two facts, however, were not: not one of the 32 Iraqis killed or wounded in Nisur Square was a combatant, and not one of the many witnesses who was there during those 15 minutes saw a weapon pointed at the Blackwater convoy.

To accept defendants' version of events, then, the jury would have had to conclude this: that these highly skilled marksmen, with their mighty and precise weapons, missed all their intended targets and mistakenly hit innocent civilians – many through the forehead, others as they were attempting to flee – instead.

The government maintained that the shooting was reckless, unprovoked, and unjustified.  The jury, save three deadlocked counts as to defendant Heard, agreed – as did the district court.  *See* 4/13/2015/147 (to Slatten: "I reject your argument that you're innocent, and I fully support the jury's verdict"); 4/13/2015/152 (to the others: "the overall wild thing that went on here just cannot ever be condoned by a court"); 7/16/2015/18 ("There was never a shot fired at them.") (RGR.34).

As they did below, defendants ably and aggressively present their one-sided view of the facts here.  But as the jury rightly found in convicting them, the record tells a very different story.

### B.    Blackwater, The Raven 23 Convoy, And Its Use-of-Force Rules

In 2007, Blackwater Worldwide was a private company that contracted with the State Department to provide security for U.S. personnel in Iraq. Blackwater's job was protective and defensive: its personal security bodyguards did not search out or fight the enemy, but escorted diplomats and other government officials to meetings throughout Baghdad.  6/30/am/77-78, 83; 7/22/am/49-50.  If an escort team ran into trouble, another, more heavily-armored tactical team would help get the protectee to safety.  6/30/am/83-84; 7/15/pm/49.  Explained a former Blackwater supervisor: "Our job was to

6

protect the principal . . . to get the principal out of there." 7/22/am/18. "[W]e're not . . . there [to] stay and fight."

Defendants were part of a 19-person, four-vehicle tactical response team called "Raven 23."

Blackwater's rules of engagement were spelled out in the State Department's Mission Firearms Policy, GX.9820; 7/30/pm/31, and were reviewed daily with the guards. 6/30/pm/51-52. The guiding principle was straightforward: human life was to be respected, and deadly force was a last resort. 7/15/pm/11-12. The guards were thus instructed to take a series of escalating steps, ranging from hand and verbal warning signals to firing into a car's engine block, before shooting a human target. 7/30/pm/25-28; GX.9820/9-10. Of course, if a lethal attack was imminent, steps could be skipped, 7/22/am/100, and the guards could always use deadly force in self-defense: that is, when a person "reasonably believes he/she or another person is in immediate and imminent danger of death or grievous bodily harm." GX.9820/15.[2]

---

[2] When hired, each Blackwater guard acknowledged that he understood the rules. *E.g.*, GX.9854 (the "sole purpose for drawing and discharging a firearm . . . is to STOP the assailant from continuing what is believed to be a DIRECT, IMMINENT, AND LIFE-THREATENING ATTACK") (contract) (capitalization in original); GX.9820/4 (the "touchstone" of deadly force "is **necessity**") (emphasis in original).

Blackwater contractors were also instructed to personally identify their targets before shooting. 7/28/am/45-46. Without such a "PID," as it was called, a guard was not to pull the trigger, including in the general direction of gunfire. 7/22/am/98, 101-02; 7/30/pm/31-32. The point, again, was to minimize innocent losses. 8/11/pm/87-88; 8/12/am/20-21; 8/5/am/93-94 (if "you engage something you're not sure of, you could destroy or kill something you didn't plan to"). Or as one witness put it: "if [the bad guy] doesn't have a weapon or [is] not doing anything bad, you can't shoot him." 7/10/am/44.[3]

On September 16, 2007, the Raven 23 convoy consisted of four vehicles that traveled in a specific order:

> Vehicle #1 (the Lead) had two turret gunners: Mark Mealy in front and Donald Ball in back. Daniel Childers, Cory Wainscott (now deceased), and Dustin Hill were inside.

> Vehicle #2 (the Emergency Response Vehicle) also had two turret gunners: Matthew Murphy in front and Adam Frost in back. The team medic, Kevin "Doc" Rhodes, Jeremy Krueger, and Jeremy Skinner were inside.

> Vehicle #3 (the Command) had only one turret gunner, Paul Slough. Its driver was Evan Liberty. Nicholas Slatten, the designated defensive marksman, and Jimmy Watson, the team leader, were inside.

---

[3]    *See also* 7/2/am/55 (while insurgents may lack regard for civilian casualties, Blackwater had to be different; "we're Americans . . . we're the good guys").

> Vehicle #4 (the Follow) had two men in the turrets: Jeremy Ridgeway in front and Dustin Heard in back. Edward Randall, the driver, Thomas Vargas, and Dean Wagler were inside.

GX.330.

The team's heavily-armored vehicles could withstand fire from most threats, including AK-47 machineguns – the weapon of choice for Iraqi insurgents and police. 6/30/pm/6-9; 7/1/am/102. The Raven 23 turret gunners carried semi-automatic rifles and stood atop the vehicles, which were mounted, additionally, with belt-fed machineguns that could fire some 200 rounds a minute. 6/30/pm/22-28, 40-44; 7/10/am/74. The up-gunners also had pistols with them at all times, and several of their rifles were equipped with grenade launchers. 6/30/pm/23, 31-35; *see* 6/30/pm/28 ("the more ammo the better"). The guards inside were also well armed. 6/30/pm/24-26; *see* GX.9070 (itemizing the team's 68 weapons). Noted a U.S. Colonel: "it would have been . . . suicidal" for insurgents to attack a U.S. convoy with small arms fire. 8/13/am/44.

Most all Blackwater contractors were former, combat-experienced military men. 6/30/am/74-75; 7/15/am/8. With Blackwater, though, they were paid much better – some $500 a day, plus room, board, and various bonuses. 6/30/am/80; *see* 6/30/am/68 ("about ten times more" than in the

Marines); 6/30/am/81 (could not make that kind of money anywhere in States); 8/11/am/14.

Blackwater expected its hires to be practiced in the weapons they would be carrying, 7/14/pm/34-35, and to be able to hit their targets.  7/30/pm/13-15; *see* 7/1/am/103-05; 7/15/am/7-9; 8/6/am/55-56 (the company's vetting and training program was rigorous).  The guards' guns and rifles were precise, 7/2/am/73-74; 8/13/am/57-58, and a number were equipped with scopes – which either magnified or put a "red dot" on a target – to further enhance accuracy.  6/30/pm/29-30.  The goal, as a former Marine gunner testified, was obvious: "[y]ou want to hit what you're aiming at."  7/10/am/47.

### C.    The Shooting In Nisur Square

In 2007, Baghdad was a dangerous place.  6/30/pm/53; 7/22/am/50. And for Blackwater, the week before September 16 had been unusually trying. 7/16/am/37-38.  Raven 23 had been involved in a firefight at Amanat City Hall, 7/15/pm/73-77, it helped rescue a downed helicopter, 7/15/pm/78-79, and a different team was hit by a hidden explosive.  8/18/pm/22-23.  Some suspected the Iraqi police were complicit in the third incident, 8/11/pm/45-46; 7/15/am/15, and there were other things to worry about, too – like roadside bombs, 6/30/am/93; 8/12/am/74-75, and insurgents who could blend into the civilian population.  7/15/am/14; 7/31/pm/53.

But as one Raven 23 guard allowed: "that's why I [was] paid $500 a day." 7/1/pm/40; *accord* 7/15/am/13-14 (had special war-related skill set); 8/18/pm/42-43 (same); 6/30/pm/109 ("we've just done this so many times"); 6/30/am/65 (it was a "thrill"); 6/30/pm/54; 7/14/pm/36-37; 7/30/pm/9-10 (knew the dangers of Baghdad in signing up).

Nisur Square, a busy traffic circle in downtown Baghdad, was unique – and, relatively speaking, secure. 6/23/pm/21; 8/13/am/31-34. It was right next to the coalition-occupied "green zone" and surrounded by government installations and American-controlled observation posts, which meant there was a significant and constant military presence there. 6/19/pm/50-55; 6/30/am/92-93; 7/30/pm/77-78; 8/13/am/25-32. Manned checkpoints were situated on all approach roads into the Square, making it hard for an armed insurgent or explosive-laden vehicle to get in. 6/18/pm/41-44; 7/9/pm/15; 8/12/am/23-25; *see* 8/13/am/32-33 (security was dramatically amped up after an April 2007 explosion in an underground tunnel). Given its security and fortifications, Nisur Square would be a particularly "lousy location" for insurgents to attack, explained a Baghdad-based U.S. colonel – as they would have scant chance of "liv[ing] to fight another day." 8/13/pm/46-47.[4]

---

[4]     A Blackwater analyst reported that there had been elevated threats and incidents in areas around Nisur Square in the months before September 2007,

On September 16, Raven 23 was the secondary response team for the day, on call should the primary rescue convoy need help. 7/28/am/95. Shortly before noon, the team learned that a car bomb had detonated near where a U.S. official was under Blackwater's protection. 6/30/pm/104-05. The guards quickly put on their body armor, readied the convoy's weapons systems, and proceeded to a checkpoint at the edge of the green zone. 6/30/pm/105-06; 7/14/pm/65-66. By that time, the primary Blackwater rescue team, Raven 22, had driven through Nisur Square without a problem. 7/17/am/88; GX.9801/6. Contrary to an order from his chain of command to remain at the checkpoint, the Raven 23 shift leader, Jimmy Watson, directed the convoy to Nisur. 7/22/am/26-28, 62-63; *see* 7/17/am/96 (the other teams were on their way back and did not need help). When Raven 23 got there, Watson announced that the team would be "locking down" the Square to facilitate the others' return. 8/5/pm/11-12; 7/22/am/64.

---

but no pre-9/16 intelligence indicated a threat to the Square. 8/25/pm/7, 10-11, 58-59.

The testifying members of Raven 23 also could not recall the team ever being attacked by a suicide car bomb, or "VBIED." 7/15/pm/12; 7/30/pm/79; 8/6/am/113. Although any number of vehicles could be a VBIED, certain traits predominated: a heavily loaded car, one breaking from the pack, and – principally – a driver who was young, male, and alone. 6/30/am/87-88; 7/8/pm/10; 6/24/am/35-36; *see* 7/1/pm/30-31 (women very unusual); 7/8/pm/59-60 (same re: a family; "it's unlikely an individual is going to kill his entire family just to strike you").

12

The four Blackwater vehicles positioned themselves at the south end of the Square, and guards threw water bottles (a commonly used signal to get a crowd's attention) to stop traffic.  7/2/pm/31-32; 7/15/pm/87-88; GX.496B. Iraqi policemen, too, brought cars to a halt.  6/23/pm/35-36, 72-73; 7/2/am/88-89; 7/2/pm/33-34; *see* 6/26/am/60; 7/2/am/86-87 (Iraqi motorists know to stop when they see an American convoy); 6/30/pm/115-16 ("typically, Iraqi drivers are afraid of us").

Observed an eyewitness: once Raven 23 was in the Square, "no car [was] moving."  7/2/am/89-90; *accord* 6/26/am/15, 35; 7/1/pm/133-34; 7/2/pm/33-34; 7/14/pm/69-70; 7/30/pm/82-83.

### 1.    It Begins: Slatten Shoots, Others Follow, And The White Kia Is Set Ablaze.

The stillness would soon be broken.  A number of witnesses – both Iraqi and Raven 23 – first heard distinct "pops" or single shots.  6/24/am/47-48; 6/26/am/63; 6/30/pm/120-21, 124; 7/2/am/90; 7/14/pm/75-76; 7/15/pm/95, 97-98; 8/5/am/21-24; 8/5/pm/93; 8/6/am/31; 8/11/am/49-51, 65-66.  Then came a woman's screams: "my son, my son."  7/2/am/90-91; 6/26/pm/17; 6/23/am/12.  A police officer ran to the fired-upon car, a white Kia, which started to move slowly forward.  7/2/am/91-93; 6/24/am/49-50; 6/26/am/16-17; 6/18/pm/48-49.  The officer saw that the

13

driver, a young man, had been shot in the head – "his whole face was full of blood" – and had thus lost control of the car.  7/2/am/92-93; 7/2/pm/36 ("when [he] was killed, the car . . . was still in gear [and] it started moving very slowly forward"); *see* 6/25/pm/10 (expert: Kia was an automatic).

Another officer, who ran to the passenger side, also saw the stricken driver.  6/23/am/13-16 (he was shot "in the middle of his [fore]head"); 7/7/pm/39.  And on hearing the first shot, a man in a truck right in front of the Kia turned to see a hole in its windshield (driver's side) and, also, that it was splattered with blood.  6/24/am/48-49 (the Kia bumped lightly into his truck soon after the first shot).

According to shift leader Watson, Raven 23's first two shots of the day were fired by Nicholas Slatten, the designated marksman (or sniper), through a gun port in the Command vehicle, where Watson was also seated. 7/28/pm/18-22, 30-35, 37; GX.498E3; GX.498H/110, 135.  Slatten was lying down, positioned "exactly" toward the Kia, and (as Watson put it) fired "coincidentally" in the Kia's direction.  7/28/pm/21-22, 38-39; GX.498H/123.  "It was very rhythmic. . . . retort and then retort." 7/28/pm/34.  After Slatten shot, he yelled, "white car, white car coming in," 7/29/am/48-49, and later, he told a teammate that he had "popped [a man's] grape," who then "slumped forward."  7/31/am/48-49.

14

Slatten alone carried the SR25 – a scoped, semiautomatic sniper rifle specially designed for precision shooting. 6/30/pm/75-76; 7/21/am/31-34, 69-70, 73-74. He was also the team's best shot. 7/30/pm/46.[5]

With the Kia driver incapacitated, the two officers walked along with the car, trying to help mother and son. 6/23/am/20-24; 7/2/am/93-96; 7/7/pm/39; 7/30/pm/91-93. They also signaled to the guards to stop shooting. 6/18/pm/49-51; 7/2/am/94-95 (one officer raised his left hand, "ask[ing] them to stop"); 6/23/am/16-17; 6/23/pm/52-53 (the other held both palms toward the convoy and shouted "please stop" in Arabic).

---

[5]    That is not all that set Slatten apart. According to his teammates, Slatten also harbored a deep and near singular hatred for the Iraqi people, 6/30/pm/61-63 (not just insurgents); 7/16/am/84-86; 7/30/pm/52-53, and boasted about killing them. 7/14/pm/62-64; 7/15/pm/57-58; 8/11/am/30-31; *see* 7/15/pm/56 (Slatten said, "those people's lives are not worth anything. They're not even humans, they are animals."); 7/15/pm/58 (bragged about "turn[ing] one guy's head into a canoe"); 7/30/pm/54 (said he was "getting payback for 9/11," and was "well on his way"); 6/30/pm/61-62; 7/30/pm/52-54 (Slatten's disdain for Iraqis stood out, even among likeminded teammates).

Slatten also had a history of unjustifiably shooting at Iraqis in order to instigate a fight. *See* 7/30/pm/69-70, 72-73 (Slatten said he would shoot to "draw out fire"); 7/15/pm/59-62; 7/16/am/83-84 (Mealy: Slatten told him to fire at somebody on a rooftop – to "shoot that motherfucker" – even though there was nothing to suggest he should be shot); 6/30/pm/100-02 (Murphy: "it was kind of like he was waiting . . . for this person . . . to present [himself] in the window . . . so he could shoot him"); 7/2/am/40-42 (Slatten fired without provocation); 7/30/pm/70-71 (at no identifiable target).

But the shooting did not stop.  In fact, as the car inched forward with the officers holding on, *see* 8/5/pm/32-33; 8/11/am/55-58; 8/4/pm/94 ("it barely rolled"); 6/26/am/39 ("ever so slowly"); 8/18/am/31 ("creeping"); 8/5/am/40 ("kind of drifting"); 8/11/am/57 ("a slow crawl"); 6/25/pm/18-19 (expert: likely less than 2½ miles an hour), Slough, Ridgeway, Heard, Watson, and Liberty opened up on it.  6/18/pm/52-53; 6/23/am/24-25; 7/15/pm/99, 103-05; 7/2/am/93, 97-98; 7/28/am/91-92; (Donald Ball also fired a couple rounds, 7/15/pm/101); 7/30/pm/87-90; 7/31/am/11; 8/5/am/29-43.  The firing continued even after the Kia came to a stop, 7/1/pm/140-41; 7/15/pm/106-07, 109-11; 8/18/am/40-41; 8/18/pm/66, and in the midst of it, Ridgeway shot the unarmed woman passenger. 7/30/pm/95-97.  Slough also fired two or three grenades at the Kia (Watson fired at least one, too, 7/28/am/92), causing it to explode.  *See* 6/30/pm/131-32 (Slough fired, let grenade cartridge fall, reloaded and fired again).[6]

---

[6]    The M-203 grenade is a particularly lethal, dual-purpose weapon: the penetrator at the front drills through its steel target, and upon impact, some 400 pieces of shrapnel radiate outward – in order to "kill or cause casualties" to people nearby.  7/10/am/50-51, 57-60; 8/14/am/86-93.  The grenade has a "kill radius" of some five meters on impact (about 15 feet), an "injury" or "incapacitation" radius of 15 meters (about 50 feet), and a potential for destruction/injury spanning 165 meters, or some 541 feet.  7/10/am/64-65, 96-98.  *See* 8/13/am/51 (U.S. Colonel: weapon inflicts a "disproportionate number of civilian casualties" in an urban environment).

The slain driver of the Kia was medical student Ahmed Haithem Ahmed Al-Rubia'y; his mother, Mahassin Mohssen Kadhum Al-Khazali, was a doctor.  7/30/am/67-68.  After the convoy left the Square, an Iraqi policeman shoveled their charred remains out of the car ("she was burned . . . stuck to the seat") and into a bag.  7/2/am/100.  "I did not sleep for a whole week."[7]

### 2.    The Shooting Continues To The South, East, And West: "The Square Turned Into Hell."

With the Kia in flames, Slough, Heard, Liberty, Ridgeway, and Watson continued shooting beyond it to the south, and Slough, Ridgeway, and Liberty also collectively fired west and east.[8]

---

[7]     *See* GX.2303, GX.2304, GX.E277S (pictures of the Kia).

[8]     Re: Slough to the south, *see* 6/24/am/54-56; 6/25/am/22 (fired multiple shots into a man – "[h]is body was shaking violently" – even after he was down on the ground); 7/30/pm/91-93; 7/31/pm/122-23; 8/5/am/48-53; 8/5/pm/42-43; 8/18/am/41-42; *see* GX.500B2 (Krueger's depiction of the post-Kia shift in fire).  To the west, *see* 6/26/pm/44-56 ("heavy shooting"), 64-70, 75-76; DX.3067; 7/2/pm/27-29; *see also* 7/17/am/54-55 (fire from the turret was "sustained"); 6/30/pm/91-97 (Murphy: week before, Slough fired grenades, machinegun at non-threats).



(footnote continued…)

17

Again, both Raven 23 and Iraqi witnesses described the scene:

- "they shot everything, . . . the cars, . . . the people, . . . the trees, . . . the asphalt, the road, . . . the sidewalk." 6/18/pm/67 (Mohammed Kinani);

- "machinegun rounds [were] skipping off the ground as [people] were running"; none had weapons; "I didn't see any reason" to be firing at them. 7/15/pm/113-14 (Raven 23 guard Mark Mealy);

- "people [were] trying to shield their children . . . just huddled down trying not to get shot." 7/14/pm/112 (Raven 23 guard Adam Frost);

---

Re: Liberty to the south, *see* 7/28/pm/55-64, 67-69 (fired out an open door); 8/11/am/81-83 (teammate: surprised to see that; "you're opening yourself up"; drivers typically do not fire). To the east, *see* 7/28/pm/94-96; 7/15/pm/118-28; GX.496C1; *see also* 7/30/pm/73-74; 7/31/am/43-45 (fired out his porthole on "full auto"); 7/14/pm/124-25 (was "firing magazine after magazine"); 7/23/am/15-19 (empty magazines with "Liberty" and "LIBO" written on them were left in the Square).

Re: Heard to the south, *see* 7/31/am/13-18, 28, 38-39; GX.497K (Heard's line of fire); 7/31/am/17 (none of the cars in his fire-line was a threat; "[they] were not moving"); 8/4/pm/90-91 (Ridgeway, who was in the adjacent turret: Heard shot a "much higher volume of fire" than he did); 6/18/pm/52-54 (along with Ridgeway, fired "savagely" and "indiscriminately"); 7/31/am/41-42 (Heard to Ridgeway after the shooting: "I smoked that guy"); 7/1/am/83 (told Murphy he fired an M-203 grenade); 7/15/am/74-76 (as convoy was leaving to the north, did not shoot although a teammate said to).

*See also, e.g.*, 7/31/am/14-18; 7/31/pm/116-19; 8/4/am/34-36; 8/4/pm/50-53; 8/11/am/69; 7/15/am/70-74 (Ridgeway's shooting); 7/28/am/65-66, 90-91; 7/28/pm/55-56, 61-71; 7/31/pm/112 (Watson's).

18

- "intense shooting . . . toward unarmed people." 7/16/pm/29 (Abdul Amir Raheem Jihan);

- civilians were shot in the forehead. 6/25/pm/92-93; 6/26/pm/53; 6/26/pm/55; 7/9/am/55-56; 8/14/pm/74;

- cars were shot as they attempted to flee. 7/8/pm/23-24; 8/12/am/97; 8/13/am/46-47, 59-61; 8/13/pm/101-02;

- "the Square . . . turned into hell." 6/18/pm/53-54.

Some 28 Iraqis testified about what happened to them, their friends, and/or their loved ones in Nisur Square.  For example:

Mohammed Kinani was traveling with his sister, her three children, and Kinani's 10-year-old son, Ali.  6/18/pm/34-35, 42.   After stopping his car at Raven 23's behest, Kinani watched the guards "shoot[] away" at the Kia, and then "turn[] their fire on . . . everyone around," including him.  6/18/pm/45-46, 52-53. "[S]hots were hitting the car in all areas, . . . the radiator, the windows, the glass, everything."  6/18/pm/56.  "We thought . . . we are all going to die."  6/18/pm/54.  As Kinani tried to call his brother and father – "maybe he can take care of my other children" – a round came through his sister's headrest, grazing her right side.  6/18/pm/54-57; 8/19/am/80.

When the shooting stopped and they thought they had survived, Kinani got out to help a man he had seen struck.  6/18/pm/59-60, 68. "[T]hey

19

. . . keep shooting at him" even after he was down in 

"a lake of blood."  6/19/am/11-13 ("his body was

shaking").  *See* GX.489A (Kinani's depiction of the

man being shot).

But then one of the cousins spoke: "uncle, Ali

got shot." 8/19/am/79.  When Kinani opened the

door where his son had been sitting, the young boy's brains fell to the ground.

6/18/pm/68-69.  "[A] portion of his head [was] no longer there."

8/19/am/80.  Ali's heart, however, was still beating – so the family rushed

him to the hospital, where Kinani implored a doctor to help.  6/19/am/18-20.

Nothing, however, could be done.  6/19/am/23.  As Kinani testified, "[t]hat

day destroyed me completely."  6/18/pm/36.

Other victims to the south:

Injured:     Wisam Raheem Fliah Hasan Al-Miri, who was out shopping for

the day.  Shot in the leg as he got off a bus, and then again in the

shoulder as he hid behind the bus stop.  7/7/am/13-18, 22-24.

Injured:     Haydar Ahmad Rabie Hussain Al-Khafaji, a taxi driver, who

signaled to the convoy that he wanted to turn around.

6/26/am/64-65; *see* 6/26/am/57-58 (car had "taxi" sign on top).

20

Shot as he was crawling on the ground, trying to escape.
6/26/am/66-68; 6/26/pm/7-8; 6/24/am/50.  Has permanent
nerve damage, and will carry shrapnel for life.  6/26/pm/9-10, 38-
39.

Dead:        Delivery man Mohamed Abbas Mahmoud, shot as he was
running away from his truck, which was facing against the flow of
traffic.  8/13/pm/96-97, 101-03; 7/7/am/29-31.

Dead:        Mohamed's 11-year-old son, Qasim, shot along with his father.
8/13/pm/97-98; 7/7/am/29-33 (they were "lying on . . . their
faces" in a "pool of blood").

Injured:     Mohamed's wife and Qasim's mother, Yasim Abdul Kidr Salhe,
hit in the lower back as she ran, screaming, after her husband and
boy.  7/7/am/29-33; 6/24/am/55; 8/13/pm/97-100.

Injured:     Farid Walid Hasoun Al-Kasab, a teacher, also behind the bus stop.
Shot in the abdomen.  7/7/am/34-36.

Injured:     Another bus traveler, Abdul Amir Raheem Jihan Yasser, who ran
a small stationary office.  Shot in the leg as he tried to cross the

21

street.  Kept running but was shot again in the same leg – and then again.  7/16/pm/8, 13-16, 19-21.  "[A]ll the shots came from behind me."  7/16/pm/53-55.  Spent 40 days in the hospital but remains disabled.  7/16/pm/23-25, 51-53.

Dead:       Businessman Sa'adi Ali Abbas Alkarkh, shot through the back of the head.  7/17/am/6-8, 17-18; *see* 7/17/am/8-13 (his car had turned away).

Dead:       Osama Fadhil Abbas, a stockbroker, gunned down and shot repeatedly after falling to the ground.  6/24/am/54-56; 7/21/pm/7.  "[T]he bullets were hitting him and coming out from his body and hitting the sidewalk."  6/24/am/54.

Injured:    Osama's friend, fellow investor Majed Salman Abdel Kareem Al-Gharbawi, struck in the abdomen, leg, shoulder, and foot as he got out of the car.  150 pieces of shrapnel remain in his body.  6/24/am/41-45, 50-53, 60.

Injured:    Hassan Jabar Salman, a lawyer, shot twice in the back and once in the arm after he turned around, trying to flee.  Lost consciousness as he was driving and his car flipped over.  7/29/pm/6-7, 10-15.

22

Injured:      Fawziyyah Aliwi Hassoon, in the Square to shop and replace her

citizenship card.  Shot in the leg, bled heavily, and lost

consciousness.  7/21/pm/17-24.


Injured:      Ali Hadi Naji Al-Rubaie, a friend of the nightguard's son, hit in

the leg at a girls' middle school south of the Square.  The

playground was hit both by Raven 23's gunfire and at least one

grenade.  7/9/pm/46-47, 54-60; 7/10/am/9.


Dead:         Mushtaq Karim Abd Al-Razzaq, who worked at one of the Nisur

checkpoints, and was on break.  7/9/pm/14, 19, 32 (wearing

civilian clothes).  Was covered in blood from chest to waist.

7/9/pm/14, 19-20, 43-44.


Injured:      Officer Alah Majeed Sghair Zaidi, also on break at a checkpoint

further south.  Bullet hit his diaphragm, liver, and kidney before

stopping in his abdomen.  Is permanently disabled.  8/12/am/24,

29-36.


     To the west:

Dead:         Ghaniyah Hassan Ali, who was taking a bus with her daughter,

Afrah, to get paperwork for a religious pilgrimage.  Shot in the

23

forehead as she held Afrah to her chest.  6/25/pm/72-76, 85-93.
Police placed Ghaniya's body on the curb next to a young man
who had also been struck in the head.  6/25/pm/92.  "[P]art of his
brain [fell on] my mother's shoulder."

Dead:        Another bus traveler, Ibrahim Abid Ayash, 77, a lifelong gardener.
             Also shot in the forehead.  8/14/pm/69-74.

Dead:        Hamoud Sa'eed Abttan, who was driving his taxi in search of
             work with his two cousins.  Struck in the back as he tried to push
             his shot-up taxi away.  7/9/am/40-42, 50-53, 61.

Dead:        Uday Ismail Ibrahiem, Hamoud's cousin, shot in the forehead as
             he crouched down on the other side of the taxi.  7/9/am/41, 54-
             56, 62.

Injured:     The third cousin, Talib Mutluk Diwan, a potato farmer.  Hit in the
             right foot as he cowered with Uday.  7/9/am/37-38, 54-60 (his
             "brains [were] on my knee").  Talib also saw another young man
             shot in the head.  "He was crawling as a child."  7/9/am/56.  "It's
             a catastrophe."  7/9/am/64.

24

Injured:     Adel Jaber Sham'ma Al-Jadiri, 63, who was returning from the
             bank to his currency shop in a taxi.  Shot in the leg.  Multiple
             efforts to heal his injuries have failed.  7/21/am/5-8, 11-15. "I
             can't get in a car, I can't bathe myself, I cannot see."
             7/21/am/15.

Dead:        Mahdi Sahib Nasir, the oldest son and breadwinner for a family of
             seven.  Fatally shot in the abdomen.  6/26/pm/56-57, 60;
             6/30/am/36-39.

Injured:     Jassim Mohammad Hashim, a mail carrier, shot in the head.  Lost
             consciousness for 20-24 days, had three operations, has lost his
             memory, and can no longer work.  6/30/am/8-9, 13-16.  "I am
             completely destroyed."  6/30/am/15.

        To the east:

Injured:     Mahdi Abid Khider Abbas Al-Faraji, a government employee,
             shot through his truck's front windshield.  Sustained injuries to his
             wrist, arm, shoulder, and left eye.  Remained blinded in the eye.
             8/12/pm/68-71, 74-75.

Dead:        Ali Khalil Abdul Hussein, a poet, father of 6, and body shop

owner.  Shot in the stomach.  7/16/am/11-13, 98-101;

7/15/pm/120-21.

Amidst the shooting, and before the shots west, Watson ordered the

convoy to leave.  7/14/pm/91.  The Command Vehicle, however, was

disabled – its radiator had been punctured by shrapnel from a Raven 23

grenade that had been fired too close – requiring the team to execute a "hook-

up" to tow it out.[9]   To do that, Vehicle #2 backed up close to the Command,

and with the Lead Vehicle operating as a "shield," guards Adam Frost, "Doc"

Rhodes, and Jeremy Krueger got out to connect the two trucks with a tow

strap.  7/14/pm/91-96.  Outside, the three felt (and were) obviously

vulnerable.  *See* 7/15/am/109 (Frost: was exposed); 8/6/am/42-43 (Rhodes:

was out in the open, a target); 8/5/am/65 (Krueger: same); 8/18/pm/75

(helicopter gunner: "the guys are . . . extremely vulnerable in that situation").

Even so, they were not shot or even fired at during the hook-up.

8/5/am/64-65; 7/1/am/30-31; 8/6/am/43-45.  There was, though, one

shooter in the Square at the time: Evan Liberty, out of his truck, shot a man

---

[9]        For more on the disabling of the Command Vehicle, *see infra*, at 42-44.

standing on a sidewalk whose hands were up.  7/15/pm/118-28; *see infra*, at 110-11.

### 3.    To The North Of The Square, Slough And Ridgeway Shoot Again.

With the Command Vehicle in tow, the convoy took its leave of the Square via the north.  The going was slow ("bumper to bumper," 7/1/am/43-44), and Mark Mealy and Matt Murphy tried to direct cars out of the way.  *Id.*; *see* 7/1/am/44-45 (Murphy gestured to two children standing in a backseat to get down; "my teammates [had] been firing wildly, and I [didn't] want these kids to get shot").  Frost saw Ridgeway shoot into a white car, 7/15/pm/133-34 ("the gentleman in it . . . was talking on his cell phone"), and Murphy saw Slough fire into a red car.  7/1/am/46, 49-50.  At that, Murphy waived his arms and yelled at Slough – "cease fucking fire!" 7/1/am/46-47, 71-72 – and Frost echoed the sentiment.  *Id.*; 7/14/pm/108-11; *see* 8/5/am/77-81 (Krueger: "I . . . didn't see any sort of threat, and I didn't know why it was engaged"); GX.500H.

The driver of the red car, a taxi, was Bara Sadoon Ismail Al-Ani.  7/2/pm/55-56.  Upon seeing the man on the phone get shot, he raised his hands – "I was trying to communicate to him that I have nothing, I am . . . surrendering" – but Slough (the guard in the turret with a "light blond

27

beard") shot him anyway.  7/2/pm/66-68; 7/3/am/18-19; 6/30/pm/56-57.

Bara got out of the car, tried to hide underneath it, but was shot again.

7/2/pm/69-70.  Struck close to the spine, Bara still has 56 pieces of shrapnel in

his body.  7/3/am/8.

Right next to the red car, 14-year-old Sami Hawas was riding with his

father and grandmother in a white Opel Omega.  7/3/am/60-63.  It, too, was

shot – and the father, Sami Hawa Hamud Al-Sabahin, a grocer, was hit in the

leg and back.  7/3/am/67-69; 8/6/pm/18; *see* 8/11/am/101 (Blackwater

guard Randall: did not consider white car Slough shot to be a threat).

* * * *

Of the 32 Iraqi citizens killed or wounded on September 16, none was a

combatant or otherwise threatened the convoy.  *See* 6/18/pm/58-59;

6/19/am/15-16; 6/24/am/46; 6/25/pm/81, 86-87; 6/26/pm/6;

6/26/pm/52; 6/30/am/25-26; 7/1/am/34-35; 7/7/am/13; 7/7/am/40-41;

7/14/pm/84-85; 7/16/pm/17, 22-23, 38; 7/17/pm/22-23; 8/12/am/34.

Only one, government mail carrier Jassim Hashim, had a gun in the Square,

but it was holstered at his waist and concealed under his shirt.  6/30/am/22-

24.  Officer Alah Majeed, shot at a checkpoint well south of the Square, also

28

had a firearm – but he was too far away to be within the convoy's sight.

8/12/am/25-27.[10]

---

[10]    *See* 8/6/pm/43, GX.9054 (bullet taken from Majeed was U.S.-made); 7/10/am/78-79 (Blackwater machinegun had a range of up to 3750 meters).

*See also* Addendum (demonstrative exhibit, displayed to the jury during argument, showing approximate locations of victims).

A number of the Iraqi victims' injuries and fired-upon cars were photographed after the shooting. *E.g.*, GX.524B, GX.524C, GX.524D (Kinani's car); GX.442A (10-year-old Ali); GX.520J, GX.2312 (Haydar's taxi); GX.460L (Wisam's injury); GX.411F, GX.411G, GX.411H (Mohamed's truck); GX.411B (11-year-old Qasim); GX.460O (where Wisam was shot at the bus stop); GX.456B, GX.456C, GX.456D (Farid's injuries); GX.443C, GX.443H, GX.443O (Abdul Yasser's injuries); GX.525B, GX.525C, GX.525D, GX.525E, GX.2319, GX.2321, GX.3574 (Sa'adi's car); GX.532C, GX.532F, GX.E282J, GX.E282L (Osama's VW Caddy); GX.4340001 (video of Hassan's car); GX.434K (Hassan at the hospital); GX.450C (Alah Majeed's injury); GX.E310F, GX.E310G (Hamoud's car); GX.467B, GX.467D (Jassim's injuries); GX.E307C, GX.E307G, GX.E307H (Mahdi Al-Faraji's truck); GX.485B, GX.485C, GX.485H (Mahdi's injuries); GX.491C, GX.491D, GX.491G (Adel's injuries); GX.469B, GX.469C, GX.469E (Bara's injuries); GX.526B, GX.526C, GX.526D (Bara's taxi); GX.531.G, GX.531O, GX.531P (Sami's car); GX.470A, GX.470B (Sami's injuries).

Trajectory analyses were also performed on a number of cars. *E.g.*, GX.E275A, GX.E280D, GX.E285D, GX.290A, GX.E295A, GX.E305D, GX.E310A, GX.E325A.

*See also* GX.4524, GX.4526, GX.8330, GX.8310, GX.4527, GX.8207, GX.4528, GX.4531, GX.4533, GX.4536, GX.8408, GX.4607, GX.4609, GX.4617, GX.4621, GX.4622, GX.4629, GX.8071, GX.8072, GX.8242, GX.8253, GX.8059, GX.8061, GX.8064, GX.4618, GX.8166 (pictures of shots into the police kiosk, trees, curbs, poles, girls' school, and scattered into signs, billboards).

### D.    The Aftermath: U.S. Army Officers Go To the Scene And Are Appalled At What They Find.

In 2007, Army Colonel David Boslego, a decorated, 30-year career military officer out of West Point, headed the U.S. team working to ready the Iraqi National Police ("INP") for the withdrawal of coalition forces. 8/12/pm/84-98; 8/13/am/15-19.[11]  At noon on September 16, Boslego was with the INP chief, who received word of the Nisur Square shooting in real time.  8/13/am/36-37.  Boslego "geared up" and got to the Square within a half hour.  8/13/am/38-40.  Knowing he would need to account to his leadership, Boslego expected to find – and went looking for – evidence of an attack on the convoy.  8/13/am/43-45 (or "two sides" to the fight).

That is not, however, what he found.  Instead, Boslego saw vestiges of a unilateral, "grossly excessive use of force," 8/13/pm/44: scores of American-made shell casings, 8/13/am/45-46; cars shot from behind as they were apparently retreating, 8/13/am/46-47, 59-61; multiple shots to windshields that appeared "well aimed," 8/13/am/62; blood and brain matter in cars and on the street.  *See* GX.3500B (video).

---

[11]    Boslego also well understood the ways of the insurgency.  *See, e.g.*, 8/13/am/11-12; 8/12/pm/93-94 (in 2005-07, he was responsible for training Iraq and Afghanistan-bound American troops; "constantly review[ed] reports from the theater" about the insurgency's "techniques and technologies" so our soldiers "received the most current guidance").

What Boslego did not see also struck him: no rocket propelled grenade launcher or other weapon that might be effective against an armored vehicle; no discarded AK-47 weapons or magazines; no spent AK-47 shell casings in or around the shot-at vehicles; no dead insurgents; no dead police officers. 8/13/am/44-48, 52, 56-57, 65.  Given the accuracy and range of the Blackwater firearms, Boslego did not think the shots had been misfired. 8/13/am/57-58; *see* 8/13/pm/15-16 (trained military men can "shoot what they're aiming at"); 7/30/pm/46 (Slough, Slatten, Liberty, and Heard were proficient with their weapons).  Nor did Boslego see anything to justify the firing of an M-203 grenade, which is designed to inflict widespread casualties, into a crowded traffic circle.  8/13/am/58-59; 8/13/pm/51-52.

Despite his initial presumption, Boslego came to believe the shooting in Nisur Square was a "one-way gunfight."  8/13/am/64; 8/13/pm/45 (and "grossly inappropriate" for "an entity whose only job was to provide personal protection to somebody in an armored vehicle").

Two other high-ranking American military officers – Colonel Michael Tarsa (a 20-year Army veteran, 7/8/am/95-96) and Lieutenant Peter Decareau (a fellow West Point graduate, 8/12/am/61-62) – saw it the same way.  Also soon on the scene, Tarsa, too, expected to find "evidence of an exchange" – but also saw none.  7/8/pm/23, 27-28 (no dead enemy

31

combatants or weapons or non-American casings in or around any of the cars).

And like Boslego, Tarsa was taken aback by the volume of U.S. shell casings,

the cars riddled with bullet holes (many which appeared to be fleeing), the

body parts, the blood.  7/8/pm/23-26.

    Lt. Decareau spent some 3½ hours in the Square right after the shooting,

and saw (and did not see) more of the same.  8/12/am/83-88; 8/12/pm/4-5,

10-11, 15-23, 36-37.  None of the shot-up cars had any indicia of a car bomb,

Decareau testified, nor was there any indication that an insurgent had been

inside any of them.  8/12/pm/20-22; 8/12/am/97-98 (a number,

"uncommon[ly]," were pointed in the opposite direction).  And like the two

colonels, Decareau saw nothing to indicate anything but a one-way shooting.

8/12/pm/36-37.

### E.    Back at Blackwater Headquarters, Some Raven 23 Guards Are Also Incensed: "The Most Horrible, Botched Thing I've Ever Seen."

    When Raven 23 returned to the Blackwater parking lot, Matt Murphy

was "beyond pissed."  7/1/am/58.  "I've seen people completely unarmed,

doing nothing wrong, get shot."  *Id.*  It was "the dumbest thing I've ever seen

in my life . . . flat out."  Murphy's fellow turret gunner, Adam Frost, was also

stunned: "Matt and I . . . sat there looking at each other . . . it was just

. . . what the F was that?"  7/14/pm/114; 7/15/pm/20 (teammates failed to

differentiate between a genuine threat and a scared innocent just trying to stay alive). Mark Mealy, Dean Wagler, and Jeremy Krueger were also "very much up in arms" and "disgusted" by what had happened, 7/1/am/85, and Doc Rhodes looked like he agreed. 7/1/am/59; *see also* 8/18/am/33-34 (Dustin Hill: saw a man, surrounded by children, waving a white flag); 7/15/pm/135-36 (Mealy: "I was . . . so upset"; saw "people killed [who] I didn't perceive as threats"); 8/13/pm/87 (Blackwater colleague who saw Mealy right after: "[h]e was shaking . . . visibly disturbed").

Slough, Ridgeway, Slatten, and Liberty, on the other hand, were "puffing their chests out . . . strutting around . . . acting like bad asses." 7/1/am/77.[12]

The Murphy-Frost-Mealy group resolved to take their concerns to management. A meeting with Jimmy Watson did not go well – "he basically said if we had problems with what happened . . . maybe . . . we needed to find a new line of work," 7/14/pm/121 – so they went up the chain of command. 7/14/pm/121-23; *see* 7/22/am/38-39 (Supervisor Pearson: "they appeared . . . shocked" by what had happened); *id.* (Frost was crying); *id.* (have never

---

[12]    Also afterwards, Doc Rhodes checked out Heard, who reported an injury. 8/6/am/47. Heard did not say he was shot and, according to Rhodes, "it wasn't critical." 8/6/am/47-49 (looked like first degree thermal-type burns; not a gunshot wound and not a priority; "I had him go see the camp doctor"); 7/31/am/42-43 (Ridgeway thought it was caused by a pen flare).

had such a meeting); 7/28/pm/103-04; 7/31/am/54 (group described the

shooting as "murder").

Watson, meanwhile, told the shooters they "need[ed] to keep [their]

stories straight," 7/31/am/55, which Ridgeway took to mean that "I need[ed]

to justify . . . my actions." *Id.* Of the same mind, Ridgeway told the State

Department, his father, and some teammates that he had seen combatants,

received fire, and shot at threats. 7/31/am/56-60, 83-85. All that, however,

was a lie. In truth, Ridgeway testified, he did not see any insurgents that day,

did not observe muzzle flashes, did not see anyone fire at the convoy, and did

not otherwise perceive anyone or anything as an imminent threat.

7/13/am/40-41, 58-59, 62-63. And he understood "immediately" that it had

been a bad shoot. 7/13/am/60; *see* 7/31/am/58 ("I lied . . . to justify my

actions and the actions of my team members.").

Tensions mounted between the two factions within the team,

7/1/am/79, with Slatten telling Frost that "things might get rough for you."

7/14/pm/123-24; 7/16/am/22-23. Heard, according to Murphy, was not

among the "backslappers," 7/1/am/84, and in the days after the shooting,

seemed "very, very nervous." 7/31/am/43 (Ridgeway). Slough also later told

Ridgeway that he felt remorseful, and that what had happened was "[his]

fault." 8/4/am/13-15.

For their part, the non-shooting Raven 23 guards (experienced military men all) were not pleased by Watson's suggestion that they were overreacting. *E.g.*, 7/16/am/17-19.  Nor would they have hesitated to pull the trigger – as they had before – were the team in danger.  *See* 7/14/pm/81 (Frost: if had seen threats in the Square, "I would have shot them"); 6/30/pm/134; 7/1/am/17-18 (Murphy; same); 8/5/am/54 (Krueger; same); 8/18/am/41 (Hill; same); *see also* 7/1/am/95-96 (Murphy: "of course" has shot at the enemy; if somebody is posing a threat to him or a teammate, "I'm trying to kill them"); 7/1/pm/46 (not scare them, "kill them"); 7/16/am/18, 59-62 (Mealy: "this wasn't my first rodeo"; fired at insurgents the week before with a belt-fed machinegun; "[I] basically out power[ed] them"); 7/15/pm/7-8 (Frost: would lose no sleep ("none") over killing someone shooting at him); 8/5/am/54-55 (Krueger: would not hesitate to take out a threat).

Nisur Square, though, was something altogether different.  7/15/pm/19-20 (Frost).  As Murphy put it: "it's the most horrible botched thing I've ever seen."  7/1/am/59.

## F.    On Incoming Fire And The Defense Case

The defendants did not testify.  It was Slatten's defense that he did not shoot the driver of the Kia.  8/28/pm/21-22.  He argued that no eyewitnesses actually saw the shooting; that the two policemen on the scene (unlike vehicle-

35

mate Watson) thought the convoy's first shots came from the turrets; that

Watson's sequencing may have been confused; and that in his "[I]-popped-a-

[man's]-grape" admission to Ridgeway, Slatten said his target was an active

shooter, not an innocent bystander. 8/28/pm/5-8, 11-13. Slatten argued that

it was Ridgeway, not he, who killed Al-Rubia'y. 8/28/pm/19-20.

Slough, Liberty, and Heard did not dispute that they shot in the Square.

On Count 2 (Al-Rubia'y's mother in the Kia), they argued that although they

turned out to be wrong, they legitimately viewed the car as a suicide bomb.

*See* 8/27/pm/15-16, 21-24, 30; 8/28/am/56. A number of their teammates

supported that view (or gave them the benefit of the doubt), *see* 7/14/pm/78-

79 (Frost); 8/5/pm/22-23 (Krueger); 8/6/am/85-86 (Rhodes); 8/11/pm/40

(Randall); 7/28/pm/40 (Watson); 7/15/pm/100-01, 109-10 (Mealy) – though

others did not. *See* 7/2/am/57-58 (Murphy: "If I had believed" it was a car

bomb, "I would have shot"); 6/30/pm/133-35 ("I'm thinking, if this is a

VBIED," it is "a really bad idea" to shoot an explosive into it); 7/1/pm/31

(VBIED is almost exclusively driven by a lone male); 7/2/am/57-58;

7/30/pm/93 (Ridgeway: did not think the Kia was a car bomb); 8/18/am/31-

32 (Hill: shooting not consistent with escalation-of-force rules).[13]

---

[13]    *Compare also* 7/8/pm/8-9 (Col. Tarsa: VBIED had largely become a
sectarian Sunni v. Shia weapon, and not a real threat to coalition forces; in

As for the many victims beyond the Kia passenger, Slough, Heard, and Liberty argued that any and all of their shots were in self-defense – and that what happened in Nisur Square was a two-way firefight provoked by an insurgent attack on the convoy. *See* 8/27/pm/76, 78 (Slough: innocents were possibly hit by defendants "defending themselves from these armed insurgents"); 8/28/am/22 (Heard: guards "reasonably believed they were in mortal danger," so "they fired back . . . in self-defense"); 8/28/am/94-95 (Liberty: only returned fire from Iraqi police).[14]

Whether or not Raven 23 came under attack, thus, was a matter of central dispute. At the outset: no witness said he actually saw an armed insurgent (or anyone else) shoot at the convoy. In fact – and while granting that everyone's vantage point is different, 8/6/am/77 – every Blackwater witness at the scene affirmatively said he did not see a shooter that day. *See* 8/4/pm/132-33 (Krueger: did not see any threats or anyone fire at the team);

---

2900 missions, not once attacked by a VBIED) *with* 8/25/am/94 (Blackwater analyst: VBIEDs posed a threat, though could not recall a Blackwater convoy ever being hit by one). *See also* 8/25/am/30-31 (defense witness Fishback: have never heard of an insurgent pushing a VBIED into a target); 7/1/pm/43-44 (Murphy: thought it "very unlikely" that Raven 23 would be a VBIED target; that "would be a very expensive way" of taking out a convoy).

[14]     These defendants, too, blamed any reckless shooting in the Square on Ridgeway – and further charged that their former teammate was "a complete fraud," 8/27/pm/97, who would say anything to curry the government's favor. 8/28/am/47-48.

8/11/am/32 (Randall: same); 8/6/am/38-39, 44-45 (Rhodes: if had seen a threat, "I would have stopped it"); 8/18/am/34-35, 55-56 (Hill: never saw anyone with a weapon or heard incoming fire; was using a scope as well as naked eye); 7/31/am/40-41 (Ridgeway: same); 8/4/am/60 ("we weren't under fire"); 7/7/pm/20-22, 27-34, 49-51 (helicopter gunner Gehrsitz: in three passes over the Square, looked behind walls, on rooftops, at bus stop, tree lines; no one from his helicopter fired; "we didn't perceive any threats"); 8/18/pm/66-70, 78-79, 85, 100-04 (helicopter gunner Gosiewski: "I looked at every single thing I could look at," but never saw a bad guy; "saw a lot of people . . . kneeling down or taking cover"; "I can absolutely identify somebody with a gun and determine . . . if they need to be shot"); 7/23/pm/114-17; 7/24/am/18-20 (helicopter gunner Spisak: "I can see your facial expressions at the level we flew"; was looking "everywhere" for threats – in treetops, on rooftops, behind barriers, at the bus stop – but saw none); 7/9/am/76, 81-83, 90-91 (helicopter pilot Bronn: could see Square from 360 degrees; no one in aircraft perceived any threats); 8/12/am/17-18 (helicopter pilot Paul: "I and my gunners did not specifically see a threat"); 7/14/pm/81, 84-85, 112; 7/15/pm/24 (Frost: did not see a single enemy combatant or perceive any incoming fire); 7/1/am/17-18, 34-35, 62 (Murphy: never saw a

threat); 7/15/pm/80, 108; 7/16/am/49 (Mealy: "I didn't see anybody [with] any kind of weapon").[15]

The Iraqi witnesses also uniformly testified that no one shot at the convoy. *See, e.g.*, 6/19/pm/22; 6/23/am/32; 6/26/am/22; 6/26/pm/6, 52; 6/30/am/25-26, 28-29; 7/2/pm/16; 7/7/am/41; 7/9/pm/21; 7/17/pm/22-23; *see also* 7/8/pm/13 (Col. Tarsa: have never experienced a coordinated attack of multiple people with small arms fire); 8/13/am/34-36 (Boslego: same; it would be an "ineffective technique" against an armored convoy); GX.9801/06 (another Blackwater team drove through Nisur Square right before Raven 23 without incident); *cf.* 7/22/am/26-28, 62-63 (Raven 23 was not even supposed to be there).

---

[15]    Watson said that at one point he believed someone was aiming a gun at the team, but later realized he was mistaken.  7/28/am/91; 7/28/pm/61-63.

Murphy and Krueger believed they heard some AK-47 fire after the convoy started shooting.  7/1/am/18-23 (two seconds worth); 8/5/pm/33-34. *Compare* 7/9/pm/13, 21 (Iraqi policeman at Nisur checkpoint: after shooting started, he ordered his officers to shoot AK-47s into the air, to warn people away).  *Compare also* 8/11/pm/130-31 (helicopter pilot Paul believed he heard AK-47 fire) *with* 8/18/pm/49-50 (helicopter gunner Gosiewski: one cannot hear bursts of groundfire over the sound of the engine jets).  Also, a defense witness a quarter mile from the Square (and too far away to see it) testified that he heard AK-47 gunfire and that rounds consistent with the AK-47 landed near him.  8/25/am/21-23, 32-33, 45 (though acknowledging that he was not a ballistics expert).

As for the circumstantial evidence, defendants argued that the "clearest evidence of incoming gunfire" were eight AK-47 shell casings found behind the bus stop at the southern end of the Square.  8/27/pm/57-58; 8/28/am/25. GX.2325; GX.2326.  Lt. Decareau, who photographed the casings on September 16, disagreed.  He thought it unlikely that an insurgent would fire eight rounds at an armored, four-vehicle convoy, and noted that when an AK-47 is fired, shells are ejected some distance away – unlike the eight, which were within a 12-inch diameter.  8/12/pm/23-24, 30-33, 56; *accord* 8/14/am/4-18, 58-60 (FBI Special Agent: AK-47 casings eject between 13-30 feet away; in thousands of AK-47 firings, has never seen casings fall to a shooter's feet); GX.8445K; *see also* 7/7/am/40-41 (Wisam Al-Miri, who was at the bus stop with another man (a teacher) and two women: no one there had a weapon).

Regarding other AK-47 shells collected in the Square after the shooting (GX.7996, GX.8006A), *see* 8/12/am/78-80 (Decareau: was common for Iraqi police to fire AK-47s into the air, usually to clear traffic, sometimes after a soccer game); 7/2/am/83-85 (Iraqi officer: in September 2007, the Square would have been "full" of spent AK-47 casings); 6/26/am/10-12, 28-30 (typically "scattered all over the place"); 6/19/am/16-17.[16]

---

[16]    During his tour of the Square right after the shooting, Colonel Boslego did not see any Iraqis attempting to clean up AK-47 cartridges or discard police uniforms – and, as he explained, that would have been odd: the Iraqi

Defendants also emphasized that, in real time, Raven 23 guard Tommy Vargas reported that Iraqi police were firing from bushes or a shack to the south.  7/1/am/23-35; 7/14/pm/85-88.  On hearing this news over the team radio, a number of guards looked for what Vargas was describing – but saw nothing.  *See* 7/1/am/23-26 (Murphy: "I didn't see anything at all that matched up"); 7/1/pm/86-87, 108-09 ("there was no shooting when [Vargas] was saying that"; "I don't think he was describing anything he was actually seeing"); *accord* 7/14/pm/88-89 (Frost); 8/5/am/56-57 (Krueger); *see* 7/28/pm/78-79 (Watson: never saw any police shooting); 8/18/am/34-36 (Hill: police he saw were trying to keep people calm); *cf.* 8/13/am/65 (no victim in the Square was a police officer or wearing a police uniform).

Watson (and apparently based in part on Vargas, 7/28/pm/26-28) also reported to the Blackwater command center that the convoy at several points was taking fire.  7/28/pm/49-50; 8/18/pm/27-28; GX.9801/6; 7/15/am/42-43 (yelled, "contact contact contact").  *But see* 7/15/pm/24 (Frost: when Watson yelled "contact," all that had happened was the convoy's shooting at the Kia); 8/5/am/44-46 (Krueger: heard "contact" after Raven 23 started shooting); 8/18/am/36-37 (Hill: when heard Watson, searched for targets but

---

judicial system is confession-based, and the very idea of physical evidence was not part of its law-enforcement culture.  8/13/am/48-49, 65.

saw none). Also, as the convoy was returning to the Blackwater parking lot, Frost heard Watson say something like, "now I got to figure out a reason why we went out there." 7/14/pm/113; *see* 7/17/am/98 (the command center's log only contains what the shift leader wants to report); 7/17/am/54-55 (Watson's voice during the incident was "very calm, collected"); 7/28/am/68 (that night, Watson lied to the State Department and said he did not shoot).[17]

Finally, there were the five or so "ding marks" on the Command Vehicle, GX.8468, GX.8469 – which a number of Blackwater personnel on the scene took to be evidence that the convoy had taken fire. *See* 7/29/am/14-15 (Watson); 8/6/am/103-05 (Rhodes); 7/14/pm/114-15 (Frost, though vehicle was "not pierced"); 8/11/pm/66-67 (Randall); 7/22/am/69-73 (Pearson, though hard to tell whether they were fresh); 8/18/pm/15-16 (Hill); 7/7/pm/45-47 (Gehrsitz); 8/8/2014 Dep.Tr. 51-53 (Blackwater mechanic

---

[17]    The log of Watson's report was itself the subject of dispute and controversy at trial. For example, the log's first entry referred to small arms fire from the northwest, not the south, where all the convoy's first shooting was directed, 7/17/am/96; GX.9801/06, and there was no report of a car bomb at all. 7/17/am/96. Also, the Blackwater operations chief ordered the log keeper to omit any mention of the order to Watson not to go to Nisur. 7/17/am/49-51 (had never before been directed to doctor a log). The judge instructed that the jury could consider that evidence in evaluating the overall trustworthiness of the log. 7/17/pm/5.

Defendants also point to "three bullet holes" in the southern-facing side of a black taxi as proof that fire was incoming. JB.23. But a firearms expert testified that those "holes" were not made by bullets. 7/10/pm/90-91.

Tyler Hill); *see also* 8/11/am/78-80 (Randall: saw what looked like 2-3 rounds impacting the Command); 7/28/am/92-94 (Watson: thought he heard rounds); 8/6/am/80-81 (Rhodes: saw radiator fluid leaking soon after the first shots). Again, there was disagreement on the point. At the time, Murphy thought the marks were caused by Slough firing M-203 rounds too close to the Command. 7/1/am/61-62. "I had seen [him] firing grenades right near it." 6/30/pm/135; 7/1/pm/97; *see* 6/30/pm/91-94 (Slough had done that before). And Ridgeway, too, suspected the marks may have been caused by grenade rounds detonating. 7/31/am/56.

While a forensic analysis was impossible – because Blackwater painted and sanded over the marks and repaired the radiator before investigators got to Baghdad, 7/23/am/49-52, 60-61; 7/23/pm/75-79 – the FBI conducted a test, by which it shot an AK-47 at a vehicle just like the Command. *See* GX.8449 (video). The jury was shown pictures comparing the damage left by those shots, GX.8454, GX.8455, GX.8456; *see* 7/23/am/72-75 (noting "starburst-type pattern"), with the different, smaller marks on the Command as photographed after the incident. GX.8468, GX.8469. Experts also described how an M-203 grenade (fired by both Watson and Slough from the Command and, according to Murphy, too close to the convoy) blows shrapnel and fragments backwards, toward a shooter, after hitting its target. 7/10/am/59-

43

60; 8/14/pm/33-34. And both an FBI metallurgist and an FBI explosives expert said shrapnel embedded in the tires of the Command was consistent with fragments from the type of grenade fired by Raven 23 that day. 8/14/pm/46-48; 7/17/pm/77, 83-84, 96-97; *id.* (they were made of the same material, and the same size, shape, height, and weight).

\* \* \* \*

All told, defendants were collectively charged on 74 counts, and convicted on 71. R.669 (verdict form).[18] Like the jury, the district court also rejected the prospect that the Blackwater convoy had come under attack. *See, e.g.,* 4/13/2015/152 ("despite their protestations . . . no witness . . . saw a weapon at the scene").

Raven 23's Ridgeway summed it up like this: "There was an intense firefight" in Nisur Square. 8/4/am/60. "[I]t was just one way."

---

[18]    Slatten was convicted of killing the driver of the Kia (Count 1), and Slough and Liberty were convicted of shooting the passenger (Count 2), an offense to which Ridgeway also pleaded guilty. Slough, Liberty, and Heard were convicted of shooting the victims on the southern end of the Square, Counts 3-8, 15-22, 27-29; Slough was convicted of shooting the victims to the west, Counts 9-13, 23-24, 30; Slough and Liberty were convicted of shooting the victims to the east, Counts 14 and 26; and Slough was convicted of shooting the victims to the north, Counts 31-32. Ridgeway alone pleaded guilty to shooting the man on the cell phone to the north. The jury hung on three counts against Heard: Count 2 (the Kia passenger) and Counts 14 and 26 (the shootings to the east). R.669.

## III.  RULINGS UNDER REVIEW

The rulings under review are identified in the argument on each issue.

## SUMMARY OF ARGUMENT

1.    <u>MEJA</u>.  The Military Extraterritorial Jurisdiction Act broadly authorizes the prosecution of private contractors whose employment "relates to supporting" the overseas mission of the Defense Department.  Defendants' employment readily cleared that bar.  As the evidence showed, the military mission in Iraq in 2007 had moved beyond fighting the insurgency to rebuilding a war-torn country, which included fostering economic, security, and political stability.  State Department officials and diplomats were very much part of that endeavor – and by protecting them when they went out into Baghdad to do that work, the Blackwater guards supported (and certainly "relate[d] to supporting") the rebuilding mission.

Moreover, with Blackwater providing diplomatic security, Army battalions that had been protecting State Department officials were freed up to perform military operations – which directly and tangibly supported DOD.  As its chief sponsor said in 2004, MEJA reaches private contractors who, though not directly associated with DOD, are aiding the rebuilding effort in Iraq, and

45

who commit crimes that bring shame to our country.  That well describes what happened here.

Defendants' various efforts to circumscribe MEJA's coverage – they claim, for instance, that it only applies when a contractor is supporting a particular Defense Department mission on the occasion of his crime – contravene the statutory text, legislative history, and common sense.  Failed legislative proposals to expand MEJA also do not inform the inquiry (this Court has called such "legislative history" "oxymoronic"), and the rule of lenity is inapplicable: defendants, surely, were on notice that firing on innocent civilians was a crime.  The district court was well within its province to reject defendants' proposed jury instructions which, in the main, memorialized their failed MEJA theories.

2.    <u>Vindictive Prosecution</u>.  After this Court reversed Judge Urbina's dismissal of the indictment, the government and Slatten had a disagreement about whether the Court's mandate applied to him upon remand.  Slatten won the argument, and thereby successfully moved to have the superseding indictment – which charged him alone with killing the driver of the white Kia – dismissed on statute-of-limitations grounds.  The government then reindicted Slatten for first-degree murder in connection with the killing, as that was the only applicable charge not time-barred.  The government also offered to forgo

46

the murder count, which carried a mandatory life sentence, and try Slatten instead for manslaughter in exchange for a waiver of his statute-of-limitations defense.

None of that was vindictive. With its manslaughter charges dismissed, the government had two choices: it could either reindict Slatten for first-degree murder or let him go free. That it chose the former evinces a legitimate desire, as the district court found, to bring a criminal to justice – not to penalize him for exercising a legal right.

It is of no moment that the evidence supporting the murder and manslaughter charges was substantially the same; that the other defendants (who did not have a statute-of-limitations right to assert) were not similarly treated; or that the government increased the charges after it came out on the losing end of the statute-of-limitations litigation. Those are features of many pretrial proceedings, routinely found not to raise a presumption of vindictiveness. So, too, the government's offer to revert back to the manslaughter charges in exchange for a waiver of Slatten's limitations defense was an above-board proposal, akin to a plea-bargaining offer. Indeed, if anything, it showed the government was not bent on upping the ante against Slatten for exercising a legal right. That Slatten may now regret not taking the government up on its offer does not make the overture vindictive.

47

3.    <u>Sufficiency of the Evidence</u>.  The evidence amply proved that Slatten shot the Kia driver, Ahmed Al-Rubia'y.  Many witnesses, Blackwater and Iraqi alike, testified to the sequence of events: when Raven 23 entered the Square, all traffic came to a halt.  Then came distinct "pops" or single shots from the convoy, followed by a woman's screams ("my son, my son") and the slow roll of the Kia – signifying, per the testimony of three eye witnesses, that the driver had been shot in the head and lost control of his car.  *See* 7/2/am/91-93 ("his whole face was full of blood"); 6/23/am/14-16 (he was shot in the "middle of his [fore]head"); 6/24/am/48-50.  The evidence also showed that Slatten – the team's best marksman who alone carried a uniquely precise, scoped sniper rifle – fired the convoy's first two shots, and exactly in the Kia's direction.  Slatten's exclamation after he fired ("white car, white car coming in") and his admission to a teammate (that he had "popped [a man's] grape," who then "slumped forward"), further completed the picture – as did his striking animus toward the Iraqi people, his pledge to "get[] payback for 9/11," and his history of shooting without provocation.

The evidence also sufficiently supported Liberty's manslaughter convictions.  Based on a variety of accounts, the jury could conclude that Liberty shot at the Kia, shot further south, and shot a man whose hands were up during the hook-up.  His southeast shooting, furthermore, aided and

48

abetted the shots that killed or wounded the victims to the south.  None of those fleeing, crawling, or cowering civilians posed a threat to the convoy – and by joining his teammates' unjustified shooting, Liberty helped turn the southern end of the Square into a kill zone. *E.g.*, 6/26/am/17 (it was "gunfire . . . all over the place").  His recklessness and guilty intent were further evinced by his unique (and uniquely savage) method of shooting – while driving with a rifle on his lap, Liberty fired on fully automatic out his truck's porthole – as well as his post-shooting false statements (he denied firing); the signature evidence he left at the scene (two empty magazines bearing his name); and his prior excessive and unjustified shooting in Baghdad.

4.    ████████ <u>Hearsay Statements</u>.  The district court did not abuse its discretion in finding that ███████████████████████████████████ ███████████████████████████████████████ – were inadmissible hearsay, and thus did not warrant severing Slatten's case from the others.  ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████



██████ statements also do not qualify under the "business records" exception to the rule against hearsay – they were not prepared as a "regularly conducted activity" of ████████ business, Fed.R.Evid. 803(6)(B), (C) – or the "residual" exception, either.  Fed.R.Evid. 807(a).  And even if the district court somehow erred in excluding the statements, any error was harmless.  ████████

5.     <u>Venue</u>.  18 U.S.C. 3238 provides that, for crimes committed overseas, venue lies where any joint offender is arrested.  Venue was proper in the District of Columbia, where Ridgeway – who, by defendants' own account, joined all aspects of the Nisur Square shooting – was arrested.  The premise of defendants' venue challenge is that *they* were entitled to venue the

trial in Salt Lake City, Utah, where none of them lived (or even lived near) because that is where they self-surrendered after Ridgeway was arrested. Section 3238 does not work that way.  By finding that Ridgeway's arrest established venue in the District – which was also home to defendants' counsel; much closer to Slatten's, Liberty's, and Heard's homes than Salt Lake (and about the same distance for Slough); where potential State and Defense Department witnesses were located; which accommodated flights to and from Iraq; and where the investigation of this overseas crime was naturally conducted – the district court was true to both the terms and intention of Section 3238.  The court also did not err in deciding, consistent with this Court's precedent, that it need not submit venue to the jury, as there were no genuine disputed facts on the issue.

6.    <u>New Trial</u>.  Before sentencing, one of the Iraqi policemen on the scene, Sarhan Monem, submitted a victim impact statement in which he told of an anguished conversation between mother and son inside the Kia after the shooting started.  The account differed from Monem's trial testimony, in which he described seeing the Kia driver killed by the first shots from the convoy.  Monem later told the government that he did not think a victim impact statement was an account of facts, but an expression of emotion, and that he had imagined the conversation he described.

51

Evaluating all the circumstances, the district court rejected defendants'
claim that Monem perjured himself at trial. That finding, supported by the
record, is classically the type of judgment entrusted to the trial-court judge.

The court, moreover, found that even at a new trial, Monem's victim
impact statement would "offer little chance of an acquittal . . . let alone make
acquittal probable" (the new trial standard), given the strength of the evidence
against defendants. The court did not thereby abuse its discretion. Monem's
trial testimony, unlike his victim impact statement, was powerfully
corroborated by other evidence. In fact, in all critical respects, it was
duplicated by other testimony. Whether or not Monem were to appear at a
new trial, thus, the result would be the same: the evidence would still show
that Slatten shot Al-Rubia'y, and it would also still show that Slough, Liberty,
and Heard unjustifiably killed or wounded the many other victims in the
Square. Indeed, Monem's testimony (about what happened to the Kia at the
beginning of the episode) had no bearing on all the bloodshed that followed.

Having found that Monem's statement would not have made a
difference at a new trial, the court also did not abuse its discretion in deciding
that a hearing was unnecessary.

7.    The 30-year-and-a-day sentences. Slough, Liberty, and Heard
were convicted of using or discharging machineguns and/or a destructive

52

device during the shooting.  That count under 18 U.S.C. 924(c) carried a mandatory term of 30-years-to-life in prison, which, by statute, was also to run consecutively to the sentences for the underlying manslaughter counts.  The district court decided to impose only one-day concurrent sentences for defendants' manslaughter convictions in addition to the Section 924(c) minimum.  A sentence of 30-years-and-a-day, it found, sufficiently and appropriately achieved the sentencing goals of 18 U.S.C. 3553(a).

Nothing about that violated the Eighth Amendment.  Contrary to their claim, Congress intended that Section 924(c) apply to defendants who commit crimes with weapons entrusted to them by the government.  Defendants' sentences are also not "grossly disproportionate" (the constitutional standard) to their crimes: as the district court found, that many killings and woundings – of defenseless men, women, and children who posed no threat to the heavily-armed and armored convoy – required a serious sentence.  Nor are defendants anything like the juveniles whose sentences of life without parole the Supreme Court has found to be "categorically" cruel and unusual.  The district court could have legitimately sentenced defendants more severely.  That it chose not to further defeats their already losing Eighth Amendment claim.

# ARGUMENT

## I.   DEFENDANTS WERE RIGHTLY CONVICTED UNDER THE MILITARY EXTRATERRITORIAL JURISDICTION ACT.

Defendants claim they are entitled to acquittal because MEJA does not authorize this prosecution.  JB.46-76, SB.60.  They are mistaken.

### A.   Standard of Review

The district court's construction of a statute is reviewed de novo.  *Gang Luan v. United States*, 722 F.3d 388, 393 (D.C. Cir. 2013).  In reviewing the sufficiency of the evidence on a jurisdictional element, this Court applies the familiar standard: whether, viewed in the light most favorable to the government, any rational factfinder could find the essential element beyond a reasonable doubt.  *See United States v. Wilson*, 240 F.3d 39, 43 (D.C. Cir. 2001) (reviewing denial of motion for acquittal).

Defendants' challenges to the MEJA jury instructions are also reviewed de novo.  *United States v. Ring*, 706 F.3d 460, 465 (D.C. Cir. 2013).  The "task is to determine whether, taken as a whole, [the instructions] accurately state the governing law."  *Id.* (citation, quotations omitted).

### B.   Background

1.   MEJA authorizes the prosecution of anyone who, "while employed by or accompanying the Armed Forces outside the United States,"

commits what would be a federal felony in this country.  18 U.S.C. 3261(a)(1).

The term "employed by the Armed Forces outside the United States" means –

(A) employed as –

(i) a civilian employee of – . . . ; [or]

(ii) a contractor (including a subcontractor at any tier) of – . . . ; or

(iii) an employee of a contractor . . . of –

(I) the Department of Defense . . . ; or

(II) any other Federal agency . . . to the extent such employment relates to supporting the mission of the Department of Defense overseas.

18 U.S.C. 3267(1)(A)(i), (ii), (iii).[19]

The district court ruled that MEJA added a jurisdictional element to the underlying felony offenses, and thus had to be submitted to the jury. R.127/45-47.  That ruling is not disputed.

2.    At trial, U.S. Colonel Michael Tarsa explained that, in 2007, the military mission in Baghdad was not just to battle the enemy, but to help bring stability to the region – by, among other things, identifying and organizing community leaders to "stimulat[e] local governance"; restoring essential

---

[19]    Defendants were employed by Blackwater, *see* GX.9845, GX.9865, GX.9885, GX.9913, which contracted with the State Department. 7/2/am/47-48.

services like sewer, water, and power; rebuilding infrastructure; and fostering economic development (by, for instance, distributing micro grants and raising funds for a hospital burn center).  7/8/am/104-08.  As he explained, by helping restore the country's "quality of life," the aim was to "dissuad[e] people from joining the insurgency."  7/8/am/107; *see also* 7/10/am/43-44 (after initial phase of warfare, the military's role in Iraq transitioned: "to rebuild the country and set up a government") (Marine Corps Officer Shelby Lasater); *accord* 8/12/am/71-73 (Army Lieutenant Peter Decareau).  A top Defense Department official agreed: after the initial incursion, Defense, along with other agencies, was essentially rebuilding a nation.  8/21/am/44-46, 57-58 (then-Deputy Secretary of Defense Gordon England).

The State Department diplomats under Blackwater's protection were very much part of that effort.  As a Raven 23 guard described it: "our clients . . . the State Department, they're . . . trying to bring along the country, trying to mentor the Iraqi government and . . . get them up and running." 6/30/am/94.  State Department employees were also part of the Army's "Provincial Reconstruction Teams," which worked with the local populace to reestablish commerce and industry in Baghdad.  7/17/am/27-28 (State and Army "worked together in tandem") (Blackwater's Juan Mendoza).  DOD's England again acknowledged the point: the lion's share of the rebuilding effort

fell to the Departments of Defense and State – and from DOD's perspective, the strategy of "help[ing] the Iraqi people build a new Iraq" required a comprehensive, integrated approach along three tracks: political, economic, security.  8/21/am/45-46, 49, 57-59.

The evidence also showed that, given the dangers in Baghdad, State Department officials who went into the red zone on behalf of the rebuilding effort needed constant protection.  8/21/am/49-50; *see* 7/1/pm/11-12 ("every single [diplomat or State official] needed security whenever they went anywhere").

With the need for security so great, the military also lent a hand to the effort.  According to Colonel Tarsa, in late 2006 and into 2007, his Army battalion dedicated about 10 platoons, of 16 soldiers each, daily to protecting State Department officials.  7/8/am/97-102.  In 15 months, Tarsa's battalion executed over 2900 escort missions in Baghdad.  7/8/am/102-03; *see* 7/8/am/100-02 (once State determined the mission, Tarsa researched and selected the routes, made the assignments, and executed the escort).

In spring 2007, with Blackwater on the scene, Tarsa was able to reduce the number of platoons dedicated to State security, 7/8/pm/5-6 – which, in turn, freed up soldiers to assume military responsibilities as part of the surge. *Id.*; 7/8/am/102-04.  Lieutenant Decareau said the same: in 2007, Army

platoons relieved of escort missions could focus on civil affairs and offensive artillery missions in support of ground troops.  8/12/am/67-74; *see also* 8/21/am/49-51, 70 (when Defense was providing security for State officials, "it was draining personnel from the DOD mission") (England).

Blackwater supported the military in other ways as well.  As noted, State Department officials worked in tandem with the military as part of the Army-led Provincial Reconstruction Teams ("PRTs") – and in addition to providing security for State employees involved in that effort, Blackwater also helped train Army PRT escort units.  7/17/am/27-28.  Sometimes, Blackwater also assigned its convoys to accompany the reconstruction teams when Army escorts were unavailable, 7/17/am/28-29, and on occasion, Blackwater guards, at State's behest, helped military security details in distress. 7/22/am/76-77; 7/23/pm/94; 7/15/pm/71-72.

## C.    Defendants' Employment "Relate[d] To Supporting" The Defense Department's Mission In Iraq.

There is much defendants say that we do not dispute: the State Department bore responsibility for providing security for its diplomats; Blackwater contracted with State to provide security services under the Worldwide Personal Protective Services ("WPPS") II contract; the Raven 23 guards were hired to support that contract; Blackwater guards were not

58

involved in the military's combat operations; Blackwater answered to the State

Department, not Defense; and it operated under State's use-of-force rules, not

the military rules of engagement.  *See generally* JB.51-57.

All that said, the text of MEJA, its legislative history, and the evidence

at trial amply show this prosecution fell comfortably within the terms of the

statute.

1.    <u>The Text</u>.  The inquiry, as always, begins with the statutory

language, *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989),

and here, MEJA's key phrase – a defendant's employment need "relate[] to

supporting" the Defense Department's overseas mission – is notably broad.  Or

as the Supreme Court has said, the terms "in relation to" and "relate to" are

"'deliberately expansive.'"  *Smith v. United States*, 508 U.S. 223, 237 (1993)

(quoting *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125,

129 (1992)).  Consulting *Webster's*, the Court went on to say "in relation to"

connotes "hav[ing] some purpose or effect with respect to."  *Id.* at 237-38; *see*

*also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) (discussing broad

scope of "relates to": means having a "connection with or reference to");

*Morales v. TransWorld Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) (same re:

"relating to": means "to stand in some relation; to have bearing . . . ; to

pertain") (citations, quotations omitted).

This Court has also so ruled: "'[t]he phrase 'relate to' [has a] broad common-sense meaning' and a statutory provision containing the phrase therefore has 'broad scope.'" *Friedman v. Sebelius*, 686 F.3d 813, 820-21 (D.C. Cir. 2012) (quoting *Metropolitan Life Ins. Co. v. Mass.*, 471 U.S. 724, 739 (1985)).

So, too, with "supporting" – which means to "promote the interests or cause of . . . assist, help, aid." *Merriam-Webster's Collegiate Dictionary* 1180 (10th ed. 2001).

By its terms, then, MEJA requires that a defendant's work have some supportive bearing on, or connection to, or helpful effect with respect to, the Defense Department's overseas mission.

2.      The Legislative History.  MEJA's legislative history also underscores its expansive (not "limited," or "narrow[]," JB.50) scope.  When originally passed in 2000, MEJA authorized extraterritorial prosecution for civilians accompanying our armed forces overseas, as well as those directly employed by the Defense Department, DOD contractors, and employees of DOD contractors.  *See* 18 U.S.C. 3267(1)(A) (2000).[20]

---

[20]      Historically, civilians accompanying the armed forces abroad were, like them, subject to court martial for crimes committed in host countries.  In a series of cases, however, the Supreme Court held it unconstitutional to subject civilians to courts-martial jurisdiction because those proceedings do not

In 2004, in the wake of the Abu Ghraib scandal – where Iraqi prisoners were abused by Interior Department contractors – Congress added the current language to expand MEJA to reach non-DOD contractors.  As its chief sponsor explained:

> Private contractors are necessary to rebuilding a healthy Iraq.  Yet we cannot allow them to escape justice for crimes they may commit overseas. . . . Our mission overseas is an honorable endeavor.  It should not be tainted by illegal acts by any, particularly a few, who embarrass our country. . . . This amendment . . . leaves no doubt whether wrongdoers can be brought to justice.

150 Cong.Rec. S6863 (daily ed.) (June 16, 2004) (remarks of Sen. Sessions); *id.* (amendment covers contractors who are not "directly associated" with DOD); *see also id.* at S6864 (remarks of co-sponsor Sen. Schumer) (amendment closes "a dangerous loophole" that "allow[s] [non-DOD] civilian contractors who do the crime to escape doing the time"); *id.* (under the provision, the "world sees when a crime is committed . . . it is prosecuted").[21]

---

provide certain rights guaranteed by the Constitution.  *E.g., Reid v. Covert*, 354 U.S. 1 (1957); *Kinsella v. Singleton*, 361 U.S. 234 (1960).  The result was a "jurisdictional gap": because many U.S. statutes prohibiting offenses like murder, rape, and robbery do not apply extraterritorially, civilians who committed such crimes overseas went unpunished.  MEJA meant to close that gap.  *See* H.R.Rep.No. 106-778(I) (2000).

[21]    Amicus' suggestion that MEJA's application here "violates the presumption against extraterritoriality," AB.7-9, is inapt.  Whether a criminal statute reaches conduct beyond our borders boils down to congressional intent – and the presumption against extraterritoriality is overcome by "affirmative contextual evidence" that Congress meant a statute to so apply.  *United States*

3.    <u>The Evidence</u>.  The jury rightly concluded that defendants'

"employment" "relate[d] to supporting" the Defense Department's mission in

Baghdad in 2007.  As the evidence showed, by that time, DOD's undertaking

had evolved: the military was no longer just trying to suppress opposition

forces and maintain security, but was also focused on reconstruction efforts.

*Supra*, at 55-56; *see* 7/8/pm/30 (troops were working "outside of their typical

roles").  State Department officials and diplomats aided that mission: they,

too, were working to get Iraq back on its feet, and also partnered with the

military as part of the Army's Provincial Reconstruction Teams.  *Supra*, at 56-

57; *see* 7/1/pm/13 (State was working to stabilize the Iraqi government).

Blackwater, for its part, provided the essential security so these

diplomats could do their jobs.  As a Raven 23 guard testified, "every single

[diplomat or State Department official] needed security whenever they went

---

*v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004); *e.g., United States v.
Bowman*, 260 U.S. 94, 97-98 (1922) ("If punishment of [essentially domestic
crimes] is to be extended to include those committed [outside] of the strict
territorial jurisdiction, it is natural for Congress to say so in the statute").  With
MEJA, Congress quite clearly said so.  It is, after all, called the Military
*Extraterritorial* Jurisdiction Act; it explicitly reaches "conduct outside the
United States," 18 U.S.C. 3261(a); and the 2004 amendment was intended to
"extend military extraterritorial jurisdiction" over non-DOD contractors
supporting DOD's overseas mission.  150 Cong.Rec. S6863.  In hearing the
case, the district court did not "interfere[] with matters of foreign policy,"
AB.9, but honored Congress's intention to bring wrongdoing overseas
contractors to justice.

anywhere." 7/1/pm/11-12. In protecting those officials and diplomats, so the jury could conclude, the guards' services supported (and surely, "relate[d] to supporting") the rebuilding mission. *See Friedman*, 686 F.3d at 820 (underscoring the "deliberately expansive" meaning of "relates to"); 150 Cong. Rec. S6963 (MEJA covers private contractors helping to "rebuild[] a healthy Iraq") (Sen. Sessions); *id.* (defendant's work need not be "directly associated" with DOD) .

Moreover, as Colonel Tarsa and Lieutenant Decareau also attested, with Blackwater providing security for State officials, their troops – which had been performing that function before – were freed up to assume DOD's civil rebuilding and warfighting responsibilities. *Supra*, at 57-58; *see* 7/8/am/103-04 (Tarsa: with Blackwater's arrival, was able to "generate a company's worth of soldiers and commit them to area security [and] battle space management"). That, also, supported the military's mission in a very tangible way – as it enabled troops otherwise occupied to get back to the DOD work at hand. Still further, Blackwater coordinated with, and supported, the Army's Provincial Reconstruction Teams, *see* 7/17/am/27-29, and was also occasionally called upon to aid military rescue operations. 7/22/am/76-77; 7/23/pm/94; 7/15/pm/71-72.

4.    <u>Defendants' Main Arguments</u>.  The crux of defendants' argument, it seems, is this: because their work "supported the State Department's statutory mission to provide diplomatic security" – and because the provision of security was "not part of the Defense Department's mission" – their employment, by its terms, did not fall within MEJA.  JB.51, 54-55.  That is wrong on several levels.  In the first place, to say that the State Department's "mission" in Iraq was to provide diplomatic security denigrates (to the extreme) State's central calling to help bring stability to a war-torn country. And the fact that the provision of diplomatic security was not part of DOD's "mission" is immaterial.  The question under MEJA is not whose "mission" it may have been to provide security, but whether defendants' employment (protecting State officials and diplomats) bore some supportive relation to the Defense Department's rebuilding mission in Iraq.

And that is where the evidence comes in – and where defendants' own witness, like others, provided the key facts: State Department officials were an important part of the rebuilding effort – and when they went into Baghdad's red zone to do that work, they "absolutely" needed security.  8/21/am/46, 49. The jury was entitled to take that evidence to heart, and find the Blackwater

guards' protective services "relate[d] to supporting" (at the very least) the rebuilding mission.[22]

Defendants respond to Tarsa and Decareau's other evidence – that Blackwater enabled them to repurpose their troops – with a variation on their main theme: when the military provided security for State officials, defendants say, it was "performing the State Department's mission, not the other way around."  JB.55-56, 58.  Be that as it may, it likewise misses the point.  Again, the question under MEJA is not whether Defense may have been doing State's job or supporting State's mission – but whether Blackwater's provision of security for State Department officials in some way supported DOD's mission.  And as Tarsa and Decareau made plain, by allowing them to redirect their escort-providing soldiers to rebuilding and military tasks, Blackwater's support was more than theoretical or tangential.  It was concrete and direct.[23]

---

[22]    If, as defendants complain, our articulation of the Defense Department's mission seems broad, JB.57-58, that is because the evidence (Army Colonel Tarsa, Lieutenant Decareau, Marine Corps Officer Lasater, Blackwater's Mendoza, DOD second-in-command England) showed it to be so.

[23]    We are not sure how a MEJA prosecution of a food services contractor who replaces an Army staffer working in the Embassy mess would turn out. *See* JB.58.  But whether or not those employees' work "relate[d] to supporting" DOD's overseas mission in a particular case, the facts here present an actual, jury-ratified, satisfaction of the statute.

65

In short: State was supporting DOD's mission, and by protecting State officials and performing other security-related work in tandem with the army, the Blackwater guards were playing an important supporting role related to DOD's mission – not only in their own work, but by giving the military some of its troops back to concentrate on DOD operations.[24]

Defendants' efforts to avert the Court's attention to other terms in the statute are unavailing. They emphasize, first, that a person is "employed by

---

[24]    Defendants' focus on their contracts (JB.51-54) is something of a distraction. Yes, Blackwater contracted with the State Department to provide personal security services. And yes, defendants contracted with Blackwater to do that work. (Though, notably, defendants' contract with Blackwater provided that they were "not limited to" the provision of certain bodyguard and protective security services, and were also obliged to perform any "security-related duties requested" by Blackwater or State in support of State's engagement of Blackwater. *E.g.*, GX.9865 § 1.12; *see also* DX.700-006 § C.1.1 (WPPS II contract: noting Bureau of Diplomatic Security's "broad range of responsibilities" to protect U.S. and foreign officials "whenever the need arises," and that contractors may be required to provide protective services for "special domestic security situations"); *id.* at § C.4.3.2.1 (contractor agrees to train "other personnel" identified by State). Also, as defendants note, JB.54, under Task Order 6, State contracted with Blackwater, *inter alia*, to protect personnel under Chief of Mission authority upon request – and as outlined in a 2004 Memorandum of Agreement between State and Defense, the Chief of Mission had security responsibility for a long list of military personnel, including those jointly agreed upon by Defense and State. R.164-3/2, 4).

But no matter. All that simply means the defendants were employed (indeed, "contracted") to provide security for State officials and diplomats, and to perform other security-related work as requested by Blackwater or State. It does not change the bottom-line point: it was that provision of security services that supported DOD's mission.

the Armed Forces" "to the extent" his employment by a non-DOD contractor

relates to supporting DOD's mission.  JB.60.  But that observation does not

move the ball – for nothing more (or less) than the "extent" of defendants'

employment is here at issue.  In addition to their everyday provision of

diplomatic security, the "miscellaneous" work (JB.59) the guards were tasked

to do by Blackwater or State – training and/or filling in for military security

convoys accompanying the Provincial Reconstruction Teams, occasionally

helping a military security team in trouble – also fell within the terms of their

employment.  Those missions were directed by Blackwater at State's request –

and the guards, of course, were paid by Blackwater for their work and

answered to Blackwater management.  7/22/am/93-94; *see* 7/2/am/47-50

(Matt Murphy: believed rescue work with the military fell within his

Blackwater contract; as its employee, he did whatever Blackwater told him to

do); 7/22/am/94-96 (Supervisor Pearson: if State saw fit to send a Blackwater

convoy out to help a military security detail, Blackwater would assign its

guards to do it).  Even had that work not fallen within the four corners of their

contracts, *but see supra*, at 66 n.24, it was what the guards were directed, and

paid, by Blackwater to do – and hence part of their "employment."  By the

same token, even if defendants themselves did not participate in such missions,

67

JB.58-59, it was still within the scope of their Blackwater employment, and

therefore relevant to the MEJA analysis.[25]

Ultimately, though, defendants land on a different sort of argument.

They read "to the extent" together with "while employed" to mean a

defendant is covered by MEJA "*only in the limited capacities or at those limited

times*" when he is actually performing a Defense-related function.  JB.60.  As

they see it, MEJA would require a jury to look only at the "specific charged

conduct" – *i.e.*, at what defendants were doing in Nisur Square on September

---

[25]     We are not exactly sure what defendants mean about an "all-or-nothing"
argument.  JB.59-60, 66-67.  We argued only that the guards' work for
Blackwater fell within defendants' "employment," and that it also supported
DOD's mission in Iraq.  Defendants' notion – that some of Blackwater's work
(*e.g.*, training or standing in for military security convoys, helping military
rescue teams in a pinch) may have supported the Defense mission while other
parts (protecting State officials and diplomats) did not, JB.61, 66-67 –
contravenes both the record and the statute.  It all "relate[d] to supporting"
DOD's mission.

     Defendants' related invocation of the harmless-error rule of *Skilling v.
United States*, 561 U.S. 358, 414 (2010), *Hedgpeth v. Pulido*, 555 U.S. 57, 60-61
(2008), and *United States v. DeFries*, 129 F.3d 1293, 1304-06 (D.C. Cir. 1997),
confuses apples with oranges.  JB.59-60 n.44.  Those cases involved
instructional error on a question of law.  Here, defendants do not allege error
in the instructions on the meaning of "relates to," the relevant legal term.  *See*
R.625/35.  The jury was simply called upon to decide, as juries do every day,
whether the evidence taken as a whole proved the statutory element – here,
whether defendants' employment related to supporting DOD's mission.
Defendants did not, apropos of their current argument, request a MEJA
special verdict.

16 – to determine whether they were supporting the military mission.  JB.42, 60-62.

Nothing in MEJA's text or purpose commends such a view.  If Congress had meant to limit MEJA to crimes committed only when a defendant is supporting a particular Defense mission, it would have said so.  It chose, rather, to make his "employment" the statutory anchor.  Indeed, MEJA's opening paragraph refers to a defendant's "conduct," 18 U.S.C. 3261(a), whereas the definitional section, 18 U.S.C. 3267, does not.  *See Duncan v. Walker*, 533 U.S. 167, 173 (2001) ("It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citations, quotations omitted).

Defendants' reading, not insignificantly, also makes no sense.  It would mean that if a contractor exploited Iraqi children, raped a woman, or brutally assaulted a local store owner on his off-hours, MEJA would not apply – because he was not doing his job ("while employed" or "to the extent" of his employment) at the time of the crime.  Such a labored construction gives way to a far more sensible one: where a defendant's employment relates to

supporting DOD's overseas mission (as the jury found here), he is covered by MEJA "while" (*i.e.*, during the time) he is so employed.

In the end, defendants' alternative argument perhaps only amounts to a reiteration of their main one: that their provision of security services did not relate to supporting the Defense mission.  The repackaging, however, does not make the argument any stronger – and like the district court, *see* 8/21/56, 8/26/am/45-54, R.748, SR.650, this Court should reject defendants' effort to skirt MEJA's plain meaning.

### D.    Neither the Views Of Executive Branch Officials Nor Failed Congressional Proposals To Further Expand MEJA Inform The Inquiry.

Defendants catalogue what they describe as an "overwhelming government consensus" after Nisur Square (save, of course, the view of the Department of Justice), that MEJA did not apply to this prosecution.  JB.47-48 & nn.32-36; 55-56 & n.40.  Here, we agree with amicus: "the focus should [instead] be on the statutory language and Congress's policy concerns" in enacting MEJA.  AB.8.  Indeed, on the most basic level, defendants' point is simply irrelevant – for it is the province of the court, not the executive branch or individual legislators, to say what the law is and to so instruct the jury. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); *Sparf v. United States*, 156 U.S. 51, 102 (1895) ("it is the duty of juries in criminal cases to take the law

70

from the court, and apply that law to the facts as they find them to be from the evidence").  Also (if it even bears mentioning), these administration officials and legislators, unlike the jurors in Judge Lamberth's courtroom, were uninformed by the facts on the ground.[26]

Nor are subsequent congressional proposals to further expand MEJA, JB.47-48, useful tools of statutory construction.  *See Cobell v. Norton*, 428 F.3d 1070, 1075 (D.C. Cir. 2005) ("post-enactment legislative history is not only oxymoronic but inherently entitled to little weight"); *see also e.g., O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) ("the view of a later Congress cannot control the interpretation of an earlier enacted statute").  For obvious reasons, there was much public and political dismay in the wake of the Nisur Square shooting.  *See* 8/21/am/51-52.  That lawmakers were quick to react was,

---

[26]    A number also appear to have been uninformed about the scope of MEJA itself.  *See, e.g.*, Report of the Secretary of State's Panel on Personal Protective Services in Iraq (2007) ("the Panel is unaware of any basis for holding non-Department of Defense contractors accountable under U.S. law") (R.34-23/5); Obama campaign announcement ("because companies like Blackwater have contracts with the State Department rather than the Defense Department, the company is not technically subject to" MEJA) (R.56-14/3); H.R.Rep.No. 110-352 (2007) (contractors who "do not work directly" in support of DOD missions are not covered by current law) (R.56-10/5).

Outside opinions, of course, can also cut both ways.  *See, e.g.*, Testimony of Blackwater CEO Erik Prince, opining that his employees in Iraq *were* subject to MEJA, *Blackwater USA: Hearing Before the Comm. On Oversight And Gov't Reform*, 110th Cong. 92-93 (2007).

perhaps, no surprise.  That their legislative proposals were not enacted may

mean, if anything, that Congress decided MEJA was up to the task after all.

*See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S.

159, 160 (2000) ("Failed legislative proposals are a particularly dangerous

ground on which to rest an interpretation of a prior statute").

### E.    The Rule of Lenity Does Not Apply.

Defendants' reliance on the rule of lenity, JB.62-63, is also misplaced.

The rule "is not applicable unless there is a grievous ambiguity or uncertainty

in the language and structure of [a statute], such that even after a court has

seized everything from which aid can be derived, it is still left with an

ambiguous statute."  *Chapman v. United States*, 500 U.S. 453, 463 (1991)

(citation, quotations omitted); *Reno v. Koray*, 515 U.S. 50, 65 (1995) (rule

applies when a court "can make no more than a guess as to what Congress

intended") (citation, quotations omitted); *Muscarello v. United States*, 524 U.S.

125, 138-39 (1998) ("[t]he simple existence of some statutory ambiguity . . . is

not sufficient . . . for most statutes are ambiguous to some degree"); *accord*

*United States v. Hite*, 769 F.3d 1154, 1163-64 (D.C. Cir. 2014).  Here, settled

principles of statutory construction – including reliance on the common usage

of "relates to" and "supporting," as well as the legislative history – leave no

grievous ambiguity about what MEJA means.

Lenity also does not mandate defendants' crabbed construction of the

statutory text.  JB. 63.  As the Supreme Court has explained:

> Because the meaning of language is inherently contextual, we have
> declined to deem a statute 'ambiguous' for purposes of lenity merely
> because it was *possible* to articulate a [more narrow] construction. . . .
> [W]e have always reserved lenity for those situations in which a
> reasonable doubt persists about a statute's intended scope even *after*
> resort to the language and structure, legislative history, and motivating
> policies of the statute.

*Moskal v. United States*, 498 U.S. 103, 108 (1990); *accord Lockhart v. United

States,* 136 S.Ct. 958, 968 (2016); *Abramski v. United States*, 134 S.Ct. 2259,

2272 n.10 (2014).

Finally, the fundamental principle upon which the rule of lenity is based

– that "no man shall be held criminally responsible for conduct which he could

not reasonably understand to be proscribed," *United States v. Lanier*, 520 U.S.

259, 265-67 (1997) (citation, quotations omitted) – does not aid defendants'

cause.  Defendants cannot plausibly say they were not forewarned that

opening fire on innocent civilians would cross a criminal line.  And their

quarrel about language in a jurisdictional statute – whether they were or were

not supporting DOD's mission in Iraq – is a particularly ill-suited basis on

which to claim lenity.  *See* Lawrence M. Solan, *Law, Language and Lenity*, 40

Wm. & Mary L.Rev. 57, 142 (1998) ("[j]urisdictional cases . . . are weak

candidates for application of the rule of lenity . . . because the federal statute

merely grants a forum in which otherwise culpable behavior can be tried. Defendants have more than adequate notice that the conduct in question is criminal").

**F.    The Jury Was Properly Instructed.**

Defendants mount several challenges to the MEJA jury instructions, all a renewal of their various theories – and all, at bottom, to say that Blackwater's provision of security to State Department officials and diplomats did not relate to supporting DOD's mission in Baghdad.  JB.64-76.  As discussed, the jury could readily disagree with that basic proposition.  Even so, we address defendants' objections to the instructions in turn.

1.    In relevant part, the district court thus instructed on the meaning of "employed by the Armed Forces outside the United States":

> [T]he definition of 'employed by the Armed Forces outside the United States' includes not only a direct employee or contractor of the Armed Forces of the United States, but also a contractor (including a subcontractor at any tier) or an employee of a contractor (or subcontractor at any tier) of any Federal agency of the United States Government *to the extent*:
>
> > (1) *such employment* relates to supporting the mission of the Department of Defense overseas . . . .
>
> > . . .
>
> [T]he Government may prove that the defendant was "employed by the Armed Forces" by establishing that:

74

(a) the defendant *was employed as a contractor, or an employee of a contractor* (including a subcontractor at any tier) of any federal agency, and

(b) that the defendant's employment related to supporting the mission of the Department of Defense overseas.

R.625/34-35 (emphasis added).

2.    Defendants claim the instructions omitted certain of MEJA's qualifying terms: the "to the extent" language, JB.65; the "employed as – a contractor (including a subcontractor . . .)" phrase, JB.68; and the word "such" in "such employment." JB.69. As the italicized words in the court's instruction show, however, defendants are simply wrong about that.

a.    What defendants really seem to complain about is the court's refusal to put their particular spin on those statutory terms. For instance, they claim the court should have instructed that defendants' "employment" meant their "contract employment" – thus requiring the jury to consult the (extensive) terms of their contracts, *e.g.*, GX.9865; the WPPS II contract, DX.700; and Task Order 6, DX.702, to decide whether their "employment" related to supporting DOD's overseas mission. JB.51-54, 68-69.

That, though, is not what the statute says. Rather, MEJA covers a defendant who is "employed as" 1) a civilian employee of a non-DOD agency; 2) a non-DOD contractor (including a subcontractor) or 3) an employee of a

75

non-DOD contractor "to the extent such employment relates to supporting

. . . ." 18 U.S.C. 3267(1)(A)(i), (ii), (iii). The statute does not say a defendant

is covered "to the extent his *contract* relates to supporting . . . ." And although

defendants claim the "clear antecedent" of "such employment" is "contract

employment," JB.52, 68-69 (again, their words, not the statute's), the much

clearer antecedent of "such employment" is actually "employed as" – which

frames all the succeeding statutory clauses, including the one applicable to *non-*

*contracting* civil employees of a non-DOD agency. That construction, in

addition to being the most natural reading of the text, also has the virtue of not

putting words in the statute's mouth. *See Pub. Citizen, Inc. v. Rubber Mfr's*

*Ass'n*, 533 F.3d 810, 816-17 (D.C. Cir. 2008) (declining to "add[] words that

are not in the statute that the legislature enacted") (citing *United States v.*

*Monsanto*, 491 U.S. 600, 611 (1989)).[27]

        b.    Defendants also resurrect their "while employed" and "to the

extent" claim to say the jury should have been instructed to look only at what

they were doing in Nisur Square to decide whether they were supporting

---

[27]    But again, this is perhaps much ado about nothing, for as we note, all
that Blackwater did in support of DOD's mission – providing diplomatic
security, sometimes training or standing in for military PRT security convoys,
occasionally helping military escort teams in distress – was contemplated both
by defendants' "employment" as well as their Blackwater contracts. *Supra*, at
66 n.24.

DOD's mission.  JB.66-68.  For the reasons already discussed, that reading of

MEJA finds no support in its text, purpose, or common sense – and the district

court properly rejected it.  *Supra*, at 68-70.

      c.    Finally, defendants claim the court "grievously erred" by

refusing to instruct the jury that "diplomatic security is a State Department

responsibility."  JB.70-76 (complaining that court rejected their requests to

inform the jury about 22 U.S.C. 4802, which directs the Secretary of State to

develop and implement programs for the provision of security "of a diplomatic

nature").  In declining to give the instruction, the district court thought out

loud about the idea, *see* JB.71-72, but in the end concluded: "I think the statute

would just be confusing to the jury and what they need to decide is taken right

out of the MEJA statute."  8/28/pm/104-05.

The court's decision not to put an entirely different statute before the

jury was sound – and it certainly did not deny defendants a "theory of

defense."  JB.72.  In the first place, defendants gave full-throated attention to

the very fact established by the statute: they put the impressive, then-second-in-

command at DOD on the stand to make the point, *see* 8/21/am/21-22 (it was

State's responsibility, not DOD's, to provide diplomatic security);

8/21/am/22-24, 71, 83 ("we were . . . loaning people to [State] to do the State

Department mission"; "they were not supporting our mission") – and drove

the point home in closing argument. *E.g.*, 8/27/pm/107-10 ("who did we call? The number 2 man in the Department of Defense at the time," who said private diplomatic security was State's job, and that "[t]hey [Blackwater] were just doing their job for the Department of State"; "they weren't there to help the Department of Defense").[28]

No one argued that it was the military's "mission" or official responsibility to provide security for State Department officials or diplomats. Our point, simply, was that by taking on that task for State, Blackwater freed up soldiers who had been providing those escort services. And as England and others explained, the military had stepped in, not because it was DOD's responsibility to provide diplomatic security, but because State did not have the manpower for the job. *E.g.*, 8/21/am/22-23 (State was "frankly undermanned for the mission" of providing security); 8/21/am/50 (Defense

---

[28]  *See also, e.g.*, 7/22/am/48-49 (it was State's responsibility to provide security for its officials, ambassadors, and employees in Iraq) (Blackwater supervisor); 7/1/pm/8-13 (guards were hired to support State Department's diplomatic security mission contract; function would ordinarily be performed by State security officers) (Blackwater guard); DX.700-006 §§ C.1.1, 1.2 (same; WPPS II contract); *accord* 7/15/am/10-11; 6/30/am/69.

Indeed, that State was responsible for providing diplomatic security – and, in turn, contracted with Blackwater to do that work – may be among the few things that went undisputed below.

"supported [State's] mission when they didn't have people to do it themselves"); *accord* 6/30/am/69; DX.700-006 § C.1.2.

Defendants' main grievance, JB.73-75, it seems, is this: Section 4802, they claim, was "fatal to the government's case" because there is a "fundamental conflict between that statutory assignment of responsibility" to the State Department and MEJA's requirement that a defendant's employment relate to DOD's mission. JB.73, 75 (the "statute actually made it impossible for any rational factfinder to conclude Defendants' diplomatic security work related to supporting the Defense Department's mission, and thus required acquittal").

That, we suggest, is as misdirected as it is overheated. Again, the pivotal question under MEJA is not whether it was State's job to protect its diplomats, but whether Blackwater's provision of security "relate[d] to supporting" DOD's mission. On that, jurors did not need a statute to tell them something they already knew – and by proposing to elevate such an ancillary proposition (by having the court read a different statute about it), the defense proposal would, as the district court found, tend to mislead, rather than inform, the jury's deliberations. *See United States v. Taylor*, 997 F.2d 1551, 1558 (D.C. Cir. 1993) (refusal to give a requested defense instruction is reversible error only if, *inter alia*, the instruction "concerns an important point in the trial so that the

79

failure to give it seriously impaired the defendant's ability to effectively present a given defense") (citation, quotations omitted).

In short: that State provided diplomatic security, and in turn hired Blackwater to do that work, was not a viable "theory of defense." It was, rather, a fact defendants stressed over and again, but which, in the end, did not answer the central MEJA "relates-to-supporting" inquiry. The court did not err in sticking to the requirements of MEJA itself.[29]

* * * *

A final note about an idea advanced by amicus: that the practical challenges posed by this extraterritorial prosecution (in, for example, evidence collection and reliance on foreign witnesses) rendered it less than "full and fair," and made MEJA's application to it unjust. AB.11-13. Not even defendants make so sweeping a claim. (Indeed, at trial, defendants argued that they abbreviated their case because the government's evidence did the work for them. *E.g.*, 8/28/am/9-10 ("you got all the evidence you needed from the

---

[29]    In any event, any possible error on any of defendants' instructional challenges was harmless. As discussed, the evidence proved that their provision of diplomatic security on September 16, as on all other days, supported DOD's mission (and certainly "relate[d] to supporting" it); there was no material variation between defendants' "employment" and their contracts; and the jury well knew that it was State's responsibility to provide diplomatic security.

80

Government's witnesses . . . to find [defendants] not guilty on all charges");
8/27/pm/13-14 ("we didn't need to put on any more evidence")).

For sure, this was a challenging case for both sides. But the evidence on
which defendants' convictions rests, contrary to amicus' suggestion, was
neither defective nor wanting. It included, *inter alia*, the eye witness accounts
of their teammates (Murphy, Mealy, Frost, Watson, Hill, Krueger, Rhodes,
Randall, Ridgeway); the observations of the U.S. Army's first responders
(Boslego, Tarsa, Decareau); the testimony of Blackwater helicopter pilots and
gunners (Gehrsitz, Gosiewski, Spisak, Bronn) who made repeated passes over
the Square in real time; numerous FBI investigators and specialists; a
Blackwater supervisor (Pearson) and communications officer (Mendoza);
extensive documentary and photographic evidence (including of the
destruction to vehicles, victims, the Square itself); and, of course, the many
Iraqis who testified about what happened to them, their friends, or their loved
ones that day. There were experts, trajectory analyses, translators, video
footage, and many hundreds of exhibits. And as amicus also appears to
recognize, *see* AB.19, these defendants were represented by some of
Washington's finest – who made an aggressive case for their innocence, and
who well put the government to its proof.

81

In the end, defendants were convicted not because of "intractable evidentiary and sovereignty problems," AB.4, but because the evidence proved their guilt beyond a reasonable doubt.  And in a sense, this was a uniquely American proceeding, true to MEJA's central aspiration: overseas crimes by Americans against foreign civilians were not ignored, minimized, or swept under the rug – but exposed and prosecuted here, in our courts before an American jury.  As the district court observed, the trial importantly "delivered to the world" a proceeding that "expos[ed] the truth of what happened in Nisur Square that day."  4/13/2015/153.  Or as one Iraqi victim put it: the trial "showed that justice knows no nationality. . . . [T]he criminal was American and the person defending our rights was American also."  R.742-6/20.

## II.    THE PROSECUTION OF SLATTEN WAS NOT VINDICTIVE.

Slatten contends that his prosecution for first-degree murder was vindictive.  SB.17-36.  As it was below, his claim should be rejected.

### A.    Standard of Review

The district court found that Slatten's prosecution did not raise even a presumption of vindictiveness.  That finding is reviewed for clear error.  *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (noting "the deference [the district court] is due under this standard").

**B.    Background**

1.    The 2008 indictment charged all the defendants, plus a fifth, on the same counts of manslaughter and attempted manslaughter, as well as one Section 924(c) firearms count.  R.1.  During the subsequent *Kastigar* hearings, the government concluded that "tainted" testimony against Slatten had been presented to the grand jury, which it could not confidently say was harmless beyond a reasonable doubt.  D.D.C. #10-mc-05 (doc.30).  It thus moved to dismiss the indictment as to Slatten.  *Id.*  When the district court dismissed the indictment against all defendants as violative of *Kastigar*, it denied as moot the government's still-pending motion to dismiss against Slatten.  R.218.

Slatten was a party to the appeal in this Court (as well as the subsequent requests for rehearing en banc and to stay the Circuit's mandate pending Supreme Court review), and the government, for its part, believed Slatten was covered by this Court's reversal and remand.  *See* R.264, 270.

2.    Meanwhile, as noted, a new team of prosecutors conducted their own two-year investigation of the Nisur Square shooting, and in October 2013, secured a superseding indictment jointly charging Slatten, Slough, Liberty, and Heard on multiple counts of voluntary and attempted manslaughter, as well as the Section 924(c) firearms count.  R.304.

In a detail Slatten fails to mention, the superseding indictment, unlike its 2008 predecessor, charged him alone with killing the driver of the white Kia, Ahmed Al-Rubia'y.  R.304 (Count 1).  As the government later told Slatten's counsel, based on evidence it had developed after this Court's remand, the government considered charging Slatten with first-degree murder in connection with Al-Rubia'y's killing, but decided, in an exercise of discretion, to instead charge manslaughter.  SR.43-1.

In November 2013, Slatten moved to dismiss, claiming the superseding charges against him were barred by the five-year statute of limitations applicable to manslaughter.  R.315.  Slatten argued that this Court's 2012 mandate, while reversing the district court's dismissal of the indictment as to the others, had affirmed the dismissal as to him.  And because he was not under indictment, Slatten argued, the superseding manslaughter charges were time-barred.  *Id.*

The district court disagreed, believing the mandate indicated that Slatten remained in the case.  R.388.  This Court, however, agreed with Slatten's reading of the mandate, and granted his petition for a writ of mandamus, R.415, and denied the government's rehearing petition.  SR.23-2/65.  The district court accordingly dismissed the superseding indictment against Slatten. R.428.

84

3.    The government then secured a one-count indictment charging Slatten with the first-degree murder of Al-Rubia'y under 18 U.S.C. 1111, the only applicable charge for which there was no statute of limitations.  SR.1.

Upon return of the new indictment, the then-Criminal Division Chief in the U.S. Attorney's office contacted Slatten's counsel: "although we have strong evidence to support the first-degree murder charge," she wrote, the government was willing to "discuss options" that would not subject Slatten to Section 1111's mandatory life sentence.  SR.43-1-2.  She also said the government sought the new indictment because it had "no [other] option for holding Mr. Slatten accountable for his crime."  SR.43-2.  Slatten's counsel welcomed any suggestions, SR.43-1, and the government then offered to dismiss the murder charge and proceed on the 2013 manslaughter charges if Slatten waived the statute-of-limitations defense.  SR.43-2.  Slatten rejected the offer and instead moved to dismiss the indictment for vindictive prosecution. SR.23.

4.    The district court denied Slatten's motion.  SR.50.  It found that the government's reindictment for first-degree murder was based not on a desire to punish Slatten for exercising his rights, but on a more straightforward prosecutorial reality: with manslaughter charges time-barred, the murder charge was the government's "only remaining opportunity to pursue criminal

85

liability" for Slatten's involvement in the Nisur Square shooting.  SR.50/6.

And "seeking accountability for alleged criminal conduct is not a vindictive

motive."  SR.50/8.

The court rejected the notion that the government's failure to reindict

Slatten within the limitations period provided it with a motive to be vindictive:

"a government oversight, without more, does not 'give rise to a suspicion'"

that it acted impermissibly.  SR.50/6 (quoting *United States v. Meyer*, 810 F.2d

1242, 1246 (D.C. Cir. 1987)).

The court also found nothing suspect or nefarious about the

government's offer to drop the murder charge and reinstate the manslaughter

charges in exchange for Slatten's waiver of his statute-of-limitations defense.

That, the court found, was "an acceptable pretrial negotiation offer," SR.50/7,

akin to plea-bargaining, where prosecutors are allowed to "driv[e] a difficult

bargain" with "a defendant they believe committed first-degree murder."

SR.50/9 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363-65 (1978)).

The court believed a pretrial decision to reindict because the statute of

limitations had run on earlier charges "f[ell] squarely within the bounds of

prosecutorial discretion," SR.50/9 – and that the presumption of

vindictiveness "is not intended to give the defendant a free ride for separate

crimes he may have committed, or to prevent a prosecutor from bringing new

86

charges as a result of changed or altered circumstances." SR.50/9-10 (citation, quotations omitted).

### C.    The Reindictment Of Slatten For First-Degree Murder Was An Appropriate Exercise Of Prosecutorial Discretion.

The United States Attorney has broad discretion to enforce our nation's federal criminal laws, and absent clear evidence to the contrary, his prosecutorial decisions are presumed to be proper. *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see United States v. Fokker Serv. B.V.*, 2016 WL 1319266 at *5 (D.C. Cir. April 5, 2016) ("The Supreme Court has repeatedly emphasized that whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.") (citations, quotations omitted).

The doctrine of vindictive prosecution is anchored in an equally basic principle: while a defendant may be punished for violating the law, he may not be punished for exercising a right. *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Although it might be said that the specter of vindictiveness arises any time a defendant asserts a right and a prosecutor responds by taking action contrary to his interests, that is not how the doctrine operates. "Prosecutorial vindictiveness," rather, is "a term of art with a precise and limited meaning," *Meyer*, 810 F.2d at 1245: "a prosecutorial action is 'vindictive' only if [it is]

87

designed to penalize a defendant for invoking legally protected rights," *id.*, and "c[an]not be justified as a proper exercise of prosecutorial discretion." *Goodwin*, 457 U.S. at 380 n.12.

His rank speculation about the government's "embarrassment" over the mandamus proceedings notwithstanding, SB.23-24, Slatten does not claim actual vindictiveness. Largely relying on *Blackledge v. Perry*, 417 U.S. 21 (1974), he instead claims the circumstances raise a presumption (or as some courts call it, the "appearance") of vindictiveness. SB.18-19. In *Blackledge* and *North Carolina v. Pearce*, 395 U.S. 711 (1969), the Court found the presumption warranted where defendants were recharged or resentenced more harshly after successfully attacking their convictions. *See Goodwin*, 457 U.S. at 376-77 (in those cases, defendants "caused a complete retrial" on a "decided question"); *Safavian*, 649 F.3d at 692-93 (a prosecutor may have a "motivation to engage in self-vindication" when a conviction is reversed) (citation, quotations omitted).

The Supreme Court subsequently made clear that the inquiry is different when a prosecutor reindicts before (rather than after) trial. Pretrial, it reasoned, defendants routinely challenge, *inter alia*, "the sufficiency and form of an indictment," or "plead an affirmative defense," or demand "to be tried by a jury" – and it is "unrealistic to assume that a prosecutor's probable response

to such motions is to seek to penalize and deter." *Goodwin*, 457 U.S. at 381.

The Court also underscored the rationale for giving the government pretrial

leeway in its charging decisions:

> A prosecutor should remain free before trial to exercise the broad
> discretion entrusted to him to determine the extent of the societal interest
> in prosecution. . . . [T]he initial charges filed by a prosecutor may not
> reflect the extent to which an individual is legitimately subject to
> prosecution.

*Id.* at 382.[30]

Accordingly, to establish the presumption in a pretrial setting, a

defendant must show a "realistic likelihood" that the charging decision was

vindictive, *Safavian*, 649 F.3d at 692, *Meyer*, 810 F.2d at 1246 – *i.e.*, that it

"result[ed] solely from the defendant's exercise of a protected legal right, rather

than the prosecutor's normal assessment of the societal interest in

prosecution." *Goodwin*, 457 U.S. at 380 nn.11 & 12; *see also United States v.*

*Aggarwal*, 17 F.3d 737, 744 (5th Cir. 1994) ("if there is any indication that the

prosecutor had a legitimate reason (other than vindictiveness) for increasing

---

[30]    Slatten and amicus suggest the mandamus proceeding was tantamount
to a post-conviction appeal, SB.28, 34 n.14, AB.25-27, putting Slatten in the
shoes of Pearce, Perry, and Safavian rather than Goodwin.  As the district
court found, they are simply wrong: at the time of the new charge, Slatten's
"case, remain[ed], unmistakably, in the pretrial phase."  SR.50/5; *see also*
6/6/2014 Order, D.C. Cir. #14-3033 (denying as premature Slatten's petition
to have his indictment dismissed for vindictive prosecution).

the charges, then no presumption of vindictiveness is created"); *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982) ("the appearance of vindictiveness" arises "only where . . . there is a realistic . . . likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights"); *United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992) (because the presumption "'may block a legitimate response to criminal conduct,'" courts "must be cautious in adopting it") (quoting *Goodwin*, 457 U.S. at 373).

As the district court found, Slatten's showing fell well short of the mark. When the manslaughter charges against him were dismissed, the government had two choices: it could either "let[] Slatten go free" or reindict him for first-degree murder. SR.50/7. That it chose the latter evinced its legitimate "motivation to try Slatten for a heinous crime," not to penalize him for exercising a legal right. SR.50/8. Indeed, the circumstances here are much less indicative of vindictiveness than in *Goodwin*. After a roadside clash with a police officer, Goodwin was charged with several misdemeanor and petty offenses, carrying a maximum total punishment of 28 months' imprisonment. 457 U.S. at 370, 387. Following plea negotiations, Goodwin demanded his right to a jury trial rather than plead guilty, and the government then charged

90

the same conduct as felonies and misdemeanors, exposing Goodwin to 15 years in prison.  *Id.* at 371, 388.  The Court found no presumption of vindictiveness notwithstanding the continued validity and availability of the original charges.  Here, in contrast, reindicting Slatten for first-degree murder "was the government's only option for keeping [him] in the case at all." SR.50/7.

 *Paradise v. CCI Warden*, 136 F.3d 331 (2d Cir. 1998), is squarely on point.  There, as here, the government reindicted a defendant on a greater charge (capital murder) after he successfully moved to have lesser murder charges dismissed as barred by the statute of limitations.  *Id.* at 333-34.  There, as here, the defendant claimed the government "upped the ante" against him because he stood on his rights.  *Id.* at 335-36.  And there, as we urge here, the court rejected that claim: because the government could proceed on the capital felony charge or "not at all," its decision to prosecute was not presumptively vindictive.  *Id.* at 336 (the capital felony charge "was simply the only charge available, after the other charges had been dismissed"); *see also State v. Gardner*, 8 S.W.3d 66, 70 (Mo. 1999) (en banc) (no presumption of vindictiveness where manslaughter defendant refused to waive his statute-of-limitations defense and prosecutor upgraded the charges to second-degree murder; "because voluntary

91

manslaughter was no longer an option," the prosecutor properly charged him with a different crime that covered his conduct).[31]

## D.    Slatten's Arguments To The Contrary Are Unavailing.

As noted (and contrary to amicus' suggestion, AB.26-27), a defendant does not raise a presumption of vindictiveness by showing that "but for" the exercise of his right, the prosecutor would not have upped the charges – for that, of course, is always the sequence of events in these cases. *See Meyer*, 810 F.2d at 1246. A defendant, rather, must present "additional facts" demonstrating vindictiveness. *Id.* Slatten's proffered "facts," however, do not add up.

---

[31]    Slatten urges this Court to discount *Paradise* because, unlike this Circuit, the Second has categorically refused to presume vindictiveness when the government increases a charge before trial. SB.34-35. Slatten is right that the Second Circuit has so held, *see id.*, and that this Court has not. *Meyer*, 810 F.2d at 1245-46. He is wrong, however, that *Paradise* was decided on that basis. In fact, the court fully addressed the defendant's fact-specific arguments on behalf of a presumption (the "totality of the objective circumstances"), and explicitly decided that they did not give rise to it. *See* 136 F.3d at 334-36.

Slatten's other effort to distinguish *Paradise* – that the increased charge simply "rearrange[d] the elements" of the original charges, SB.35-36 – fares no better. It is not the elements of a new offense, but its greater penalty, that "ups the ante" on a defendant. (Indeed, the heightened elements here only "upped" the burden of proof for the government.) And the Second Circuit had no trouble deciding that a death-eligible felony was more severe than charges that did not, as the court put it, threaten to "dispatch Paradise to that other world for which he is named." 136 F.3d at 335 & n.5.

Slatten claims, "most important[ly]," that he was treated differently than his co-defendants: he "saw his charge upped to premeditated murder . . . after asserting his rights," while the others, "who did not assert statute-of-limitations rights, remained under indictment for manslaughter." SB.21-22 (citing *Meyer*, 810 F.2d at 1246). But Slatten overlooks the key fact relevant to the disparate-treatment analysis: the other defendants, unlike him, simply had no statute-of-limitations right to assert.[32]

Slatten also emphasizes (as does amicus, AB.27-28) that the first-degree murder charge was based on substantially the same evidence as the 2013 manslaughter charge. SB.10, 22, 26. True. But while new evidence is one reason a prosecutor may supersede with new charges, *Meyer*, 810 F.2d at 1246-47, the absence of new evidence does not evince vindictiveness. Indeed, in *Goodwin* itself, the increased felony charges were based on the same facts as the original misdemeanor charges. *See* 457 U.S. at 377 ("[i]t was not disputed that the additional charge was justified by the evidence, [and] that the

---

[32]    This case is thus unlike *Meyer*, where some 200 political protestors were arrested outside the White House. 810 F.2d at 1243-44. While most elected to plead guilty to the initial charges and pay a fine, others elected to go to trial – and the government then added charges against everyone in the trial-demanding group. *Id.* Unlike Slatten and his co-defendants, all the *Meyer* protesters had the same right to assert (to go to trial) – and the Court was troubled that the government, unlike here, treated such similarly situated defendants differently. *See id.* at 1246.

prosecutor was in possession of this evidence at the time the original

indictment was obtained").  So it was, too, in *Bordenkircher*, where the Court

also refused to presume vindictiveness when the government increased the

charge (to one mandating life in prison) because the defendant refused to plead

guilty to the original charge (which carried a two-to-ten-year sentence).  434

U.S. at 358-59.  Again: "It is not disputed . . . that the prosecutor was in

possession of [the evidence supporting the new charge] at the time of the

original indictment."  *Id.* at 359; *see also United States v. Saltzman*, 537 F.3d

353, 361-62 (5th Cir. 2008) (finding no presumption of vindictiveness where the

government "had full knowledge of the facts" when it originally indicted on

lesser charges); *accord United States v. Barner*, 441 F.3d 1310, 1313, 1319-20

(11th Cir. 2006); *Paradise*, 136 F.3d at 335-36; *Esposito*, 968 F.2d at 302-04.[33]

---

[33]      Indeed, as *Goodwin* noted, a contrary rule would compel prosecutors to
bring "every conceivable charge" against a defendant at the outset.  457 U.S.
382 n.14 (noting the "certain advantages in avoiding [such] a rule").

Also contrary to Slatten's accusation, SB.20-21, the government never
represented to this Court that manslaughter was the only charge befitting his
crime.  In requesting reconsideration of the mandamus grant, the government
said the ruling "effectively terminated the manslaughter, attempted-
manslaughter, and weapons prosecution" of Slatten.  SR.23-2/48.  That was
(and is) true: the first two indictments charged Slatten with the voluntary and
attempted manslaughter of some 32 Iraqis; after the mandamus, he stood trial
only for the murder of Al-Rubia'y.  Also, that Slatten did not have advance
notice that the charges might be increased if he pursued his statute-of-

Slatten also claims that, in offering to drop the first-degree murder charge in exchange for a waiver of his statute-of-limitations defense, the government evinced a "'disturbing willingness to toy with'" him. SB.22-23 (quoting *Meyer*, 810 F.2d at 1247). To the contrary: if a prosecutor can threaten to bring stiffer charges when a defendant refuses to waive a legal right, *see Bordenkircher*, 434 U.S. at 364-65, the inverse, surely, does not raise a presumption of vindictiveness. *See id.* at 360-61 ("this case would be no different" had the prosecutor secured the harsher charge at the outset and then "offered to drop that charge as part of the plea bargain").

Slatten suggests *Bordenkircher* is inapposite, SB.31-32 (citing a pre-*Goodwin* case for the proposition that "*Bordenkircher* must be confined to the plea bargaining context") (citation omitted) – but again, the Supreme Court has rejected that idea. In *Goodwin*, there was no "give-and-take" and no bargaining: the defendant had already declined to plead guilty to the misdemeanor charges when the prosecutor brought the felony indictment. 457 U.S. at 370-71. As the Court itself noted, the increased charge was "brought outside the context of plea negotiation," and that fact did not favorably

---

limitations defense, SB.21 n.11, does not raise a presumption of vindictiveness. *See Meyer*, 810 F.2d at 1246 (noting the same was true in *Goodwin*).

distinguish Goodwin's vindictiveness claim.  *Id.* at 382 n.15; *accord Barner*, 441 F.3d at 1321.

But perhaps more to the point, as with plea bargaining, Slatten was "'advised by competent counsel,'" "'capable of intelligent choice in response to prosecutorial persuasion'" and certainly "'free to accept or reject the prosecution's offer'" to waive the limitations defense and stand trial for manslaughter rather than murder.  SB.31 (quoting *Bordenkircher*).  That Slatten may now regret his choice does not mean the government's actions were somehow vindictive.  *See Gardner*, 8 S.W.3d at 70 (no "reasonable likelihood" of vindictiveness where the government offered to reduce second-degree murder charge to manslaughter in exchange for waiver of defendant's statute-of-limitations defense).  Maybe Slatten reckoned he could more readily beat the first-degree murder charge, which required the government to shoulder the substantial extra burden of proving malice aforethought.  But like a defendant who turns down a plea deal and is convicted on more serious charges by the jury he demanded, "[a] claim of vindictive prosecution cannot insulate a defendant from the lawful consequences of his tactical choices."  *United States v. Wall*, 37 F.3d 1443, 1448-49 (10th Cir. 1994) (citation, quotations omitted).[34]

---

[34]    And again, this is unlike *Meyer*, where the Court found suspicious the prosecutor's willingness to drop the enhanced charges after the district court

The *Meyer* circumstances aside, Slatten's main argument, it seems, is this: so embarrassed and surprised was the government at having lost the mandamus proceedings, its response – to indict him for the only offense for which the statute of limitations had not run – was a presumptive act of "self-vindication" rather than an exercise of proper prosecutorial discretion.  SB.9-10, 23-25, 28-29.

Like Slatten, we were unable to find any case even remotely embracing that idea in a similar sort of situation.[35]  In any event, whether the government

---

granted what promised to be a burdensome jury trial on those counts.  *See* 810 F.2d at 1247.  Here, the government was fully committed to its enhanced charge.  That it won a conviction shows it was not "toying" with anyone.

[35]     Although Slatten claims the facts of *United States v. Korey*, 614 F.Supp.2d 573 (W.D.Pa. 2009), are "remarkably similar," SB.25, the *Korey* facts, actually, are starkly dissimilar: after Korey successfully appealed his convictions on lesser charges, the government charged him with a firearms crime predicated on premeditated murder; represented before the appeal that "there was no principled way" it could allege a capital offense; knew the defendant had been acquitted in state court of the same premeditated murder; failed to proffer any reason for the new charge in response to Korey's vindictiveness claim; and admitted that it did not intend to actually prove the predicate murder or seek a life sentence, but added the charge only to invoke a longer statute of limitations.  614 F.Supp.2d at 583-86; *United States v. Korey*, 2009 WL 1940381, at *1-2 & n.1 (W.D.Pa. 2009) (denying reconsideration).

Slatten's citation to *United States v. Groves*, 571 F.2d 450, 453 (9th Cir. 1978), SB.25, is also unilluminating – as it predated *Goodwin* and relied on a line of authority (*Blackledge* and *Pearce*, *supra*) that *Goodwin* found in the main inapplicable to a prosecutor's pretrial charging decisions.  *See* 457 U.S. at 376-77.  And *United States v. Krezdorn*, 693 F.2d 1221 (5th Cir. 1982), SB.25 n.12,

was (or was not) embarrassed is of no moment.  *See Maddox v. Elzie*, 238 F.3d 437, 447 (D.C. Cir. 2001) ("any personal pique of the trial prosecutor about losing his case . . . [is] irrelevant to the existence of prosecutorial vindictiveness").  The question is whether, viewed objectively, the government likely reindicted Slatten to hold him accountable for his actions in Nisur Square, or only to punish him for asserting his statute-of-limitations rights.  *See Goodwin*, 457 U.S. at 380 n.11.  And although Slatten did not stress his current argument below, the district court nevertheless answered it: "throughout this case, the government has exhibited nothing more than a motivation to try Slatten for a heinous crime it believes he committed."  SR.50/8.

Slatten and amicus relatedly suggest that the government may properly reindict only when a previous indictment was dismissed "through no fault of its own."  SB.27-29, AB.25.  But that, too, is not the law.  *See, e.g., Barner*, 441 F.3d at 1319 ("the government's attempt to correct its earlier mistake and charge the conduct in a way that could support a conviction does not show" vindictiveness); *Paradise*, 136 F.3d at 336 n.7 (defendant cannot invoke vindictiveness to "require the release of a guilty defendant every time a

---

should be cited as contrary authority: per *Goodwin*, it drew a sharp distinction between a post-trial decision to increase charges (which itself justifies a presumption of vindictiveness), and a pretrial charge (which does not).  *Id.* at 1225-27.

prosecutor stumbles into an inadvertent pleading error"); *United States v. Taylor*, 749 F.2d 1511, 1514 (11th Cir. 1985) (a "mistake or oversight in the prosecutor's initial decision is a sufficient explanation to negate a subsequent claim of vindictiveness"); *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir. 1977) (same); *accord Goodwin*, 457 U.S. at 382 n.14.[36]

---

[36]    Other courts, too, have declined to presume vindictiveness where the government increased charges after a defendant successfully challenged an indictment. *See, e.g., United States v. Banks*, 682 F.2d 841, 845 (9th Cir. 1982) (vindictiveness unlikely when "the prosecutor is required by court order to obtain a new indictment" and "necessarily has to review the evidence and reconsider what charges to present to the grand jury"); *accord United States v. Moon*, 513 F.3d 527, 534-36 (6th Cir. 2008); *United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir. 1983) (en banc); *United States v. Westoff*, 653 F.2d 1047, 1051 (5th Cir. 1981); *cf. United States v. Weathers*, 493 F.3d 229, 236 n.2 (D.C. Cir. 2007) (curing a defect in an indictment pretrial does not constitute prosecutorial vindictiveness).  Nothing in *Safavian*, contrary to Slatten and amicus' suggestion, SB.28-29, AB.25, holds otherwise.

Slatten (SB.24-25) and amicus (AB.28-29) ask the Court to focus on how the government's actions would appear to future defendants.  But that concern cannot be unmoored from the vindictiveness inquiry itself – and as the Supreme Court has emphasized, the due process violation in cases like *Blackledge* and *Pearce* "lay not in the possibility that a defendant might be deterred from the exercise of a legal right . . . but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction." *Bordenkircher*, 434 U.S. at 363.  And, in any event, an objective future defendant would surely recognize that, as in *Paradise* and *Gardner*, the government would likely replace a charge barred by the statute of limitations with a charge that was not.

Relying on *United States v. Jamison*, 505 F.2d 407 (D.C. Cir. 1974),

Slatten further urges dismissal because the government did not justify the

enhanced charges "on the record" at the time it brought them.  SB.20, 26-28.

Again, the district court rightly rejected that claim, recognizing that the

*Jamison* holding was confined to new charges brought after a mistrial.

SR.50/10-11; *see* 505 F.2d at 414-16.  *Goodwin*, decided after *Jamison*, further

lays Slatten's claim to rest.  As it noted: given the presumption of regularity

accorded a prosecutor's charging decision, the government "is not required to

sustain any burden of justification for an increase in charges."  457 U.S. at 384

n.19.  It is only after a defendant shows a "realistic likelihood" of

vindictiveness that the burden shifts to the government to objectively justify its

decision.  *See Meyer*, 810 F.2d at 1245.[37]

---

[37]     As the district court found, Slatten did not overcome the first hurdle.
But even if he had, the government readily made the "minimal" showing
needed to overcome a presumption of vindictiveness.  *See Safavian*, 649 F.3d at
694 ("any objective evidence justifying the prosecutor's actions will suffice").
As the government explained to Slatten and the court, SR.43, it brought the
new charge, as in *Safavian*, "in response to an adverse ruling of the court" that
took its manslaughter charges off the table.  649 F.3d at 694.  And also as in
*Safavian*, the court's ruling provides an "objective[ly] reasonable[]" basis for its
actions.  *Id.; cf. United States v. Dvorin,* 2016 WL 1085744, at *11-13 (5th Cir.
March 18, 2016) (finding addition of forfeiture count on retrial vindictive,
where there was no "objective event" – such as a dismissal of an original
charge – to legitimately explain the added penalty).

As reflected in its 2013 indictment, the government believed manslaughter charges against Slatten were appropriate.  That does not mean, of course, that those were the only charges that fit his crime.  *See Goodwin*, 457 U.S. at 382 ("the initial charges . . . may not reflect the extent to which an individual is legitimately subject to prosecution").  As was its obligation and prerogative, the government evaluated "the societal interest" in prosecuting Slatten for the murder of Al-Rubia'y after its manslaughter charges were dismissed.  *Id.*  Slatten, for his part, would understandably have preferred to go free, and not be reindicted for a crime with no statute of limitations.  But that is not his right.  And by any objective standard, the government was simply trying to do its job – and bring someone it believed committed a terrible crime to justice.  That the jury agreed (beyond a reasonable doubt) only underscores the reasonableness of the government's decision.

## III.   THE EVIDENCE PROVED SLATTEN'S AND LIBERTY'S GUILT.

Slatten (SB.46-53) and Liberty (JB.108-112) claim the evidence did not sufficiently support the verdicts against them.  They are wrong.

### A.    Standard of Review

In evaluating a sufficiency challenge, this Court views the evidence "in the light most favorable to the government, drawing no distinction between

direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (citation, quotations omitted).[38]  The Court defers to the jury's determination if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; *United States v. Fennell*, 53 F.3d 1296, 1298 (D.C. Cir. 1995) (the jury may draw "a vast range of reasonable inferences").

## B.    The Evidence Supported Slatten's First-Degree Murder Conviction.

Slatten claims the government presented "virtually no evidence" against him.  SB.46.  Actually:

As the evidence showed, Slatten had a unique role on the Raven 23 team.  He was its best triggerman, and the convoy's so-called designated marksman, or "sniper."  7/30/pm/46; 8/5/am/22.  He alone carried a scoped, semiautomatic sniper rifle specially designed for precision shooting,

---

[38]    Accordingly, defendants' revival of their trial narrative – that cooperating witness Ridgeway was a "thoroughly discredited" liar who would say anything to save his skin, JB.36-39 – is wasted on this Court.  *See United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [the jury] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").

which had been further modified (improperly) to be on a "hair" trigger. 7/8/pm/93-94, 105, 113 ("you sneeze and it goes").

As the evidence also showed, when Raven 23 got to Nisur Square, the guards in the turrets, as well as the Iraqi police, brought all traffic to a stop, as was customary when an American convoy approached. *Supra*, at 13; 6/24/pm/22-23 ("[t]hey come, we stop"); 7/2/am/89-90 ("no car [was] moving"). The first thing many witnesses heard were distinct "pops," or single shots, from the convoy. *E.g.*, 7/2/am/90; 7/14/pm/75-76; 8/5/am/21; 8/11/am/49-51; 6/30/pm/120-21; *supra,* at 13. It was then, *after* the shots were fired, that the Kia started to slowly move, and a woman was heard screaming, "my son, my son." 6/24/am/48-49; 6/24/pm/28-29; 6/26/am/15-17, 35-36; 6/26/pm/17; 7/2/am/89-93; 7/2/pm/33-36; 7/14/pm/75-76; 8/11/am/53-55, 67.

A police officer (Ali Al-Hamidi) ran to the Kia and saw the driver had been shot in the head – "his whole face was full of blood," 7/2/am/91-93 – causing the car to roll slowly forward on its own "drive" power. 7/2/pm/36; 6/25/pm/10.[39] Another officer (Sarhan Monem) ran to the passenger side,

---

[39]    Although defendants tried (and try) to portray the Kia as moving "at a threatening speed," "suggesting the driver was alive and driving," JB.82-83 n.51, the overwhelming weight of the evidence is otherwise – instead suggesting the driver was likely dead and not driving. *See supra*, at 16 (citing

and also saw the bloodied, stricken driver shot in the "middle of his

[fore]head." 6/23/am/13-16. A third witness, Majed Al-Gharbawi, who was

in a truck right in front of the Kia, heard the shot, turned around, and saw a

hole in the driver's side windshield, which was also splattered in blood.

6/24/am/48-51. Majed was prompted to turn when the Kia bumped lightly

into his truck. *Id.*

From this – the shots, the screams, the Kia's slow roll, the bloody

headshot – the jury could conclude that the first, single shots from the convoy

killed Al-Rubia'y, the Kia's driver.

Jimmy Watson, the Raven 23 shift leader, supplied the next piece of the

proof. Inside the Command vehicle next to Slatten, Watson recounted that

Slatten was the first on the team to shoot: he "fired twice," Watson said, and

"then right after the second shot, the turret guns opened up." 7/28/pm/31.

When pressed, Watson said it was his "clear" and "fairly strong" recollection

that Slatten fired first. *Id.* And still again:

> In the beginning, I'm referring to Nick Slatten shooting once and then
> shooting twice, the sniper rifle. . . . [T]here was like maybe a slight pause
> and then all the guns . . . seemed to just roar.

_____

multiple accounts: *e.g.*, the Kia "barely rolled," was "creeping," "a slow
crawl," "kind of drifting"); 6/25/pm/18-19 (expert: likely moving less than 2½
miles an hour).

7/28/pm/31-32, 35.[40]  *Accord* 7/28/pm/35-37, 52-53.

As for how Slatten's shots sounded: "[i]t was very rhythmic. . . . retort and then retort."  7/28/pm/33-34 (the second shot was "maybe a second or two" after the first); *see also* 8/11/am/49-52 (Blackwater guard Randall, who was driving the vehicle right behind, believed the first shots came from Slatten's vehicle, but not the turret).

Watson also described Slatten's shooting position: he was lying down on a bench in the truck, facing south, with his rifle pointed out the gun port. 7/28/pm/18-22, 33.  And as for where Slatten fired: "[c]oincidentally," Watson testified, "the direction that he was firing is where the [Kia] was. . . . [I]t was . . . exactly where he was."  7/28/pm/38-39.

Putting those pieces together, the jury could conclude that the first shots from the convoy killed Al-Rubia'y – and that Slatten, the first (and best) shooter who fired "exactly" in the Kia's direction, was the one who pulled the fateful trigger.  Indeed, as Watson also testified, Slatten yelled, "white car, white car coming in" *after* he shot, 7/29/am/48-49 – further confirming, so the jury could infer, that Slatten had hit his mark.  Also, Slatten later told Ridgeway that he had "popped [a man's] grape," who then "slumped

---

[40]    All this testimony, provided to the grand jury, was admitted at trial.  *See* 8/20/pm/30-35; GX.498H.

forward." 7/31/am/49. That, of course, well describes what would happen if someone was shot in the head while sitting behind the wheel of a car.[41]

The evidence also showed that Slatten had both the intent and motive to open the firing in the Square. His hatred toward Iraqis stood out, even among those who held such views. He boasted about killing them (*e.g.*, "turn[ing] one guy's head into a canoe"), said their "lives are not worth anything," called them "animals," and avowed that he was "well on his way" to "getting payback for 9/11." *Supra*, at 15 n.5. Of a piece, Slatten also had a history of shooting at Iraqis without provocation – to "draw out fire," as he put it – in order to instigate a fight. *Id.*; *see United States v. Russell*, 971 F.2d 1098, 1106-07 (4th Cir. 1992) ("Hostility is a paradigmatic motive for committing a

---

[41]    Slatten emphasizes (SB.52), as he did below, that he also told Ridgeway that the person he shot was "taking aim on the convoy." 7/31/am/49. But that self-serving add-on does not undermine the central force of Slatten's admission. (It was, after all, against the rules to shoot someone in cold blood.) *See* R.821/15-16 (district court: jury could find that Slatten was lying to Ridgeway about his victim being an active shooter). Indeed, Slatten said other such things after the incident: he talked "about shooting people . . . guys with AKs . . . guys running around with AKs." 7/1/am/57-58, 61-62. Like Slatten's teammates, the jury could credit the admission and disbelieve the excuse. *See* 7/1/am/62 (Murphy: "it was clear from [Slatten's] tone that he wasn't describing something real"); *accord* 7/16/am/27-30 (Mealy).

The jury could also view the difference between Slatten's description (that his target "slumped forward") and Monem's (that Al-Rubia'y was "leaning to the side" when he got to him, 6/23/am/18), as less momentous than does Slatten. SB.52-53.

crime"); *United States v. Long*, 328 F.3d 655, 661-62 (D.C. Cir. 2003) (evidence shows "a pattern of operation that would suggest intent") (citations, quotations omitted); *United States v. Seale*, 600 F.3d 473, 495 (5th Cir. 2010) (evidence of racial animus was relevant to show motive and intent); *see also United States v. Love*, 419 F.3d 825, 828 (8th Cir. 2005) (when defendant denies the charged conduct, intent is at issue).[42]

To be sure, when face-to-face with Slatten in the courtroom, Watson was fuzzier about the initial sequence of events, SB.51 – but the jury was allowed to instead credit his clear, properly admitted grand jury testimony.  *See United States v. Boyd*, 803 F.3d 690, 692-93 (D.C. Cir. 2015) (where witness equivocated at trial, her prior grand jury testimony came in as substantive evidence, and was properly relied upon to prove a central fact) (citing Fed.R.Evid. 801(d)(1)(A)); *see also* 7/28/pm/30 (Watson: "I spoke nothing but the truth" in the grand jury).

---

[42]    Slatten, as noted, argued that Ridgeway shot Al-Rubia'y.  But Ridgeway fired at the Kia after the shooting started, and, thus, after Slatten.  *See* 7/30/pm/87-88.  In any event, that Ridgeway (or any other guard) may also have shot at Al-Rubia'y does not exonerate Slatten.  *See, e.g., Brackett v. Peters*, 11 F.3d 78, 80 (7th Cir. 1993) ("[A] murderer does not avoid conviction by pointing out that his act was only one of many causes that concurred to bring about his victim's death.  It is enough if his act was one of the causes"); *United States v. Rodriguez*, 766 F.3d 970, 982-84 (9th Cir. 2014) (collecting cases).

Slatten also emphasizes, as he did at trial, that two Iraqi policemen believed the first shots came from the turrets.  SB.47-49.  But again, the jury could credit Watson, who was in the same truck within feet of Slatten, rather than officers who were out on the street and unable to see what was going on inside.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (it is for the trier of fact to "resolve conflicts in the testimony [and] weigh the evidence"); *United States v. Cardinas Garcia*, 596 F.3d 788, 796 (10th Cir. 2010) ("conflicting versions of facts are precisely within the province of the jury to resolve").  The officers' (mis)perception, moreover, is not surprising: as Watson testified, right after Slatten's two shots, the turret guns "just roar[ed]."  7/28/pm/31-32.

So, too, with Jeremy Krueger's testimony that he thought the first shots sounded like 5.56 rounds, rather than the 7.62 round that Slatten would have fired.  Far from being "critical," SB.50, "sound testimony," as Slatten himself observed in closing argument, can be "exceptionally unreliable."  8/28/pm/34; *see also* 8/5/am/23 (Krueger was inside a different armored truck and wearing ear protection, which impairs hearing).

That a bullet in the Kia's steering wheel did not match Slatten's likewise casts no doubt on the verdict.  SB.50.  As the jury could well conclude, Slatten – with his special, scoped sniper rifle and unique skill set – hit his target, not the steering wheel.  And, of course, the Raven 23 team itself assured that there

would be no other physical evidence in the Kia – for after they opened up on it, the car and its passengers were set ablaze and destroyed. *See, e.g.*, GX.E277S; 7/2/am/100 (policeman: "I used a shovel" to take mother and son out of the car "and put [them] in a bag").

Slatten forcefully presented his version of the facts at trial. The jury, for its part, reasonably rejected them.

## C.    The Evidence Supported Liberty's Manslaughter Convictions.

So it is, also, with Liberty. The driver of the Command vehicle, Liberty was convicted on the counts charging the death of Al-Rubia'y's mother in the Kia, and the killing or wounding of victims to the south and east.

As for the Kia, Liberty claims his conviction rests on the insufficient assumptions of teammates who mistook Jimmy Watson for Liberty. JB.110. Watson testified that as the Kia was moving, he told Liberty to kick his door open, and that he (Watson) laid across Liberty's lap and fired at the car. 7/28/pm/40-43. Jeremy Krueger's identification of Liberty as also firing goes well beyond mere assumption: Krueger saw the shooter, shouldering his weapon, sitting up with his back against the driver's seat. 8/5/pm/90-93; 8/5/am/35-38 (shooter fired at least 25-30 rounds; his upper body was above

the steering wheel). That, the jury could readily conclude, describes the driver, not a man lying across the driver's lap.[43]

As for the shots to the east: during the hook-up, Mark Mealy saw a guard, kneeling outside at the rear of the Command, rifle shouldered, aiming to the northeast. 7/15/pm/118-21, 125-28; *see* GX.496C1. When he looked to see what the shooter



Green dots indicate Raven 23 member Sector of fire based on my observation. Blue dot indicates man with hands up.



was firing at, Mealy was particularly rattled by what he saw: an unarmed Iraqi standing on the sidewalk, with his hands up, shot in the stomach. 7/15/pm/120-21 (he "just fell over backwards"); 7/16/am/49. *Compare also* 7/16/am/10-13 (marking the victim's location, next to a motorcycle, when he was shot, GX.496D1 (photo)); *with* 7/16/am/99-101 (wife of victim Ali Khalil Hussein, identifying the motorcycle as Hussein's, GX.496D); *id.* ("he was hit in the stomach . . . I saw a hole").

---

[43]    Unlike Liberty, we do not believe Eddie Randall identified Liberty as shooting the Kia. *See* 8/11/am/79-80 (Randall was unclear when, exactly, he saw shooting out the open, driver's-side door of the Command).

The evidence showed that Liberty was outside the Command during the hook-up. 7/28/pm/94-96; *see id.* (Watson: "I do not recall what he did out there"). None of the other guards who was outside during the hook-up (Frost, Krueger, Rhodes) fired his weapon that day. 7/14/pm/112; 8/4/pm/132; 8/6/am/38-39. Watson never left his truck, 7/28/am/65, nor is there any indication that anyone else did, either. *See* 7/14/pm/38 ("the turret gunners are always going to stay in the vehicle"). The jury could thus reasonably infer that it was Liberty whom Mealy saw – and who shot Ali Hussein while his hands were up. Indeed, an evidentiary detail that Liberty fails to mention further supports the inference: two empty magazines bearing his name ("LIBO" and "Liberty") were left outside in the Square. 7/23/am/15-19.[44]

Regarding the victims to the south. At the threshold, the evidence did not confine Liberty's shooting to the southeast, as he claims. JB.109-10. After

---

[44]    That Mealy thought the shooter's rifle had an ACOG, rather than an EOTech, scope does not doom his account. JB.110. In the first place, Liberty was issued the EOTech in November 2006, one year before the shooting, GX.8005, and guards could rather easily swap the scopes among themselves. 7/28/pm/97; *see* 6/30/pm/28-30 (guard: rifles did not come with scopes attached; went back and forth between them). And, in any event, even if Mealy was mistaken about the particular scope on Liberty's gun, the jury was not required to jettison the rest of his more compelling testimony – especially since Liberty was one of only four guards outside during the hook-up, and the other three did not shoot. *See United States v. Dozier*, 162 F.3d 120, 125 (D.C. Cir. 1998) ("a jury may accept some parts of a witness' testimony and reject others").

Watson first fired at the Kia, he shut Liberty's door – but then told Liberty to again open the door and fire.  7/28/pm/49-50.  (By Watson's account, his and Liberty's shooting to the southeast appears to come later.  *See* 7/28/pm/54-56, 59-61, 68-70.)  The jury could infer that Liberty heeded Watson's order and joined the team's southbound shooting, either at the Kia or more generally to the south.  *See also* 7/28/pm/61-62 (Liberty "was engaging in the direction of the south").

But even more strikingly, there is this: as the team was heading back to their quarters after the shooting, Liberty told Ridgeway he had pulled "another Grey 55" in the Square: that is, with his rifle on his lap, he fired out the porthole of the truck on "full auto" as he was driving.  7/31/43-44; 7/30/pm/73-74.  Even Ridgeway found that idea "a little shocking."  *Id.* "[T]here's just no way you can even aim from the porthole, and you're supposed to be driving."  The jury, surely, could infer that that sort of shooting was not confined to any particular corridor.  *See also* GX.496B (diagram of vehicles' positions; Liberty's door would have been facing due south).[45]

---

[45]    In challenging this evidence, Liberty offers Tyler Hill, Blackwater's mechanic.  *See* JB.110 ("Hill . . . testified that Liberty did not leave with Ridgeway, but stayed at the motor pool.").  That, though, is not what Hill said. He testified, rather, that he saw Liberty and Heard after lunch, at the Blackwater auto shop, where the Command vehicle had been taken.  8/8/2014 Dep.Tr. 46-50.  Hill, thus, was in the picture later (after lunch, after the

Even so, Liberty's southeast shooting separately supports his convictions

on an aiding-and-abetting theory.  Out of the gate, Liberty's contrary claim

misapprehends two key points.  First, he was not charged with only aiding and

abetting Ridgeway, JB.111, *see* R.304, nor did the government present the case

that way.  It was our theory, rather, that a shooter could aid and abet any other

reckless shooter (including, but not limited to, Ridgeway).  Second, that

Watson was not charged, JB.111, does not mean Liberty could not aid and

abet Watson's reckless shooting.  To the contrary, "all participants in [criminal

conduct] are 'principals'" under 18 U.S.C. 2, and so "the fate of other

participants is irrelevant."  *Standefer v. United States*, 447 U.S. 10, 20 (1980); *id.*

at 19 (a defendant may be convicted of aiding and abetting even after the

actual perpetrator has been acquitted of the charged offense); *see United States*

*v. Catalan-Roman*, 585 F.3d 453, 473 (1st Cir. 2009) (rejecting argument that an

aider and abetter cannot be convicted if a principal is not charged).

Under *Rosemond v. United States*, 134 S.Ct. 1240 (2014), a person is liable

as an aider and abetter if he 1) "facilitated any part . . . of a criminal venture"

with 2) sufficient foreknowledge of the offense such that he could have "opted

---

Command had been moved) – so would have had no idea who left the parking
lot with whom after the shooting, much less what Liberty said to his
teammate.

out." *Id.* at 1246-51.  Contrary to Liberty's apparent reading of the first prong (JB.109-10), he did not need to actually shoot at the victims to the south to be an aider and abetter.  Rather, the statute "comprehends all assistance rendered by words, acts, encouragement, support, or presence." *Rosemond*, 134 S.Ct. at 1246 (citations, quotations omitted).  Or as the Court elsewhere put it, "every little bit helps." *Id.*

The evidence showed that, as the shooting unfolded, the turret gunners fired to the south and southwest.  *See, e.g.*, GX.500B2 (Krueger's depiction of southward fire from the Command and Follow Vehicles); GX.497K (Heard's line of fire, also to the south); GX.496B1 (Mealy's depiction of rounds hitting the ground to the southwest).  The direction that Watson and Liberty fired – to the southeast, GX.498D2 – thus assured that Raven 23 rifles and machineguns would be trained on virtually the whole southern end of the circle.  And that, in turn, meant (among other things) that everyone down south had nowhere to turn.  As Krueger described just one scene:

> I was seeing rounds impact . . . I saw people running.  I saw one gentleman . . . hiding behind a car and kind of frantically wondering what to do and how to get away. . . . [He] was trying . . . maybe deciding which way to run, and he just didn't know what the safe direction was.

8/5/am/47-50 (rounds were impacting around him).  By helping create such a deadly situation, *see* 7/7/am/37 (gunfire was like "heavy rain falling"), and

114

cutting off an avenue of escape, Liberty's shots contributed more than just a "little bit" to the crime.  *See, e.g., In re Adrian*, 661 N.Y.S.2d 277, 277-78 (N.Y.App.Div. 1997) (one who blocks a victim from escaping aids and abets another's crime); *accord Davis v. United States*, 735 A.2d 467, 470, 476 n.15 (D.C. 1999); *see also United States v. Branch*, 91 F.3d 699, 731-32 (5th Cir. 1996) (Branch Davidian who shot toward helicopters to the north aided and abetted the manslaughter of ATF agents on the other side of the compound; "[w]e find no difficulty in holding that actively participating in a gunbattle in which a gunman kills a [victim] can aid and abet that killing").

As for Liberty's knowledge: contrary to his claim, there is no requirement that he communicated with any other shooter (much less Ridgeway), or knew what any of them was thinking.  JB.111.  Rather, as *Rosemond* makes clear, "advance knowledge" may come in the midst of the crime itself.  134 S.Ct. at 1249-51; *id.* at 1253 (same) (Alito, J., concurring and dissenting in part).  The question, thus, is whether Liberty understood that Watson and/or the others were shooting unjustifiably, and joined in anyway – rather than "opting out," as did 12 of his 19 teammates.

Again, the evidence was more than sufficient on the point.  Like Liberty, the jury could see that none of the victims to the south was an insurgent or posed a threat to the convoy, and that shooting at them – as they were

crawling, running away, crouching in their cars, hiding behind a post,

screaming after a fallen child – exhibited, at the very least, a "conscious

disregard of an extreme risk of death or serious bodily injury." R.625/21 (jury

instruction on requisite intent for manslaughter); *see United States v. Alexander*,

471 F.2d 923, 947 (D.C. Cir. 1973). Liberty's own heartless shooting – the

"Grey 55" especially stands out, as does his decision to leave his truck,

shoulder his rifle, and shoot a man whose hands were up – demonstrates that

he fully participated in the day's reckless and unjustified bloodshed. Also,

Liberty further evinced his guilty knowledge and intent after the shooting. At

some point, Liberty's brother sent him a YouTube video, which pictured one

of the two "Liberty" magazines left in the Square. 7/31/am/45. Talking to

Ridgeway about it, Liberty recognized he was in something of a jam: "how am

I going to explain this?" he wondered aloud. "I told them I didn't fire."

7/31/am/45-46. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010)

("false exculpatory statements are evidence – often strong evidence – of guilt");

*United States v. Johnson*, 46 F.3d 1166, 1171 (D.C. Cir. 1995) (they evince a

"consciousness of guilt"); *United States v. Porter*, 745 F.3d 1035, 1054 (10th Cir.

2014) (and "unlawful intent") (citation, quotations omitted).

Liberty, moreover, had shown himself capable of uniquely reckless

shooting before. A former teammate recalled an episode when Liberty fired,

repeatedly, when the team was not being engaged and other guards saw no threats. 8/13/pm/82-84. Afterwards, Liberty, the up-gunner that day, said his truck fired over 1000 rounds, which was "exponentially higher" than all the others. 8/13/pm/85-86. When asked about it, Liberty said: "when other people on the team are shooting, just shoot at something." 8/13/pm/86.[46] "Just shooting at something" – without identifying or reasonably perceiving a threat – finds no justification even in the wartime rules of engagement, much less in 18 U.S.C. 1112 and 1113.

Defendants fought for, and got, the *Rosemond*-based aiding and abetting instruction they wanted. *See* 8/26/pm/34-36; R.625/33-34.[47] The jury was also instructed, notably, on the lesser-included offense of involuntary manslaughter. R.625/24-26. The jury rightly chose, for Liberty as with the others, to convict on the greater offense.[48]

---

[46] Although Liberty attempted to impeach this testimony with a Blackwater after-action report that did not list him as on the mission, 8/13/pm/89-92, the witness had a vivid recollection of the event, and had "absolutely" no doubt about what Liberty said. 8/13/pm/92-93.

[47] The jury was told that, to convict, it had to find "the defendant knew in advance the crime would be committed or was being committed, and knowingly and deliberately associated himself with the crime charged in that Count in some way as a participant – someone who wanted the crime to be committed – not as a mere spectator." R.625/34.

[48] Slough and Heard do not contest sufficiency as to any particular victims. Their evidentiary challenges, rather, are confined to MEJA and venue.

## IV. THE EXCLUSION OF ███████████████████████ ████████████████ STATEMENTS WAS NOT AN ABUSE OF DISCRETION.

Slatten moved to sever his case from the others.  He claimed that

statements ███████████████████████████████████████████

██████████████████████████████████████████

███████████████ would be admissible at his separate trial and were crucial

to his defense.  Finding that ██████ out-of-court statements were

inadmissible hearsay in any case, the district court denied Slatten's motion.  To

no avail, Slatten challenges that ruling.  SB.36-46.

### A. Standard of Review

This Court reviews the exclusion of a hearsay statement "[u]nder the

deferential abuse of discretion standard."  *United States v. Moore*, 651 F.3d 30,

83 (D.C. Cir. 2011).

### B. Background

1. ████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████

MATERIAL UNDER SEAL DELETED





2.    At the outset, the district court rejected Slatten's claim that ████ ████████████████████████████████ ████████████████████████████████ ████████████████████ His current case for severance, thus, rests on the admissibility of ████ out-of-court statements at a trial in which ████ would not be subject to cross-examination.

In rejecting Slatten's claim below, the district court found, first, that ████████████████████████ ████████████████████████ ████████████████████ ████████ ████ ████████ ████████████████ ████████████████

For the same reason, the court rejected Slatten's claim that the statements were admissible under the "residual" (Fed.R.Evid. 807(a)(1)) and

"business records" (Fed.R.Evid. 803(6)) exceptions to the hearsay rule.

SR.85/6-7.

**C.** 

Under ███████████, a hearsay statement is admissible if: ████████

1. ████████████████████

MATERIAL UNDER SEAL DELETED

██████████ statements do not pass the test. ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

MATERIAL UNDER SEAL DELETED



Although we did not make this argument in the district court, this Court "may affirm on grounds other than those presented and relied on below." *United States v. Lawson*, 410 F.3d 735, 740 & n.4 (D.C. Cir. 2005).

MATERIAL UNDER SEAL DELETED

███████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████

Also contrary to Slatten's contention (SB.39-41), the ████████ part of

D's statement cannot be cleaved from the █████████████████

part. ███████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████

MATERIAL UNDER SEAL DELETED

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

    2.   Even if ████████ statement about ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

MATERIAL UNDER SEAL DELETED



On behalf of the statements' trustworthiness, Slatten offers that ▮▮▮▮▮▮

was under oath and subject to Section 1001 liability, *but see Haywood v.*

*Chicago*, 378 F.3d 714, 718-19 (7th Cir. 2004) (noting the "remote" prospect of

a perjury prosecution), and ▮▮▮▮▮ made the statements "in close temporal

proximity to the incident."  SB.39.[51]

Those explanations do not suffice, ▮▮▮▮▮▮▮▮▮▮▮.  As the

district court found, ▮▮▮▮▮▮▮▮▮▮▮

_____

[51]    Elsewhere, Slatten says (without citation) that ▮▮▮▮▮▮  ▮▮▮▮▮ SB.42. ▮▮▮

MATERIAL UNDER SEAL DELETED



Furthermore, the statement that Slatten finds so compelling – ███

███████████████████████████████████████████ – is

twice undercut: first, ████████████████████████

████████████████████████████████████████, and

also by ███████████████████████████

███████████████████████████████████[53]

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

The burden is Slatten's.  And neither below nor here has he presented

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ Far from showing the district

court abused its discretion, Slatten's failure to ██████████████████

████████████ separately defeats his claim. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

**D.**   ████████   **Statements Were Not A Record Of A Regularly Conducted Business Activity.**

The "business records" exception to the hearsay rule, Fed.R.Evid. 803(6), "is intended to allow introduction of reliable and accurate records without the necessity of calling every person who made or contributed to the record." *United States v. Smith*, 521 F.2d 957, 963 (D.C. Cir. 1975). The district court doubted ████████ statements qualified as a record of a "regularly conducted activity," *see* Rule 803(6)(B) – but even putting that aside, it found the statements failed to meet another statutory prerequisite for admission: both

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████

Slatten's effort (SB.44) to cast ████████ statements as analogous to a police report, *see Smith*, 521 F.2d at 962-64, falls wide of its mark. *Smith* found that while the routinely documented facts in a police report (like the date and time of a crime) were admissible under the Rule, a witness's statement

describing the crime was not – for such a statement "is not made in the regular course of the witness' business," and does not therefore "deserve the presumption of regularity accorded a business record." *Id.* at 964; *accord United States v. Warren*, 42 F.3d 647, 656 (D.C. Cir. 1994).

Although it may have been an occasional requirement of his job, it was not ████████ business to make statements about shootings or to fill out after-action reports. (████████████████████████████████████████████ it was not a "regularly conducted activity" or a "regular practice." Rule 803(6)(B), (C)). Also, when he sat down to write his report ████████ ████████████████████████████████  ████████████████████ ████████████████████ ████████████████████. His statements were thus more analogous to the accident report created by the railroad employee in *Palmer v. Hoffman*, 318 U.S. 109 (1943), which the Court held was not a business record: it was not prepared as part of the "systematic conduct of the business as a business," and thus lacked the trustworthiness of "routine reflections" of the business's operations. *Id.* at 113-14 ("the fact that a company makes a business out of recording its employees' versions of their

accidents does not put those statements in the class of records made 'in the regular course' of the business").[54]

### E.    Any Error In Excluding ████ Statements Was Harmless.

Also contrary to Slatten's contention (SB.45-46), any error in excluding ████ statements was harmless. *See United States v. Mahdi*, 598 F.3d 883, 892 (D.C. Cir. 2010) (non-constitutional harmless-error standard – "*i.e.*, error is harmless unless it has substantial and injurious effect or influence in determining the jury's verdict" – generally applies where court misapplies an evidentiary rule) (citation, quotations omitted).

As we describe, the evidence amply proved that Slatten fired the first shots that hit Al-Rubia'y. *Supra*, at 102-09. Under oath, team leader Watson, who was seated next to Slatten ████████████, described his "clear" recollection that Slatten fired first: "right after [Slatten's] second shot, the turrets opened up"; there was a "slight pause and then all the guns . . . seemed to just roar." 7/28/pm/31-32, 35. Slatten's shots, moreover, were not randomly fired, but "exactly" in the Kia's direction. 7/28/pm/38-39. In

---

[54]    By the same token, ████ statements were not admissible under the residual hearsay exception which, as its first prerequisite, requires that a statement have "equivalent circumstantial guarantees of trustworthiness" as those covered by the other, specific hearsay exceptions. Fed.R.Evid. 807(a)(1). SB.42-43. Just as ████ statements are untrustworthy under ████ and 803(6), so they are under Rule 807, too.

MATERIAL UNDER SEAL DELETED

his own words, Slatten also graphically signaled that he delivered the headshot ("popped his grape") that disabled the driver (he "slumped forward") and set the Kia in motion.  7/29/am/48-49 (Slatten yelled, "white car white car coming in" *after* he fired); 7/31/am/49.

Slatten also uniquely had the skills (the team's best shot); the rifle (the most precise); the motive (to get "payback for 9/11"); and the animus (they are "animals") to shoot at an Iraqi without provocation, as he had before.  *E.g.*, 7/15/pm/59-62 (told Mealy to "shoot that motherfucker" on a rooftop, even though there was no reason to).  *See supra*, at 15 n.5.

Against all that, the jury would have had, not ████████ live testimony, but his ████████, out-of-court ███████████████████████ ████████████████████████████████████████████████ ██. That, surely, would not have turned the tide.  ███████████████ ████████████████████████████████████████████████ ███████████████████████████████ Furthermore, any selective introduction of ███████ statements would have opened the gates to ███████ ██████████████████████████████████, *see* Fed.R.Evid. 806 – giving the jury ████████████████████████████████████████████████ ████

# V.    VENUE WAS PROPER IN THE DISTRICT OF COLUMBIA.

Defendants claim the evidence did not support venue in this district. JB.96-102, SB.58-59.  Both Judges Urbina and Lamberth rightly disagreed. Defendants also contend that venue should have been put to the jury.  JB.103-06.  The court rightly rejected that claim, too.

## A.    Standard of Review

The government bears the burden of establishing venue on each charged count by a preponderance of the evidence.  *United States v. Haire*, 371 F.3d 833, 837 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005).  This Court reviews sufficiency of venue, like other sufficiency challenges, in the light most favorable to the government.  *Id.*

## B.    Background

1.    As defendants (JB.97-98) and amicus (AB.13-15) emphasize, proper venue in criminal proceedings was a matter of concern to our nation's founders – so twice in the Constitution they specified that criminal trials are to be held in the district wherein the crime "shall have been committed."  U.S. Const. art. III, § 2, cl. 3; amend. VI.

That vicinage provision, however, is not applicable here.  Rather, as the Constitution also provides, "[t]he Trial of all Crimes . . . not committed within any State . . . shall be at such Place or Places as the Congress may by law have

directed."  Art. III, § 2, cl. 3; *see Reid v. Covert*, 354 U.S. 1, 7-8 (1957) ("[f]rom the very first Congress," venue for crimes committed overseas has been established by statute).

The relevant statute provides:

The trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, *shall be in the district in which the offender, or any one of two or more joint offenders, is arrested* or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. 3238 (highlighting provision here at issue).[55]

In earlier versions of Section 3238, overseas joint offenders had to be tried separately if they were arrested in more than one judicial district.  *See* 18 U.S.C. 3238 (1948).  In 1963, Congress enacted the current language to "cure" that "defect": by providing for venue where any joint offender is arrested or "first brought," its aim was to bring those who together commit an overseas crime into one courtroom, in order to reduce the burden and expense of trying related cases separately.  *See* S.Rep.No. 88-146, at 1-2 (1963) (separate trials for cases "arising from a joint crime" place an undue burden on the government;

---

[55]    A defendant is "first brought" into a jurisdiction when, having been arrested outside the United States, he is then "brought" into the district already in custody.  *United States v. Feng*, 277 F.3d 1151, 1155 (9th Cir. 2002).

are unnecessarily expensive, inefficient, and time-consuming; and can encumber overseas witnesses, who might have to make multiple trips to the United States).

2.    Venue in this case was predicated on the arrest of Ridgeway, the defendants' joint offender, in the District of Columbia – where the government convened a grand jury soon after the Nisur Square shooting and where it secured the indictments.

a.    On November 18, 2008, the district court issued a warrant for Ridgeway's arrest in connection with the manslaughter of Mahassin Al-Khazali (the Kia passenger), and the attempted manslaughter of Abdul Al-Qalamchi (the man on the cell phone north of the Square).  GX.497G (the warrant).  That same day, Ridgeway voluntarily flew to Washington, D.C. and was arrested by FBI Agent John Patarini.  7/31/am/62.  He was booked and then taken to the district court to plead guilty to the charges.  *Id.*; 7/31/pm/11-13 ("I was told I was under arrest"); *id.* ("it was my understanding I was under arrest"); *id.* (was handed the arrest warrant); *id.* (Patarini displayed handcuffs, and said if Ridgeway "behave[d]," he would not put them on).

b.    Several weeks later, the grand jury in D.C. returned an indictment against the other (and current) defendants, and warrants for their arrests were issued here as well.  R.50/2.  The indictment charged the

135

participation of a "joint offender" (*i.e.*, Ridgeway) on all the manslaughter and attempted manslaughter counts.  R.1.  On December 7, 2008, having been advised of the warrants, the defendants self-surrendered at the federal courthouse in Salt Lake City, Utah, where one of them (Donald Ball, an original though not current defendant) lived.  R.50/2, 20.  A federal magistrate there rejected defendants' request for a probable cause hearing (the determination having already been made by a grand jury) and also declined to consider their MEJA and venue arguments, directing defendants instead to the district court in the District of Columbia.  D.Utah #2:08-350 (doc.30).

3.    Back here, Judge Urbina denied defendants' motion to dismiss the indictment for lack of venue.  The court found that Ridgeway was a "joint offender" under Section 3238 based on the affidavit accompanying his arrest warrant, which "put[] [Ridgeway] as well as the other co-defendants, in the same place at the same time, more or less doing the same thing." R.127/77 (noting that while the ultimate showing would have to be forthcoming, the facts before the court showed "concerted activity" among the co-defendants). The court also found that Ridgeway's voluntary submission to arrest, which assured he would be brought to court, constituted an "arrest" for purposes of Section 3238.  R.127/78.

As for "general considerations of fairness," the court found that re-filing the indictment in Utah would mean that three defendants would be much farther "from their family, friends, and community" than if trial were in D.C. R.127/76-77.[56]  The court also observed that the "bulk of the evidence" was overseas, and that D.C.'s international airport well accommodated flights to and from Iraq.  *Id.*  Further, defendants had retained D.C. counsel ("not [an] inconsequential consideration[]"), and evidence from the Departments of State and Defense would be here, too.  *Id.*  Regarding the government's "motivation" for bringing the case in the District, the court noted that D.C. is "well known as a default jurisdiction," R.127/78-79 (citing voting rights and Guantanamo Bay cases), and that the court was "no stranger to entertaining cases that have international or foreign elements."  *Id.*

4.    Following return of the superseding indictment in 2013, Judge Lamberth denied defendants' renewed motion to dismiss for lack of venue. The court rejected defendants' notion that a "joint offense" under Section 3238 required something like a conspiracy, R.436/6 (citing legislative history), and "easily conclude[d] that Jeremy Ridgeway was a joint offender," as he

---

[56]    Liberty, from New Hampshire, lived 2400 miles from Salt Lake, and 513 miles from D.C.  Heard and Slatten, both from Tennessee, lived 1800 and 1700 miles, respectively, from Salt Lake, and 503 and 585 miles, respectively, from D.C.  The distances for Slough, from Texas, would have been about the same. R.50/20 n.8.

137

"participated along with the defendants in the commission of the crimes charged in the superseding indictment."  R.436/6-7.

The court separately rejected Slatten's claim that the charging differences (manslaughter for Ridgeway v. first-degree murder for Slatten) meant Ridgeway was not Slatten's "joint offender."  SR.90/5 (Slatten's reindictment for murder "does not change the unmistakable unity of conduct among Ridgeway, Slatten, and, for that matter, the *Slough* defendants" in Nisur Square).

The court again denied defendants' venue motions after the government rested its case, at the close of all the evidence, and then again after the jury's verdicts.  SR.650, R.748 ("the Court finds that no facts or law have meaningfully changed . . . since its previous denials of such motions").

### C.    Ridgeway Was A "Joint Offender."

Defendants renew their claim that Ridgeway was not a "joint offender" under Section 3238 because his were "individual" crimes, unrelated to the likewise individual actions of his teammates.  JB.98-100.  But as both judges Urbina and Lamberth found, what happened in Nisur Square was one concerted criminal episode: the Raven 23 shooters traveled in the same convoy, under the same command, at the same time, to the same place, and together killed or wounded those ill-fated to be in the Square that day.  They

138

were all "joint offenders" in the most natural and logical sense of the word –

and in a way most true to the purpose and intention of Section 3238.  Congress

enacted the current language to avoid the "inefficient, unnecessarily time-

consuming and expensive" burden of trying related cases in different districts,

and to relieve foreign witnesses from having to make multiple trips to different

places to testify about the same events.  S.Rep.No. 88-146, at 1-2, 4.  The

meaning of "joint offender," accordingly, takes its cue from that practical

statutory purpose, *see, e.g., Hite*, 769 F.3d at 1163, as well as everyday

language.  *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)

("[w]hen terms used in a statute are undefined, we give them their ordinary

meaning").  The district court, thus, got it right: "Joint offenses are merely

offenses 'committed by the participation of two or more persons.'"  R.436/6

(quoting Black's Law Dictionary 1109 (7th ed.)); *id.* (rejecting defendants'

formulation as "too narrow").

In that way, Section 3238 is something of a cousin to the joinder rule,

which provides that defendants who "participated . . . in the same series of acts

or transactions" may be tried together.  Fed.R.Crim.P. 8(b).  That rule, too,

promotes efficiency and serves the interests of justice, *see Zafiro v. United States*,

506 U.S. 534, 537-38 (1993) (by avoiding the "inequity of inconsistent

verdicts" among similarly situated offenders) – and the preference for joinder is

139

"especially strong" when the charges "require presentation of much the same evidence, testimony of the same witnesses" and involve defendants who participated "in the same illegal acts." *United States v. Wilson*, 605 F.3d 985, 1016 (D.C. Cir. 2010); *see also United States v. Caldwell*, 560 F.3d 1202, 1212-13 (10th Cir. 2009) (joinder does not require identical charges or a conspiratorial agreement, but a "common thread to each of the defendants"); *United States v. Golb*, 69 F.3d 1417, 1425-26 (9th Cir. 1995) (a series of "logical[ly] relat[ed]" acts); *accord United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000); *United States v. Halliman*, 923 F.2d 873, 883 (D.C. Cir. 1991); *United States v. Riley*, 621 F.3d 312, 334 (3d Cir. 2010).

The same principles animate Section 3238 – and nothing in the statute's text or history commends defendants' technical and freighted reading of words intended to serve a non-technical and practical purpose.

That Ridgeway pleaded guilty to only two counts ("likely out of a multitude that could have been charged," R.436/7) does not change the calculus. JB.99-100, SB.59-60. *See United States v. Levy Auto Parts*, 787 F.2d 946, 949 (4th Cir. 1986) (offender who pleaded guilty to a lesser offense was still defendants' "joint offender" on greater charges; evidence showed he participated in "concerted criminal activity" with the others, and "[t]here is nothing in § 3238 which prevents the prosecution from reaching a plea

140

agreement with a suspected joint offender"); *United States v. Hong Vo*, 978 F.Supp.2d 49, 62-64 (D.D.C. 2013) (the underlying facts, not the specific charges, determine whether someone is a joint offender); *United States v. Holmes*, 670 F.3d 586, 595 (4th Cir. 2012) (focus remains on the underlying offense, regardless of "procedural developments as with subsequent or superseding indictments"); *cf. United States v. Miller*, 808 F.3d 607, 621 (2d Cir. 2015) (venue properly laid under Section 3238 where aider and abettor was arrested).

Nor, contrary to defendants' idea, JB.98-100, must the government prove that Ridgeway had something like a preplanned "meeting of the minds" or "mutual intent" with the others to establish venue.[57] As its legislative history makes clear, Section 3238 is not limited to conspiratorial agreements, S.Rep.No. 88-146, at 1-2; nor does it import all the requirements of substantive guilt and intent into the venue inquiry. (That, of course, is covered by the elements of the charged offenses, which must be proved beyond a reasonable doubt as to each defendant.) Had Congress meant to have Section 3238 apply only to co-conspirators or co-defendants charged in the same counts, it would

---

[57]    At trial, defendants requested an instruction specifying that, to be a joint offender, Ridgeway had to engage in "criminal activity that has been planned, arranged, adjusted, agreed on, and settled between parties acting together pursuant to some design or scheme." R.618-2/42-43.

have said so.  It chose, instead, a more flexible and practical set of words, and defendants' construction is true to neither Section 3238's text nor purpose.

Here, moreover, Ridgeway's joint offender status is particularly clear – for the evidence showed that he fired alongside his teammates throughout the episode.  Like all the others, Ridgeway shot at the Kia.  *See* 7/30/pm/88 ("When I saw [Slough] firing . . . I switched my weapon to fire").  He also fired beyond the Kia to the south, *see* 7/31/am/11-17 ("After I observed [Heard] firing . . . I began firing in the same direction"); to the west, *e.g.*, 7/15/am/70-74; and to the north, again with Slough, as the convoy was leaving.  *Supra*, at 27.

Indeed, as defendants themselves described the evidence, Ridgeway was the *most* joint of offenders in the Square.  *E.g.*, 8/28/pm/19 (Ridgeway "shot the driver of the white Kia"); 8/27/pm/77 ("Ridgeway was firing . . . to the south the whole time"); 8/27/pm/86 ("Ridgeway fired . . . to the west and the northwest"); 8/27/pm/90 ("the evidence all points to Jeremy Ridgeway" on the cars to the far north); 8/28/am/67-75 ("if [Ridgeway] had never gotten out to Nisur Square, we wouldn't be here").  Having cast Ridgeway as their leading man on the facts, defendants should not now be heard to portray him, in challenging venue, as a bit player.

142

Other than Heard, defendants were all convicted of shooting the Kia,

and beyond the two Kia-related counts, Slough, Liberty, and Heard variously

stand convicted of aiding and abetting the shootings to the south, west, east,

and north. These were not "individual" crimes, but a deadly joint enterprise –

and Ridgeway, so defendants stressed time and again, was very much part of

the joint undertaking. *See also* R.436/6-7 (Ridgeway "participated along with

the defendants" in the charged crimes).[58]

---

[58]    Elsewhere, defendants raise a variation on their argument: that Ridgeway was not arrested "in connection with the offenses charged." JB.100-02, SB.58-59. Putting aside that those words are not in the statute, the cases that use them make a point inapplicable here. *See, e.g., United States v. Catino*, 735 F.2d 718, 724 (2d. Cir. 1984) (defendant arrested on narcotics trafficking charges in one district was not therein "arrested" in connection with the later and unrelated charge of misusing an American passport, for which he was restrained in another district). Here, as in *Hong Vo*, Ridgeway was arrested in connection with the "same course of criminal conduct" that defendants participated in, too. 978 F.Supp.2d at 60, 62. And again, it is the evidence about what happened in Nisur Square, not how the shooters were particularly charged, that informs the Section 3238 inquiry. *See Levy Auto Parts*, 787 F.2d at 949 (looking to the underlying facts set forth in the affidavit accompanying the joint offender's arrest warrant – not the charges to which he pleaded guilty – to determine whether he engaged in concerted criminal activity with defendants). That is also why, contrary to Slatten's more particular claim, SB.58-59, the change in the charges against him from manslaughter to murder did not unsettle venue. As the district court found, Slatten's reindictment "d[id] not change the unmistakable unity of conduct" among Ridgeway, Slatten, and the others, which "surely satisfies the plain-meaning definition of the term "joint offender." SR.90/5 & n.2. Indeed, in shooting Al-Rubia'y and setting the Kia in motion, Slatten prompted Ridgeway to shoot at Al-Rubia'y, too – making them "joint offenders" with respect to that shooting in even the narrowest sense of the term.

143

### D.    Ridgeway Was "Arrested" in D.C.

Defendants also claim that Ridgeway was not "arrested" in D.C. because he was "never restrained of his liberty."  JB.101.  They misread that Section 3238 requirement, too.  When Ridgeway arrived in D.C., he was given a warrant for his arrest; he was told by an FBI agent that he was under arrest; he believed himself under arrest; he was formally booked; he was shown handcuffs (which the agent indicated he would not use so long as Ridgeway complied with his orders); and he was accompanied by the FBI to court to plead guilty to the charges against him.

All that more than suffices.  A reasonable person in Ridgeway's shoes would have believed "he was not free to leave" during the encounter.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see, e.g., United States v. Leal-Felix*, 665 F.3d 1037, 1041 & n.2 (9th Cir. 2011) (a "formal arrest may be indicated by informing the suspect that he is under arrest") (citing *Brendlin v. California*, 551 U.S. 249, 252 (2007)); *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992) (question is whether "police conduct . . . communicated . . . that the person was not free to decline the officers' requests or otherwise terminate the encounter") (citation, quotations omitted).

That Ridgeway self-surrendered in the District does not defeat the point. As the Supreme Court has made clear, an arrest requires either "physical force

144

. . . *or*, where that is absent, *submission* to the assertion of authority."

*California v. Hodari D.*, 499 U.S. 621, 626 (1991).  Here, there was an assertion

of authority (*e.g.*, the arrest warrant, Agent Patarini's directive –

"I was told I was under arrest" – the displayed handcuffs), to which Ridgeway

indisputably submitted.  *Hodari D.* thus provides the rule: "an assertion of

authority and purpose to arrest followed by submission of the arrestee

constitutes an arrest." 499 U.S. at 626-27 (citations, quotations omitted).

Indeed, defendants themselves count their self-surrender in Utah – where

they each apparently flew, voluntarily, some distance – as an "arrest" for

purposes of Section 3238.  JB.96.  They cannot have it both ways.

### E.    The Government Did Not "Manufacture" Venue.

Defendants' "manufactured venue" claim (JB.107-08) rests on the

assumption that *they* were entitled to choose their own venue by presenting

themselves at the courthouse in Salt Lake City – where one of them (Donald

Ball) lived at the time, but where none of them (Ball not having been reindicted

in 2013) lives now.  *See* R.127/62 (defense counsel: "in all candor . . . we

chose Utah"); AB.5 ("this prosecution could properly have been brought only

in Utah"); JB.3 (same); JB.107-08 (government should have returned the

indictment "in a district where *at least one* Defendant lived").

But that is not what Section 3238 says or how it works.  In the first place,

its two clauses must be read in the disjunctive, *see United States v. Gurr*, 471

F.3d 144, 155 (D.C. Cir. 2006) – and so venue is laid where a defendant

resides only if he (or a joint offender) is not "arrested" or "first brought"

elsewhere.  *See* 18 U.S.C. 3238 (trial "shall be" where any joint offender is

arrested or first brought, "but if such offender . . . [is] not so arrested or

brought," an indictment "may be filed" in the district of an offender's

residence, or "if no such residence is known" in the District of Columbia).

Moreover, as noted, there is no preference, constitutional or otherwise,

for venue in a defendant's home jurisdiction.  *See United States v. McManus*,

535 F.2d 460, 463 (8th Cir. 1976) ("[c]riminal defendants have no

constitutional right to a trial in their home districts"); *United States v. Bithoney*,

472 F.2d 16, 22-23 (2d Cir. 1973) (same).  The founders, rather, made the

location of the crime the focus of the Constitution's vicinage provisions – and

where that is inapplicable, as with overseas crimes, they gave Congress

authority to site venue where it sees fit.

By deciding to venue overseas crimes where a joint offender is arrested

or first brought, Congress implicitly contemplated some measure of

government control over venue in these cases – as the government, typically,

does the arresting or the "bringing" of a defendant into a jurisdiction.  *See*

146

*United States v. Provoo*, 215 F.2d 531, 539 (2d Cir. 1954) (recognizing that

under Section 3238, the government is "able to handpick its forum" under the

"first brought" provision (because it can choose where to bring a defendant),

and "courts must take the statute as they find it"); *see also Holmes*, 670 F.3d at

596 ("Congress simply, and to some extent arbitrarily," deemed venue for

overseas crimes to be proper where a defendant is arrested or first brought)

(citation, quotations omitted); *Catino*, 735 F.2d at 724 (the purpose of Section

3238 is "not to fix the place of arrest but simply to have the place of trial

conform to the place of arrest") (citation, quotations omitted); *Miller*, 808 F.3d

at 621 n.12 (government is not required to arrest a returning, overseas offender

at its first opportunity; it may wait and arrest him in a different district); *United

States v. Guild*, 341 Fed.Appx. 879, 885 (4th Cir. 2009) (venue was proper

"under the arrest option" in Section 3238 even if the defendant was "first

brought" elsewhere); *United States v. Rivera-Niebla*, 37 F.Supp.3d 374, 379

(D.D.C. 2014) (Section 3238 "provides the government with options for

venue"); *United States v. Henson*, 2010 WL 1068152, at *3-4 (D.Md. 2010)

(while defendant might prefer to defend the case where he resides, that is not

what Section 3238 provides).

There is nothing untoward about that.  Even for crimes committed in the

United States, venue is not (as defendants and amicus would appear to have it)

147

an inflexible concept. In conspiracy cases, for instance, the government can properly venue a case for all defendants where any one of them commits any overt act. *See, e.g., United States v. Watson*, 717 F.3d 196, 198 (D.C. Cir. 2013); *United States v. Rommy*, 506 F.3d 108, 119-20 (2d Cir. 2007) (so a defendant "need not himself have ever been physically present in a district" for the charge against him to be venued there). And for continuing offenses, venue is proper where any one of many aspects of the crime takes place. *See, e.g.*, 18 U.S.C. 3237(a) (venue properly lies in "any district in which such offense was begun, continued, or completed"); *id.* (mail fraud may be prosecuted in any district "from, through, or into which" the mail moves); *see also United States v. Lam Kwong-Wah*, 924 F.2d 298, 301-02 (D.C. Cir. 1991) (venue in D.C. would be proper for defendant who did nothing in the District but aided and abetted accomplices who themselves acted in D.C.); *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) ("Prosecutors often have wide choice of venue") (citing more examples, including government "sting" operations).

Indeed, the very notion of "manufactured venue," which is drawn from a footnote in *United States v. Myers*, 692 F.2d 823, 847 n.21 (2d Cir. 1982), has "received a chilly reception in the appellate courts." *United States v. Vega*, 2011 WL 3757883, at *4 (S.D.Ala. 2011); *see United States v. Al-Talib*, 55 F.3d

148

923, 929 (4ᵗʰ Cir. 1995) ("[t]here is no such thing as manufactured venue");

*Rodriguez-Rodriguez*, 453 F.3d at 462 (rejecting idea of "venue manipulation");

*Rommy*, 506 F.3d at 127 ("[i]n the quarter century since *Myers*, this court has

never vacated a conviction on the basis of manufactured venue").  We are also

aware of no situation where the idea has been applied (or even deemed

remotely applicable) in a prosecution for an overseas crime or one involving a

joint offender.  *Cf. United States v. Spriggs*, 102 F.3d 1245, 1250-51 (D.C. Cir.

1996) ("[i]t is unclear exactly what a claim of 'manufactured venue' entails");

*id.* (suggesting the government might act improperly were it to lure a defendant

into a "distant district," far from the principal vicinity of his crime, for some

minor criminal event simply to establish venue).

 As the Seventh Circuit has also observed, a defendant's legitimate

interests in the face of possible venue shopping can be safeguarded via

Fed.R.Crim.P. 21, which permits transfer to a different venue "in the interest

of justice."  *Rodriguez-Rodriguez*, 453 F.3d at 462; *see Platt v. Minn. Mining &*

*Mfg. Co.*, 376 U.S. 240, 245-26 (1964) (location of defendant's home, while

having "no independent significance" in transfer determination, may be

considered along with "such factors as the convenience of records, officers,

personnel and counsel").

Although defendants did not request a transfer, the district court signaled why their preferred venue would likely not qualify. Salt Lake City, as noted, was home only to Donald Ball (who is no longer in the case) – and was much further from home than D.C. for Slatten, Heard, and Liberty, and about the same distance for Slough. D.C.'s international airport also conveniently accommodated flights to and from Iraq (an especially notable consideration here); was home to defendants' D.C. counsel; home, also, to possible State and Defense Department witnesses; and the logical place for the investigation and trial of an overseas case such as this.

By both the terms of Section 3238 and "general considerations of fairness," R.127/76-77, venue was proper in the District. *See Levy Auto Parts*, 787 F.2d at 952 (no unfairness in prosecuting defendants in Virginia, where a joint offender was arrested, although none resided there and although Virginia was further from their homes than Michigan, where two of the conspiracy's overt acts were committed; noting that the "investigation naturally and properly developed" in Virginia "with a substantial investment of time and energy on the part of prosecutors and grand jurors").

150

### F.    The District Court Did Not Err, Reversibly Or Otherwise, By Not Submitting Venue To The Jury.

"It is established law in this circuit . . . that a venue 'instruction is necessary only when the question of venue is genuinely in issue.'" *United States v. Fahnbulleh*, 752 F.3d 470, 477 (D.C. Cir. 2014) (quoting *Haire*, 371 F.3d at 840), *cert. denied*, 135 S.Ct. 1520 (2015); *see United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011) (venue should go to the jury only if, after proper objection, "there is a genuine issue of material fact") (citations, quotations omitted).[59]

As the district court found, there was no genuine factual issue on the two relevant venue questions: whether Ridgeway was arrested in D.C., and

---

[59]    In this, the Court is not alone.  *See, e.g., United States v. Zamora*, 661 F.3d 200, 208 (5th Cir. 2011) (jury instruction on venue is unnecessary if "the defendant fails to contradict the government's evidence"); *United States v. Muhammad*, 502 F.3d 646, 656 (7th Cir. 2007) (defendant's "factual submissions" must "make venue a serious issue"); *United States v. Perez*, 280 F.3d 318, 334-35 (3d Cir. 2002) (defendant must place venue in issue by "establishing a genuine issue of material fact").  Although other circuits appear to take a different path, *see* JB.106 & n.57, some of those courts also appear to have more recently reconsidered.  The Eighth Circuit, for instance, has held that a district court may determine venue "as a matter of law" if a defendant fails to "present[] any evidence at trial that create[s] a factual dispute on whether venue [i]s proper."  *United States v. Bascope-Zurita*, 68 F.3d 1057, 1063 (8th Cir. 1995); *accord United States v. Jaber*, 509 F.3d 463, 466 (8th Cir. 2007).  And the Fourth Circuit, too, has effectively aligned itself with this Court and its like-minded sister circuits.  *See United States v. Engle*, 676 F.3d 405, 413 (4th Cir. 2012) (court must instruct on venue if "'there is a genuine issue of material fact with regard to proper venue'") (quoting *Perez, supra*).

whether he was defendants' joint offender. 8/26/pm/56. The circumstances of Ridgeway's arrest were uncontested – and whether (or not) Ridgeway was "witheringly impeached" on other issues, JB.104, there was no dispute about what happened with FBI Agent Patarini on November 18, 2008. And the question whether a person has been "arrested" or is in "custody" is routinely entrusted to a court's determination. *See, e.g., Thompson v. Keohane*, 516 U.S. 99, 112-15 & n.13 (1995); *Hui Lin Huang v. Holder*, 677 F.3d 130, 135 (2d Cir. 2012); *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009); *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005).

So, too, whether Ridgeway was a "joint offender" under Section 3238. Given the undisputed evidence of Ridgeway's multi-directional shooting (as most forcefully articulated by defendants themselves), the only question was whether those facts satisfied the statutory term – again, a legal matter that the court was well within its province to decide. *See Fahnbulleh*, 752 F.3d at 477 (rejecting claim that instruction was required where defendants, though objecting to venue, did not establish a genuine issue of material fact).

Relying on *United States v. Gaudin*, 515 U.S. 506 (1995), defendants alternatively urge the Court to hold that "it is per se reversible error" to withhold venue from the jury over defense objection. JB.104-06. The Court should decline to so hold if only for the most basic of reasons: *Fahnbulleh*

152

rejected any such rule, and "[o]ne three-judge panel . . . does not have the authority to overrule another three-judge panel of the court." *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

But even if the Court were writing on a clean slate, it should reject defendants' proposal and maintain its allegiance to the majority rule. *Gaudin* held that a defendant has the right, under the Fifth and Sixth Amendments, to a jury determination of guilt beyond a reasonable doubt on each element of the crime charged. 515 U.S. at 510. Venue is different. As the courts of appeals have roundly found, venue is not a substantive or essential element of a crime. *See Rommy*, 506 F.3d at 119 (and why it need only be proved by a preponderance of the evidence); *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009); *Muhammad*, 502 F.3d at 652; *United States v. Sickle*, 454 F.3d 1265, 1271-72 (11th Cir. 2006); *Perez*, 280 F.3d at 330; *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998); *United States v. Kaytso*, 868 F.2d 1020, 1021 (9th Cir. 1988); *United States v. Griley*, 814 F.2d 967, 973 (4th Cir. 1987); *see also United States v. Borda*, 952 F.Supp.2d 43, 46 (D.D.C. 2013) (drawing same conclusion from this Court's precedents).

Also, "unlike the substantive facts which bear on guilt or innocence . . . [v]enue is wholly neutral; it is a question of procedure, more than anything else, and it does not either prove or disprove the guilt of the accused." *Wilkett*

153

*v. United States*, 655 F.2d 1007, 1011-12 (10th Cir. 1981); *accord Perez*, 280 F.3d

at 330; *Kaytso*, 868 F.2d at 1021.  Because venue has no bearing on guilt or

innocence, it does not implicate *Gaudin's* requirement that a jury must

determine guilt on every element of a crime beyond a reasonable doubt.

Indeed, as Justice Rehnquist noted in his *Gaudin* concurrence, even after

that case, the "propriety of venue . . . may be decided by the trial court."  515

U.S. at 525-26 (Rehnquist, C.J., O'Connor & Breyer, JJ., concurring).  This

Court need not second-guess that sound judgment.[60]

## VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING A NEW TRIAL.

After trial but before sentencing, one of the police officers on the scene,

Sarhan Monem, submitted a victim impact statement ("VIS") that contradicted

an aspect of his trial testimony.  As they did below, defendants claim the

statement entitles them to a new trial – though also as below, they make

different arguments.  Slatten contends that Monem's statement provides newly

---

[60]     Of course, also contrary to defendants' "per se" argument, even a
*Gaudin* error is subject to harmless-error analysis, *Neder v. United States*, 527
U.S. 1, 8-11 (1999) – and here, given the uncontested facts showing that
Ridgeway was a "joint offender" who was arrested in D.C., any possible error
in not submitting the issue to the jury was harmless.  *See United States v. Casch*,
448 F.3d 1115, 1117-18 (9th Cir. 2006) (error harmless where evidence on
venue was "substantial" and "uncontroverted"); *see also Haire*, 371 F.3d at 837
(venue need only be proven by a preponderance).

discovered and direct evidence of his innocence.  SB.53-58.  The other

defendants claim it proves Monem perjured himself at trial, and that their

convictions are thereby fatally infected.  JB.76-96.

Both claims fail, at bottom, for the same reason: even with Monem's

victim impact statement in hand, defendants fail to show, as they must, that

they would probably be acquitted at a new trial.  As the district court found,

the statement "would offer little chance of an acquittal at a new trial, let alone

make acquittal probable."  R.821/19.

### A.    Standard of Review and Legal Principles

This Court reviews a district court's decision to deny a new trial for

abuse of discretion.  *United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010).

To obtain a new trial based on newly discovered evidence, a defendant must

show, *inter alia*, that the new evidence is not "merely cumulative or

impeaching"; is material; and "must be of such nature that in a new trial it

would probably produce an acquittal."  *Id.* at 847-48 ("[t]his is a high bar to

cross") (citation, quotations omitted).

The same ultimate standard applies where, as here, a defendant claims

the government unknowingly presented perjured testimony at trial.  *See United*

*States v. Williams*, 233 F.3d 592, 594-95 (D.C. Cir. 2000) (post-trial discovery

of perjury merits a new trial "only if [defendant] can establish that he would probably be acquitted on retrial").[61]

### B.    Background

1.    At trial, Monem testified that, as one of two officers nearest the convoy, he ran to the Kia after hearing the first gunshots and saw its driver, Al-Rubia'y, dead from a bullet to the head.  6/23/am/9-16.  That testimony accords with what Monem said many times before.[62]

---

[61]    Defendants mistakenly claim that the district court's probable-acquittal finding, "like *Brady* materiality," is reviewed de novo.  JB.77-78.  As this Court has made clear, however, a new trial motion predicated on a *Brady* allegation is "different from other new trial rulings" because the "question of prejudice is folded into the [legal] determination of whether a [*Brady*] violation has occurred."  *United States v. Oruche*, 484 F.3d 590, 595-96 (D.C. Cir. 2007).  In non-*Brady* situations, as here, the Court continues to review a determination that new evidence would not probably produce an acquittal for an abuse of discretion.  *See, e.g., United States v. Pettiford*, 517 F.3d 584, 592 (D.C. Cir. 2008); *United States v. Johnson*, 519 F.3d 478, 487-88 (D.C. Cir. 2008); *United States v. Lafayette*, 983 F.2d 1102, 1106 (D.C. Cir. 1993); *see also United States v. Kelly*, 790 F.2d 130, 133-34 (D.C. Cir. 1986) (standard new-trial inquiry is not applicable in *Brady* context).

[62]    For instance:

To the Iraqi Police, 9/18/2007:

> "[T]hey [the convoy] were stopped and few moments later, they opened fire . . . The American soldier opened fire at a white Credos car which was driven by a man with a woman next to him, leading to the death of the man who was driving it."  R.773-3.

(footnote continued…)

156

2.      Before sentencing, a victim witness advocate in the U.S.

Attorney's Office solicited victim impact statements from Iraqis who had been

in the Square during the shooting.  She received Monem's on April 2, 2015 (in

Arabic) via email, R.773/3, which was translated on April 4.  *Id.*  The package

_____

To the U.S. Army, 9/18/2007:

> [T]he convoy shot the white Kia . . . and the young man driving the Kia was
> shot in the head and killed. . . . [He] was shot and killed before it moved
> toward the circle.  R.773-3.

To the FBI, 9/24/2007:

> Moneim heard "a little bit" of firing . . . from American weapons.
> . . . Moneim did not hear any firing from any other area before they began to
> shoot. . . . Moneim could see the driver of the Kia was shot in the forehead.
> . . . [He] went to the passenger side . . . [and] saw the lady holding her son.
> R.773-4.

To the grand jury, 5/27/2008:

> "They started firing. . . . After the gunfire, we heard . . . [the] scream of a
> woman . . . 'My son. My son.' . . . I went towards that car, and I saw the
> driver with a bullet in his head.  His head was split. . . . [The woman] was still
> alive, but she was hugging her son and screaming, . . ."  R.773-5/12.

At the *Kastigar* hearing, 12/4/2013:

> "I approached the [Kia] . . . The person who got shot was the driver, was shot
> in the face, and next to him was a lady."  R.773-8/12.

To the FBI, 4/4/2014:

> [Monem] said when he approached the car he saw the driver had been shot.
> There was a single bullet hole in the center of the driver's forehead.  R.773-9.

*See also* R.773-6 (confirming accuracy of relevant grand jury testimony) (6/21/2009).

of statements she collected (there were 14 in all) was produced to the court and defense four days later, on April 8, along with the government's sentencing memorandum.  *See* R.742-6 (most of the produced pages (55 of 83) were duplicate Arabic versions, claim forms, or cover sheets).

In his victim impact statement, Monem said something new.  He wrote about his guilt over not being able to help the Kia occupants, and also about a conversation between mother and son:

> I saw a mother crying for her son, who was a doctor and she had a feeling that he would be killed.  She was unable to move, and her son was trying to get her out of that damned car, but I was unable to move and help him.  So I gave up and just watched.  The mother cried and hugged her son as she was telling him 'don't go, don't go, we will be killed.'  The son was telling her 'get out of the car, we'll be killed,' she was hugging him and begging him not to go.  The son was killed by you then the mother started crying crazily and then she was killed, too.

R.742-6/72; *see also id.* ("I feel guilty . . . I learned that life is worthless

. . . They died because . . . I did not help them . . . I still dream and imagine some scenes").  As defendants point out, the statement, contrary to Monem's trial testimony, portrays Al-Rubia'y as alive after the shooting began.

The government contacted Monem in Iraq on April 10, 2015.[63]  Monem explained that he did not understand a victim impact submission to be a

---

[63]     Although defendants make much of the notion that this was an "ex parte" interview, SB.55-56, JB.81-82, we know of no principle that prevents the government from calling a witness without having the defense on the line.

"factual statement" about what happened in the Square, but thought it an "expression" of emotions – and that, in writing it, he was "imagining" what it would have been like to be in the Kia.  R.773-16.[64]

In the April 10 interview, Monem also affirmed actual facts: that when he approached the Kia, the driver had a "hole in his forehead," which had killed him; that he never heard the driver talking or saw him moving after he was shot; that the driver was in the woman passenger's arms; that he (Monem) tried unsuccessfully to get the woman out of the car; and that his colleague, Ali Salman, was on the other side.  R.773-16.

3.    In moving for a new trial, Slatten claimed that Monem's victim impact statement proved he did not kill Al-Rubia'y.  SR.659/17-20.  All defendants claimed the statement showed Monem perjured himself on the stand – and that the government knew or should have known it.  R.765/19-24, SR.659/22-24.  They do not renew the second part of that contention here.

The district court found that Monem did not testify falsely.  R.821/8.  In so finding, it noted the obvious: "Monem's VIS contradicted his testimony as

---

[64]    Monem's sense was not, as defendants would have it, incredible: in soliciting victim impact statements, the government asked not for a factual account of events, but for an expression of how a witness or victim was affected by the shooting.  *See, e.g.*, R.742-6/19 (asking victims to describe, *inter alia*, "feelings of anger, . . . blaming self . . . helplessness, vulnerability, fear . . . hopelessness, frustration . . .").

159

to when Al-Rubia'y died and whether Monem heard him speak after the shooting had begun." R.821/10.[65] The court then found that Monem fully repudiated his VIS in the April 10 interview – including the notion that Al-Rubia'y was alive after the shooting began – which rendered the statement "pure impeachment evidence," not proof of perjury. R.821/11-14; see R.821/10 (emphasizing that it examined "the specific facts of this case" to determine the "probative value and reliability" of Monem's sentencing statement and subsequent repudiation).

Notably, the court did not just deny the motion because it deemed Monem's victim impact statement "pure impeachment" evidence. Rather, it went on to find that even if Monem was a "sufficiently crucial witness" to warrant retrial, the "addition of [his] VIS at a new trial" would not, given the strength of the other evidence, probably result in acquittal. R.821/17.

---

[65]    The court disagreed with defendants, however, that the victim impact statement also "reveals [that Monem] never left his kiosk, cowering instead inside." JB.82-83. The court found that Monem represented not that he hid in the kiosk the whole time, but only while the Kia was being destroyed. R.821/10-11 (citing VIS passages). And that, the court found, fully comported with his trial testimony – in which Monem said he ran back and hid in the kiosk when the convoy bombarded the Kia with gunfire. *Id.* (citing trial testimony). "[W]hat defendants portray as a shocking revelation," the court found, "is more sensibly read as a reiteration of what Monem has attested to many times before." R.821/11.

The court also found, in light of the record and its assessment of

Monem's credibility, that a hearing was unnecessary.  R.821/19.  It concluded:

> This Court, having spent several months immersed in the evidence and
> testimony presented at one trial, is unpersuaded that another would
> vindicate any recognized legal right. . . . [T]he weight of the evidence is
> heavily against defendants, and, in the Court's view, the VIS – an
> implausible and quickly rescinded recantation that is powerfully
> contradicted by the record – would offer little chance of an acquittal at a
> new trial, let alone make acquittal probable.

*Id.*

## C.    Defendants Fail To Show That Monem's Victim Impact Statement Would Probably Produce An Acquittal On Retrial.

### 1.    Monem's Testimony, In Context

Although defendants portray him as the government's star witness (the

"linchpin" of the case, JB.89-90), Monem's part was not so pivotal – either

against Slatten or (especially) against anyone else.  As noted, a number of

witnesses testified that with traffic at a halt, they first heard distinct "pops," or

shots, from the convoy, *supra* at 103 – followed by the slow roll of the Kia and

a woman's screams for her boy.  *Id.*  Monem's testimony – that he then

approached the Kia and saw Al-Rubia'y shot in the head – did not stand alone.

His partner, Ali Salman Al-Hamidi, heard, saw, and did the same things: after

hearing the shots and the woman's cry, he ran to the Kia, saw the driver with

blood coming from his head and covering his face, as well as the mother

holding her son, screaming.  7/2/am/91-93 ("the car started moving slowly because the young man was killed, and he did not have control of the car"); 7/2/pm/36.

Al-Hamidi, too, walked with the car, 7/2/am/95-96, and also tried to get the convoy to hold its fire.  7/2/am/94-95 (he raised his left hand: "I was trying to communicate" with the convoy "to stop the shooting").  Helicopter gunner Gehrsitz recalled this as well:  he saw two policemen at the Kia, and that one "was yelling" at the convoy "and waving his hand in the air." 7/7/pm/39.

Majed Al-Gharbawi further corroborated the policemen's accounts. Right in front of the Kia, his truck was lightly bumped by the Kia after the first shot, 6/24/am/48 – again supporting the inference that, hit by the shot, Al-Rubia'y lost control of his car.  *See also* 6/25/pm/10 (expert: Kia was an automatic); 6/25/pm/18-19 (likely going less than 2½ miles per hour).  Upon hearing the shot and getting bumped, Majed turned around, heard the woman's screams, and saw a hole in the driver's side windshield – which was splattered with blood.  6/24/am/48-49.

As we also describe, the principal evidence tying Slatten to those first shots came, not from Monem, but from Jimmy Watson and Slatten himself. *Supra*, at 104-07.  Indeed, Slatten actually embraced Monem as *his* witness on

162

this point – highlighting (with not a small bit of flourish) Monem's belief that the first shots "came from the turrets," 6/23/am/11-12, not inside.[66]  As the district court noted, that itself "seriously undermines any attempt to recast Monem as the pivotal witness against Slatten."  R.821/16.

## 2.    The Victim Impact Statement Is Not Direct, Exculpatory Evidence Of Slatten's Innocence.

Against all that, Slatten claims Monem's "new evidence" is "direct evidence that [he] is not guilty" of killing Al-Rubia'y, and that the victim impact statement would therefore probably lead to an acquittal.  SB.56. Slatten fails to explain, though, exactly how that would work.  If, on one hand, Monem decided not to attend a retrial, Slatten could not introduce the statement as substantive evidence in the case, for it would be inadmissible hearsay.  *See* Fed.R.Evid. 801(c); *United States v. Mackin*, 561 F.2d 958, 962-63 (D.C. Cir. 1977) (recanting witness's out-of-court statements would be inadmissible as substantive evidence upon retrial).[67]

---

[66]    *See* 8/28/pm/14-16 ("Mr. Moniem . . . knows precisely who fired those first shots at the white Kia . . . Here's what Mr. Moniem testified to . . . [reading testimony] . . . Mr. Moniem . . . testified under oath that he was three to four meters away . . . and those first shots came not from the holes on the side of the vehicle, but from a turret gunner. . . . [He] was adamant . . . I didn't cross-examine Mr. Moniem because this was done on direct examination").

[67]    Slatten's co-defendants posit that Monem's statement could come in under Rule 804(b)(3) as a statement against interest, or Rule 803(5) as a

Furthermore, without Monem, a new jury could still readily convict Slatten based on the other duplicative and/or independent evidence of his guilt: the stopped traffic, the first shots, the screams, the slow roll of the Kia, Al-Hamidi, Majed, Watson, Ridgeway, Randall, the expert, Slatten himself. *See supra*, at 13-15 & n.5; 102-07.  In fact, without Monem, Slatten would lose what he heralded as some of *his* best evidence.

The more likely scenario is that Monem would again come to a new trial, *see* R.821/14 (the court "has little trouble concluding" that Monem would appear), and testify as he did (and has) before.  Slatten, then, could use the victim impact statement as impeachment.  That, perhaps, might strike some at Monem's credibility – though a jury could also well accept Monem's explanation that he was expressing emotions, not facts, in his statement (that, after all, is what the government had asked him to do), and that his imagined scene in the Kia was of a piece.  *See* R.742-6/72 ("I still dream and imagine some scenes").  In any event, as the district court found, any impeachment of

---

recorded recollection.  JB.91-92.  But Monem says nothing against his pecuniary or penal interest in the sentencing statement, and it does not meet the contemporaneity or impaired-memory requirements of a recorded recollection, either.  *See* Fed.R.Evid. 803(5)(A)-(B).  Even if the statement were somehow admitted, it would be forcefully countered by Monem's sworn, extensive, and mutually reinforcing trial and *Kastigar* hearing testimony.  *See* Fed.R.Evid. 804(b)(1).

Monem would not leave the government's case in tatters. *See* R.821/14 (rejecting idea that "Monem [is] thoroughly discredited by his VIS"); R.821/13, 19 (Monem's "implausible" victim impact statement, "quickly rescinded," is "powerfully contradicted by the record"); R.821/17, 19 (given the "weight of the evidence" against defendants, the statement would "offer little chance" of acquittal, "let alone make acquittal probable"). Slatten has not shown how the court's assessment was wrong, much less an abuse of discretion.

### 3.   The Victim Impact Statement Does Not Entitle Slough, Liberty, Or Heard To A New Trial, Either.

The joint defendants' claim is even further afield. They spend many pages parsing the victim impact statement and commending its "powerful indicia of truthfulness," JB.79-80, 82-86 – all to say that Monem perjured himself at trial. JB.82. And it is "plain," they continue, that Monem's perjury means they would probably be acquitted on retrial. *Id.* All that is wrong.

In the first place, the court's finding that Monem did not lie on the stand is the very sort of judgment classically entrusted to the district court, with its front row seat to the proceedings. And here, there is much to commend the court's finding. As noted, Monem has repeatedly affirmed that Al-Rubia'y was killed by Raven 23 fire at the beginning of the shooting: he said so to Iraqi

and U.S. Army investigators right afterwards; to the FBI in subsequent months

and years; to the grand jury; and under oath and subject to cross-examination

at trial.[68]  The district court had the opportunity to twice watch Monem testify

and assess his credibility, *e.g., United States v. MMR Corp.*, 954 F.2d 1040, 1046

(5th Cir. 1992); Monem's trial testimony, unlike the victim impact statement,

was a detailed and complete account of what he did and saw in the Square,

*e.g., United States v. DiPaolo*, 835 F.2d 46, 50 (2d Cir. 1987); and, perhaps most

importantly, the testimony, again unlike the sentencing statement, was

corroborated and consistent with other evidence in the case.  *E.g., United States*

*v. Carbone*, 880 F.2d 1500, 1502 (1st Cir. 1989).  The victim impact statement –

with its unlikely (and by Monem's own lights, "imagined") rendition of a

conversation between mother and son inside a car some distance away –

stands as a complete outlier.  As a factual account, it is as incredible as

---

[68]    Monem was even cross-examined about whether he told a *Der Spiegel*
journalist that the Kia moved before the first shots – and he flatly denied it.
6/23/pm/37-39 ("It's not true").

Defendants suggest, as they did below, that Monem's many consistent
statements are suspect because the first one was coordinated by an Iraqi
colonel.  JB.93, SB.54-55.  The district court rejected that suggestion more than
once.  *See* R.821/17-18 (no indication that Monem or his partner were corrupt;
defendants' idea requires "quite a leap"); 3/26/2014 Tr.28-29 (sealed) ███████
████████████████████.  The better explanation for the similarity in the
officers' accounts about the Kia is less conspiratorial: they "s[aw] the same
thing."  R.821/18.

Monem's trial testimony was credible.  *See* R.821/13 ("the VIS . . . is

implausible in light of the trial evidence"); R.821/19 (is "powerfully

contradicted by the record").[69]

   But apart from all that, the Court can deny defendants' claim for the

simplest of reasons.  For they fail to show how Monem's testimony – even if

patently untrue, as they urge – would entitle them to a new trial.  As this Court

has explained, in a case of undisputed perjury, a defendant's requisite showing

(that he would probably be acquitted on retrial), requires a look ahead at a new

trial, not back at the original one.  *Williams*, 233 F.3d at 594-95.  So the

question is not, as defendants seem to think, JB.4, 86-90, whether the

government's case would have been "eviscerated" or "demolished" had this

---

[69]    We also agree with the district court that Monem fully repudiated the
VIS's disputed passage in the April 10 interview, though for a more
straightforward reason.  As the interview notes explain, Monem was "asked to
recount his actions involving the white Kia."  R.772-16.  Fairly read, that is
what the notes describe – and defendants' suggestion (SB.55, JB.81, 85) that
Monem left out an event of real significance before the Kia was shot
(contradicting everything he has ever said) places too much weight on too few
words.  *See* R.821/12-13 ("Monem's April 10 statements are more reasonably
interpreted to mean that he denied the VIS's implication that Al-Rubia'y
survived the initial burst of gunfire").  That alone could also end the inquiry.
*See, e.g., United States v. Provost*, 969 F.2d 617, 620 (8th Cir. 1992) (affirming
denial of new trial where district court concluded that witness's subsequent
statements contradicting his trial testimony were not credible); *United States v.
Glantz*, 884 F.2d 1483, 1485-86 (1st Cir. 1989) (same, where witness repudiated
his recantation of trial testimony).

jury known that Monem committed perjury. Rather, the question is what would likely happen at a future trial – which could, as defendants even believe probable (JB.92), include the prospect of Monem not testifying at all. *See Williams*, 233 F.3d at 595-96 (evaluating whether acquittal would be probable in the absence of the perjury-committing witness on retrial); *United States v. Davis*, 960 F.2d 820, 825-26 (9th Cir. 1992) (same).

As noted, in a trial minus Monem, the jury would still have more than enough evidence – both duplicative and independent of Monem's – to conclude that Slatten fired the first shots that killed Al-Rubia'y.

But that, still, is not the biggest problem with the joint defendants' claim. As they acknowledge, Monem's relevant testimony bore on what happened to the Kia. JB.78-79, 88-91. Slough, Liberty, and Heard, however, collectively stand convicted of shooting many victims beyond the Kia, to the south, west, east, and north of the circle. And although the government argued that Slatten's shooting of Al-Rubia'y "lit the match" that started the episode, JB.90, we never suggested that defendants' culpability for all that followed somehow hinged on the shots to the Kia.

That would have been silly. The Kia was unique in the scheme of the Nisur Square tragedy. Indeed, defendants' main argument was that at virtually the same time the Kia fast approached the convoy, insurgents separately

168

opened fire on the team, and that the other innocents in the Square were caught in the cross-fire. *E.g.*, JB.2. The government did not counter that narrative by "generaliz[ing] any perceived misconduct or criminal intent" vis-à-vis the Kia to the other victims, JB.89 – but squarely argued that the ensuing slaughter went well beyond what happened with the Kia. *See* 8/27/am/75 ("[I]n the end, the Kia is ultimately just one facet of this case. It involves two deaths, only one of which Slough, Liberty, and Heard are charged with . . . There's so much more death and destruction that occurred outside the white Kia").

Indeed, the government also argued (exactly contrary to defendants' notion) that even if the Kia initially presented something of a close call, none of the other shootings did:

> [The defense] . . . hit[s] hard this notion of split second decisions. . . . [T]hey want you to focus on this white vehicle . . . But, that was perhaps the only split second decision that was arguably made that day. . . [W]ere these really split second decisions? Perhaps with the Kia. But with the other things that were going on? . . .

8/28/pm/68-69; *see* 8/28/pm/75-77 (noting the "shift" in action after the Kia: defendants are "moving from car to car to car to car and also seeing that what they're doing is not justified. . . . What possible threat could the vehicles or the people . . . be to those men up in the turrets, [or] Mr. Liberty in the driver's seat? . . . None.").

Whatever one might make of Monem's trial testimony or his victim impact statement, the fact remains: one witness, relevant to one unique count, simply would not bring the government's entire case against Slough, Liberty, and Heard to its knees.[70]

### D. The District Court Acted Within Its Discretion In Not Holding A Hearing.

Also contrary to defendants' contention, JB.94-96, the court did not abuse its discretion in deciding that an evidentiary hearing was unnecessary. *See Lam Kwong-Wah*, 924 F.2d at 308 (noting the "deferential" standard of review). As this Court has noted, even where a witness submits an affidavit recanting his trial testimony, the district court may rule on a new trial motion without a hearing. *United States v. Kearney*, 682 F.2d 214, 219-20 (D.C. Cir. 1982); *accord Provost*, 969 F.2d at 619-20 (collecting cases); *United States v. Connolly*, 504 F.3d 206, 220 (1st Cir. 2007) (hearings on new trial motions "are

---

[70] We, of course, part company with defendants about the strength of our case, JB.87-89 – and we certainly disagree that there was a "dearth" of evidence that they fired beyond the Kia, *see supra*, at 17-18 n.8, or that defendants' "obvious evidence of an attack on the convoy" went unrefuted. JB.87. As we describe, *supra*, at 35-44, that issue was fully joined – and the length of the jurors' deliberations likely indicates that they worked scrupulously through the evidence, carefully weighing and resolving the evidentiary disputes, and giving the 74 charged counts the individualized attention they deserved. That the jury returned guilty verdicts on 71 counts (hanging on three against Heard) is a better gauge, we submit, of our case's strength.

the exception rather than the rule").  Here, what the district court had was a post-trial victim impact statement, not under oath, that was both "implausible and quickly rescinded," and, perhaps most importantly, "powerfully contradicted by the record."  R.821/19.

Among the factors this Court has looked to in assessing a district court's decision to credit trial testimony over a recantation without a hearing are: the trial testimony was subject to thorough cross-examination; it was corroborated by other witnesses; and the presiding judge tried the case, and hence observed the witness's testimony and demeanor – making him "exceptionally well qualified" to pass on the believability of the new evidence.  *Kearney*, 682 F.2d at 219-21.  Those boxes are checked here.

But again, that is not the most decisive point.  For beyond its determination that Monem did not lie on the stand – or that the sentencing statement was implausible or that Monem fully repudiated it – the district court did not need a hearing to get to the bottom line: in the end, it simply would not have mattered.

171

# VII.  DEFENDANTS' SENTENCES ARE NOT CRUEL AND UNUSUAL.

Slough, Liberty, and Heard challenge their 30-year Section 924(c)

sentences under the Eighth Amendment.  JB.112-17.  As with nearly all such

claims, theirs fails.

## A.    Standard of Review

Whether a sentence violates the Eighth Amendment is reviewed de

novo.  *See United States v. Said*, 798 F.3d 182, 196 (4th Cir. 2015), *petition for*

*cert. filed*, No. 15-7332 (Dec. 8, 2015); *Pharaon v. Bd. of Governors of the Fed.*

*Reserve Sys.*, 135 F.3d 148, 157 (D.C. Cir. 1998).

## B.    Background

1.    18 U.S.C. 924(c)(1)(B)(ii) provides a 30-year mandatory minimum

sentence for anyone who uses a machinegun or destructive device during and

in relation to a crime of violence.  The statute also provides that the mandatory

prison term run consecutively to the sentence(s) on the underlying crime-of-

violence count(s).  18 U.S.C. 924(c)(1)(A).

A machinegun is "any weapon which shoots, is designed to shoot, or

can be readily restored to shoot, automatically more than one shot, without

manual reloading, by a single function of the trigger."  18 U.S.C. 921(a)(23);

26 U.S.C. 5845(b).  A destructive device is "any explosive, incendiary . . .,"

including a grenade.  18 U.S.C. 921(a)(4)(A)(ii).  The jury convicted Slough,

Liberty, and Heard on one Section 924(c) count, finding that all three used or

discharged a machinegun in relation to multiple manslaughter counts, and that

Slough and Heard also used or discharged a destructive device.  R.669/14-16.

    2.    For their manslaughter convictions, the Presentence Investigation

Reports ("PSR") assigned each defendant a combined offense level of 34 and a

criminal history category I, yielding a Guidelines range of 151-188 months'

imprisonment.  Slough PSR ¶ 325; Liberty PSR ¶ 244; Heard PSR ¶ 227.

Because that range only accounted for a maximum of five units, *see* Guidelines

§ 3D1.4(a) – and because Slough and Liberty would have had "significantly

more units" had each of their victims been counted – their PSRs identified the

potential for an upward departure on that basis.  Slough PSR ¶ 354; Liberty

PSR ¶ 273.  *See* Guidelines § 3D1.4, comment. (backg'd) (noting that departure

"would be warranted" where "the additional offenses resulted in a total of

significantly more than 5 Units"); *e.g., United States v. Lente*, 759 F.3d 1149,

1154, 1158, 1163-64 (10th Cir. 2014) (affirming upward departure for

involuntary manslaughter, as Guidelines "did not adequately account for the

multiple fatalities"); *accord United States v. Menzer*, 29 F.3d 1223, 1234-35 (7th

Cir. 1994) (arson); *United States v. Fei*, 225 F.3d 167, 172 (2d Cir. 2000) (alien

smuggling).

The government requested upward departures for Slough (to a 262-327-month range), Liberty (to 210-262 months), and Heard (to 188-235 months) for the manslaughter counts.  R.742/27-29.  It argued that by failing to adequately account for the number of victims killed or injured in Nisur Square, the Guidelines substantially understated the extent of defendants' harm, *see* Guidelines § 5K2.0(a)(3), and that departure was also warranted because the shooting "significantly endangered" our national security.  *See* Guidelines § 5K2.14.  R.742/22-27.

3.     The district court rejected both the government's request for upward departures, 4/13/2015/29, and defendants' claim that the 30-year mandatory minimum under Section 924(c) violated the Eighth Amendment.  As to the latter, it found that given "the seriousness of the crimes," the 30-year penalty was not excessive or grossly disproportionate.  4/13/2015/23-24; *id.* ("I'll take the words of Congress and apply them").

After hearing, *inter alia*, from defendants and their supporters, the court sentenced each to 30 years plus one day in prison, treating the Section 924(c) count and the underlying manslaughter counts as a "sentencing package" to "achieve an overall appropriate sentence."  4/13/2015/150 (citing *United States v. Townsend*, 178 F.3d 558, 567-69 (D.C. Cir. 1999)).  The court said it "fully agree[d]" with the 30-year sentences, finding them sufficient but not

174

greater than necessary to reflect the sentencing goals of 18 U.S.C. 3553(a).

4/13/2015/151-54. A "serious sentence . . . needs to be imposed for . . . this

many killings and woundings," the court stated, "and the victims are entitled

to have the Court take seriously this case." 4/13/2015/154; *id.* at 152

(defendants fired "wildly into cars . . . going the other direction . . ."); *id.* (the

killed and injured Iraqis "were all innocent"); *id.* ("no witness . . . testified that

they ever saw a weapon at the scene"); *id.* at 154 ("I'm very satisfied with a 30-

year sentence. But I don't think in light of" defendants' backgrounds that "it's

necessary to go greater.").

## C.    The Sentences Befit Defendants' Crimes.

Under the Eighth Amendment, "[e]xcessive bail shall not be required,

nor excessive fines imposed, nor cruel and unusual punishments inflicted."

U.S. Const. amend. VIII. A defendant may challenge a sentence as cruel and

unusual in two ways. With an "as-applied" challenge, he contests a term-of-

years sentence as disproportionate to his crime "given all the circumstances of

a particular case." *Graham v. Florida*, 560 U.S. 48, 59 (2010). In a

"categorical" challenge, he asserts that an entire class of sentences is excessive

based on the nature of the offense (*e.g.*, the death penalty for nonhomicide

crimes) or the "characteristics of the offender" (*e.g.*, juveniles or the

intellectually disabled).  *Id.* at 60-61.  Defendants argue that their sentences are

constitutionally infirm in both ways.  JB.113.  They are twice wrong.

### 1.    The Section 924(c) Sentences Are Not Grossly Disproportionate To Defendants' Crimes.

In an as-applied challenge, courts assess a sentence under a "narrow

proportionality principle," which "forbids only extreme sentences that are

grossly disproportionate to the crime."  *Graham*, 560 U.S. at 59-60 (citations,

quotations omitted).  That a sentence is mandatory has no bearing on the

analysis, *Harmelin v. Michigan*, 501 U.S. 957, 994-95 (1991); *id.* at 1006-07

(Kennedy, J., concurring), and "[r]eviewing courts, of course, should grant

substantial deference to the broad authority that legislatures necessarily possess

in determining the types and limits of punishments for crimes."  *Solem v. Helm*,

463 U.S. 277, 290 (1983); *see Graham*, 560 U.S. at 87 (the Eighth

Amendment's "narrow proportionality principle does not grant judges blanket

authority to second-guess decisions made by legislatures or sentencing courts")

(Roberts, C.J., concurring).

Successful as-applied disproportionality challenges in non-capital cases,

thus, are "exceedingly rare," *Hutto v. Davis*, 454 U.S. 370, 374 (1982); *Rummel

v. Estelle*, 445 U.S. 263, 272 (1980) – and, indeed, the Supreme Court has only

found one.  *See Solem*, 463 U.S. at 296-97 (striking life sentence for a recidivist

who passed a worthless $100 check, a crime "involv[ing] neither violence nor threat of violence," and whose prior offenses "were all relatively minor"). *Compare Harmelin*, 501 U.S. at 957, 961, 1001 (upholding life sentence without parole, "the second most severe penalty permitted by law," for possessing 672 grams of cocaine); *Lockyer v. Andrade*, 538 U.S. 63, 68, 76-77 (2003) (upholding two consecutive terms of 25-years-to-life for recidivist convicted of petty theft); *Ewing v. California*, 538 U.S. 11, 28, 30-31 (2003) (upholding 25-years-to-life sentence under "three strikes" law for stealing golf clubs worth $1200); *Hutto*, 454 U.S. at 371, 375 (upholding 40-year sentence for possessing marijuana with intent to distribute); *Rummel*, 445 U.S. at 275-76 (upholding life sentence for fraud recidivist who obtained $120.75 under false pretenses). Defendants cite no case, and we, too, know of none, in which a court has found a Section 924(c) sentence to violate the Eighth Amendment. *See United States v. Bowers*, 811 F.3d 412, 431-32 (11th Cir. 2016) ("[g]enerally, sentences within the statutory limits are neither excessive nor cruel and unusual . . . because we accord substantial deference to Congress" to establish penalties for crimes) (citation, quotations omitted).

Defendants argue that they are different – because they did not "choose to arm themselves with a powerful weapon," but were "required to carry" them to "respond to mortal threats in a war zone," JB.114; JB.46 (they "used

[the weapons] defensively"). Among other problems with the argument, it defies the verdicts. Defendants may not have chosen to carry their weapons, but they did choose (unlike 12 of their teammates) to fire them on defenseless civilians – which the jury found was unjustified and, most certainly, not "defensive[]."

These, moreover, were not just any weapons. Liberty fired his M-4 rifle from his lap on "full auto" (as he put it), and also left two magazines (which hold 30 rounds a piece, 6/30/pm/27) in the Square. *See* GX.E201-0004-5 (the M-4 can fire up to 90 rounds a minute). Slough and Heard fired their belt-fed M-240 machineguns (an area weapon that can fire some 200 rounds a minute, 7/10/am/74), and they also launched the particularly lethal M-203 grenade, which sends shrapnel "mushroom[ing] out" upon impact, 7/10/am/58-60, and is specifically designed to "kill or cause casualties" in the vicinity of its target. 7/10/am/51; *see* 7/30/pm/36 (Blackwater guard: "I can't really think of too many" circumstances to use an M-203 in an urban setting); *supra*, at 16 n.6 (describing the grenade's extensive kill, injury, and incapacitation radius). These, also, were not defendants' only choices: their M-4 rifles could be set to fire one shot at a time, 6/30/pm/26-27, and they also carried Glock pistols, 6/30/pm/24, neither of which would have qualified for the Section

924(c)(1)(B)(ii) penalty.  Defendants instead chose to fire (and fire) the most

deadly weapons they had.

Although defendants might think it should be otherwise, Congress did

not exempt from Section 924(c) those who commit crimes with government-

issued firearms.  To the contrary, in 1984 it amended the statute to explicitly

reach those who unjustifiably misuse the weapons entrusted to them.  Before

then, Section 924(c) provided that a firearm had to be carried "unlawfully" for

its penalties to apply.  In dropping that requirement, the Senate Judiciary

Committee explained:

> The 'unlawfully' provision was added originally to section 924(c)
> because of congressional [intent that] . . . the section [be] directed at
> persons who chose to carry a firearm as an offensive weapon for a
> specific criminal act. . . . The committee has concluded that persons who
> are licensed to carry firearms and abuse that privilege by committing a
> crime with the weapon, as in the extremely rare case of the armed police
> officer who commits a crime, are as deserving of punishment as a person
> whose possession of the gun violates a state or local ordinance.

S.Rep.No. 98-225, at 314 n.819 (1983).

 Courts, accordingly, have held police, sheriffs, border patrol agents,

prison guards, and others who are issued government weapons accountable for

crimes committed with them.  *See, e.g., United States v. Gonzalez*, 528 F.3d

1207, 1212 (9th Cir. 2008) ("Congress intended § 924(c) to apply when police

officers, or in this case, Border Patrol agents abuse the privilege of carrying a

179

firearm by committing a crime with the weapon"); *United States v. Guidry*, 456 F.3d 493, 508 (5th Cir. 2006) (rejecting argument that, "as a police officer, [defendant] must carry his gun"); *accord United States v. Ramos*, 537 F.3d 439, 458 & n.15 (5th Cir. 2008); *United States v. Vazquez-Guadalupe*, 407 F.3d 492, 500 n.4 (1st Cir. 2005); *United States v. Patterson*, 348 F.3d 218, 227 (7th Cir. 2003); *United States v. Williams*, 343 F.3d 423, 429-30 (5th Cir. 2003); *United States v. Radcliff*, 331 F.3d 1153, 1159-60 (10th Cir. 2003); *United States v. Novaton*, 271 F.3d 968, 1013 (11th Cir. 2001); *United States v. Washington*, 106 F.3d 983, 1010 (D.C. Cir. 1997); *United States v. Winters*, 105 F.3d 200, 204 (5th Cir. 1997); *United States v. Contreras*, 950 F.2d 232, 241 (5th Cir. 1991); *United States v. Rivera*, 889 F.2d 1029, 1031 (11th Cir. 1989). Consistent with Congress's intent, defendants, too, should be held to account for unjustifiably turning their fearful weapons on innocent civilians.

Defendants also ask the Court to compare their sentences to the mean sentences for other manslaughter defendants and for other "firearms offenses." JB.115-16 (claiming their sentences are "[s]everely skewed" in comparison). As the Supreme Court has held, such a comparison need only be made "in the rare case" when a court first determines that a sentence is "grossly disproportionate." *Graham*, 560 U.S. at 60 (to "validate[] . . . [the] initial judgement" of gross disproportionality) (citation, quotations omitted); *see*

180

*Solem*, 463 U.S. at 290 n.16 ("a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate").

This Court, thus, should not engage in the inquiry – but even if it did, any such comparison would only validate defendants' sentences as just and proportionate. In the first place, given the mandatory nature of Section 924(c), every defendant, regardless of jurisdiction, who violates its provisions is subject to the same minimum penalties. Defendants, moreover, are unlike the mine-run of manslaughter offenders they ask the Court to compare them to. JB.115-16. This was not a tragic drunk driving accident or a lover's quarrel that got out of hand: it was a mass shooting of innocent men, women, and children, ages 10 to 77, none posing a threat, many attempting to flee, all defenseless.

The government, as noted, requested sentencing packages for each defendant to account for all the Nisur Square victims, at between 23 to 32 months per victim, in addition to the Section 924(c) minimum. R.742/29. In its discretion, the court not only rejected the government's proposal, it also decided to impose only a one-day concurrent sentence on the manslaughter counts – finding the 30-year minimum adequately served the sentencing goals of 18 U.S.C. 3553(a). In making that judgment, the court did not express any reservations about the 30-year term, but said it "fully agree[d]" and was "very

satisfied" that the sentences were just. 4/13/2015/152-54 (citing the number of killings and woundings, the unjustified firing into fleeing cars and at unarmed civilians, and the lack of provocation); *id.* at 152 ("the overall wild thing that went on here just cannot ever be condoned by a court").[71]

Although it was authorized to go well above 30 years, the court chose not to. That decision – which reflects both the congressional judgment in Section 924(c) and a manifest act of mercy by the district court – does not run afoul of the Eighth Amendment.

### 2.    Defendants' Sentences Are Not Categorically Cruel And Unusual.

Aside from death penalty cases, the Supreme Court has twice categorically proscribed certain sentences under the Eighth Amendment: life without the possibility of parole for juveniles who commit non-homicide crimes, *see Graham*, 560 U.S. at 74-75, and, more recently, mandatory-life-

---

[71]    Even putting aside the Section 924(c) count, the court could have reached the same, or even higher, sentences by running the manslaughter counts consecutively under 18 U.S.C. 3584(a). Slough's maximum statutory exposure for his manslaughter convictions (10 years per victim who died, and 7 years per victim who was injured) was 249 years; Liberty's was 164 years; and Heard's was 137 years. *See United States v. Fight*, 625 F.3d 523, 525-26 (8th Cir. 2010) (sentencing court reasonably imposed consecutive sentences on multiple counts of involuntary manslaughter).

without-parole for juveniles convicted of homicide.  *See Miller v. Alabama*, 132

S.Ct. 2455, 2460 (2012).

In both cases, the Court stressed that children are different.  *See Graham*,

560 U.S. at 68 (noting that juveniles, due to their lack of maturity,

underdeveloped sense of responsibility, and increased susceptibility to negative

influences "have lessened culpability" than adults); *Miller*, 132 S.Ct. at 2464

(also noting that a "child's character is not as well formed as an adult's" and

citing "developments in psychology and brain science" showing "fundamental

differences between juvenile and adult minds") (citation, quotations omitted).

In *Graham*, the Court also noted that defendants "who do not kill . . . or

foresee that life will be taken" are "categorically less deserving of the most

serious forms of punishment."  560 U.S. at 69 (with homicide offenses, "life is

over for the victim") (citation, quotations omitted).

Defendants ask this Court to carve out another group – and to

categorically prohibit 30-year Section 924(c) sentences for "government

contractors who have used service weapons in a war zone."  JB.116-17.  The

Court should decline.  In the first place, Congress spoke clearly in Section

924(c) about the penalties it deemed appropriate for various firearms crimes,

including for those who carry government-issued weapons.  *See Graham*, 560

U.S. at 62 (categorical analysis begins with the "objective indicia of national consensus," as most reliably reflected in our nation's laws).

Defendants, moreover, are not children. They are former military men, well-trained in the weapons they carried (both in how to use them, and in their specific, destructive capabilities, *see* 7/28/am/46-47); they were reminded daily about the war zone rules of engagement, *e.g.*, GX.9854 (the "sole purpose" for "discharging a firearm . . . is to STOP . . . what is believed to be a DIRECT, IMMINENT, AND LIFE-THREATENING ATTACK"); they were trained to personally identify a hostile target before shooting it, 7/8/pm/12 ("to make sure we are engaging combatants and . . . aren't injuring or killing innocent people"); and they had choices, some more deadly than others, among the firearms at their disposal. They stand convicted of unjustifiably killing many innocent civilians, whose lives have been "irrevocab[ly]" lost. *Graham*, 560 U.S. at 69. And although their sentences are lengthy, they are not condemned to spend the rest of their lives behind bars. *See id.* at 69-70 (noting the singular severity of a life-without-parole sentence).

With their categorical Eighth Amendment argument, defendants try to force a very square peg into a round hole – and like all such efforts, their claim simply does not fit the law. Defendants, moreover, made all their self-defense,

184

war-zone arguments to the jury, which also knew the Section 924(c) counts carried a 30-year mandatory minimum prison term.  *See* 8/4/pm/17-19.  In convicting, the jury, like the district court, did not think the penalty disproportionate to the crime.  Nothing in the Eighth Amendment compels, or even commends, setting the sentences aside.

## CONCLUSION

Defendants' convictions and sentences should be affirmed.

Respectfully submitted.

CHANNING D. PHILLIPS
United States Attorney
District of Columbia

ANTHONY ASUNCION
JAY I. BRATT
JOHN CRABB JR.
CHRISTOPHER KAVANAUGH
KENNETH C. KOHL
GREGG A. MAISEL
JONATHAN M. MALIS
T. PATRICK MARTIN
DAVID MUDD

LESLIE R. CALDWELL
Assistant Attorney General
Criminal Division
U.S. Department of Justice

SUNG-HEE SUH
Deputy Assistant Attorney General

/s/ Demetra Lambros
DEMETRA LAMBROS
Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 616-4526
demetra.lambros@usdoj.gov

185

# CERTIFICATE OF COMPLIANCE

I hereby certify that, pursuant to this Court's Order of December 18, 2015, the Proof Brief For The United States contains 41,955 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(2). The brief has been prepared in a proportionally spaced typeface (Calisto MT 14-point).

/s/ Demetra Lambros
DEMETRA LAMBROS

May 2, 2016

## CERTIFICATE OF SERVICE

I certify that, on May 2, 2016, I served the public copy of the Proof Brief For The United States on counsel for all parties via the Court's ECF system. I also separately sent a copy of the sealed brief to Bruce Bishop, lead counsel for defendants Slough, Heard, and Liberty, and Steven Fredley, counsel for defendant Slatten.

/s/ Demetra Lambros
DEMETRA LAMBROS
Attorney, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 616-4526
demetra.lambros@usdoj.gov

# ADDENDUM

USCA Case #15-3078    Document #1611451    Filed: 05/02/2016    Page 209 of 209

